# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; and UNITED STATES OF
AMERICA,

*Defendants.*

Case No. 1-25-cv-10313-JEK

(Leave to file excess pages granted on
February 11, 2025)

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO STAY AGENCY ACTION
## AND FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF FACTS ...................................................................... 3

       A.    Gender Identity, Transgender People, Nonbinary People, and Intersex
             People ................................................................................... 3

             1.    Gender Identity................................................................. 3

             2.    Transgender, Nonbinary, and Intersex People Experience Pervasive
                   Violence, Harassment, and Discrimination................................. 4

       B.    The Importance of Passports Consistent with Gender Identity ............... 5

       C.    The Passport Policy.................................................................. 7

       D.    The Policy Has Caused Plaintiffs Immediate and Ongoing Harm. ......... 8

III.   LEGAL STANDARD ......................................................................... 9

IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................10

       A.    The Policy Violates the APA. ......................................................10

             1.    The Policy Is a Final Agency Action Subject to APA Review. ...............10

             2.    The Policy Is Arbitrary and Capricious. ....................................11

             3.    The Agency Defendants Acted Without Observance of Procedure
                   Required by Law When Replacing Passport Application Forms.............16

             4.    The Agency Defendants' Actions Also Violate the APA Because
                   They Are Unconstitutional.......................................................17

       B.    The Policy Also Violates Plaintiffs' Constitutional Rights to Equal
             Protection, Travel, and Privacy. ...................................................17

             1.    The Policy's Sex- and Transgender Status-Based Classifications
                   Trigger Heightened Scrutiny Under Equal Protection Analysis. .............18

             2.    The Policy Infringes Plaintiffs' Constitutionally Protected Right to
                   Travel. ...........................................................................20

             3.    The Policy Infringes Plaintiffs' Right to Privacy, Triggering
                   Heightened Scrutiny. ..........................................................24

       C.    The Policy Is Unconstitutional Under Any Standard of Review. .........................26

i

1.  The Policy Does Not Survive Heightened Scrutiny. ................................26

2.  The Policy Cannot Survive Even Rational Basis Review. .......................27

V.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A STAY OR PRELIMINARY INJUNCTION. ..................................................................................28

VI.  THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR A STAY AND PRELIMINARY INJUNCTION. ..................................................................................29

VII.  CONCLUSION ..........................................................................................................30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964) ................................................................................22

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018) ..................................................3, 24

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) .................................................20

*Bos. All. of GLBT Youth v. HHS*,
557 F. Supp. 3d 224 (D. Mass. 2021)....................................................19

*Bowen v. Gillard*,
483 U.S. 587 (1987) ...............................................................................19

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010)....................................................................30

*Citizens Awareness Network, Inc. v. United States*,
391 F.3d 338 (1st Cir. 2004)..................................................................15

*City of Cleburne, Tex. v. Cleburn Living Center*,
473 U.S. 432 (1985) ........................................................................19, 27

*Covidien LP v. Esch*,
229 F. Supp. 3d 94 (D. Mass. 2017) ......................................................29

*Dickson v. Secretary of Defense*,
68 F.3d 1396 (D.C. Cir. 1995)...............................................................12

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ........................................................................21, 24

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ................................................................6

*Doe v. McHenry*,
2025 WL 388218 (D.D.C. Feb. 4, 2025)..................................................2

*Doe v. Plymouth*,
825 F. Supp. 1102 (D. Mass. 1993) .................................................24, 25

*Dorce v. Wolf*,
    506 F. Supp. 3d 142 (D. Mass. 2020)..................................................................................30

*Drs. for Am. v. OPM*,
    2025 WL 452707 (D.D.C. Feb. 11, 2025) ......................................................................2, 11

*Eunique v. Powell*,
    302 F.3d 971 (9th Cir. 2002)……………………………………………………………..23

*F.V. v. Barro*n,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ..............................................................................3

*Gill v. OPM*,
    699 F. Supp. 2d 374 (D. Mass. 2010)..............................................................................27

*Graham v. Decker*,
    454 F. Supp. 3d 347 (S.D.N.Y. 2020) ..............................................................................29

*Greater Bos. Television Corp. v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970) ..........................................................................................12

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................................................................19

*Haig v. Agee*,
    453 U.S. 280 (1981) ..........................................................................................................22

*Housatonic River Initiative v. EPA*,
    75 F.4th 248 (1st Cir. 2023)........................................................................................11, 12

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*,
    925 F.2d 6 (1st Cir. 1991)..................................................................................................30

*Jones v. Mnuchin*,
    529 F. Supp. 3d 1370 (S.D. Ga. 2021) ..............................................................................23

*Kallstrom v. Columbus*,
    136 F.3d 1055 (6th Cir. 1998) ..........................................................................................24

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ..........................................................................................19

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) ............................................................................................22

*Kent v. Dulles*,
    357 U.S. 116 (1958) ....................................................................................................21, 22

*Lainer v. Boston*,
    95 F. Supp. 2d 17 (D. Mass. 2000) ....................................................... 30

*Livsey v. Salt Lake Cnty.*,
    275 F.3d 952 (10th Cir. 2001) ............................................................... 24

*Love v. Johnson*,
    146 F. Supp. 3d 848 (E.D. Mich. 2015) ..................................... 3, 15, 24

*Loving v. Virginia*,
    388 U.S. 1 (1967) ................................................................................. 18

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
    286 F. Supp. 3d 704 (D. Md. 2018) ...................................................... 20

*Maehr v. United States Dep't of State*,
    5 F.4th 1100 (10th Cir. 2021) (Lucero, J. concurring) .......................... 23

*Mohamed v. Holder*,
    266 F. Supp. 3d 868 (E.D. Va. 2017) .................................................... 22

*N.L.R.B. v. Lily Transp. Corp.*,
    853 F.3d 31 (1st Cir. 2017) ................................................................... 12

*Nat'l Cable & Telecomm. Ass'n v. FCC*,
    555 F.3d 996 (D.C. Cir. 2009) .............................................................. 25

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
    407 F. Supp. 2d 323 (D. Mass. 2005) ................................................... 30

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................. 10

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................. 20

*PFLAG, Inc. v. Trump*,
    No. 8:25-337-BAH (D. Md.), Dkt. 62 (Feb. 14. 2025) ..................... 2, 20

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) ................................................................. 24

*Ray v. McCloud*,
    507 F. Supp. 3d 925 (S.D. Ohio 2020) .............................................. 3, 25

*Risenhoover v. Wash. Cty. Cmty. Servs.*,
    545 F. Supp. 2d 885 (D. Minn. 2008) ................................................... 23

*Romer v. Evans,*
    517 U.S. 620 (1996) ...................................................................................................27

*Seafreeze Shoreside, Inc. v. Dept. of Interior,*
    2023 WL 3660689 (D. Mass. May 25, 2023) ...................................................... 9, 10

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017) .....................................................................................................19

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ...................................................................................................21

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ..........................................................................................10

*Tarhuni v. Holder,*
    8 F. Supp. 3d 1253 (D. Or. 2014) ..............................................................................22

*Timbs v. Indiana,*
    586 U.S. 146 (2019) ...................................................................................................24

*Trafalgar Cap. Assocs., Inc. v. Cuomo,*
    159 F.3d 21 (1st Cir. 1998) .................................................................................. 10, 11

*Union of Concerned Scientists v. Wheeler,*
    954 F.3d 11 (1st Cir. 2020) .................................................................................. 11, 17

*United States v. Kravetz,*
    706 F.3d 47 (1st Cir. 2013) ........................................................................................24

*United States v. Virginia,*
    518 U.S. 515 (1996) ....................................................................................... 18, 26, 27

*Vaquería Tres Monjitas, Inc. v. Irizarry,*
    587 F.3d 464 (1st Cir. 2009) ......................................................................................28

*Walters v. Bos. City Council,*
    676 F. Supp. 3d 26 (D. Mass. 2023) ..........................................................................28

