# EXHIBIT F



# INTERSECTIONS

## DIVING INTO THE FRA LGBTI II SURVEY DATA

## INTERSEX BRIEFING

Prepared By :

Cianán B. Russell, Ph.D.
Senior Policy Officer, ILGA-Europe

Irene Amoroso, Policy Officer, OII Europe

Jana Hugo, Policy Officer, OII Europe

Ins A Kromminga, Awareness Raising and
Campaigns Officer, OII Europe



**Co-funded by the European Union**

*Intersectional analysis from findings of the European Union Agency for Fundamental Rights (FRA) 2nd LGBTI survey on LGBTI people in the EU and North Macedonia and Serbia (2019)*

# Introduction

A significant number of EU citizens continue to experience discrimination, inequalities and violence based on their sexual orientation, gender identity, gender expression or sex characteristics (SOGIESC). These problems undermine fundamental EU values and show how some Member States have failed to effectively protect the rights of all citizens.

In 2019, the European Union Agency for Fundamental Rights (FRA) conducted the second round of the LGBTI Survey which shows how LGBTI people experience their fundamental rights in daily life across Europe. [1] For the first time, the survey included the experiences of intersex people, and determined that intersex people experience some of the highest levels of discrimination across all groups included in the study.

This briefing, and other briefings in the Intersections [2] series, seeks to elaborate on existing analysis of the FRA LGBTI Survey II, and summarises the most relevant data about the experiences of intersex people in Europe.

The methodology and background information on the survey are available in Annex 1.

1.  FRA (European Union Agency for Fundamental Rights) (2020), A long way to go for LGBTI equality, Luxembourg, Publications Office. Available at: https://fra.europa.eu/en/publication/2020/eu-lgbti-survey-results
2.. Available from https://www.ilga-europe.org/report/fra-lgbti-report-2019-intersections/

## Recommendations

- Based on this analysis, ILGA-Europe and OII Europe recommend that States and institutions:

- Improve the visibility and understanding of intersex persons' lived experiences by strengthening data collection efforts that better reflect their intersectional experiences.

- Establish and implement laws and policies that prohibit non-vital medical interventions and/or treatments on intersex persons without their prior, free and informed consent, along with comprehensive action to ensure the protection of the intersex person's right to health, including:

  - Enforcing the obligation for medical doctors to provide full, up to date information about the treatment options and their consequences,

  - Guaranteeing the right to expert-sensitive and individually tailored psychological and psycho-social counselling and support for all intersex people and their families, and

  - Establishing obligatory training for all medical professionals, such as doctors, midwives, psychologists and other professionals working in the health sector.

- Ensure that intersex people are explicitly protected by hate crime/speech and anti-discrimination laws, policies, and action plans by specifically including the ground or bias motive of "sex characteristics".

- Adopt comprehensive measures to prevent discrimination and exclusion in all areas of life, through awareness raising towards society at large about intersex human rights; implement education and training programmes addressed to professionals and service providers in all areas of life.



# Results and Discussion

Respondents to the FRA LGBTI II Survey were asked questions about their identities and demographic information, intersex-specific issues, socioeconomic status, experiences with discrimination, violence, and harassment, and life satisfaction. In this briefing, we highlight key findings from the cross tabulation regarding the lived experiences of intersex people.

The full disaggregated data analysis is available in table form at this link.

## Demographic Information

The total number of respondents of the FRA LGBTI II Survey was 139,799. From those responses, 877 people are included in the intersex respondents in this briefing (0.63%). [3]

Slightly more than half of the intersex people (56.83%) identified as being trans [4] (trans men, trans women, non-binary, genderqueer, gender-fluid, agender, polygender, or other); this represents a much higher percentage of trans intersex people than among the entire respondent population (14.51%). Further, intersex people were much less likely to identify as men and much more likely to identify as non-binary or to indicate that they did not identify with any of the options than the overall LGBTI population (Table 1).

Table 1. Answers to the question "How would you describe yourself today?" [5]

| | All respondents | Intersex respondents |
|---|---|---|
| Woman/girl | 37.81% | 28.59% |
| Man/boy | 51.36% | 27.43% |
| Trans woman/girl | 1.84% | 8.50% |
| Trans man/boy | 1.90% | 7.20% |
| Non-binary | 6.22% | 23.03% |
| Do not identify with any of these | 0.86% | 5.24% |

Page 3

3. See Annex 1 for details on the composition of the cohort for this briefing.
4. The survey asked respondents if they were a trans person, and stated that "the term trans is used in this survey as a broad umbrella term that includes all those who are transgender, non-binary, gender variant, polygender, agender, gender-fluid, cross dressers, transsexual, or men and women with a transsexual past, and other terms".
5. Note that not all trans women and girls or men and boys selected "trans woman or girl" or "trans man or boy" for their identities; the majority selected "woman or girl" or "man or boy", respectively, from the options available on this question.

When asked about their sexual orientation, respondents could describe it as "gay", "lesbian", "bisexual", "heterosexual/straight", "other", or "unknown". While many intersex respondents indicated that they were heterosexual or straight, the percentage is still quite low and may indicate that straight intersex people were not reached as effectively as LGBQ intersex people in the survey dissemination (Table 2).