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 2016) .....................................................................................30

*Woodward v. Rogers,*
    344 F. Supp. 974 (D.D.C. 1972), *aff'd,* 486 F.2d 1317 (D.C. Cir. 1973) ...............23

*Yue v. Conseco Life Ins. Co.,*
    282 F.R.D. 469 (C.D. Cal. 2012) ...............................................................................29

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ....................................................................................................22

**Statutes**

5 U.S.C. § 704 .............................................................................................................10

5 U.S.C. § 705 ...............................................................................................................9

5 U.S.C. § 706 .......................................................................................................10, 17

8 U.S.C. § 1185 .............................................................................................................5

44 U.S.C. 3506 ............................................................................................................16

**Other Authorities**

Exec. Order 14168, 90 Fed. Reg. 8615 ...............................................................*passim*

Exec. Order 14183, 90 Fed. Reg. 8757 .......................................................................20

Agency Information Collection Activities; Proposals, Submissions, and
    Approvals: Application for a U.S. Passport, 90 Fed. Reg. 9652 ..........................17

## I.    PRELIMINARY STATEMENT

This Motion seeks to prevent irreparable injury inflicted by the federal government's abrupt, discriminatory, and dangerous change in policy denying usable passports to transgender, nonbinary, and intersex people.  For years, the government issued passports to Americans reflecting a sex designation aligning with their gender identity, including an X sex designation upon request.  That policy not only provided accurate passports, it prevented harms such as people being outed as transgender or nonbinary against their will every time they used their passport—including to domestic authorities and hostile foreign authorities.  Defendants abruptly instituted a new policy implementing an Executive Order issued on the first day of the Trump Administration, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "EO").  The State Department is already enforcing the EO's edict by issuing passports listing only either female or male sex designations, determined by whether a person "belong[ed], at conception" or at birth "to the sex that produces" either "the large" or "the small reproductive cell."  EO 14168, 90 Fed. Reg. 8615, 8615 (Jan. 20, 2025).[1]  Defendants' new policy seeks to deny the existence of transgender, nonbinary, and intersex people.  And it is causing grave, immediate harm.

Plaintiffs are entitled to a stay of agency action under the Administrative Procedure Act ("APA") and a preliminary injunction.  Plaintiffs are citizens harmed by the federal government's policy of denying passports to those whose proper sex designations do not adhere to the government's misguided definitions of sex—a policy now reflected in and implemented by State Department documents and public guidance (the "Policy").  Plaintiffs are likely to succeed on their

---

[1] As explained in this Motion, the State Department has at times used a slightly different formulation for "sex" than the EO, relying on "biological sex at birth."  Both definitions are equally unlawful, and the inconsistency only highlights the haphazard, unreasoned nature of the agency actions at issue.

claims that the Policy violates both the APA and the U.S. Constitution.  The Policy is arbitrary and capricious under the APA: it is unreasoned and irrational, lacks any justification, and modifies passport forms without statutorily required notice and comment.  It implicates constitutional equal protection principles because it facially classifies based on sex and transgender status.  And it implicates the Fifth Amendment's rights to travel and informational privacy.  These principles require the Policy to survive heightened scrutiny, but it fails even the slightest scrutiny.  It advances *no* legitimate governmental interest, let alone an important one.  And it is motivated by impermissible animus.

Plaintiffs will suffer irreparable injury absent a stay or injunction.  Under the Policy, the State Department rejected some Plaintiffs' applications seeking sex designations matching their gender identities, instead issuing passports that conform to the Policy's definitions.  Other Plaintiffs have requested updated sex designations on their passports that will necessarily be denied under the Policy.  The resulting harm is immediate.  The Policy has prompted fear about what may happen to Plaintiffs if they travel internationally or need to use their passports, inflicted psychological harm, and cast uncertainty upon upcoming travel plans.  Plaintiffs with inaccurate passports face an impossible choice: use a passport outing them as transgender—exposing them to potential violence and making their passports unusable—or forgo the right to travel.

Underscoring the Administration's broad attack on transgender and nonbinary people, numerous courts have recently enjoined governmental actions under the Administration's executive orders targeting transgender people—including other actions under the same EO challenged here.  *See Doe v. McHenry*, 2025 WL 388218 (D.D.C. Feb. 4, 2025); *Drs. for Am. v. OPM*, 2025 WL 452707 (D.D.C. Feb. 11, 2025); *PFLAG, Inc. v. Trump*, No. 8:25-337-BAH (D. Md.), Dkt. 62 (Feb. 14, 2025).  And courts have repeatedly held that transgender people have the

right to use accurate identification documents or rejected governmental attempts to deny them those documents. *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 939-40 (S.D. Ohio 2020); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015). This Court should likewise stay and enjoin the Policy.

## II.    STATEMENT OF FACTS

### A.    Gender Identity, Transgender People, Nonbinary People, and Intersex People

#### 1.    Gender Identity

As explained in the accompanying declaration of endocrinologist Dr. Sarah Corathers, "gender identity" refers to a person's core, internal sense of belonging to a particular sex. Corathers Decl. ¶ 40. "Sex" refers to multiple physiologic attributes, such as chromosomal and hormonal makeup, anatomy, secondary sex characteristics, and gender identity. *Id.* ¶ 18. "Sex assigned at birth" refers to the designation of sex generally noted on a birth certificate shortly after birth, almost always based solely on the appearance of an infant's external genitalia. *Id.* ¶¶ 24, 26. A person's gender identity is an essential part of their identity and often informs how they will be identified by others more accurately than their sex assigned at birth. *Id.* ¶ 42. Because of this, a person's gender identity is the most important and accurate characteristic for determining what sex designation should be on their passport. *Id.* After all, a passport is an identity document, and should reflect a person's identity.

According to the American Medical Association, the American Psychiatric Association, and dozens of other major medical professional associations, "variations in . . . gender identity are a normal part of human development" and "research and experience shared by scholars, clinicians, and patients have shown that . . . efforts [to change someone's gender identity have not succeeded] and are harmful." *Id.* ¶ 44. Most people are "cisgender," meaning that they have a gender identity

that aligns with their sex assigned at birth. *Id*. ¶ 47. Transgender people have a gender identity different from their sex assigned at birth. *Id.* ¶ 48. "Nonbinary" people have a gender identity that is neither exclusively male nor exclusively female. *Id.* ¶ 49. The term "intersex" describes a wide range of natural bodily variations. *Id.* ¶ 33. Intersex people are born with sex characteristics that do not fit binary notions of bodies designated "male" or "female." *Id*. Intersex variations include variations in chromosomes, external genitals, internal reproductive organs, and/or hormone production. *Id.* Intersex traits may be discovered at birth, at puberty, or not at all. *Id.* Some intersex people do not produce either the "large reproductive cell" or "small reproductive cell"— ovum and sperm—that are at the core of the definitions of female and male in the EO. *Id.* ¶ 32.

### 2. Transgender, Nonbinary, and Intersex People Experience Pervasive Violence, Harassment, and Discrimination.

Transgender, nonbinary, and intersex people often experience violence, harassment, discrimination, and stigma when these characteristics are made public. *Id.* ¶ 66. For decades, both private individuals and government actors have oppressed and discriminated against transgender, nonbinary, and intersex people and have tried to deny their existence. *Id.* ¶ 67.

Transgender people are far more likely to suffer violence, harassment, and discrimination than the population at large. *Id.* ¶ 68. According to the National Center for Transgender Equality's U.S. Transgender Survey, *see* Chaput Decl., Ex. B:

- In the year prior to completing the survey, nearly 46% of transgender respondents were harassed, and 9% physically attacked, because of being transgender. *Id.* at 199, 202–03.[2]
- After showing identification with a name or sex designation inconsistent with their gender presentation, 25% of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave an establishment, and 2% assaulted or attacked. *Id.* at 89–90.