Table 2.  Answers to the question "In terms of sexual orientation, we can only use a limited number of categories for our analysis. So we would like to ask you which group best matches your sexual orientation. Select the answer that best matches your sexual orientation."

|  | All respondents | Intersex respondents |
|---|---|---|
| Don't know | 0.06% | 0.96% |
| Lesbian | 19.86% | 17.95% |
| Gay | 36.96% | 26.11% |
| Bisexual | 38.90% | 31.74% |
| Heterosexual/straight | 1.59% | 8.99% |
| Other | 2.63% | 14.24% |

Out of all intersex respondents, 14.47% said they considered themselves as being part of an ethnic minority (including of a migrant background), compared to 7.71% of all LGBTI respondents. Likewise, 20.29% said they considered themselves as a "minority in terms of disability", compared to 5.18% of all LGBTI respondents. In this briefing, we have used these variables to show differences in some results.

## Openness

Overall, intersex people are much less open about their SOGIESC than their endosex [6] counterparts (Figure 1). While less than a quarter of all respondents say that they are very open about being LGBTI (22.94%), only 12.11% of intersex respondents are very open about being intersex. By contrast, 44.39% of intersex respondents are never open, compared with the 30.84% of all LGBTI respondents.

6. "Endosex" refers to people who are born with sex characteristics that fit into the socially defined expectations for men's or women's bodies



## Health status

Respondents were asked two questions related to their health status. Firstly, respondents ranked their health in general; in this question, intersex respondents assessed their health to be much poorer than the overall LGBTI respondents (Figure 2).



Respondents also were asked to indicate if they had a long-term health problem or illness; 55.17% of intersex people indicated that they did, compared to 33.66% of all LGBTI respondents.

## Intersex-specific issues

In addition to the demographic questions asked of all respondents, intersex respondents were presented with a set of questions that probed experiences specific to being intersex. Some of these questions were also used to disaggregate data in other sections of the survey.

The first question was about the type of variation of sex characteristics that the person had; respondents were able to select more than one option. After dropping those who selected "None of these" (see Annex 1 for methodology), 29.52% of respondents had variations of sexual anatomy and/or reproductive organs, 41.57% had variations of chromosomes and/or hormonal patterns, and 55.70% had variations of secondary sex characteristics and anatomical features, such as hair growth; 7.97% indicated that they had another type of variation.

Participants were also asked how old they were when they realised that they had a variation of sex characteristics; respondents could enter any number. Figure 3 shows the distribution of responses.



Figure 3. Grouped responses to "How old were you when you first realised that you have a variation in your sex characteristics?"

Respondents were also asked about how old they were when having their first medical treatment or intervention to modify their sex characteristics; 12.80% of respondents indicated this happened at birth, 22.08% by the age of 5 (including at birth), 33.91% by the age of 14, and 53.72% were 18 or older.

The survey also provides data about who gave consent to the first interventions or treatments by asking whether the respondents themselves, both the respondents and their parents, just their parents, or someone else or no one, provided consent.

Table 3 is a cross tabulation of A) the responses to the question related to consent provided to the first treatment or intervention with B) the responses to the question about the types of interventions undergone, where respondents could select all the options that applied to their situation, including "Surgery related to being intersex", "Hormonal treatment" and "Other treatment" (note that these refer to potentially different interventions - consent was related to only the first intervention while types of interventions refers to all interventions, including but not limited to the first).

This reveals that among intersex respondents who had "surgeries related to being intersex", 60.87% stated that their "parents or someone else" or "no one" gave consent to their first treatment or intervention, which indicates that these respondents experienced at least one intervention in which they did not provide personal consent. It is particularly important here to note the distinction, in bioethical terms, between "consent" and "authorisation". Only the individual concerned has the capacity to provide "consent"; when parents or another third party make a decision, this is "authorisation". [7]

Table 3. Answers to "Who gave consent before your first medical treatment or intervention to modify your sex characteristics?", cross-tabulated with answers to "Which of the following treatments have you undergone? Read all options and select all that apply"

|  | Intersex respondents who had treatments | Intersex people who had surgeries related to being intersex | Intersex people who had hormonal treatment | Intersex people who had other treatments |
|---|---|---|---|---|
| I gave consent | 49.49% | 26.77% | 52.86% | 59.02% |
| My parents gave consent | 27.88% | 45.12% | 23.42% | 19.76% |
| Both me and my parents did | 11.89% | 12.36% | 12.63% | 7.50% |
| Someone else/ no one | 10.74% | 15.75% | 11.09% | 13.71% |

7. Separating these two distinct categorical kinds of approval allows for a more precise evaluation of whether the right of a person to bodily autonomy and self-determination is protected in practice. See https://rm.coe.int/proceedings-minsk-8-dec-2017-e/16807b4e41 for more discussion. See also Council of Europe BIO/ENF-CP, Draft guide for the participation of children in decision-making process regarding their health (10 October 2022), pages 25 and 29, available from https://rm.coe.int/bio-enfcp-2022-1-rev2-draft-guide-children-participation-e/1680a8a4c7 and the Convention on Human Rights and Biomedicine (Oviedo Convention), Articles 5 and 6. Available from: https://www.coe.int/en/web/conventions/full-list?module=treaty-detail&treatynum=164