---

[2] 58% of respondents reported mistreatment during the past year by law enforcement who thought or knew they were transgender, including 4% who were physically attacked and 3% who were sexually assaulted. Chaput Decl., Ex. B at 186.

- 43% of respondents who went through airport security were treated negatively, including being harassed, detained, subjected to bodily searches, and physically attacked. *Id.* at 272.

- Transgender people experience significantly higher rates of discrimination in employment (including being fired, not hired, harassed, physically attacked, and/or sexually assaulted at work), health care, housing, higher education, and public accommodations when others learn or suspect they are transgender. *Id.* at 97, 136, 148, 150, 153–54, 178, 214.

- Fed by all this, 39% of respondents experienced serious psychological distress in the month prior, compared with only 5% of the population as a whole. *Id.* at 105.

- Contributed to by this mistreatment, 40% percent of respondents attempted suicide in their lifetime—nearly nine times the rate in the population as a whole (4.6%). *Id.* at 114.

For transgender people of color, these forms of mistreatment are even more common. *Id.* at 89, 97, 136, 151, 153, 179, 187, 199, 202–03, 214, 222. Nonbinary and intersex people are also more likely to suffer violence, discrimination, harassment, and mistreatment.[3]

**B.    The Importance of Passports Consistent with Gender Identity**

A passport is an essential government-issued document. They are necessary for travel abroad and for reentry into the United States. *See* 8 U.S.C. § 1185(b). While abroad, passports often are the only identification recognized by foreign authorities and businesses. They are needed in many countries at hotels, banks, and hospitals. If there is an emergency while abroad, passports are the primary way for U.S. citizens to identify themselves to U.S. officials at an embassy.

Recognizing the importance of identification documents, the American Medical Association "supports every individual's right to determine their . . . sex designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual." Corathers Decl. ¶ 85; Scheim Decl. ¶ 20. Forcing transgender, intersex, and nonbinary people to use identity documents that do not align with their gender identity can cause anxiety and distress. Corathers Decl. ¶ 82. It is also inconsistent with social transition protocols

---

[3] *See, e.g.*, Chaput Decl., Exs. C, D, E; *see also* Corathers Decl. ¶¶ 71–72; Scheim Decl. ¶ 19.

under widely accepted clinical guidelines for treatment of gender dysphoria.[4]  *Id.* ¶ 77.

Issuing a transgender person a passport that lists their sex as defined by the EO or the Policy can out them to strangers as transgender because of the mismatch between the passport's sex designation and the bearer's gender identity and presentation—as explained in the accompanying Declaration of Ayden Scheim, a professor of epidemiology.  Scheim Decl. ¶¶ 16, 23–24.  And requiring people who want an "X" sex designation on their passports to instead have "M" or "F" designations forces them to disclose whether they meet the EO's definition of male or female.  These are profoundly private pieces of information to which attaches a reasonable expectation of privacy.  *Id.* ¶ 24.  The Policy deprives people of significant control over the circumstances surrounding disclosure of that information, including when, where, how, and to whom this aspect of their identity is disclosed.

Forcing someone to disclose that they are transgender, intersex, or nonbinary against their will subjects them to significant risks of violence, discrimination, and harassment, including in travel, employment, and interactions with government employees (such as law enforcement personnel).  Scheim Decl. ¶¶ 22–24.  Hundreds of transgender people were killed around the world in 2023.  Chaput Decl., Ex. J.  Having a sex designation on a passport that involuntarily discloses that someone is transgender, intersex, or nonbinary thus exposes that person to the risk of bodily harm, discrimination, and harassment—and, in many countries, even arrest and imprisonment.

---

[4] Gender dysphoria is a medical condition defined by a marked incongruence between gender identity and sex assigned at birth and clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Corathers Decl. ¶ 53.  Social transition includes correcting identity documents to allow people to live consistently with their gender identity.  For social transition to be clinically effective, it must be respected consistently across all aspects of an individual's life.  *Id.* ¶ 82; *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024).

### C.    The Passport Policy

On January 20, 2025, President Trump issued the EO, which sets forth definitions of sex that rely on inaccurate descriptions of biology and seek to deny the existence of transgender, intersex, and nonbinary people.  Corathers Decl. ¶ 28.  Implementing the EO's directive, Secretary Rubio ordered the State Department to integrate these definitions of sex into the issuance and renewal of passports.  As widely reported, in a State Department cable (the "Cable"), Secretary Rubio declared that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall be used" on passports.  Chaput Decl., Ex. A.  Further, he ordered agency staff to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker."  *Id*.  Shortly after the Cable was issued, the Department removed existing passport application forms, DS-11, DS-82, and DS-5504, from its website and replaced them with older versions of the documents that do not permit self-selection or use of an X sex designation.  *Compare id.*, Exs. M, N, O, *with id.*, Exs. P, Q, R.

The Policy was implemented immediately: by January 28, the State Department issued transgender people—including some Plaintiffs—passports with sex designations reflecting the Policy's sex definitions, rather than the designation sought by applicants.  *See* Perysian Decl. ¶ 11; Anderson Decl. ¶ 11; *see also* Orr Decl. ¶ 12.  The State Department suspended others' applications pending review.  On February 8, the State Department issued an additional directive (the "Directive") specifically ordering all passport issuances and renewals to comply with the EO.  *See* Chaput Decl., Ex. I.  The State Department updated its website on February 12 to state that, pursuant to the EO, it "will only issue passports with an M or F sex marker that match the customer's biological sex at birth as defined in the executive order" and "will no longer issue U.S. passports . . . with an X marker."  *Id.*, Ex. H.  The reference on the State Department's website to

"biological sex at birth" differs from the definition in the EO (based on purported sex at conception), but it is equally discriminatory and equally inaccurate.[5]

As a result of the Policy, several Plaintiffs have received passports with the wrong sex designation, while others are unable to apply for a new passport or renew their passport with the correct sex designation. For example, Zaya Perysian, a transgender woman, sought a passport with a female sex designation to match her gender identity, other identity documents, and the sex she lives and expresses, but instead received a passport with a male designation. Perysian Decl. ¶¶ 4, 10–11. A notice accompanying her new passport stated that her sex had been "corrected" to "match our records." *Id.* ¶ 11. Chastain Anderson similarly received a passport with the sex designation different than she requested. Anderson Decl. ¶ 11. Ashton Orr, a transgender man, was told by a passport agency that "the agency needed to 'investigate my sex assigned at birth,' and given that my sex assigned at birth is female, they can only issue my passport with an 'F' Marker" or withdraw the application. Orr Decl. ¶ 12.

### D.    The Policy Has Caused Plaintiffs Immediate and Ongoing Harm.

The Policy has immediately and concretely harmed Plaintiffs and others like them. Many previously have had harmful experiences as a result of identity documents inconsistent with their gender identity. All fear for their safety if they were to try to travel with a passport with the wrong sex designation. For example, Orr was accused by the Transportation Security Administration ("TSA") of presenting false identity documents because his passport, which had a female sex designation, did not match his appearance or driver's license, which has a male designation. Orr Decl. ¶ 10. TSA required Orr to undergo secondary screening; and he was permitted to proceed only once he disclosed his transgender identity. *Id.* Orr has plans to travel abroad for a medical

---

[5] The term "biological sex" ignores the evidence that gender identity has a durable biological element as well and is an imprecise term that should be avoided. Corathers Decl. ¶¶ 26 & n.1, 52.

appointment on March 13, 2025 and he fears that he will now miss that appointment due to the Policy. *Id.* ¶ 13. He is "terrified" that having a passport with a female sex designation will lead to the same invasive questioning, scrutiny, and mistreatment—or worse, physical harm. *Id.* ¶ 14. Orr states in his declaration that the "constant fear and anxiety of potential confrontations" are "emotionally exhausting and traumatic." *Id.* ¶ 15.