## Non-vital medical interventions on intersex people

More detailed national statistics on the number of interventions are still scarce. However, two full case studies on the frequency of so-called "feminising" and "masculinising" operations, in relation to the number of diagnoses of so-called "variants of sex development", on intersex children aged 0-10 exist for Germany. [8],[9] The first of these, by Hoenes et al., investigated "whether there has been a decline in surgical "corrections" of "ambiguous" genitalia in children in Germany between 2005 and 2016". [10] The study concluded that the number of interventions on children under 10 years of age had "remained relatively constant in relation to the number of diagnoses between 2005 and 2016". [11] The study found 1871 annual cases on average, amounting to 21% relative frequency, with no notable decline year on year. As the study focused on operations performed on children under the age of 10, it is reasonable to assume that none of the children were able to provide consent, given their age and capacities (legal and otherwise).

Further investigation of this question involved creating cross-tabulation with a question about whether those giving consent or authorisation received sufficient detailed information, including about the possible positive and negative consequences of a given intervention. Figure 4 (next page) shows this distribution; and shows clearly that involvement of intersex people themselves means that it is more likely for sufficient information to have been given. Even in those cases where personal consent was given, though, a lack of detailed information was quite common (26.74% of those who consented themselves and 40.60% of those who consented together with their parents did not receive sufficient detailed information).

Page 8 ●────────────────────────────────────●

8. Josch Hoenes, Eugen Januschke, Ulrike Klöppel, Häufigkeit normangleichender Operationen "uneindeutiger" Genitalien im Kindesalter. Follow Up-Studie (Bochum, 2019), Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletin-broschueren/bulletin-texte-44-3/bulletin44-entwurf-final.pdf
9. Ulrike Klöppel, Zur Aktualität kosmetischer Operationen 'un-eindeutig' Genitalien im Kindesalter. Hg. von der Geschäftsstelle des Zentrums für transdisziplinäre Geschlechterstudien der Humboldt-Universität zu Berlin (Berlin, 2016), Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletins/bulletin-texte-42/kloeppel-2016_zur-aktualitaet-kosmetischer-genitaloperationen
10. Josch Hoenes, Eugen Januschke, Ulrike Klöppel, Häufigkeit normangleichender Operationen "uneindeutiger" Genitalien im Kindesalter. Follow Up-Studie (Bochum, 2019), p.6, Available from: https://www.gender.hu-berlin.de/de/publikationen/gender-bulletin-broschueren/bulletin-texte-44-3/bulletin44-entwurf-final.pdf
11.  Ibid, p. 19



Another cross-tabulation of two questions looks at how old an intersex respondent was when they first realised that they had a variation of sex characteristics compared with whether the person has had medical interventions to modify their sex characteristics; Figure 5 shows this relationship.



A further look into the survey results reveals that of the intersex respondents who underwent an intervention or treatment - whether surgical, hormonal or other - 43.21% reported having difficulties in registering their gender marker. This may indicate that a large percentage of intersex persons wish to change their gender markers from the one assigned to them at birth. Given that 23.03% of intersex respondents identified as non-binary, this could indicate that the absence of non-binary or third gender markers in much of Europe presents a key obstacle to registration for intersex people. However, many intersex people do identify as men or women: including those of them who want to change their gender marker to one that falls within the binary.

## Provision of information to parents prior to non-vital interventions

The survey data indicate that 68.24% of the parents who gave consent did not receive detailed information prior to the intervention. These data are better understood when read together with results from a study [12] showing that a lack of provision of psycho-social counselling options for parents of intersex children can be extremely harmful or even fatal for the child. Most notably, it showed that parents of intersex children who are provided with medicalised information by medical practitioners are almost three times more likely to consent to surgery than those who receive de-medicalised information. In the absence of conclusive data proving the "benefits" of early surgery and rather in the presence of robust evidence as to its harmful consequences [13], there is a danger of medicalised information provided to parents resulting in irreversible and inadequately-grounded decisions taken on behalf of their child, often in the belief that this decision is in their child's future best interest.

According to another study, parents very often - including even those who are medical practitioners themselves - are immediately confronted with complex medical explanations about the so-called "condition" of their new-born child, which they are reportedly unable to follow. [14] These are often further accompanied by offers or pressure by doctors to proceed with medical treatments that will allegedly "fix" the intersex child. The 2017 Resolution of the Parliamentary Assembly of the Council of Europe emphasises that this kind of medicalised counselling puts parents under immense pressure to make "life-changing decisions on behalf of their child, without having a full and genuine understanding of the long-term consequences for their children".[15]

Page 10

12. J. C. Streuli, E. Vayena, Y. Cavicchia-Balmer & J. Huber (2013), Shaping parents: impact of contrasting professional counselling on parents' decision making for children with disorders of sex development, Journal of Sexual Medicine, Vol. 8 No. 3, pp. 1953–1960, Available from:http://www.ncbi.nlm.nih.gov/pubmed/23742202.