Anderson, a transgender woman, has had similar experiences and fears. Anderson Decl. ¶ 5. In 2017, prior to updating her driver's license to an accurate female sex designation, she was strip-searched at a TSA checkpoint. *Id.* ¶ 13. She has been involuntarily outed when presenting her old license with a male sex designation when trying to attend concerts, order drinks, open a bank account, and lease an apartment. *Id.* ¶ 12. She is "terrified" that having an inaccurate male sex designation on her passport will place her in "uncomfortable and unsafe circumstances." *Id.* ¶ 13. She feels "anxiety knowing that a document that is supposed to help identify [her] will now not only make it *harder* to identify [her], but also put [her] at harm at every use." *Id.* ¶ 14. The other Plaintiffs have suffered or are at imminent risk of similar harms. Soe Decl. ¶¶ 7, 11; Boe Decl. ¶¶ 14–15; Solomon-Lane Decl. ¶¶ 5, 11; Hall Decl. ¶¶ 7, 14–15; Perysian Decl. ¶¶ 14–15.

## III.    LEGAL STANDARD

The APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion" of APA proceedings, "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. There is "substantial overlap" between the factors considered in analyzing a stay under the APA and a preliminary injunction. *Seafreeze Shoreside, Inc. v. Dept. of Interior*, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023). Courts weight four factors in considering a motion for a preliminary injunction: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the

plaintiffs; and (4) the effect, if any, on the public interest." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (cleaned up). In considering both whether to grant a stay of agency action or a preliminary injunction, "the first two factors are the most critical." *SeaFreeze*, 2023 WL 3660689, at *3 (cleaned up). When the government is the party opposing the injunction, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).

## IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    The Policy Violates the APA.

Courts must set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or inconsistent with "procedure[s] required by law." 5 U.S.C. § 706(2)(A), (D). Plaintiffs are likely to prevail on their APA claim.

### 1.    The Policy Is a Final Agency Action Subject to APA Review.

Under the APA, courts may review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. A final agency action is a "definitive statement of the agency's position with direct and immediate consequences." *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998). (cleaned up). "The core question [for finality] is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* (cleaned up). The Policy meets these requirements.

Secretary Rubio and the State Department (the "Agency Defendants") have certainly completed the decision-making process: according to reports, Secretary Rubio has directed that "when an applicant requests a change in their sex marker" only "the applicant's biological sex at birth" can appear on the passport. *See* Chaput Decl., Ex. I ¶ 8. The Agency Defendants have definitively and conclusively established that they will "only issue passports with an M or F sex marker that match the customer's biological sex at birth" and will "no longer issue U.S.

10

passports . . . with an X marker." *See id.* Under any rubric, the Policy represents a "definitive statement" of the Agency Defendants' position. *Trafalgar*, 159 F.3d at 35.

Indeed, the Policy is already being implemented, with "direct and immediate consequences" for Plaintiffs and others like them. *Id.* The Agency Defendants have removed passport application forms from the official website that previously allowed for an X sex designation and contained instructions permitting self-selection of sex. *E.g.*, Chaput Decl., Ex. A; *see Drs. for Am.*, 2025 WL 452707, at *5 (APA reaches removal of long-standing information from government webpages). And some Plaintiffs have ***already*** received passports that do not contain the sex designation they requested and do not accurately indicate their sex. *See* Perysian Decl. ¶ 11, Ex. A; Anderson Decl. ¶ 11. Others have been told they will not receive a passport that contains anything other than the sex they were assigned at birth. *See* Orr Decl. ¶ 12, Ex. A. The Policy has "directly affect[ed]" Plaintiffs by denying them passports they can use without placing them at risk for harassment, discrimination, and even violence. *See Trafalgar*, 159 F.3d at 35. The Policy is thus a final agency action subject to APA review.

### 2. The Policy Is Arbitrary and Capricious.

An agency action is arbitrary and capricious if, as here, it is not accompanied by a reasoned explanation, failed to consider pertinent aspects of the problem, or reached a conclusion so implausible that it cannot be attributed to the application of agency expertise. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21 (1st Cir. 2020).

a)      The Agency Defendants Have Not Provided a Reasoned
        Explanation for the Policy.

"The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale

at the time of decision." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). Where, as here, an agency's policy is an "about-face" from a prior policy, a "more detailed justification may be required." *Housatonic*, 75 F.4th at 270.  Before changing prior policy, an agency must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).  The Agency Defendants have not—and cannot—satisfy the "reasoned analysis" required by the APA.

The Policy is a total reversal of prior State Department policy allowing people to choose their passport's sex designation, including the option to select an X designation.  *Compare* Chaput Decl., Exs. M, N, O, *with id.*, Exs. P, Q, R.  People have been able to update the sex designation on their passports for more than 30 years.  From 1992 through 2010, citizens were able to update the sex designation with proof of surgery; from 2010 to 2022 (including during the first Trump administration), they could receive an updated sex designation with a medical certification; and since 2022 they have been able to self-select M, F, or X.[6]

All agency actions require a reasoned explanation, but the Policy's radical reversal of long-standing prior approaches requires an even "more detailed justification." *Housatonic*, 75 F.4th at 270; *see also N.L.R.B. v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017).  This the Agency

---

[6] *See* Chaput Decl., Exs. S (Ernesto Lodono, "Transgender Americans Challenge Trump's Passport Policy in Court," *N.Y. Times* (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/transgender-americans-lawsuit-trump-passports.html (last accessed Feb. 11, 2025), T (Lisa Mottet, "Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People," 19 *Mich. J. Gender & L.* 373, 383 (2013), https://repository.law.umich.edu/mjgl/vol19/iss2/4), L (U.S. Department of State, 8 Foreign Affairs Manuel 403.3, Gender Change (May 31, 2019), archived version at https://web.archive.org/web/20190531235228/https://fam.state.gov/FAM/08FAM/08FAM040303.html.)

Defendants have failed to provide.  Indeed, the Agency Defendants have offered ***no explanation*** for the government's sudden about-face—not in the Cable, not in the Directive, not in public guidance.  The only reasoning available for the Court to review would be provided by the EO, which the Policy implements.  But the EO contains no "reasoned analysis" that could support the Policy.  It makes specious, unsupported allegations that transgender people are mounting an "attack against the ordinary and longstanding use and understanding of biological and scientific terms . . . unmoored from biological facts."  90 Fed. Reg. at 8615.  It also offers vague and conclusory assertions about an objective to "defend women's rights."  *Id.*  The attempt to characterize the Policy as "defending women from gender ideology" and the EO's depiction of transgender people as intruders seeking to "gain access to intimate single-sex spaces and activities designed for women" are simply ideological positions that are so disconnected from factual reality[7] that they fail to explain how the Policy rationally advances any legitimate government interest.  Instead, these "justifications" only demonstrate Defendants' animus.

Compounding this lack of reasoning, the EO fails to even take into account the problems that will result when the sex designation on someone's passport conflicts with how they present and with their other identity documents,[8] or the overwhelming challenges in determining an individual's sex as defined by the Executive Order.  And it is the EO—not transgender people—

---

[7] *See* Brief of Amici Curiae Law Enforcement Officers in Support of Respondent, at 3–12, *Gloucester Cty. Sch Bd, v. G.G.*, S. Ct. No. 14-2056, 2017 WL 836845 (Mar. 2, 2017); Brief of Amici States of New York, et al. at 19-27, *Gloucester Cty. Sch Bd, v. G.G.*, S. Ct. No. 14-2056, 2017 WL 2061869 (Mar. 1, 2017).