13. Kavot Zillén, Jameson Garland and Santa Slokenberga, The Rights of Children in Biomedicine: Challenges posed by scientific advances and uncertainties, Commissioned by the Committee on Bioethics for the Council of Europe (January 2017), p. 43. Available from: https://rm.coe.int/16806d8e2f

14. A. Krämer, K. Sabisch (2017), Inter*: Geschichte, Diskurs und soziale Praxis aus Sicht der Geschlechterforschung. In: Kortendiek, B., Riegraf, B., Sabisch, K. (eds) Handbuch Interdisziplinäre Geschlechterforschung. Geschlecht und Gesellschaft, vol 65. Springer VS, Wiesbaden. p. 31-34, Available from: https://link.springer.com/referenceworkentry/10.1007/978-3-658-12500-4_78-1

15. Parliamentary Assembly of the Council of Europe (PACE) (2017): Resolution 2191 (2017). Promoting the human rights of and eliminating discrimination against intersex people. Doc. 14404 Report, Part C Articles 29, 49, 61, 68, 69. Available from: https://bit.ly/2gfohnV

# Obstacles in accessing legal gender recognition procedures

Along with the difficulties that trans and intersex people face when trying to access legal gender recognition procedures that are not based on self-determination, intersex people may also face unique difficulties that impact them specifically.

In Member States that still require such prerequisites, "[s]urgical requirements are particularly harmful where an inappropriate initial sex assignment was itself imposed through unwanted and irreversible changes to sex characteristics" [16]. In other Member States, a "medical-orientated precondition for legal gender recognition is the requirement that applicants obtain a diagnosis of gender dysphoria, gender identity disorder or transsexualism" [17]. This disregards the reality of intersex people whose experience of what medical doctors refer to as "gender dysphoria" or similar diagnoses is in fact a result of unwanted and unconsented changes to their sex characteristics in order to align their physical appearance to the "typical" male or female one.

However, any legal gender recognition procedures that are not solely based on self-determination are potentially harmful for both trans and intersex people, as they assume that "physical interventions are an inherent part of gender transition processes and that Europe's trans [or intersex, or intersex trans] people inevitably desire to change their bodies, particularly their sex characteristics" [18], and therefore violate the person's fundamental rights.

In relation to the importance of accessing legal gender recognition procedures, research has shown that denial of access to such procedures is directly linked to experiences of inequality and ultimately becomes a gateway for future social and legal discrimination. [19],[20]

Page 11 ────────────────●

16. see Background Note on Human Rights Violations against Intersex People, p.35. Available from: https://www.ohchr.org/sites/default/files/Documents/Issues/Discrimination/LGBT/BackgroundNoteHumanRightsViolationsagainstIntersexPeople.pdf
17. see Dunne, P. & van den Brink, M. (2018). Trans and intersex equality rights in Europe – a comparative analysis. European network of legal experts in gender equality and non-discrimination, p.63. Available from: https://ec.europa.eu/newsroom/just/items/638586
18. See Dunne, P. & van den Brink, M. (2018). Trans and intersex equality rights in Europe – a comparative analysis. European network of legal experts in gender equality and non-discrimination, p.63. Available from: https://ec.europa.eu/newsroom/just/items/638586
19. See Dunne, P. & van den Brink, M. (2018), p.60.
20.  It is also important that legal gender recognition procedures are properly implemented in a way that prevents loopholes and further obstacles. For example, in 2020 it was reported to OII Europe that, in Denmark, intersex persons when changing their civil registration number may face losing access to some of their medical history as well as being temporarily blocked from having access to payments or cash withdrawals from their bank.

## Socio economic status

The survey asked respondents several questions pertaining to their socioeconomic status. When asked if their household total income met their needs, more than 1 in 5 intersex respondents said they had "difficulty" or "great difficulty" (25.06%, compared to 13.91% of all LGBTI respondents). This share was higher for intersex respondents from an ethnic minority (including of migrant background) (31.93%) and intersex respondents with disabilities (31.22%). Additionally, 36.20% intersex people who had experienced any intersex-related interventions [21] and 34.16% of intersex respondents who had had obstacles with their identity registration [22] selected one of these options.

When asked about their experiences of homelessness, 34.03% of intersex people reported having experienced housing difficulties (Figure 6). This number is higher for intersex respondents with disabilities (49.55%) and intersex respondents from ethnic minorities and/or migrant backgrounds (53.42%). The number was also higher for trans intersex respondents (39.02%), those who have had medical interventions (41.89%) and those who have experienced obstacles registering their gender marker (50.58%). Most intersex people who had experiences of homelessness (70.27%) had to stay with friends or relatives, although a much higher percentage needed to stay in an emergency shelter (32.09%) or sleep outside (20.72%) than among all LGBTI respondents (19.19 and 8.41%, respectively).