[8] Those problems include interference with efficient screening of passport bearers' identity; the "outing of transgender, intersex, and nonbinary individuals that will force them either to forego international travel or risk ensuing harassment, discrimination, and even violence; and the harms to third parties such as businesses whose impacted employees will be unable to travel internationally for necessary work and members of the military stationed abroad who will be unable to have impacted family members visit or live with them.

that "attack[s] . . . ordinary and longstanding use and understanding of biological and scientific terms."  90 Fed. Reg. at 8615.  Both science and history establish that transgender, intersex, and nonbinary people exist and always have.  Corathers Decl. ¶¶ 44, 51–52.

Finally, there are no indications that the EO's sex definitions on passports could further the stated aim of "defending women."  To the contrary: preventing transgender, intersex, and nonbinary people from safely traveling with documentation that aligns with their gender identity does not make cisgender women any safer; it only makes transgender, intersex, and nonbinary individuals, including those who are women, *less* safe by exposing them to harassment, discrimination, and violence.  Scheim Decl. ¶¶ 22–24.

The only viable conclusion is that the Policy is motivated by the Administration's express animus toward transgender people, which of course cannot constitute the reasoned explanation required by the APA.  Because the Agency Defendants have not given a sufficient explanation "including a rational connection between the facts found and the choice made," the Policy is arbitrary and capricious and should be set aside.

        b)    <u>The Policy's Implementation Creates a Nonsensical and Unmanageable Landscape.</u>

Implementation of the Policy also creates an illogical and unworkable framework— certainly not one attributable to agency expertise.  ***First***, the definitions on which the Policy is based are "irrational."  *See Beverly Enterprises-Massachusetts*, 174 F.3d at 23.  The EO defines male and female based on whether, "at conception," the person "belong[s]" to the sex that produces either the large or small reproductive cell (the State Department, meanwhile, claims to be relying on "biological sex at birth").  90 Fed. Reg. at 8615; Chaput Decl., Ex. I at ¶ 2.  But embryos have undifferentiated reproductive cells during the period immediately following conception.  Corathers Decl. ¶ 20.  Further, this definition ignores the biological reality that some intersex individuals do

not at conception, and may never, belong to a sex that produces either a large or small reproductive cell. *Id.* ¶ 39. Nor does the Policy include a workable process for determining sex based on the EO definitions—as illustrated by the State Department itself employing a different definition. While the Directive references evidence of sex assigned at birth, such as birth certificates, those are almost always based on the appearance of an infant's external genitalia, which is not dispositive of the EO definitions. Corathers Decl. ¶ 47.

***Second***, insisting that passports rely on these definitions of sex undermines passports' usefulness in confirming the bearer's identity. Transgender, intersex, and nonbinary people often will not look like the sex defined by the EO or Policy, which can cause problems. *See Love*, 146 F. Supp. 3d at 856, 857 ("[W]hen such individuals furnish their [documents] to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the [document]."). Moreover, for individuals like Plaintiffs Perysian and Anderson, whose other identification documents accurately reflect the sex they live and identify as, *e.g.*, Perysian Decl. ¶ 9; Anderson Decl. ¶ 7, being forced to use a passport that conflicts with other identifying documents will create confusion for anyone attempting to identify them. Indeed, Plaintiff Orr has experienced precisely that situation when TSA accused him of presenting fake identity documents due to the inconsistency between his REAL ID, which features a male sex designation, and his passport, which incorrectly contains a female designation. Orr Decl. ¶ 10. The Agency Defendants have not addressed this aspect of the issue at all and thus have acted "precipitously or in an irrational manner," *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 352 (1st Cir. 2004), in violation of the APA.

*Third*, the Policy conflicts with current government practice concerning passports from foreign countries. At least 19 countries allow people to select a sex designation by self-attestation.[9] And at least 16 countries permit an X sex designation on passports.[10] The government recognizes these passports as valid, underscoring that the Policy is not necessary for accurately confirming bearers' identities. And *fourth*, the Policy creates unnecessary conflicts with state laws governing identity documents that permit updates to sex designations or use of an X sex designation. At least 22 states and Washington, D.C. include an X designation on driver's licenses, and 46 states allow individuals to update their sex-designation on driver's licenses.[11] At least 16 states and Washington, D.C. include an X designation on birth certificates, and 44 states allow individuals to update the sex designation on their birth certificates.[12] For those who have opted to choose or change the sex designation on these identity documents, the Policy arbitrarily prevents them from obtaining a passport matching their other identity documents.

### 3. The Agency Defendants Acted Without Observance of Procedure Required by Law When Replacing Passport Application Forms.

Under the Paperwork Reduction Act ("PRA"), when an agency seeks to collect information from the public, such as with government forms, it must provide "60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information[.]" 44 U.S.C. 3506(c)(2)(A). The Agency Defendants failed to do so. President Trump issued the EO on January 20. In the days that followed, the State

---

[9] Argentina, Belgium, Brazil, Colombia, Denmark, Ecuador, Finland, Germany, Greenland, Iceland, Ireland, Luxembourg, Malta, New Zealand, Norway, Portugal, Spain, Switzerland, and Uruguay. *See* Chaput Decl., Ex. K.
[10] Argentina, Bangladesh, Canada, Denmark, Germany, Greenland, Iceland, India, Malta, Nepal, New Zealand, Pakistan. *Id.*
[11] Movement Advancement Project, Identity Document Laws and Policies, https://www.lgbtmap.org/equality-maps/identity_documents (last accessed Feb. 18. 2025).
[12] *Id.*

Department removed the existing passport applications forms from its website, replacing them with older, expired versions that provide no X option and that do not include instructions for self-selecting a new sex designation.  *See* Chaput Decl., Exs. M, N, O, P, Q, R.  There was no opportunity for public comment before that change, nor, since the forms were changed just days after President Trump assumed office, could there have been meaningful consultation with other affected agencies.[13]  This unilateral replacement violated the PRA and therefore the APA.

### 4.    The Agency Defendants' Actions Also Violate the APA Because They Are Unconstitutional.

The APA provides that courts must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity[.]"  5 U.S.C. § 706(2)(B).  Thus, the APA "generally provides a vehicle for reviewing agency decisions that are alleged to violate federal law."  *Union of Concerned Scientists*, 954 F.3d at 17.  As explained below, the Policy violates Plaintiffs' constitutional rights to equal protection, travel, and privacy.

### B.    The Policy Also Violates Plaintiffs' Constitutional Rights to Equal Protection, Travel, and Privacy.[14]

The Fifth Amendment guarantees equal protection of the laws and protects the right to travel and the right to privacy.  Because the Policy classifies based on sex and transgender status and burdens these constitutional rights, it triggers heightened scrutiny.  It cannot survive that demanding standard, or any standard of constitutional review.

---

[13] On February 14, 2025, after it already replaced the forms, the State Department issued a notice of request for public comment for changes to the DS-11 passport form consistent with the EO.  The notice skips the required 60-day comment period and improperly only provides for 30 days of comment.  *See* Agency Information Collection Activities; Proposals, Submissions, and Approvals: Application for a U.S. Passport, 90 Fed. Reg. 9652 (proposed Feb. 14, 2025).  More fundamentally, it underscores that the agency flouted the PRA in changing the forms.

[14] The Policy also violates the First Amendment.  Compl. ¶¶ 28–35.  Plaintiffs do not seek a preliminary injunction based on that cause of action, but they do not waive that claim or the ability to seek relief based on it.

1.    **The Policy's Sex- and Transgender Status-Based Classifications Trigger Heightened Scrutiny Under Equal Protection Analysis.**

"[A]ll gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quotations omitted).  That standard applies here because the Policy classifies based on sex.  It also classifies based on transgender status, which independently warrants the application of heightened scrutiny.

a)    The Policy Classifies Based on Sex on Its Face, Triggering Heightened Scrutiny.