Figure 6. Intersex repondents who have experienced housing difficulties, disaggregated

21. Disaggregation based on question IX6.
22. Disaggregation based on question IX8.

## Obstacles to employment

The survey results clearly show us that intersex people face especially significant barriers in employment. Their income-related difficulties can be contextualised because of the reportedly higher risk of poverty that intersex people face, due to lack of education as a result of pathologisation and related trauma experienced from an early age. Furthermore, the strain of discrimination and stigmatisation may lead to higher absence rates at work, increasing the risk of intersex people losing their jobs. Research shows that intersex persons may also face difficulties in explaining or accounting for gaps in their education or employment history, resulting from times when they were hospitalised or when they were not able to work due to trauma [23] as a result of non-consensual non-vital interventions or bias-motivated crimes committed against them.

Such struggles with employment concur with the relatively high rates of homelessness among intersex people. Additionally, relationship/family problems and instances of domestic violence also affect intersex persons' housing situations. A 2021 study highlighted this link: of the 72 participating organisations, representing 32 countries across Europe, over half (52%) stated that they work specifically with intersex youth. According to this research, the most common reason for homelessness among LGBTI youth is reported to be identity related family conflict (72%), including young people's choice to flee from violence in the family home. [24]

## Life satisfaction

Respondents were asked to rank their life satisfaction on a scale from 0 to 10, with 10 being the most satisfied and 0 the least. Intersex people were less satisfied than the total population of survey respondents (5.53 and 6.41, respectively), and those experiencing intersectional exclusion even less so: intersex trans women at 5.47, non-binary intersex people at 5.16, and intersex people with disabilities at 4.73.

23. M. Carpenter, D. Hough (2014): Employers' Guide to Intersex Inclusion. Sydney: Pride in Diversity and Organisation Intersex International Australia, p. 20, Available from: *https://ihra.org.au/wp-content/uploads/key/Employer-Guide-Intersex-Inclusion.pdf*
24. Shelton, J., Ritosa, A., Van Roozendaal, B., Hugendubel, K. & Dodd, S.J. (2021). Perceptions: Addressing LGBTI Youth Homelessness in Europe and Central Asia - Findings from a Survey of LGBTI Organisations. ILGA-Europe, True Colors United, and the Silberman Center for Sexuality and Gender at Hunter College, p. 3, 14, 15, Available from: *https://www.feantsa.org/public/user/Activities/events/2021/Perceptions_-_ILGA_Europe_Compressed.pdf*; in total, 71 organisations participated in the survey, representing 32 countries' estimates of the in-country prevalence rate of LGBTI youth homelessness.

## COVID-19 impacts

In 2020, OII Europe conducted its first COVID-19 survey [25] on the impact of the pandemic on intersex persons' health and wellbeing. The survey revealed that a high percentage of intersex respondents experienced increased mental health issues as a result of the pandemic. Of all respondents, 62% reported a worsening of their mental health, and 21% are experiencing a relapse of their previous mental health issues. These findings represent another worrying, though not surprising, finding: the COVID-19 pandemic exacerbated the mental health issues experienced by intersex people through the violations of their physical and psychological integrity and through the stress of living invisible, isolated lives, with stigma and taboo making intersex individuals especially vulnerable to struggling with their mental health.

## Experiences of discrimination

The survey asked respondents if they felt discriminated against for being LGBTI in several areas of life, during the last 12 months. The share of intersex respondents that felt discriminated against by **healthcare or social services personnel** (Figure 7) is 43.34%. This share is much higher for intersex people with disabilities (51.95%), trans intersex people from an ethnic minority (including migrants) (60.03%), trans intersex women (54.80%) and non-binary intersex people (53.54%).



Figure 7. Percentage of respondents stating they felt discriminated against in healthcare or social services in the last 12 months

25. Dan Christian Ghattas, Covid-19. A report on the situation of intersex people in Europe and Central Asia, OII Europe, 9 December 2020, p.16 - 17. Available from: **https://www.oiieurope.org/covid-19-survey-report**

Over a quarter (36.13%) of young respondents felt discriminated against by **school or university personnel**, compared to 19.51% of all LGBTI respondents. Within this age group, the share is higher for intersex people with disabilities (40.41%) and non-binary intersex respondents (43.74%).

The survey asked respondents if they felt discriminated against **when looking for work and when at work**. The share of intersex respondents that felt discriminated against when looking for a job is 27.98% (compared to 10.17% of all LGBTI respondents). This share is much higher for intersex trans women (43.55%).

Nearly a third of intersex people people felt discriminated against **when showing their ID** (30.64%, compared to 4.66% of all LGBTI respondents), and the share is highest among intersex trans people from ethnic minorities (including migrants) (48.85%) and intersex trans men (45.80%).

Even with this high prevalence of experiences of discrimination, intersex people were much less likely to report discrimination to their equality bodies than the overall LGBTI population: while 10.81% of all LGBTI respondents reported to an equality body, only 2.73% of intersex respondents did. Intersex people were, however, more likely to report to politicians, with 10.24% of intersex respondents (and 24.46% of intersex people with disabilities) doing so, compared to 2.11% of all LGBTI respondents. Intersex people were much more likely to indicate that they did not know how to report discrimination (19.65% of intersex respondents compared to 3.03% of all LGBTI respondents), did not trust authorities (29.96% and 7.88%, respectively), and believed that nothing would happen (45.01% and 2.92%, respectively).