The Policy classifies based on sex on its face because it hinges the issuance of an "M" or "F" passport on a person's sex.  The EO announces a federal policy to recognize only two sexes and defines these two sexes.  90 Fed. Reg. at 8615.  Implementing this mandate, the Policy requires that the sex designation on a passport match the EO's definition of sex, subjecting individuals to distinct rules based on whether the EO defines a person as male or female.[15]  That means for applicants who live and express themselves as women and seek to travel with a passport reflecting that identity, only those whose sex designated at birth is female, and not those whose sex designated at birth is male, can receive a passport with an "F" sex designation.  The person's defined sex under the Policy thus determines whether the government will issue them a passport reflecting their identity as a woman.  That is disparate treatment based on sex.

On its face, the Policy also enforces sex stereotypes by tethering individuals to their sex assigned at birth.  The Supreme Court has made clear that heightened scrutiny is warranted when

---

[15] Similarly, the Supreme Court has repeatedly found that laws and policies that create racial definitions and then dictate behavior based on those definitions constitute racial classifications. For example, Virginia's Racial Integrity Act defined "white person" as a person "who has no trace whatever of any blood other than Caucasian" (except if they have one-sixteenth or less of American Indian blood) and then prohibited anyone classified as a "white person" from marrying anyone other than another "white person." *Loving v. Virginia*, 388 U.S. 1, 5 n.4, 6 (1967).  The Supreme Court considered it self-evident that this law "rest[ed] solely upon distinctions drawn according to race," that triggered heightened scrutiny. *Id.* at 11.

18

the government acts based on "overbroad generalizations about the way men and women are," or should be. *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017). That is precisely what the government does here. By preventing a citizen defined as "male" under the EO from having a passport that lists that person's sex as anything other than male, the Policy enforces the overbroad expectation that all people at conception likely to have a "small reproductive cell" will live, identify, and express themselves as men for their entire lives. The same thing is true for those assigned male "at birth." That expectation is not true for Plaintiffs and for hundreds of thousands or millions of other transgender, intersex, and nonbinary individuals who live and identify as a sex different from that which they were assigned at birth.

        b)      <u>The Policy Classifies Based on Transgender Status on Its Face, Triggering Heightened Scrutiny.</u>

The Policy likewise facially classifies based on transgender status: it requires transgender people, including those who are nonbinary, but not cisgender people, to have a sex designation on their passport that is inconsistent with their gender identity. Courts identify quasi-suspect classifications, which trigger heightened scrutiny, by considering four factors: (1) a history of discriminatory treatment against members of the class; (2) whether the class characteristic bears a relation to the ability to perform or contribute to society; (3) whether class members share a sufficiently discernible characteristic to define them as a class; and (4) the political power of the class. *See, e.g.*, *Bowen v. Gillard*, 483 U.S. 587, 602 (1987); *City of Cleburne, Tex. v. Cleburn Living Center*, 473 U.S. 432, 441 (1985). Transgender status satisfies each factor. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020). For that reason, courts in this Circuit and others have applied intermediate scrutiny to government classifications based on transgender status. *See, e.g.*, *Bos. All. of GLBT Youth v. HHS*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021); *accord Grimm*, 972 F.3d at 610; *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019);

19

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719–720 (D. Md. 2018); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016).

> c) The Policy Is Based on Animus Against Transgender People, Triggering Heightened Scrutiny.

Even if the Policy did not facially classify based on sex and transgender status, it would trigger heightened scrutiny because it was adopted at least in part "because of," not "in spite of," the Trump Administration's ideological opposition to transgender people and gender transition. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Policy's stated purpose is to impose the Administration's view that individuals' sexes "are not changeable" and therefore that transgender people are not to be recognized for any federal purposes. Chaput Decl., Ex. I ¶ 1; 90 Fed. Reg. at 8615 (purpose is to combat "the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true").

The Policy is part of a systemic effort by the federal government to restrict legal protections for transgender people spearheaded by President Trump, who has issued a litany of orders during his first weeks in office targeting transgender people. For example, an order issued on January 27, 2025 declares that "adoption of a gender identity inconsistent with an individual's sex" conflicts with a "commitment to an honorable, truthful, and disciplined lifestyle." Exec. Order 14183, Prioritizing Military Excellence and Readiness, 90 Fed. Reg. 8757 (Jan. 27, 2025). As one federal court observed regarding another executive order, one "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG*, No. 8:25-337-BAH, Dkt. 62 at 41.

### 2. The Policy Infringes Plaintiffs' Constitutionally Protected Right to Travel.

Although the State Department has not outright denied Plaintiffs passports under all conditions, the Policy substantially burdens the right to international travel for transgender,

intersex, and nonbinary people by denying them access to a usable passport and subjecting them to the risk of discrimination, harassment, and violence.  *See e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (one-year residency requirement for welfare benefits burdens right to travel).  This right to international travel has a long history of constitutional import in our country that warrants heightened scrutiny.

<blockquote>a)     <u>The Right to Travel Abroad Is an Important Constitutional Value.</u></blockquote>

The freedom to travel abroad is a deeply rooted value that is "a part of our heritage" and a "'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."  *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958).  A "careful analysis of the history of the right [to travel]," *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 238 (2022), reveals its deep roots at and before the Founding.  Foundational texts like the Magna Carta enshrine the right to international travel and emphasize its historical, documented existence throughout time "in accordance with ancient and lawful customs."  *See* Magna Carta, c.41, 42 (1215) ("any man" could "leave and return to our kingdom unharmed and without fear").  The Articles of Confederation reference the right to "free ingress and regress," Articles of Confederation Art. IV, § 1, and the Declaration of Independence lists the restriction of movement among the "history of repeated injuries and usurpations" perpetuated by King George III, The Declaration of Independence, para. 9 (U.S. 1776).  The right to travel abroad is also deeply rooted in our nation's history as a matter of custom and practice: international travel has been customary since the Founding, as shown by the first State Department's issuance of passports beginning in 1789.  *See* Research Our Records: Passport Applications, Nat'l Archives (Oct. 27, 2021).

Reflecting this historical role, the Supreme Court has long recognized the importance of the right to international travel, noting that "[t]ravel abroad, like travel within the country, may be necessary for a livelihood.  It may be as close to the heart of the individual as the choice of what

he eats, or wears, or reads.  Freedom of movement is basic in our scheme of values." *Kent*, 357 U.S. at 126.  The Court has held that travel abroad is a "constitutional liberty closely related to the rights of free speech and association" that is "guaranteed in the Fifth Amendment."  *Aptheker v. Sec'y of State*, 378 U.S. 500, 514, 517 (1964) (striking down law preventing passports being issued to members of Communist organizations); *see also Zemel v. Rusk*, 381 U.S. 1, 85 (1965) (suggesting that the right to international travel is comparable to that of interstate travel).  Courts have recognized that Americans "undoubtedly have a strong liberty interest in . . . international travel."  *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019); *see also Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1271 (D. Or. 2014) ("[T]he right to international travel is a constitutional right protected by substantive due process."); *Mohamed v. Holder*, 266 F. Supp. 3d 868, 878 (E.D. Va. 2017) (noting the liberty interest and difficulty in separating international from interstate travel).

    b) <u>Restrictions on Such a Valued Right Should Be Reviewed Under Heightened Scrutiny.</u>

  Although the Supreme Court has not articulated an explicit standard of review for restrictions on the right to travel abroad, and lower courts have applied a variety of tests, a burden on such a valued right demands heightened scrutiny.  Several Supreme Court decisions assessing government restrictions on international travel have employed language and analysis resembling strict scrutiny without explicitly using that phrase.  *See, e.g.*, *Aptheker*, 378 U.S. at 514 ("precision must be the touchstone" for restrictions "so affecting basic freedoms" like the right to travel internationally and restrictions must be "narrowly drawn" (cleaned up)); *Zemel*, 381 U.S. at 3, 16 ("requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction," and upholding challenged passport restriction only after finding that it was "supported by the weightiest considerations of national security"); *Haig v. Agee*, 453 U.S. 280, 307, 308 (1981) (upholding passport revocation

of a former CIA employee who was publicly exposing undercover agents only after finding "that no governmental interest is more compelling than the security of the nation" and that "[r]estricting Agee's foreign travel . . . is the only avenue open to the Government to limit these activities").