Specifically in the context of healthcare, intersex people experienced much higher obstacles to health compared to LGBTI respondents, including difficulty gaining access, having their specific needs ignored, inappropriate curiosity or comments (28.99%), pressure to undergo treatment (19.22%), and avoidance of services (17.06%) (Figure 8).



## Exposure to mistreatment in healthcare settings

Intersex people regularly speak in self-help groups and report to national intersex NGOs or to OII Europe that they are at risk of sexual harassment in medical settings, including in some cases rape, and are exposed to degrading examinations, verbal violence and derogatory comments. [26] In addition, a severe lack of knowledge about intersex people, the fundamental rights violations they face and the specific needs that follow from these experiences still exists among medical practitioners. [27] It is often matched with personal bias that can result in disbelief and insults, the refusal to perform needed examinations, and examinations being carried out in violent ways or without the intersex person's consent. When seeking medical help for issues directly related to their sex characteristics, diagnosis or sexuality, intersex people often face highly insensitive and violent behaviour. For example, a 2014 Dutch study on the experience of intersex people in different areas of life emphasised that six out of seven respondents spoke "with a great deal of emotion about poor information, insensitive communication and discourteous treatment", echoing the FRA 2019 survey results about how many intersex respondents have experienced inappropriate curiosity or comments about their body.

Additionally, specific subgroups of intersex people were at a heightened exposure to such barriers in healthcare settings (Figure 9). Among others, 40.04% of intersex respondents from an ethnic minority or migrant background, and 25.77% of intersex respondents who identify as genderqueer or non-binary avoided healthcare services (i.e., more than a quarter). Furthermore, 42.11% of intersex respondents with disabilities felt their needs were ignored by healthcare staff when seeking to access healthcare services. The data also reveals that 31.03% of trans intersex women - nearly a third - experienced pressure to undergo treatments (compared to only 3.18 % of all LGBTI respondents).

Page 16 ●────────────────●

26. See the Shadow Report submitted to the Group of Experts on Action against Violence against Women and Domestic Violence (GREVIO) by Intersex Greece on 6 May 2022, p. 3-4 and 7, Available from: https://rm.coe.int/greece-2022-shadow-report-grevio-cbr/1680a675f7?fbclid=IwAR1OiUovdT-NvgMG7R63_VX8Q5N9gYAPSIfT0a6nQTdV8J6YAHKvEJ-g8iU, See also OII Germany: CEDAW Shadow Report. (20th of January 2017), Available from: https://tbinternet.ohchr.org/Treaties/CEDAW/Shared%20Documents/DEU/INT_CEDAW_NGO_DEU_26315_E.pdf.
27. Parliamentary Assembly, Promoting the human rights of and eliminating discrimination against intersex people. Report. Doc. 14404 (25 September 2017), part C, paras. 49-50, Available from: https://pace.coe.int/en/files/24027/html#_TOC_d19e146



Figure 9. Exposure to specific barriers in access to healthcare, disaggregated intersex groups

# Experiences of hate-motivated violence and harassment

The survey asked respondents whether they had been physically or sexually attacked in the last 5 years. Almost half of intersex respondents (49.40%) indicate that they had been physically or sexually attacked in that period, compared to 24.55% of all LGBTI respondents. Furthermore, intersex people, and particularly intersex trans men, were much more likely to describe being physically or sexually attacked "all the time" (Figure 10). Among those intersex people who were attacked at least once for any reason, almost half of respondents (49.21%) indicated that they were attacked for being intersex; this amounts to 24.06% of all intersex respondents. [28]



Figure 10. Number of times exposed to physical or sexual attack in the last 5 years, disaggregated

28. *The percentage of all intersex respondents attacked specifically for being intersex was calculated using responses to survey questions E1 (exposure to attack for any reason) and E2 (among those attacked, whether the attack was due to being [respondent category] (e.g. intersex)).*

Within this exposure to attack, 42.66% of attacks experienced by intersex people involved a specifically sexual component (either being a "sexual attack" or a "physical and sexual attack"), compared to 28.42% of all LGBTI respondents, oncemore revealing that the exposure to sexual violence is higher for intersex people than for LGBTI populations. This is further exacerbated for intersex trans people, being reported by 52.91% of intersex trans men and 54.96% of intersex trans women.

When asked who attacked them, many intersex respondents said that the attacker was a family member (11.21% of intersex people and 13.01% of intersex people with disabilities). More than 1 in 5 intersex trans women (22.44%) said the attack happened at home, more than double any other group of intersex people. Sexual and physical violence inside families or by relatives can be exerted as a form of "punishment", in particular in families where the existence of the intersex family member is considered to be shameful for the family. In the case of intersex children, perpetrators of such violence abuse the specifically vulnerable situation of the intersex child, who is not considered by the family to be of the same value as their non-intersex siblings.

 Again looking at the data on circumstances in which such violence is perpetrated through an intersectional lens, it is clear that intersex trans men were most likely to be attacked by an acquaintance or friend (21.55%) or someone from school (22.40%); intersex people from an ethnic minority (including migrants) were highly exposed to attack from a member of an extremist or racist group (13.30%) and non-binary intersex people to attacks from a group of teenagers (32.85%). In most cases, the attack happened either in a public space such as a cafe, public transportation, or a street or park (62.18%).