Applying these teachings, courts and judges have repeatedly contemplated heightened scrutiny of restrictions on international travel.  For example, in *Eunique v. Powell*, Judge McKeown explained that "intermediate scrutiny comes the closest to being the proper standard" when considering burdens on the right to travel abroad and another judge would have applied strict scrutiny.  302 F.3d 971, 976 (9th Cir. 2002) (McKeown, J. concurring); *id.* at 979 (Kleinfeld, J., dissenting).[16]  Judge Lucero similarly explained that "intermediate scrutiny is the best way to remain faithful to both the full spectrum of Supreme Court caselaw and the role of international travel in the history of our nation and its conception of well-ordered liberty."  *Maehr v. United States Dep't of State*, 5 F.4th 1100, 1116 (10th Cir. 2021) (Lucero, J. concurring).  And other courts agree.  *See also, e.g.*, *Risenhoover v. Wash. Cty. Cmty. Servs.*, 545 F. Supp. 2d 885, 890 (D. Minn. 2008) (the government must have an "important reason" to interfere with an individual's right to international travel); *Woodward v. Rogers*, 344 F. Supp. 974, 988 (D.D.C. 1972), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973) (no "serious national purpose" was served and the asserted purpose could be "served by far less restrictive means.").  Some lower courts have applied rational basis review to the right to travel abroad, but these nonbinding cases fail to account for the importance of the right, its place in our national history, and the better-reasoned opinions applying heightened scrutiny.  *See, e.g.*, *Jones v. Mnuchin*, 529 F. Supp. 3d 1370, 1378 (S.D. Ga. 2021).  As described above, the right to travel is "fundamental to our scheme of ordered liberty" and "deeply rooted in

---

[16] In *Eunique*, two judges voted for some form of heightened scrutiny (intermediate or strict) and one judge voted for rational basis review.  The court upheld the denial of a passport due to unpaid child support after finding that it satisfied both rational basis and intermediate scrutiny.

this Nation's history and tradition." *Timbs v. Indiana*, 586 U.S. 146, 154 (2019); *see also Dobbs*, 597 U.S. at 237–38 (same). Where, as here, such a right is burdened, Supreme Court precedent— and logic—make clear that at least some form of heightened scrutiny must apply.

> **3.      The Policy Infringes Plaintiffs' Right to Privacy, Triggering Heightened Scrutiny.**

The Supreme Court has held that the Constitution guarantees a right to informational privacy. *See, e.g.*, *Doe v. Plymouth*, 825 F. Supp. 1102, 1107–08 (D. Mass. 1993). Compelled disclosure of personal matters implicates a fundamental right to privacy where the disclosure may: (1) invite stigma or harassment, *id.*; (2) invite bodily harm, *Kallstrom v. Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998); or (3) reveal personal details of an intimate nature, such as information implicating one's sexual, medical, or mental health, including one's transgender status, *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (recognizing a privacy right in maintaining the confidentiality of one's transgender identity); *United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (medical, mental health); *Livsey v. Salt Lake Cnty.*, 275 F.3d 952, 956 (10th Cir. 2001) (sexual, medical). Disclosure of one's transgender status implicates all three considerations.

Indeed, many courts have held that requiring transgender individuals to have sex designations on identification documents inconsistent with their gender identity infringes their fundamental right to informational privacy by compelling disclosure of their transgender status. *See*, *e.g.*, *Powell*, 175 F.3d at 111; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (denying sex marker changes on driver's licenses "forces [transgender people] to disclose their transgender status in violation of their constitutional right to informational privacy" and recognizing that "there are few areas which more closely intimate facts of a personal nature than one's transgender status" (cleaned up)); *Love*, 146 F. Supp. 3d at 856 (where "disclosure of this [highly intimate] information may fall into the hands of persons harboring negative feelings, [denial of a license with an accurate sex

marker] creates a very real threat to Plaintiffs' personal security and bodily integrity" (cleaned up)); *Ray*, 507 F. Supp. 3d at 931–32 ("forced disclosure of an individual's transgender status could subject them to risk of bodily harm[,]" and harassment, and that this "highly personal" information is "protected by the due process clause's informational right to privacy").

Here, requiring Plaintiffs to display sex designations on their passports that do not comport with their gender identity necessarily forces disclosure of Plaintiffs' transgender status in every situation requiring presentment of their passports. Drew Hall explains that "[g]iven my [feminine] presentation and the way that I am perceived by other people, a male sex designation would immediately indicate to any person who looks at my ID that I am transgender." Hall Decl. ¶ 15.

Plaintiffs who are "out" as transgender or nonbinary in other aspects of their lives are also harmed by forced disclosures of personal information to strangers. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 934 ("Plaintiffs do not lose their informational right to privacy by choosing to share the private information at certain times with certain people."); *Nat'l Cable & Telecomm. Ass'n v. FCC*, 555 F.3d 996, 1001 (D.C. Cir. 2009) ("It is widely accepted that privacy deals with determining for oneself when, how and to whom personal information will be disclosed to others."). While some Plaintiffs are known to be transgender by some people in their lives, it is new information to strangers, including border officials. Disclosure can invite stigma, harassment, and even violence, given widespread prejudice against transgender people. *See Plymouth*, 825 F. Supp. at 1107–08. Plaintiff Anderson, for example, was subjected to a "terrible" experience by TSA in which "[t]wo agents isolated" her "for thirty minutes, until a manager entered and conducted strip search of [her] body, and [she] felt that it was direct result of the fact that [her] body did not match [her] sex designation on [her] license." Anderson Decl. ¶13; *see also* Perysian Decl. ¶ 8; Orr Decl. ¶ 7; *Ray*, 507 F. Supp. 3d at 933 ("[I]t is not just Plaintiffs' own experiences that have caused them to fear

disclosing their [transgender] status but also a broader reality that, unfortunately, many transgender individuals do face a heightened risk of 'discrimination, harassment, and violence because of their gender identity.'").  Plaintiffs who are "out" in some aspects of their lives retain a privacy interest in whether, when, how, and to whom to disclose their transgender or nonbinary status, including to potentially hostile border officials in this and other countries.

**C.    The Policy Is Unconstitutional Under Any Standard of Review.**

**1.    The Policy Does Not Survive Heightened Scrutiny.**

Because the Policy is subject to heightened scrutiny, it is only lawful if supported by "an exceedingly persuasive justification." *Virginia*, 518 U.S. at 531.[17]  To succeed, Defendants must show that the Policy "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id.* at 533 (cleaned up).  The asserted "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id.*  The "burden of justification is demanding," not "deferential," and it "rests entirely on the State."  *Id.* at 533, 555.  That demanding burden cannot be met here.

The Policy identifies no governmental objective that it seeks to achieve.  Instead, it refers to the EO.  Chaput Decl., Ex. I ¶ 1.  But as described in detail above, *supra* IV.A.2.a, the EO's asserted justifications—including "defend[ing] women's rights," 90 Fed. Reg. at 8615—are illusory.  The Policy does not advance an interest in protecting anyone, including cisgender women; it only makes transgender, intersex, and nonbinary individuals *less* safe by exposing them to harassment, discrimination, and violence.  Scheim Decl. ¶¶ 22–24.

To the extent Defendants offer justifications for the sudden reversal in policy that do not appear in the Policy or the EO, including any claimed interest in accuracy of identification in

---

[17] If the Court applies strict scrutiny for any claim, the Policy would fail for the same reasons.

documents, heightened scrutiny does not permit such *post hoc* justifications.  *Virginia*, 518 U.S. at 533.  Neither the EO nor the Policy offer any rationale regarding accuracy to make such a justification colorably genuine.  In any event, it is difficult to fathom how a government interest in accurate identification would be advanced by forcing individuals to carry identification based on the size of reproductive cell a person at conception may make or a person's sex assigned at birth.  In actuality, the Policy hinders any such government interest.  *See supra* IV.A.2.b.