When asked if they had reported the attack, intersex people were somewhat more likely to have reported the attack than the all LGBTI respondents (29.57% and 20.79%, respectively), though 43.81% of intersex people with disabilities and 41.07% of intersex trans women did report to someone.

In addition to questions about attacks, respondents were also asked about experiences of harassment. Intersex people were more likely to have experienced some kind of harassment than all LGBTI respondents (72.81% compared to 56.06%, respectively), with more than 4 out of 5 intersex people with disabilities having this experience (87.95%). (Figure 11)



The survey also shows that intersex respondents experienced double the amounts of the following kinds of harassment than all LGBTI respondents together: 27.75% of intersex respondents reported experiencing threats of violence in person (compared to 12.98% of all LGBTI respondents), 22.52% of intersex respondents reported being loitered, waited or followed (compared to 10.57% of all LGBTI respondents), 18.80% of intersex respondents experienced receiving emails or texts (compared to 9.96% of all LGBTI respondents), and 27.73% of intersex respondents reported receiving threatening comments online (compared to 10.07% of all LGBTI respondents).

## Intersexphobic attacks

Because being intersex is still not widely known in society, and protection is still not available to intersex persons, perpetrators have a specific advantage over their intersex victim, which they exploit. Thus intersex persons - specifically those with intersectional identities - are specifically vulnerable to experiencing physical and sexual violence, and they are frequently specifically targeted by perpetrators because of being intersex.

*The following section directly quotes intersexphobic online speech.*

In addition, intersex people are exposed to intersexphobic verbal attacks, including threatening and hateful comments online. OII Europe member organisations have been collecting data on online hate speech against intersex people, and their reports show that hate speech is widespread and getting worse, as per the following examples:

- "Two sexes that's all. Any variation from that are deformities. They are infertile right? So, on a species level they are not viable". Twitter user, 22/11/2018;
- "We the dyadics don't have a disgusting alien between our legs. You are f*cking human errors and we won't stop talking like we do to include your atrocity into our normality." Curiouscat user, 2018;
- "They champion negroes, illegal aliens, Muslims, sexual deviants, and Intersex (a new word I just learned), which means freaks who are born with a genital problem, such as hermaphrodites, and congenital eunuchs, all horrible genetic mistakes of nature [...] I like how the ancient Spartans took their sickly, weak, and/or deformed babies and threw them off a cliff. That's what all the white nations should be doing now". Stormfront user, 2020.

Many additional examples are available in OII Europe's Submission "Towards an extension of the list of EU crimes to hate speech and hate crime". [29]

29. See OII Europe's Submission "Towards an extension of the list of EU crimes to hate speech and hate crime", published 20.04.2021. Available from: **https://www.oiieurope.org/wp-content/uploads/2021/05/OII-Europe-Submission_Extension-Hate-Speech-and-Crime_FINAL.pdf**

## Importance of including "sex characteristics" as a specific protection ground in legislation

As the data reveal, intersex persons are often targeted by perpetrators of violent acts specifically because of being intersex, or because of being intersex in combination with other personal characteristics. While some EU Member States have implemented laws and action plans that specifically protect intersex persons from discrimination and violence on the basis of sex characteristics, [30] gaps in protection still remain, especially where disaggregated data on the specific bias-motive or protected ground (in this case the sex characteristics of the victim) are still not being collected. Only if they systematically record, collect and publish annual data on anti-LGBTI hate crime, disaggregated by the specific ground, will Member States be in the position to develop effective, evidence-based legal and policy responses to this phenomenon.[31]

Member States must also be aware that no measure designed to tackle discrimination and bias-motivated violence would be sufficient until intersex genital mutilation (IGM) is also legally prohibited and such prohibition effectively implemented. IGM is one the most egregious forms of discrimination and violence motivated by prejudice towards a person because of their variation of sex characteristics. It includes non-vital surgical, hormonal and other medical interventions and practices that aim at altering a person's sex characteristics without their personal, prior, free and fully informed consent. See the box, above, on "Non-vital medical interventions on intersex people" for further details.

30. Malta and Finland, Bosnia and Herzegovina and Montenegro, The Netherlands, Serbia, Belgium and Denmark all offer comprehensive legal protection against discrimination on the grounds of sex characteristics. Greece and Portugal offer partial legal protection against discrimination. All offer comprehensive protection from hate crime by explicitly mentioning the ground of sex characteristics: Belgium, Denmark, Greece and Malta, as well as in some regions of Spain and Sweden. For further reading, see OII Europe's yearly publication of good practice maps: https://www.oiieurope.org/library-en/map/. See also ILGA Europe's Rainbow Map: https://rainbow-europe.org
31. European Union Agency for Fundamental Rights (2018). Hate crime recording and data collection practice across the EU, p. 23, Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2018-hate-crime-recording_en.pdf

# Conclusion

The objective of this briefing was to provide an in-depth overview of the specific challenges and obstacles faced by intersex persons, by conducting an intersectional analysis of the data from the 2019 FRA LGBTI II survey. This process has allowed for detecting the following main points:

**1. Intersex people are among the most vulnerable groups among the LGBTI population**
Compared to all the LGBTI respondents to the survey, intersex respondents reported lower levels of life satisfaction, much higher difficulties in making ends meet and housing difficulties, higher prevalence of discrimination coupled with a much greater likelihood to indicate that they did not know how to report discrimination, did not trust authorities, and believed that nothing would happen. They also accounted for experiencing much higher obstacles to healthcare. Intersex people reported much higher exposure to physical and, especially, sexual attacks - in half cases the attacks were specifically based on the victim being intersex - and greater exposure to harassment.