### 2.    The Policy Cannot Survive Even Rational Basis Review.

Although the Policy must and cannot survive heightened scrutiny, it also fails any level of review and must be struck down for want of any "rational[] relat[ion] to a legitimate state interest." *Cleburne*, 473 U.S. at 440.  For the reasons explained above, the Policy is irrational on multiple grounds and fails to serve any legitimate interest.  *See supra* IV.A.2.

Further, the Policy is transparently motivated by a "bare desire to harm" transgender people, *Romer v. Evans*, 517 U.S. 620, 635 (1996) (cleaned up), and its animus-based objective is anything but legitimate.  Defendants cannot identify any valid governmental objective to justify the Policy.  The Policy purports to implement the EO, which asserts that "women are biologically female, and men are biologically male" and rejects as false the "claim that males can identify as and thus become women and vice versa."  90 Fed. Reg. at 8615.  In other words, the Policy implements a government pronouncement that transgender people do not exist and in the process seeks to prevent transgender, nonbinary, and intersex people, and only them, from being able to obtain a passport that is consistent with who they are.  *See Gill v. OPM*, 699 F. Supp. 2d 374, 396 (D. Mass. 2010) ("When the proffered rationales for a law are clearly and manifestly implausible, [the] court may infer that animus is the only explicable basis." (cleaned up)).  Because the Policy's objective is "inexplicable by anything but animus toward the class it affects[,] it lacks a rational relationship to legitimate state interests" and fails rational basis review.  *Romer*, 517 U.S. at 632.

27

## V.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A STAY OR PRELIMINARY INJUNCTION.

Without the Court's intervention, Plaintiffs will suffer irreparable harm.  As a threshold matter, the Policy denies Plaintiffs their constitutional rights to equal protection, travel, and privacy.  Because these rights are "of such qualitative importance as to be irremediable by any subsequent relief," their violation constitutes irreparable harm as a matter of law.  *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009); *see also Walters v. Bos. City Council*, 676 F. Supp. 3d 26, 47 (D. Mass. 2023) (concluding that violations of the Equal Protection Clause "constitute[] irreparable harm").  This alone is sufficient to stay and enjoin the Policy.

Further, the injury in this case extends well past those violations.  If not enjoined or stayed, the Policy will cause immediate and concrete harm to each Plaintiff—harm that cannot await or be compensated by relief following final judgment.  ***First***, the Policy creates an immediate risk of physical harm to the Plaintiffs.  For transgender and nonbinary people, identity documents that reflect their gender identity are a matter of physical safety.  Plaintiff Perysian, for example, attests that she faced "significant harassment"—including sexual harassment by TSA agents—when her driver's license bore a male name and sex marker.  Perysian Decl. ¶ 8.  Plaintiff Anderson describes similar issues she encountered "carrying out everyday tasks" before obtaining a driver's license with a female sex designation, and she explains that document "ensures my safety as I navigate local and domestic travel and venues."  Anderson Decl. ¶ 12.  Every Plaintiff similarly explains in urgent terms why they need usable passports with updated sex designations to be able to safely navigate spaces (such as international airports) where that document is required.  *See* Perysian Decl. ¶ 14; Solomon-Lane Decl. ¶¶ 11–12; Hall Decl. ¶¶ 14–15; Anderson Decl. ¶ 13; Boe Decl. ¶ 13; Orr Decl. ¶¶ 14–15; Soe Decl. ¶ 11.  By barring them from obtaining such a document, the

Policy creates an irreparable harm. *See Graham v. Decker*, 454 F. Supp. 3d 347, 357 (S.D.N.Y. 2020) ("Imminent risk to life, health or safety is [] an irreparable harm.").

   ***Second***, the Policy constitutes a loss of privacy to Plaintiffs, who are now forced to "out" themselves each time they present their travel documents for inspection. *See, e.g.*, Hall Decl. ¶ 15; *supra* IV.B.2. This loss of privacy cannot be adequately compensated by post-judgment remedy. *See Covidien LP v. Esch*, 229 F. Supp. 3d 94, 99 (D. Mass. 2017) ("improper disclosure of confidential information is, in itself, an irreparable harm" (cleaned up)).

   ***Third***, Plaintiffs have imminent travel plans that the Policy has thrown into limbo. Plaintiff Orr plans to travel to Ireland on March 13, 2025 for a medical procedure but now worries that he "will not be able to travel outside of the" U.S. Orr Decl. ¶ 15. Plaintiff Anderson needs to travel to a work conference in France in October; the Policy impedes her and her company's ability to plan for it and deprives her of professional opportunities. *Id.* ¶ 9. Plaintiff Hall is an American student enrolled in a Canadian university and living in Vancouver. They frequently travel back to the U.S. to visit friends and family and attend academic conferences, but now cannot. Hall Decl. ¶¶ 8–9, 14. Bella Boe, a university student, fears she will have to forgo educational opportunities abroad, including one in mid-March. Boe Decl. ¶¶ 9, 14–15. This kind of "uncertainty, stress, and inability to plan" are inescapable so long as the Policy remains in effect and "constitute irreparable injury." *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 484 (C.D. Cal. 2012).

## VI.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR A STAY AND PRELIMINARY INJUNCTION.

   The balance of harms and public interest favor Plaintiffs in light of Plaintiffs' strong likelihood of success on the merits, the irreparable harm they will suffer if a stay or preliminary injunction does not issue, and the constitutional and civil rights at stake. The harms to Plaintiffs absent a stay or injunction are immediate and irreparable. *See supra* V. Further, "it is always in

the public interest to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned up). And likewise, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 2016) (recognizing substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations").

Any harm to Defendants, by contrast, is immaterial. The government would be required to enforce federal policy as it existed for years. It would only lose the ability to implement a new policy that advances no legitimate interest and is unlawful. *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) ("The status quo [is] the last uncontested status which preceded the pending controversy." (cleaned up)). This pales in comparison to the glaring constitutional problems with the Policy: "Defendants cannot properly assert that they will suffer harm by an injunction that merely prohibits them from [unlawful conduct]." *Lainer v. Boston*, 95 F. Supp. 2d 17, 21 (D. Mass. 2000). The public interest does not favor enforcement of a discriminatory, unconstitutional policy that inflicts grave harm without legitimate justification.[18]

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court enter the relief requested in the Motion.

*[Signature block on next page]*

---

[18] For these same reasons, Plaintiffs also request that this Court not impose a security bond. *See Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991).

Respectfully submitted,

February 18, 2025

/s/ Isaac D. Chaput
Isaac D. Chaput (*pro hac vice*)
William P. Kasper (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: 415-591-6000
Facsimile: 415-591-6091
ichaput@cov.com
wkasper@cov.com

Jessie J. Rossman (BBO # 670685)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
Telephone: 617-482-3170
jrossman@aclum.org

Jon W. Davidson (*pro hac vice*)
    (admitted only in California)
Li Nowlin-Sohl (*pro hac vice*)
    (admitted only in Washington)
Sruti J. Swaminathan (*pro hac vice*)
Malita V. Picasso  (*pro hac vice pending*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org
sswaminathan@aclu.org
mpicasso@aclu.org

31

Aditi Fruitwala (*pro hac vice pending*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Ansel F. Carpenter (*pro hac vice*)
Gavin W. Jackson (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

Jonathan Thompson (*pro hac vice*)
Sean M. Bender (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-5891
Facsimile: 202-778-5891
jothompson@cov.com
sbender@cov.com

Yuval Mor (*pro hac vice*)
Alyssa L. Curcio (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-841-1000
Facsimile: 212-841-1010
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs*

32

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 18, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

*/s/ Isaac D. Chaput*
Isaac D. Chaput