**2. Intersex people from marginalised groups are at an increased vulnerability**
An intersectional analysis was necessary to spot the link between the diverse experiences and identities of intersex people and their respective exposure to several forms of fundamental rights' violations: intersex respondents from ethnic minorities and/or migrant backgrounds were more likely to experience homelessness and to avoid healthcare services; intersex people with disabilities reported lower levels of life satisfaction, were more exposed to having their needs ignored by healthcare staff when seeking to access healthcare services, and reported a dramatically high incidence of harassment; trans intersex women were disproportionately exposed to discrimination by healthcare or social services personnel and when looking for work and when at work; young intersex respondents and non-binary intersex respondents were more likely to feel discriminated against by school or university personnel; experiences of physical and/or sexual attacks were particularly prevalent among intersex trans people.

**3. Intersex people are subjected to non-vital non-consensual interventions and face severe obstacles in healthcare**
The majority of intersex people have faced, and still continue to face, systematic violations of their fundamental rights to self-determination and bodily integrity: A vast number of intersex respondents who were subjected to surgeries did not personally consent to the first decisions about their own bodies, as the majority of them stated that their "parents or someone else" or "no one" gave consent to their first treatment or intervention. In combination with a frequent lack of personal consent, the survey also points to the very low likelihood that the intersex person received detailed information. We can also infer from further responses to the survey that poor education and training on intersex people's needs and rights is a recurring issue. This does not only impact on the exposure to non-vital non-consensual interventions but also affects the intersex person throughout their life.

# Annex 1: Methodology and survey background information

**Background: FRA LGBTI II Survey 2019**

The statistics used to write this brief come from the 2019 EU LGBTI II Survey conducted by the European Union Agency for Fundamental Rights. The survey was open to individuals who were 15 years of age or older who self-identified as lesbian, gay, bisexual, trans and/or intersex. The survey was conducted online in 27 EU Member States, the UK, Serbia and North Macedonia between May and July of 2019. The respondents were asked a series of questions about their lived experiences, including information about their experiences of discrimination, harassment, violence, openness about their sexual orientation, gender identity, and sex characteristics, experiences in education and at work, their relationships and parenting, health, housing difficulties, living conditions and socio-economic status.

**Representativeness of the results used in the report**

The survey was available to LGBTI people who had access to the internet. As such, the survey did not provide a random sampling of LGBTI people, which would have made it representative of the LGBTI community in Europe. However, the weighting scheme developed by FRA (2019) [32], which adjusts the response numbers to better represent the LGBTI population as a whole across participating Member States, was applied to the data in this analysis so the results presented in the report are as representative of the population as possible.

**Sample**

This briefing provides information on intersex people. Respondents to the survey were able to indicate if they were intersex directly in question A5 [33]; respondents who indicated "yes" on this question were asked the intersex-specific questions in section IX. For the purpose of this briefing, this group was further narrowed based on answers to question IX1, which asked respondents about the nature of their variation in sex characteristics, as follows:

*IX1. What type of variation of your sex characteristics do you have (or were you treated for)? Read all options and select all that apply*

> A. Variation of sexual anatomy and/or reproductive organs
> B. Variation of chromosomes and/or hormonal patterns
> C. Variation of secondary characteristics and anatomical features such as muscle mass, hair distribution, breasts and other body features
> D. Other [IF SELECTED INSERT OPEN TEXT RESPONSE FIELD – MAX 70 CHARACTERS]
> E.  None of these
> F.  Prefer not to say

This briefing dropped all respondents who selected "E. None of these" or "F. Prefer not to say" from the analysis, because it was not possible to determine if they had described themselves as intersex in error. As such, this analysis focuses on a sample size of 877 respondents (0.63% of the total population of 139,799 respondents).

**Statistical methods**

The report is based on descriptive statistics extracted from the survey. The primary method used is cross tabulations, which is used to quantitatively analyse the relationship between multiple variables.

Page 22

32. FRA (European Union Agency for Fundamental Rights) (2020), A long way to go for LGBTI equality – Technical Report, Luxembourg, Publications Office. Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2020-lgbti-equality-technical-report_en.pdf
33.  FRA (European Union Agency for Fundamental Rights) (2020), A long way to go for LGBTI equality – Questionnaire, Luxembourg, Publications Office. Available from: https://fra.europa.eu/sites/default/files/fra_uploads/fra-2020-questionnaire-eu-lgbti-ii-survey_en.pdf