# EXHIBIT T

## Michigan Journal of Gender & Law

Volume 19 | Issue 2

2013

# Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People

Lisa Mottet
*National Gay and Lesbian Task Force*

Follow this and additional works at: https://repository.law.umich.edu/mjgl

Part of the Law and Gender Commons, Legislation Commons, Sexuality and the Law Commons, and the State and Local Government Law Commons

### Recommended Citation

Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 MICH. J. GENDER & L. 373 (2013).
Available at: https://repository.law.umich.edu/mjgl/vol19/iss2/4

This Article is brought to you for free and open access by the Journals at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in Michigan Journal of Gender & Law by an authorized editor of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

# MODERNIZING STATE VITAL STATISTICS STATUTES AND POLICIES TO ENSURE ACCURATE GENDER MARKERS ON BIRTH CERTIFICATES: A GOOD GOVERNMENT APPROACH TO RECOGNIZING THE LIVES OF TRANSGENDER PEOPLE

*Lisa Mottet**

INTRODUCTION   •   376

I.   UNDERSTANDING THE PROBLEM   •   379

    A.   *A Brief Overview of the Legal Landscape with Regard to Correcting Gender on Birth Certificates*   •   379

        1.   The Model State Vital Statistics Act (MSVSA)   •   380

        2.   Current U.S. State Law and Policies Overview   •   381

        3.   New Policy on Consular Reports of Birth Abroad and Passports   •   383

        4.   The U.K. Approach: The Gender Recognition Act of 2004   •   384

        5.   Argentina's New Law   •   385

---

   *   Transgender Civil Rights Project Director at the National Gay and Lesbian Task Force. I would like to thank the National Gay and Lesbian Task Force for establishing and continuing to fund my work at the Transgender Civil Rights Project since 2001. I would also like to thank Equal Justice Works for funding the first two years of the project through an Equal Justice Works Fellowship. Although this article represents scholarship conducted in large part outside of my role at the Task Force, I am indebted to the many law students and legal volunteers of the Task Force who helped with doing much of the background research, specifically Thomas Bousnakis, Alex Garnick, Ashland Johnson, and Yam Menon. I am incredibly appreciative to Donald Johnson who served as one of my research assistants for much of this project. I am also especially grateful to Vikram Swaruup who assisted with this article first as a legal fellow at the Task Force, and later by reviewing drafts and serving as one of my research assistants for this project. I am especially indebted to Professor Dean Spade who encouraged me to write; over the years, his work and thoughts have influenced mine, and while we do not always agree, he has been a visionary for change for the transgender and social justice movements. I am grateful to Professor Shawn Crincoli, Professor Julie Greenberg, Sarah Josephson, Anya Lakner, Dylan Orr, Harper Jean Tobin, and Janson Wu who reviewed drafts and provided insight into the best analysis to make and Donna Cartwright for editing. I am also grateful for the encouragement and support of my spouse, AJ Pearlman.

B. *An Overview of Gender Transition and its Relation to Corrections on Birth Certificates* • 386

C. *Data on the Ability to Correct Gender Markers on Birth Certificates* • 389

D. *The Importance of an Accurate Birth Certificate* • 391

   1. Purpose of a Birth Certificate • 391

   2. Legal and Practical Implications of an Inaccurate Gender Designation • 391

      a. *Initial Gender Designation on Governmental Identity Documents and Those Governmental and Non-Governmental Documents Derived Therefrom* • 392

      b. *Discrimination in Employment* • 393

      c. *Police, Security Personnel, and Others that Inspect Identification During Daily Life and Travel* • 395

      d. *Marriage Recognition* • 396

      e. *Health and Health Insurance Records* • 397

      f. *Access to, and Treatment in, Sex-Segregated Facilities* • 398

      g. *College Admissions* • 398

      h. *International Adoption* • 399

II. MODERNIZING THE LEGAL STANDARD FOR CORRECTING GENDER MARKERS • 399

A. *Overview of Existing Legal Standards* • 400

   1. Standard from the MSVSA, State, and Local Jurisdictions • 400

   2. Modernized Laws and Policies • 402

      a. *Washington* • 402

      b. *Vermont* • 402

      c. *California* • 403

      d. *Standard from Consular Reports of Birth Abroad* • 404

      e. *Standard from the United Kingdom's Gender Recognition Act* • 404

    B.  *Issues to Consider When Modernizing the Legal Standard*  •  405
        1.  A Surgical Requirement Contradicts Current Medical Understanding  •  405
        2.  Surgery is Not Common and is Often Unattainable  •  407
        3.  A Surgical Requirement is Inconsistent with Other Public Policies Related to Transgender People  •  410
        4.  Reasons Given for a Surgical Requirement are Not Valid  •  413
            a.  *Fraud or Security*  •  413
            b.  *Permanence of the Correction*  •  416
            c.  *Concerns About Sex-Specific Facilities and Situations*  •  417
        5.  Surgical Requirements Raise Serious Constitutional Concerns  •  422
    C.  *Specific Recommendation for Legal Standard for Gender Correction*  •  425
III.  DEVELOPING AN ACCESSIBLE AND EFFICIENT PROCEDURE FOR GENDER MARKER CORRECTIONS  •  427
    A.  *Existing Laws and Policies Related to Process*  •  428
    B.  *Issues to Consider When Designing a Correction Process*  •  431
        1.  Practical Concerns with the Court Order Process  •  431
        2.  Privacy Concerns with the Court Order Process  •  432
        3.  Concerns about Lack of Judicial Education and Bias Toward Surgery  •  433
        4.  Constitutional Problems with a Court Order Process  •  435
    C.  *Specific Recommendation for the Gender Correction Process*  •  435
IV.  ESTABLISHING COMPREHENSIVE PRIVACY PROTECTIONS  •  437
    A.  *Existing Privacy Protections*  •  437

1. Privacy Protections in the MSVSA • 437
   a. *New Versus Amended Certificates* • 437
   b. *Treatment of Name Changes in the MSVSA* • 439
   c. *Records Storage and Accessibility in the MSVSA* • 439
2. State Laws and Policies Related to Privacy • 440
3. Privacy for Consular Reports of Birth Abroad • 443
4. Privacy Protections in the U.K. and Argentina • 443

B. *Issues to Consider When Developing Privacy Policies* • 444
   1. The Individual Importance of Privacy • 444
   2. Constitutional Right to Privacy • 444

C. *Specific Recommendations Related to Privacy Protections* • 446

V. RECOMMENDED LANGUAGE AND POLICY • 447
A. *The Model Provision* • 447
B. *Implementation* • 450

CONCLUSION • 451

## INTRODUCTION

Across the country, laws governing corrections to gender markers on birth certificates are relatively uniform, in large part because many states adopted the relevant provisions of the 1977 revision of the Model State Vital Statistics Act (MSVSA). The MSVSA, developed by the U.S. Department of Health and Human Services, guides states on the most efficient laws and procedures related to maintaining accurate birth, death, and other vital records at the state, local, and territorial level. At the time when the government promulgated the MSVSA provision related to gender corrections, it served as a forward-thinking model because it acknowledged that vital records should be corrected in the case of individuals who change their gender. Specifically, the 1977 MSVSA recommended that corrections to gender markers on birth certificates be granted after applicants change their

sex by "surgical procedure" and provide a court order to that effect.[1] Additionally, the MSVSA recommended that the correction be kept private.[2]

Over the past three decades, transgender legal rights have advanced and understanding of transgender medicine has evolved. Experts in transgender law and medicine entirely reject the idea that recognition of a person's gender should come only after surgery. This notion has also been significantly eroded in law and policy. Yet, with the exception of new laws and/or policies in three states,[3] birth certificate statutes and policies have yet to be modernized in this respect.

Other scholars have examined the harms to transgender people caused by medically out-of-date policies related to updating gender markers on identity documents and have suggested general frameworks for updating these policies.[4] This Article focuses more specifically on birth certificates by providing a detailed analysis of the rules governing a change in gender markers for all United States jurisdictions that issue them. It also presents policymakers with model statutory and policy language and is the first to resolve this issue within the framework of good government practices in addition to transgender rights.

This Article explains why and how state, local, and territorial birth certificate laws and regulations ought to be revised based on changes in law and medicine. In addition, the Article discusses public policy factors that governments should consider when modernizing their policies, including the cost of various policies and the policies' legal and practical effects on the lives of transgender people.

After providing important background information about gender transition and the state of the law in Section I, the Article discusses three aspects of birth certificate laws and policies. In Section II, it examines the standard of proof—the evidence a person must demonstrate to be eligible for the correction. In Section III, the Article considers the procedure by which the correction is authorized—primarily whether an individual must

---

1. MODEL STATE VITAL STATISTICS ACT AND REGULATIONS § 21(e) (Ctr. for Disease Control & Prevention 1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf.

2. *See infra* notes 245–48 and accompanying text.

3. The exceptions are California, Washington, and Vermont, each of which has updated statutes or policies in the last several years. *See infra* Part II. A. 2.

4. *See* Dean Spade, *Documenting Gender*, 59 HAST. L.J. 731 (2008); Harper Jean Tobin, *Against the Surgical Requirement for Change of Legal Sex*, 38 CASE W. RES. J. INT'L L. 393 (2005) [hereinafter Tobin, *Against the Surgical Requirement*]; Harper Jean Tobin, *Fair and Accurate Identification for Transgender People*, HARV. KENNEDY SCH. LGBTQ POL'Y J. (2011), *available at* http://isites.harvard.edu/icb/icb.do?keyword=k78405&pageid-icb.page414493 [hereinafter Tobin, *Fair and Accurate Identification*].

obtain a court order or whether that individual can go directly to the vital statistics agency for the correction. In Section IV, the Article analyzes privacy protections, or their lack thereof, that exist in these policies.

In each of these sections, the Article documents the state of the law, presents issues to consider when designing a new policy, including constitutional considerations, and provides detailed recommendations for a modernized statute. The Article reviews the relevant MSVSA provisions, provides an overview of birth certificate laws in the fifty-seven state, local, and territorial jurisdictions[5] that administer birth certificates, and examines in greater detail the laws of states which have policies that might serve as models. Where relevant, the Article also describes the 2010 policy regarding federal birth certificate equivalents (known as "Consular Reports of Birth Abroad") for U.S. citizens born outside of the country, as well as the approaches taken by the United Kingdom and Argentina.

Ultimately, in Section V, the Article delineates a model statute for the 21st century, recommending statutory language to be used by state, local, and territorial legislatures, vital statistics agencies, and the U.S. Department of Health and Human Services in future revisions of the MSVSA.[6] Adoption of the language presented here will ensure implementation of a vital statistics system that meets four goals: (1) issuance of accurate birth certificates in accordance with contemporary medical standards, (2) efficient use of government resources, 3) respect for constitutional rights, and (4) proper consideration of both the human and legal effect of an accurate birth certifi-

---

5. The fifty-seven jurisdictions are the fifty states, Guam, Puerto Rico, United States Virgin Islands, American Samoa, Commonwealth of the Northern Mariana Islands, New York City, and the District of Columbia. *See infra* app. A.

6. The U.S. Department of Health and Human Services is currently revising the Model State Vital Statistics Act. *See* Ctrs. For Disease Control & Prevention, *2011 – Model Law Revision*, http://www.cdc.gov/nchs/nvss/model_law_revision.htm (last updated Nov. 10, 2009). I am indebted to my colleagues Mara Keisling and Harper Jean Tobin of the National Center for Transgender Equality, Masen Davis and Kristina Wertz of the Transgender Law Center, Dean Spade of the Sylvia Rivera Law Project, Dru Levasseur of Lambda Legal, Shannon Minter of the National Center for Lesbian Rights, and Jennifer Levi and Janson Wu of the Gay & Lesbian Advocates & Defenders with whom I have discussed and debated extensively the best legislation and policy in this arena. My recommendations are sharper because of their insight. Furthermore, our organizations were, in 2009, able to make a collective recommendation to the Model State Vital Statistics Working Group of the National Center for Health Statistics of the U.S. Department of Health and Human Services, as it considers revisions to the MSVSA. *See* Harper Jean Tobin, Nat'l Ctr. Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). The recommended legislation in this Article deviates from that collective recommendation in some important respects and should not be taken as the recommendation of my colleagues.

cate. In certain states, this recommended statutory language could be adopted as regulations or written policy to the same positive effect.

While the changes discussed in this Article to vital statistics laws and policies can seem technical in nature, the effect of not having government documentation that matches one's gender identity is tremendous. Although for many, lack of accurate documentation may trigger smaller problems caused by undesired disclosure of their transgender status, for others, the lack of government documentation can have dire effects. Policies that provide transgender people with identity documents that match their gender identity give them a better chance to live life in their gender, and avoid bias, discrimination, and violence in the areas most critical to quality of life, such as employment, housing, and education.

Finally, there is another benefit—to governments and to transgender people—that may result from modernizing birth certificate statutes and policies. Currently, courts struggle to determine the appropriate assessment of legal gender, and often settle on finding physical attributes or presumed genetic traits of the body to be determinative.[7] Transgender rights litigators, aware that relying upon bodily attributes to define legal gender leaves a large majority of transgender people without recognition, often with disastrous consequences, instead point to gender identity—a person's innate sense of themselves as male or female—as the relevant legal determinant.[8] If birth certificate laws and policies were reformed in the manner described in this Article, both courts and litigators could find a mutually satisfactory path forward. Courts would be able to defer to a person's official gender marker on his or her birth certificate, and transgender rights litigators would be satisfied because the ability to change the gender marker on one's certificate would be accessible to all transgender people who undergo gender transition.

## I. Understanding The Problem

### A. A Brief Overview of the Legal Landscape with Regard to Correcting Gender on Birth Certificates

For decades, various government agencies have recognized that those who transition gender should be able to correct the gender on their identity documents. The following section provides an overview of the legal and

---

7. *See, e.g.*, *In re* Estate of Gardiner, 42 P.3d 120 (Kan. 2002); Littleton v. Prange, 9 S.W.3d 223 (Tex. Ct. App. 1999); Kantaras v. Kantaras, 884 So. 2d 155 (Fla. Dist. Ct. App. 2004).

8. Interview with Dru Levasseur, Transgender Rights Attorney, Lambda Legal in New York, N.Y. (October 12, 2012).

policy approaches taken in the United States related to correcting gender markers, as well as information about the approaches taken in the United Kingdom and Argentina for comparison.

## 1. The Model State Vital Statistics Act (MSVSA)

The first Model State Vital Statistics Act[9] was issued in 1907 by the United States Census Bureau.[10] The stated purpose of having an MSVSA is to "promote uniformity among States in definitions, registration practices, disclosure and issuance procedures, and in many other functions that comprise a State system of vital statistics."[11]

Since its inception, the MSVSA has been updated only five times, with the most recent version being released in 1992. The 1977 version of the MSVSA was the first to address corrections to gender markers. The 1992 revision did not alter the language regarding gender markers; thus, today, the MSVSA reflects the best thinking of 1977 on gender corrections. It is quite remarkable that the MSVSA included language regarding these corrections in 1977, as transgender people had only been in national public consciousness beginning in the 1950s.[12]

The MSVSA is currently under review for additional revisions, a multi-year process that started in 2009 and was expected to conclude in 2011, although it has not yet been completed.[13] Organizations engaging in

---

9.  Although I abbreviate the Model State Vital Statistics Act as MSVSA, the U.S. Department of Health and Human Services refers to it as the "Model Law" or "Model Law and Regulations." *See* MODEL STATE VITAL STATISTICS ACT AND REGULATIONS (1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf. Because this Article sets out its own model law, I use the MSVSA abbreviation to avoid confusion for the reader.

10. The 1942 version was also drafted by the Census Bureau. NAT'L CTR. FOR HEALTH STATISTICS, U.S. DEP'T OF HEALTH & HUMAN SERVS., U.S. VITAL STATISTICS SYSTEM: MAJOR ACTIVITIES AND DEVELOPMENTS, 1950–95 5 (1997), *available at* http://www.cdc.gov/nchs/data/misc/usvss.pdf. In 1946, the responsibility for the MSVSA was transferred to the U.S. Department of Health, Education and Welfare, which issued the 1959 version. *Id.* at 6. The Department of Health, Education and Welfare was split, and became the Department of Health and Human Services (HHS) and Department of Education. HHS now issues the MSVSA.

11. CTR. FOR DISEASE CONTROL & PREVENTION, *Preface* to MODEL STATE VITAL STATISTICS ACT AND REGULATIONS (1992).

12. In the early 1950s, Christine Jorgensen's gender transition was well-documented by national media. *See Medicine: The Case of Christine*, TIME, Apr. 20, 1953, http://www.time.com/time/magazine/article/0,9171,822780,00.html.

13. Cathy Molchan Donald, Karen Hampton & Linette Scott, Model Law Work Group Progress Report at The Joint Annual Conference of National Association for Public Health Statistics and Information Systems and the National Center for Health Statistics (June 7, 2010) (PowerPoint presentation available at http://www.naphsis.org/mtg/Pages/2010AnnualMeetingPowerPointPresentationLibrary.aspx).

Case 1:25-cv-10313-JEK    Document 33-9    Filed 02/18/25    Page 11 of 100

2013]    MODERNIZING STATE VITAL STATISTICS STATUTES    381

advocacy for the lesbian, gay, bisexual, and transgender (LGBT) communities have submitted recommendations to the Department of Health and Human Services on this issue, but it is not yet clear to what extent these will be adopted.[14]

## 2. Current U.S. State Law and Policies Overview

In addition to the fifty states, birth certificates are issued by the District of Columbia, New York City, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the United States Virgin Islands.

Twenty-nine of these fifty-seven jurisdictions[15] explicitly allow for gender corrections on birth certificates in their statutory codes, potentially with accompanying policies or regulations to implement the statute. Nine more jurisdictions[16] deal with gender corrections only in their regulations while two have written, sub-regulatory policies.[17] Ten operate without a written policy, or at least not one available to the public, but will correct the birth certificate upon court order or doctor's affidavit, generally using the same procedure for other corrections.[18]

In total, forty-six states, the District of Columbia, New York City, Guam, and Northern Mariana Islands clearly allow people to correct their gender marker.[19] Oklahoma, Texas, and American Samoa do not have clear policies on whether or not changes are actually allowed. Tennessee has the only explicit statutory ban on correcting gender markers;[20] for various reasons, Idaho, Ohio, and Puerto Rico also do not allow individuals to correct gender. Ohio does not correct gender markers as a result of a trial court decision that interpreted its ambiguous statute regarding birth certificate

---

14. Tobin, *supra* note 6.
15. The twenty-nine jurisdictions are Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Illinois, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New Hampshire, New Mexico, North Carolina, Oregon, Utah, Vermont, Virginia, Wisconsin, the District of Columbia, Guam, and the Commonwealth of Northern Mariana Islands. For citations to the relevant laws in these jurisdictions, *see infra* app. A.
16. These are Delaware, Kansas, Maine, Mississippi, Montana, North Dakota, Nevada, Wyoming, and New York City. *See infra* app. A.
17. These are New York State and Washington. *See infra* app. A.
18. These are Alaska, Florida, Indiana, Minnesota, Pennsylvania, Rhode Island, South Carolina, South Dakota, West Virginia, and United States Virgin Islands. *See infra* app. A.
19. *See infra* app. A for a comprehensive listing of these statutes and regulations.
20. "The sex of an individual will not be changed on the original certificate of birth as a result of sex change surgery." TENN. CODE. ANN. § 68-3-203(d) (West 1997).

amendments to disallow gender marker corrections.[21] Idaho's state vital statistics agency does not interpret its general authority to make corrections on certificates to include the authority to make corrections for gender markers.[22] Puerto Rico does not make corrections based on a 2005 Puerto Rico Supreme Court decision.[23]

Of the fifty-three jurisdictions that allow gender marker changes to birth certificates, twenty-five require a court order,[24] twenty-one utilize an administrative process,[25] and a handful allow either process[26] or have unclear procedures.[27] Most jurisdictions do not have clear policies carefully guarding the privacy of people who have corrected their gender. The poli-

---

21. *In re* Ladrach, 513 N.E.2d 828 (Ohio Prob. Ct. 1987) (finding the statute only authorized corrections if there was an error at the time of birth, thus only permitting a probate court to correct a fact that was inaccurate at the time of birth in the court's view). However, since the case was decided, the statute related to corrections (now also called amendments) has changed. The current provision is now titled "Amended records" (changed from "[c]orrection of birth record") and refers to corrections and amendments, whereas the old statute referred only to facts that have "not been properly and accurately recorded." *Compare* OHIO REV. CODE ANN. § 3705.20 (Lexis-Nexis 1980) *with* OHIO REV. CODE ANN. § 3705.22 (West 2011). Therefore, there is a textual argument that the new text is not as limiting, and that the measure of accurateness could be taken as a contemporary measure, as opposed to one connected to a person's time of birth.

22. The Idaho statute provides that "alterations" may be made to birth records in accordance with the statute or rules promulgated by the State Board of Health and Welfare. *See* IDAHO CODE ANN. § 39-250 (West 2010). Lambda Legal indicates that there is anecdotal evidence that the agency does not allow gender changes on birth certificates. *Sources of Authority to Amend Sex Designation on Birth Certificates*, LAMBDA LEGAL, http://www.lambdalegal.org/publications/sources-of-authority-to-amend (last updated Oct. 3, 2012). Idaho's statute also notes that an amendment denied by the Registrar may be appealed to a court of law. *See* IDAHO CODE ANN. § 39-250(5) (West 2010). However, there is no published case law of a person attempting to appeal a denial to a court; thus, there could be an opening for an individual to achieve gender change through a court appeal.

23. *Ex Parte* Alexis Delgado Hernandez, 2005 TSPR 95 (P.R. 2005) (holding that a transgender person may not correct the gender on one's birth certificate).

24. The twenty-five jurisdictions that require a court order are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, New Hampshire, Nevada, Oregon, South Dakota, Utah, the Virgin Islands, Virginia, Vermont, Wisconsin, Wyoming, the District of Columbia, and the Northern Mariana Islands. *See infra* app. A.

25. The twenty-one jurisdictions that do not require a court order are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kansas, Kentucky, Massachusetts, Maine, Michigan, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, Washington, New York City, and Guam. *See infra* app. A.

26. Minnesota, Pennsylvania, and West Virginia allow individuals to use either a court order or an administrative process. *See infra* app. A.

27. Four jurisdictions have unclear procedures: Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

cies of all fifty-seven U.S. jurisdictions that administer birth certificates are summarized in a chart in Appendix A.

### 3. New Policy on Consular Reports of Birth Abroad and Passports

The U.S. Department of State, in June of 2010, updated its policy with regard to Consular Reports of Birth Abroad of U.S. Citizens (CRBAs) and passports.[28] CRBAs are provided to U.S. citizens who were born outside the U.S., where the fifty-seven birth certificate issuing agencies do not have jurisdiction. CRBAs are functionally equivalent to birth certificates for those born in the United States; they prove citizenship, identity, and other information about the person's circumstances of birth.

Since at least 1992, the Department of State has required proof of "sex reassignment surgery" to correct gender on passports, and the same policy was presumably applied to CRBAs.[29] In an effort to modernize its policy in accord with medical standards, the Department of State adopted a new policy simply requiring that an applicant's treating or evaluating physician write a letter certifying that a person "has had appropriate clinical treatment for gender transition to the new gender."[30]

---

28. *New Policy on Gender Change in Passports Announced*, U.S. DEP'T OF STATE (June 9, 2010), http://www.state.gov/r/pa/prs/ps/2010/06/142922.htm. There were slight, but important, changes to the policy in January 2011. *VICTORY: State Department Makes Additional Changes*, ADVANCING TRANSGENDER EQUALITY (Jan. 28, 2011, 6:58 PM), http://transgenderequality.wordpress.com/2011/01/28/victory-state-department-makes-additional-changes.

29. The 1992 State Department policy regarding passports required "sex reassignment surgery" to permanently change the gender marker on one's passport and on its face did not deal with CRBAs. U.S. DEP'T OF STATE, PASSPORT BULLETIN 92-22 (1992). However, in the new policy for passports, the Foreign Affairs Manual explains that: "The . . . Consular Report of Birth Abroad of Citizen of the United States of America, can be amended by the Vital Records Section of Passport Services . . . to reflect the change in gender. The same documentary requirements specified above for passport services would pertain to amending gender in a [CRBA]." U.S. DEP'T OF STATE, 7 FOREIGN AFFAIRS MANUAL 1340 app. M (2012), *available at* http://www.state.gov/documents/organization/143160.pdf. I have not located an old policy that specifically applies to CRBAs. It is also possible that: (1) gender corrections on CRBAs were denied entirely, (2) gender corrections were processed under an old policy that is not publicly available, or (3) gender corrections were processed utilizing no written policy and therefore were not standardized. Regardless, because the Passport Vital Records section processes the corrections, the standard of proof for CRBAs was likely the same as that for passports.

30. U.S. DEP'T OF STATE, 7 FOREIGN AFFAIRS MANUAL 1320 app. M(b)(1)(g) (2012), *available at* http://www.state.gov/documents/organization/143160.pdf.

### 4. The U.K. Approach: The Gender Recognition Act of 2004

The United Kingdom enacted a groundbreaking statute in 2004 when it passed the Gender Recognition Act. This statute is understood as the first national statute to recognize the gender of transgender people who transition without surgical procedures. Other countries have considered or adopted similar approaches, some being more or less restrictive.[31]

The Gender Recognition Act, passed in response to the 2002 decision in *Goodwin v. United Kingdom*, required the government to develop a system to recognize the post-transition gender of transgender people, finding that failure to provide such recognition was a human rights violation.[32]

The Gender Recognition Act does not require any specific medical treatment; however, it requires: (1) a diagnosis of Gender Dysphoria,[33] (2)

---

31. The United Kingdom law is included here because it is the basis for many of the other laws, and full texts of other laws, other than Argentina's, are not available in English. In 2007, Spain passed a law similar to the Gender Recognition Act, although hormonal treatment is required unless advanced age or medical concerns exist. Marc-Roger Lloveras Ferrer, *A Spanish Law for Transsexual Citizens*, InDret (2008), http://ssrn.com/abstract=1371559. In 2009, Uruguay passed a law that allows gender amendments after a showing the person has gender dysphoria, with no medical treatment required, but the diagnosis has to be persistent and stable for two years, and amendments are only available to those over eighteen. Derecho A La Identidad De Género Y Al Cambio De Nombre Y Sexo En Documentos Identificatorios (Parliament Law No. 18, 620/2009) (Uruguay), *available at* http://www0.parlamento.gub.uy/leyes/AccesoTextoLey.asp?Ley=18620&Anchor=. In 2011, Portugal enacted a law, considered less restrictive than both the United Kingdom and Spanish laws, which replaced its law requiring a court order and sex reassignment surgery. The Portuguese law requires a report from medical professionals to be submitted to the Civil Registry, one being a psychiatrist and the other a psychologist, with no reported apparent time or age requirement. Cria o procedimento de mudança de sexo e de nome próprio no registo civil e procede à décima étima alteração ao Código do Registo Civil (No. 7/2011) (Portugal), *available at* http://dre.pt/pdf1sdip/2011/03/05200/0145001451.pdf.

32. Goodwin v. United Kingdom, VI Eur. Ct. H.R. (2002).

33. "*Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." World Prof'l Ass'n for Transgender Health, Standards of Care 5 (7th ed. 2011). Currently, the Diagnostic and Statistical Manual, published by the American Psychiatric Association, uses the slightly different diagnostic term, "Gender Identity Disorder," and the International Classification of Diseases uses the diagnostic term "transsexualism." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual 576 (4th ed., 2000); *see also* World Health Org., International Classification of Diseases (10th ed. 2010), http://apps.who.int/classifications/icd10/browse/2010/en#/F64. The next version of the DSM, to be officially released in 2013, will use "Gender Dysphoria." *See* Rosie Mestel, *Changes to the Psychiatrists' Bible, DSM: Some Reactions*, L.A. Times, December 9, 2012, http://www.latimes.

that people live in their "acquired gender" for at least two years and intend to do so until death, and (3) documentation from two medical professionals.[34] Upon submitting satisfying evidence to the Gender Recognition Panel,[35] people receive a Gender Recognition Certificate, a new entry in the birth registry,[36] and general recognition that they are the new gender as a legal matter.[37] The law requires that information about the gender correction is kept confidential throughout the process.

### 5. Argentina's New Law

In May of 2012, Argentina became the first country to allow transgender people to update the gender marker on their birth certificates with no requirement for them to show any medical condition or supervision.[38] People over eighteen have the right to update gender markers and first

com/health/boostershots/la-heb-dsm5-american-psychiatric-association-20121207,0, 1392058.story. Despite the different terminology, these are roughly equivalent diagnoses. All of the diagnoses are controversial. *See, e.g.*, Kate Richmond & Kate Sheese, *Gender Interrupted: Controversy & Concerns about Gender Identity Disorder (GID)*, ASS'N FOR WOMEN IN PSYCHOLOGY, http://www.awpsych.org/index.php?option= com_content&view=article&id=96&catid=74&Itemid=126 (last visited Dec. 25, 2011).

34. Gender Recognition Act 2004, c. 7 § 2 (U.K.).

35. *Id.* at c. 7 § 1 (U.K.).

36. *Id.* at c. 7 § 10 sch. 3 (U.K.).

37. Generally, having a Gender Recognition Certificate entitles the holder to be legally recognized as that gender for the majority of purposes. *Id.* at c. 7 §§ 9–21 (U.K.). Exceptions include: religious officials do not need to perform marriages involving a holder of a Gender Recognition Certificate, sports organizations are exempt from recognizing the gender if it would affect "fair competition" or the "safety of competitors," and, for crimes where gender is a relevant factor, the acquired gender will not be recognized. *Id.* at c. 7 § 11 sch. 4, c. 7 §§ 19–20 (U.K.). One very controversial part of the law is the provision of only Interim Recognition Certificates to transgender people who are married at the time of application. *Id.* at c. 7 § 4 (U.K.). The individual must either divorce or get an annulment in order to receive a full Gender Recognition Certificate. *Id.* Couples in this situation who desire to stay in a legally-recognized relationship must then receive a "Civil Partnership" which provides some, but not all, the rights and responsibilities of marriage to same-sex couples in the U.K. Civil Partnership Act 2004, ch. 33 (U.K.). This has been criticized by Press for Change, the U.K.'s transgender advocacy group, as requiring individuals to choose between "their marriage and another human right." Camillo Fracassini, *Sex-Change Couple Seek Marriage Recognition*, THE SUNDAY TIMES, Oct. 30, 2005, http://www.timesonline.co.uk/tol/news/uk/scotland/article584590.ece.

38. The new law, Regime for Recognition and Respect for Gender Identity, also granted updated national identity cards as well as a right to medical treatment under all health care systems and plans in the country. Law No. 26.743, May 23, 2012, 32.404 B.O. 1, 2 (Arg.), *available at* http://www1.hcdn.gov.ar/proyxml/expediente. asp?fundamentos=si&numexp=8126-D-2010. An English translation is available at http://www.msmgf.org/files/msmgf//Advocacy/Argentina_GenderIdentity_Law.pdf.

names upon request. Those under eighteen must also have their legal representative (which will likely be their parent) or a judge agree to the correction. The law is explicit that no surgical, hormonal, or psychological treatment of any kind can be required.[39] The birth certificate and information about the corrections are kept confidential and are accessible only by court order.

Although this law is relatively new and has not yet been emulated by other countries, the explicit shift from any proof of gender identity, other than the person's statement, is enlightening and encouraging.[40]

### B. An Overview of Gender Transition and its Relation to Corrections on Birth Certificates

A short review of terminology related to transgender people and gender transition is helpful before going any further.

*Transgender* is used generally as a broad term to refer to all of those whose gender identity[41] or expression[42] does not match the social attributes of the gender that they were assigned at birth.[43] While the term "transgender" is used appropriately to refer to a range of people, including transsexuals, cross-dressers, genderqueers, the androgynous, and many other identities, this Article only addresses one specific type of transgender per-

---

39. *Id.* at Art. 4.

40. While Argentina's new law should be considered for the basis of the recommendations made in this Article, I have chosen to factor in the political landscape of this country in shaping the more conservative recommendations found herein.

41. *Gender identity* is used to mean an individual's internal sense of being male, female, or another gender.

42. *Gender expression* is used to mean how individuals outwardly indicate their gender identity to others, often through behavior, clothing, hairstyle, voice or body characteristics.

43. National Center for Transgender Equality, *Transgender Terminology* (May 2009), http://transequality.org/Resources/NCTE_TransTerminology.pdf.

son—those who undergo gender transition to live their life as a gender different from their sex[44] assigned at birth.[45]

*Gender transition* is the process of beginning to live and outwardly express a gender different from one's assigned gender at birth.[46] Gender transition is not undertaken casually, as it is often accompanied by a wide range of negative social consequences, including rejection by friends or family, losing one's job, or even being physically attacked. Gender transition is

---

44. Throughout this article, the terms *sex* and *gender* are used interchangeably, with a tendency for *sex* to be used in contexts where a statute uses that term, and "gender" to be used otherwise. Some believe that the two terms have different meanings and should be used accordingly. *What Do We Mean by "Sex" and "Gender"?*, WORLD HEALTH ORGANIZATION, http://www.who.int/gender/whatisgender/en/ (last visited Dec. 25, 2011). In that conception, *sex* refers to one's biological status and *gender* refers to the social identity and expression of being male and/or female. *Id.* However, the Supreme Court uses both terms in its jurisprudence relating to women's constitutional rights and Congress also has used both *sex* and *gender* in different civil rights statutes, while not intending a different meaning. *See* Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (collapsing the distinction between biological status and social expectations for the purposes of Title VII analysis); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000) (using the framework of *sex* under Title VII under the Gender Motivated Violence Act). This Article uses the terms interchangeably because interpreting them in a legal context to mean separate things would lead to absurd results. Furthermore, the conception of sex being biologically based tends to imply, incorrectly, that the biology of sex is clear cut and easy to measure, when in fact, much more diversity exists. *See* Erwin K. Koranyi, *Transsexuality Revisited*, 16 AUSTRL. J. OF FORENSIC SCI. 34, 37 (1983) *available at* http://www.tandfonline. com/doi/abs/10.1080/00450618309410678 ("Sex of a person—a simple 'yes' or 'no' before—was broken down by Science to chromosomal sex, nuclear sex, hormonal sex, gonadal sex, and gender sex- to the dismay of courts, finding scientists in argument over as 'simple' a question as whether the subject is male or female.").

45. This subset of the transgender community are sometimes called *transsexuals* to distinguish them from others covered by the broad term *transgender*. However, many transsexual people, as well as advocates for equality, disfavor the term *transsexual* as overly medical, scientific, and technical, or because the word's integration of the term *sex* could be taken to sexualize the person. In addition, *transsexual* is often used by those who oppose equal rights as an inflammatory and disrespectful term. *See, e.g., 'Speechless' awaits March premiere*, AM. FAMILY ASS'N J., Feb. 2008, http://www. afajournal.org/0208afa_insp.asp (referring to homosexuals and transsexuals with regard to federal legislation); *Transgendered Confu-; Homosexual movement takes U.S. into bizarre world*, AM. FAMILY ASS'N, Oct. 2000, http://www.afajournal.org/2000/ 102000AFAJ.pdf (using the term transsexual repeatedly to refer to transgender people). This phenomenon is similar to how many gay and lesbian people prefer these identity terms over the more scientific and sexualizing term "homosexual." GLAAD, MEDIA REFERENCE GUIDE 6, 8 (8th ed. 2010) (noting that many transgender people prefer "transgender" to "transsexual"). In respect for the generally favored terminology preferences of the community, this article uses the term "transgender" throughout, unless describing case law that uses other terminology.

46. Gender transition may happen, or appear to happen, over a short period of time or a long period of time, depending on the individual.

often mistaken as referring only to the process of altering one's hormonal makeup and other bodily characteristics to match one's gender identity. However, gender transition actually refers primarily to the *social process* of transition, and includes the process of changing one's name (if needed or desired), updating identity documents and records (if able to do so), in addition to taking medical steps, depending on the individual.

The medical processes, for those who undergo them, are incredibly important. The American Medical Association has recognized that treatment is effective and medically necessary and has recommended that public and private health insurance systems cover care related to gender transition.[47] According to the expert medical consensus,[48] treatment can consist of four therapeutic options: 1) changes in gender expression or role, 2) hormone therapy, 3) various surgeries,[49] and 4) psychotherapy.[50] Whether a person should undergo all four or just one of the options is determined based on the needs of the individual. It is important to realize that those who undergo only changes in their gender expression or role (the first option) are still considered to have made a *medical* transition.[51]

Name and gender are the two pieces of information that transgender people typically seek to correct on their birth certificates. Although the process and accessibility of *name* changes are not going to be addressed by this Article,[52] the Article will address the privacy concerns regarding name

47. AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION 122 (2008).

48. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33; *infra* Section II.B.1.

49. Despite the popular conception of one surgery that completely transforms a person's gender, in reality, there are many different surgical options. For example, breast or chest surgery, metoidioplasty, phalloplasty, penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty, hysterectomy/ovariectomy, facial feminization surgery, voice surgery, thyroid cartilage reduction, vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses are some of the primary surgical options, although others exist. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 57–58, 62–64.

50. Psychotherapy may be important for: "exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience." *Id.* at 10.

51. The medical seriousness of changing gender role is apparent throughout the WPATH Standards of Care. For example, changes in gender role are supposed to be recorded in a person's medical chart and changes in gender role are required for 12 months before genital surgeries. *Id.* at 61.

52. To receive a name change, one typically has to receive a court order and go through a publication process, although sometimes courts allow the publication requirement to be waived due to privacy concerns. *See, e.g.,* TRANSGENDER LAW CENTER, ID PLEASE. . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

changes related to gender transition. Importantly, not all transgender people choose to change their names. Some may have a gender-neutral name and keep it, or may initially keep it and decide to change it later. Others may choose to keep what others consider a gender-specific[53] name for personal reasons, despite the fact that it does not "match" their gender identity. Regardless, not all transgender people change their name and name changes will not necessarily occur before or simultaneously with the request to correct their gender marker.

### C. Data on the Ability to Correct Gender Markers on Birth Certificates

In order to understand the impact of birth certificate laws and policies, newly available data describing the ability of transgender people to correct gender on their birth certificates in the United States should be examined. Specifically, reporting on only those individuals who are already living full-time as a gender different from the gender that they were assigned at birth, the National Transgender Discrimination Survey[54] found:

- 24% were able to correct the gender marker on their birth certificates;

- 18% were denied the correction, and;

- 53% had not attempted to correct their birth certificate.[55]

Many of the 53% who did not attempt to correct their birth certificates likely chose not to try because they knew they would not meet the requirements of the established policies; for example, they may not have had a required surgery. The data appear to confirm this, with higher rates of attempting to change one's gender marker among those who have had surgery:

---

53. Gender associations of first names are somewhat arbitrary and have a tendency to change over time. *See, e.g.,* Stanley Lieberson, Susan Dumais & Shyon Baumann, *The Instability of Androgynous Names: The Symbolic Maintenance of Gender Boundaries,* 105 AM. J. SOC. 1249 (2000) (describing 80 years of naming practices in Ohio and noting how names changed with regard to being considered feminine or masculine).

54. The National Transgender Discrimination Survey, conducted in 2008–09 both in paper and online, had 6,456 respondents from all fifty states, D.C., the U.S. Virgin Islands, Puerto Rico, and Guam. For a detailed description of the methodology, see JAIME M. GRANT ET. AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 12–15 (2011).

55. *Id.* at 143. Five percent of the respondents selected "not applicable" in response to the birth certificate question. These individuals likely either "did not have a birth certificate or they did not desire to change it." *Id.*

| Description of Respondents[56] | % Who Attempted to Correct Birth Certificate[57] |
|---|---|
| Transgender Women with Some Type of Surgery | 65% |
| Transgender Men with Some Type of Surgery | 56% |
| Transgender Women with No Surgery | 28% |
| Transgender Men with No Surgery | 12% |

In addition, those who have had some type of surgery were more than six times as likely to have been able to correct their gender marker than those who have not had any surgery (39% compared to 6%).[58] Yet, notably, even surgery does not guarantee the approval of a gender marker correction. Twenty percent (20%) of people who had some surgery were still denied the correction.[59] Some courts and state agencies also appear to consider the *type* of surgery undergone, summarized in the following chart.[60]

| Description of Respondent | % Who Received a Corrected Birth Certificate |
|---|---|
| Transgender Women with Any Surgery | 43% |
| Transgender Women with Breast Surgery | 32% |
| Transgender Women with Orchiectomy[61] or Vaginoplasty[62] | 74% |
| Transgender Men with Any Surgery | 37% |
| Transgender Men with Chest Surgery | 56% |
| Transgender Men with Metoidioplasty[63] | 82% |
| Transgender Men with Phalloplasty[64] | 78%[65] |

---

56. Transgender woman refers to a person who was assigned male at birth and now lives as a woman. Transgender man refers to a person who was assigned female at birth and now lives as a man.

57. GRANT ET AL., *supra* note 54, at 143–44.

58. *Id.* at 144.

59. *Id.*

60. *Id.* at 143–44.

61. Orchiectomy refers to the "surgical removal of the testes (the scrotum and testicles)." *Id.* at 181.

62. Vaginoplasty refers to the "surgical creation of a vagina." *Id.*

63. Metoidioplasty is a "surgical procedure to create a neopenis by releasing and extending the clitoris, often combined with surgery to allow for urination through the penis." *Id.* at 181.

64. Phalloplasty refers to the "surgical creation of a penis." *Id.* at 181.

65. Note that the different rates of ability to change their birth certificates between metoidioplasty (82%) and phalloplasty (78%) may not be meaningful because of the

These data show that courts and agencies are looking at the specific types of surgeries[66] individuals undergo and are making the determination that many do not meet the standard in their current law or policy to receive a gender marker correction.

### D. The Importance of an Accurate Birth Certificate

#### 1. Purpose of a Birth Certificate

According to the Office of Inspector General at the Department of Health and Human Services, birth certificates provide "vital information about the person whose name appears on the certificate (e.g., legal proof of parentage, citizenship, date, place, and time of birth)."[67] While originally intended as a record of the existence and circumstances of birth, the birth certificate is now used widely in determining eligibility for employment, obtaining other documents (e.g., driver's licenses, Social Security cards, passports, and other state identification documents), establishing school records, proving age, and enrolling in government programs.[68] Thus, the birth certificate is currently used as an identity document[69] and has evolved away from being a simple historical or statistical record.

#### 2. Legal and Practical Implications of an Inaccurate Gender Designation

There are many practical, legal, and social realities that result from having an inaccurate gender marker, some of them with potentially fatal consequences. Although the gender recorded on a person's birth certificate may not be considered legally binding,[70] in many circumstances, it is an

---

low numbers of transgender men who have had these surgeries in the survey sample. *Id.*

66. *See infra* note 114 and accompanying text.

67. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OEI-07-99-00570, BIRTH CERTIFICATE FRAUD at 2 (2000), *available at* http://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf.

68. "[Birth certificates] are also used extensively for employment purposes, to obtain benefits or other documents (e.g., driver's licenses, Social Security cards, and passports), to assist in determining eligibility for public assistance and other benefits, to enroll children in school, and as proof of age eligibility for sports and other age restricted activities." *Id.* at 6.

69. Federal experts caution that a birth certificate should not be used alone as an identity document because it is impossible be sure that the holder of the certificate is the person appearing before the agency. *See id.* at 20.

70. Because of this, some have pursued gender change orders that declare a person's legal gender (unrelated to birth certificate corrections). Interview with Janson Wu, Staff Attorney, Gay & Lesbian Advocates & Defenders (confirmed Feb. 11, 2012). Gender change orders can be particularly helpful for people who are at higher risk of

important factor in determining whether or how an individual's gender is recognized as a practical matter. In addition, transgender people holding birth certificates that are not corrected following gender transition risk having their transgender histories revealed, which can lead to a number of serious harms. This is not an abstract issue; inspection of one's birth certificate (or documents it generates) can lead directly to discrimination and even violence, especially when a situation involves interactions with security officers, employment, or access to sex-segregated facilities. The following subsections describe areas in which an incorrect gender designation and one's transgender status, as revealed by the gender on one's birth certificate, can be especially consequential in the United States, either because of the meaning attached to the gender designation, or because the disclosure of one's transgender status may lead to harm.

a.   Initial Gender Designation on Governmental Identity Documents
and Those Governmental and Non-Governmental
Documents Derived Therefrom

Birth certificates establish the initial gender designation for other governmental identity documents, such as driver's licenses, passports and Social Security records.[71] The birth certificate, as well as these other government documents, in turn breed[72] many other identity documents, such as school records, college ID cards, work identification, and commercial licenses.

---

having their gender challenged by interested third parties, such as parents or children who would gain a right to inherit if their transgender relative's marriage is held invalid.

71. Although generally not written formally in policy, a person's initial gender on a driver's license/state ID will match that on one's birth certificate. Although it is less common, at least two state Departments of Motor Vehicles require a corrected gender on one's birth certificate before updating the gender on one's driver's license (Montana and Kentucky). *See Driver's License Policy by State*, NAT'L CTR. FOR TRANSGENDER EQUAL., http://transequality.org/Resources/DL/DL_policies.html (last visited Sept. 20, 2012). Similarly, to establish a person's initial gender on a passport, the birth certificate gender (or gender on other citizenship/identity evidence) is generally used. *See* 7 DEPT. OF STATE FOREIGN AFF. MANUAL 1310 app. M (2011) ("This appendix provides policy and procedures that passport specialists and consular officers must follow in cases in which an applicant requests a gender on the passport application different from the one reflected on some or all of the submitted citizenship and/or identity evidence, including a prior passport.").

72. In fact, birth certificates and driver's licenses are both referred to as "breeder" documents because once a person had these forms of identification, other identity documents can be created, with birth certificates being the primary breeder document. *See* John Mercer, *Breeder Documents: The Keys to Identity*, 29 KEESING J. OF DOCUMENTS & IDENTITY 14, 14 (2009), *available at* http://www.naphsis.org/NAPHSIS/files/ccLibraryFiles/Filename/000000001179/breeder_documents_the_keys_to_identity.pdf.

Regulations under the REAL ID Act, which has been partially implemented in the U.S.,[73] require persons to show they are a U.S. citizens or are in the U.S. lawfully, as well as "establish their identity" to obtain a driver's license.[74] Accepted documents include birth certificates and passports (as well as various immigration documents).[75] Among U.S. citizens, birth certificates are more commonly used because only 28% of the U.S. population have passports.[76]

### b.  Discrimination in Employment

Some employers may discriminate against a transgender person, especially in the hiring process, when the employer inspects identity documents that do not match a person's gender presentation. In much of the United States, this discrimination may be viewed as legal.[77] For example, U.S. employers are required to fill out the I-9 Employment Eligibility Verification Form for each employee at the time of hire. Although various documents can be used to show eligibility for work, if a U.S. citizen does not have a passport or a Social Security card, he or she must show a birth certificate to

---

73. *Real ID Deadlines Looms*, HOMELAND SECURITY NEWS WIRE (Jan. 31, 2012), http://www.homelandsecuritynewswire.com/dr20120131-real-id-deadlines-looms.

74. Real ID Act, Pub. L. No. 109-13 § 202(c)(2)(b) (2005). Because the Real ID Act also required gender to appear on the license, some state motor vehicle agencies were concerned that it would curtail their authority to set policies on gender corrections. However, the regulations issued by the Department of Homeland Security in 2008 indicated the opposite. *See* 6 C.F.R. § 37.17 (2008).

75. 6 C.F.R. § 37.11 (2011) (listing acceptable documents as a U.S. passport, a birth certificate, a Consular Report of Birth Abroad, a Permanent Resident Card, a U.S. visa, Certificate of Naturalization or Citizenship, a REAL ID-compliant driver's license or identification card).

76. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-891, STATE DEPARTMENT: COMPREHENSIVE STRATEGY NEEDED TO IMPROVE PASSPORT OPERATIONS 11 (2008), *available at* http://www.gao.gov/new.items/d08891.pdf.

77. Although "sex" in Title VII of the Civil Rights Act of 1964 should be interpreted to prohibit employment discrimination against transgender people, not all federal courts have agreed with this proposition. *Compare* Schroer v. Billington, 577 F. Supp. 2d 293, 300 (D.D.C. 2008) (holding that "sex" in Title VII protects the transgender plaintiff), *and* Glenn v. Brumby, 663 F.3d 1312, 1320 (11th Cir. 2011) (holding that plaintiff's termination due to transgender status was sex discrimination in violation of the Equal Protection Clause), *with* Etsitty v. Utah Transit Authority, 502 F.3d 1215, 1221 (10th Cir. 2007) (holding that the sex discrimination prohibition does not protect a transgender plaintiff). Therefore, discrimination is only clearly illegal in the 16 states and over 150 local jurisdictions that have gender identity/expression protections explicit in the law, which cover 45% of the US's population. NAT'L GAY & LESBIAN TASK FORCE, JURISDICTIONS WITH EXPLICITLY-TRANSGENDER INCLUSIVE NONDISCRIMINATION LAWS (2012), *available at* http://www.thetaskforce.org/downloads/reports/fact_sheets/all_jurisdictions_w_pop_6_12.pdf.

satisfy this requirement. If a person does have a Social Security card and therefore can avoid showing a birth certificate, the person must also show an identity document like a driver's license or school identity card. However, these documents may also have an inaccurate gender marker on them if they were derived from an inaccurate birth certificate. Employers may also learn of a person's transgender status if a background check reveals the gender assigned at birth, based on documents derived from a birth certificate.

The National Transgender Discrimination Survey found that 90% of transgender people had experienced mistreatment or discrimination at work or took actions to avoid such discrimination.[78] Nearly 47% of those surveyed lost their jobs, were denied a promotion, or were denied a job as a direct result of being transgender.[79] Hiring discrimination was also rampant, and rates of discrimination were higher for those whose driver's license gender marker did not match their gender identity.[80] The percentages of those experiencing hiring discrimination rose from 52% of those with corrected driver's licenses to 64% for those without corrected driver's licenses.[81] For understandable reasons, many transgender people desire to keep their transgender identity private from employers at the time of hiring, yet may be unable to do so because of birth certificate policies in their jurisdiction of birth.

Other discrimination can arise when a person goes through gender transition while remaining in the same workplace. One of the primary issues that can arise is which bathroom a person should use. Many employers think a fair policy is to have persons switch bathrooms when they have corrected the gender on their driver's licenses, state identification documents, or less commonly, their birth certificates. Because the gender on a driver's license often is generated by the gender on a person's birth certificate, the state's failure to correct gender on birth certificates can prevent a transgender person from being able to access the appropriate gender-specific restroom facility at the workplace.

---

78. GRANT ET AL., *supra* note 54, at 51.
79. *Id.*
80. *Id.* at 139.
81. *Id.* at 154.

c.   Police, Security Personnel, and Others who Inspect Identification
During Daily Life and Travel

Unfortunately, it is not uncommon for police, security personnel, and others to respond in violent or discriminatory ways when they discover a person is transgender.[82]

In addition, a police or security officer, or any other person who inspects ID (such as a store clerk) may share information about a transgender person's status with others in the community, who in turn may cause the person harm. For example, consider the case of a person who lives in a small community who presents identification with an inaccurate gender marker to a Transportation Security Officer at the local airport, or a store clerk to verify identity when using a credit card at the local market. When the clerk or officer discusses this information with others in the community, the transgender individual could be fired from his or her job or become the victim of a bias-motivated assault.

The National Transgender Discrimination Survey found that 40% of people who presented identification that did not match their gender presentation were harassed at some point due to the mismatch, 15% were asked to leave an establishment, and 3% were assaulted.[83] Higher numbers of people of color were assaulted, with 9% of African Americans and Latino/Latinas and 6% of multiracial respondents reporting assault when presenting ID that did not match their gender presentation.[84]

The data is supported by published reports of violence and discrimination that have occurred after a person is outed as transgender. For example, in an incident brought to public consciousness by an award-winning movie, Brandon Teena was sexually assaulted and later murdered by those who knew him as a man when they discovered, due to a printed police report in the newspaper, that his legal name was "Teena Brandon."[85] In a less violent case, a transgender woman was sent a threatening letter and DVD saying that homosexuals should be put to death by the DMV clerk who had processed her gender correction.[86]

---

82. 22% of respondents reported harassment, 6% reported physical assault, and 2% reported sexual assault by police officers due to being transgender. GRANT ET AL., *supra* note 54, at 160.

83. *Id.* at 153.

84. *Id.*

85. THE BRANDON TEENA STORY (Bless Bless Productions 1998); BOYS DON'T CRY (Fox Searchlight Pictures 1999).

86. Bob Egelko, *Transgender Woman Settles DMV Suit*, S.F. CHRONICLE (Aug. 16, 2011, 5:01 PM), http://articles.sfgate.com/2011-08-16/bay-area/29891260_1_transgender-woman-amber-yust-dmv; http://www.huffingtonpost.com/2011/08/16/amber-yust-settlement_n_928285.html.

The actual discrimination, disclosure, and violence, as well as the fear of it, can cause transgender people to limit interactions where their identity documents will be inspected, especially travel. Furthermore, as proving one's lawful presence in the U.S. becomes more important as a political and/or criminal matter, showing one's actual birth certificate—not just documents derived from it—may become a more common practice. Already several states have passed laws that allow police to require people to show proof of citizenship.[87] The Supreme Court approved the part of the Arizona law that allows officers to ask for documentation of citizenship of those that they suspect may be undocumented.[88]

### d.    Marriage Recognition

Transgender people should also be able to marry, and be recognized as legally married to their partners. Because forty-one states restrict marriage to different-sex couples,[89] a transgender person's gender is of great legal significance in those states. Being legally married, or not, is of great legal consequence to whether or not a person has rights to child custody and visitation. Additionally, marital status is important for intestate inheritance,[90] ability to sue for wrongful death,[91] spousal support after marriage, eligibility for Social Security benefits after death of a spouse, and potentially, the ability to be granted a divorce and have marital property divided. For bi-national couples, marriage recognition is critically important for the ability to reside legally in the United States. During the marriage, being recognized as a spouse by third parties can be important to determine eligibility for a host of benefits, including health insurance, ability to make medical decisions for

---

87. *Anti-Immigrant Arizona Copy Cat Laws*, ACLU, http://www.aclu.org/arizonas-sb-1070-and-copycat-laws (last visited Dec. 10, 2012) (stating that five states - Alabama, Georgia, Indiana, South Carolina and Utah - have passed laws similar to that in Arizona that allow police to ask documentation of a person's citizenship).

88. Arizona v. United States, 567 U.S. ___ (2012).

89. As of November 2012, Connecticut, Iowa, Maine, Maryland, Massachusetts, New Hampshire, New York, Vermont, Washington and the District of Columbia are the only U.S. jurisdictions that perform and recognize same-sex marriage. *See* Teresa Walsh, *Will the Gay Marriage Election Results Have a National Impact?*, U.S. NEWS & WORLD REPORT, November 8, 2012, http://www.usnews.com/opinion/articles/2012/11/08/will-the-gay-marriage-election-results-have-a-national-impact.

90. J'Noel Gardiner lost her inheritance, due to her as a wife, when her husband died intestate and the Kansas Supreme Court decided that she was legally male and thus, not married to her husband. *In re* Estate of Gardiner, 42 P.3d 120, 121-122 (Kan. 2002).

91. Christie Lee Littleton's wrongful death case relating to medical malpractice committed against her husband was dismissed by Texas courts, which declared her a legal male and as such did not have standing as a spouse. Littleton v. Prange, 9 S.W.3d 223 (Tex. Ct. App. 1999).

each other, tax filing status, and numerous others. Transgender people in different-sex marriages often worry their marriage will be nullified by a judge's decision that they have not validly and legally changed their gender. Although there is no single place where one's "legal gender" is recorded, the gender on a person's birth certificate is sometimes given at least some legal deference by courts.[92]

Because most of the marriage cases involving a transgender spouse indicate that having a corrected gender marker on one's birth certificate is not a controlling factor, the *practical* effect, in the form of discouraging third parties from challenging the legality of a marriage, is likely more important than the actual *legal* effect during a challenge.

The story of a New Jersey couple—a non-transgender woman and a transgender man who had problems getting a marriage license—is illustrative. Because the transgender man's birth certificate still designated him as female, the local clerk refused to issue a marriage license and instead said she could only issue them a civil union license. This issue was resolved only after they consulted with an attorney, who helped the man get his birth certificate amended. This process took several months, delaying many of the couple's life plans, as well as requiring a significant financial outlay.[93]

### e.   Health and Health Insurance Records

Birth certificates and the documents they influence can also affect what gender people are considered to be by their health insurance providers, their health systems, their state's medical assistance program, or Medicare. Depending on what gender is recorded in these records, certain treatments, screenings and procedures may be disallowed, despite the fact that the best practice is to screen and treat all of a person's bodily organs, regardless of a person's gender identity and regardless of whether or not the treatment relates to gender transition. For example, a transgender man might be denied hormone therapy on the basis that he should not be receiving testosterone when his records indicate *female*. Or a transgender woman may be denied needed gynecological services because they are only covered for females.[94]

---

92. *See* Kantaras v. Kantaras, 884 So. 2d 155, 161 (Fla. Dist. Ct. App. 2004); *In re* Lovo-Lara, 23 I. & N. Dec. 746, 753 (B.I.A. 2005).

93. Email from Angie Gambone, attorney, to author (Feb. 13, 2012, 9:08 EST) (on file with author).

94. AM. C. OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE OPINION NUMBER 512: HEALTH CARE FOR TRANSGENDER INDIVIDUALS (December, 2011) http://www.acog.org/Resources_And_Publications/Committee_Opinions/Committee_on_Health_Care_for_Underserved_Women/Health_Care_for_Transgender_Individuals.

f.   Access to, and Treatment in, Sex-Segregated Facilities

A small but important number of facilities are sex-segregated. These range from those needed on a daily basis—such as bathrooms—to those in otherwise non-segregated spaces—such as locker rooms in gyms. Further, there are a number of gender-segregated residential or quasi-residential facilities, programs or services that can be critically important and life-sustaining, such as homeless shelters, group foster homes, substance abuse facilities (including court-mandated drug programs), and domestic violence shelters. In these places, transgender people can be kept out of the correct facility, or forced into the wrong facility, because of the gender on their identity documents, and violence can sometimes result. For example, although it is contrary to best practices developed nationally,[95] in homeless shelters, transgender people are typically housed with others of their sex assigned at birth, which can create dangerous conditions.[96] According to the National Transgender Discrimination Survey, 55 percent of transgender people who stayed at a shelter were harassed there and 22 percent were sexually assaulted there.[97] In addition, 29 percent who sought shelter were denied outright.[98] In many emergency housing facilities, transgender people are processed by low-level intake staff who make on-the-spot decisions about where to place a person. Therefore, the gender markers on a person's identification documents take on heightened importance.[99]

Although there is no case law on the question of how relevant a person's gender marker on his or her birth certificate is when it comes to having a legal right to access these sex-segregated facilities, certainly one can imagine that disputes with regard to access to any of these facilities could in part hinge on gender markers on birth certificates.

g.   College Admissions

In 2011, the "Common Application," a standardized college application for admission used by over 400 colleges, included new instructions which state: "Federal guidelines mandate that we collect data on the legal sex of all applicants. Please report the sex currently listed on your birth certificate."[100] Given the highly burdensome medical requirements and procedures for changing birth certificates, most transgender college-age youth

---

95. *See infra* notes 169–170 and accompanying text.

96. *Housing and Homelessness*, NAT'L CTR. FOR TRANSGENDER EQUAL., http://transequality.org/Issues/homelessness.html (last visited Sept. 26, 2012).

97. GRANT ET AL., *supra* note 54, at 106.

98. *Id.*

99. *See* Spade, *supra* note 4, at 775.

100. *How Should I Answer the Sex Question?*, COMMONAPP.ORG, https://www.commonapp.org/commonapp/helpline.aspx?src=sexHelp (last visited Sept. 26, 2012).

do not have a corrected birth certificate. Even those with supportive parents and financial ability to pay are unlikely to have had any surgery, given that surgery is disfavored by the WPATH Standards of Care for those under 18.[101] The new Common Application policy is especially devastating for those who have been living in their gender since a very young age[102] and who may not be "out" to anyone other than family members. For these young people, the application would require them to "out" themselves or otherwise be at risk for accusations of fraud on their application. For this reason alone, some transgender students may decide not to apply through the Common Application, therefore limiting their access to higher education. Similarly, potential students may worry that if they write their birth certificate gender on the Common Application, as they are required to do, they will be assigned to gendered dormitories on that basis.

Women's colleges may also look to the gender designation on a potential student's birth certificate or school records or other government documentation derived from the birth certificate to determine whether a student is eligible to attend.[103]

### h.  International Adoption

Given that international adoptions generally require prospective parents to show their birth certificates during the adoption process, international adoption agencies and/or the country of the child may learn about the transgender history of the applicant, and take adverse actions.[104] Thus, lack of a new birth certificate with a corrected gender marker could put international adoptions at risk.

## II. MODERNIZING THE LEGAL STANDARD FOR CORRECTING GENDER MARKERS

The first area of law and policy that needs to be examined is the legal standard—what a person has to show—to qualify for the correction of their gender marker. When determining the legal standard, policymakers should

---

101. *See* WORLD PROF. ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 21 (stating that surgery should not be allowed until a youth reaches the age of legal majority in their country).

102. Alan B. Goldberg & Joneil Adriano, *'I'm a Girl'—Understanding Transgender Children*, ABC 2020, Apr. 27, 2007, http://abcnews.go.com/2020/story?id=3088298&page=1#.UGI8MtCXRUM.

103. Allie Grasgreen, *Women's Colleges Examine Transgender Policies*, USA TODAY, Aug. 2, 2011, 6:09 PM, http://www.usatoday.com/news/education/2011-08-01-womens-college-transgender_n.htm.

104. *Dossier*, ADOPTION.COM, http://international.adoption.com/foreign/dossier.html (last visited Sept. 26, 2012).

consider contemporary medical standards, legal and constitutional concerns, as well as other public policy issues, including how the standard affects the ability of those who seek the correction to receive it.

### A. Overview of Existing Legal Standards

#### 1. Standard from the MSVSA, State, and Local Jurisdictions

The 1977 MSVSA requires that a person seeking a correction to the gender on his or her birth certificate show that "the sex of an individual born in this State has been changed by *surgical procedure*"[105] (terms not defined in the model statute).[106] Thirteen jurisdictions use the exact language from the MSVSA in their statutes.[107] Another nine states[108] and Guam have a surgery standard in their statute, not using the language of the MSVSA. Several more states refer to gender corrections in statutes but do not specify that surgery must take place: Mississippi ("gender reassignment"), New Hampshire ("has had a sex change"), Utah ("has had a sex change"), and Virginia ("medical procedure"). In three states, legislatures have explicitly repudiated surgical or hormonal requirements, with language noting that "surgery or other treatment" (Iowa[109]), "clinically appropriate treatment" (California) or "surgical, hormonal, or other treatment" (Vermont) will suffice.[110]

Some states do not address gender corrections in statute, but deal with them in official regulations or written, sub-regulatory policy. Connecticut,

---

105. MODEL STATE VITAL STATISTICS ACT AND REGULATIONS § 21(d) (Ctr. for Disease Control & Prevention 1992) (emphasis added).

106. There is no published case law interpreting the term "surgical procedure."

107. Alabama, Arkansas, Colorado, Commonwealth of the Northern Mariana Islands, Delaware, District of Columbia, Georgia, Kentucky, Maryland, Missouri, New Jersey, New Mexico, and Oregon. (Montana integrates the language from the MSVSA into its regulations, not statute). *See infra* app. A.

108. Arizona, Hawaii, Illinois, Louisiana, Massachusetts, Michigan, Nebraska, North Carolina, and Wisconsin. *See infra* app. A.

109. Iowa has statutory language making it clear that surgery is not required. The code requires a "notarized affidavit by a licensed physician and surgeon or osteopathic physician and surgeon stating that by reason of *surgery or other treatment* by the licensee, the sex designation of the person has been changed." IOWA CODE ANN. § 144.23 (West 2009) (emphasis added). However, the fact that the law twice says "and surgeon" in referring to the physician that must provide the letter seems to imply, for those unfamiliar with Iowa's medical code, that a surgeon is involved in the person's care. In fact, all physicians in Iowa are referred to, throughout Iowa code, as "physician and surgeon." *See, e.g.*, IOWA CODE ANN. § 147.139 (West 2011). In practice, despite the statutory rejection of a surgery requirement, the Iowa Department of Public Health does require proof of surgical treatment. *See* Spade, *supra* note 4, at 768.

110. *See infra* app. A.

Maine, Montana, New York City, and North Dakota each have surgical requirements in official regulations, although their statutes are silent.[111] In New York State, a written policy requires surgery even where the regulations and statutes do not. In Virginia, even though the statute specifies only a "medical procedure," the regulations require surgery.[112]

In Kansas, Mississippi, Nevada, and Wyoming, there is no statutory language related to gender corrections, and the official regulations are ambiguous with regard to whether surgery is required.[113] In two more states, Florida and Rhode Island, there is no official written policy but surgery is essentially required in practice.[114]

Regardless of the exact language used relating to surgery, medical treatment, or gender corrections more generally, there are a wide variety of surgeries deemed sufficient to be eligible for the correction of a gender marker. For example, as a practical matter, sometimes any surgery will qualify an individual for correction, but other times an agency will have strict (generally unwritten) rules that a particular surgery must be shown.[115]

In nine jurisdictions, *the judge determines the standard* because there is no statutory or regulatory language, or the language is too vague.[116] An additional three states let people choose to get a court order.[117] While a court order requirement does not explicitly mean proof of surgery is necessary, generally advocates have found this to be the case in practice.[118] Although there has been at least one instance where a person has successfully received a court-ordered correction to her birth certificate without surgery,

---

111. *Id.*

112. *Id.*

113. *Id.*

114. *Id.*

115. Interview with Janson Wu, *supra* note 70; Interview with Kristina Wertz, Director of Policy and Programs, Transgender Law Center (Feb. 14, 2012, 10:55 AM); Interview with Dru Levasseur, Transgender Rights Attorney, Lambda Legal (Feb. 10, 2012).

116. These are Alaska, Indiana, Mississippi, New Hampshire, Nevada, South Dakota, Utah, Wyoming, and the United States Virgin Islands. *See infra* app. A. Several more jurisdictions are not clear what the process even is—whether it requires going to the agency or to a court—for gender correction: Kansas, Oklahoma, South Carolina, Texas, and American Samoa. Thus, in those jurisdictions, a judge may be the one determining the standard. *See infra* app. A.

117. In three of these states—Minnesota, Pennsylvania, and West Virginia—a person can go directly to the agency, but must show surgery, or the person can choose to seek an order from a judge, who can use whatever standard he or she judges appropriate. *See infra* app. A.

118. *See infra* Section III.B.3.

this case involved an individual who was able to demonstrate that surgery
was not medically feasible for her given her health conditions.[119]

### 2. Modernized Laws and Policies

Although it has been decades since most state's legislatures or policy-
makers have examined their policies regarding gender corrections, Washing-
ton, Vermont, and California have done so in the last few years. As a result,
these three states have the laws or policies that most closely comport with
contemporary medical and legal standards and warrant closer examination.
In addition, the standard from the U.S. Department of State with regard to
Consular Reports of Birth Abroad, updated in 2010, and the U.K. Gender
Recognition Act from 2004 are also helpful.

#### a.   Washington

The Washington statute governing birth certificates gives the Secretary
of Health broad authority to administer birth certificates.[120] Because the
statute does not mention gender corrections specifically, the Secretary of
Health has empowered the Director of the Center for Health Statistics to
develop the policy. The policy currently in effect[121] has been in place since
July 1, 2008 and, according to staff at the agency, is a codification of the
unwritten policy that was in effect for many years.[122] The policy requires a
registrant to submit a written request and to include a "letter, on applicable
letterhead, from the requestor's medical or osteopathic physician stating
that the requestor has had the *appropriate clinical treatment.*"[123]

#### b.   Vermont

Vermont's updated statute was originally part of an overall moderniza-
tion effort of the vital statistics law in 2011.[124] However, the overall mod-
ernization effort was stalled due to its length and complexity, and the

---

119. Interview with Kristina Wertz, *supra* note 114.

120. WASH. REV. CODE ANN. §43.70.150 (West 2009).

121. WASH. DEPT. OF HEALTH, CTR. FOR HEALTH STATS., PROC. NO. CHS-B5,
    CHANGING GENDER ON BIRTH CERTIFICATES (2008) (on file with author).

122. Email from Spencer Bergstedt to author (October 2, 2012, 20:01 EST) (noting that
    their previous unwritten policy was not very clear, but that gender marker correc-
    tions were approved under the old policy with very little information submitted with
    the request).

123. WASH. DEPT. OF HEALTH, *supra* note 120 (emphasis added). Washington is the first
    jurisdiction to use the term "appropriate."

124. H. 99, 2011–12 Leg. (Vt. 2011).

Commissioner on Health asked the legislature to add this provision to a bill related to midwifery so that these provisions could become law in 2011.[125]

Before this law passed, Vermont's statutes did not explicitly provide for gender corrections, so they were processed as any other amendment after an individual received a court order ordering the vital statistics agency to amend the gender marker.[126] Anecdotal evidence indicates that only a limited number of judges were willing to make a gender correction using this provision and did so only upon proof of completed surgery.[127]

The new language in Vermont requires that "the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition."[128] This language accurately reflects the contemporary medical understanding of transgender people because it explicitly considers that an individual may not undergo hormonal or surgical treatment as part of their transition. Treatment "appropriate" to an individual may be limited to living full-time in one's new gender role.

However, the statute also requires a person to have "completed" sexual reassignment.[129] While this should not cause significant confusion, using the term "completed" may unduly exclude some people who have fully transitioned but hope or plan for additional medical treatment later in life. Furthermore, since many individuals receive hormonal treatment indefinitely, they may be seen as never having "completed" treatment.

### c.  California

In 2011, the California legislature enacted a law that modernized and simplified the state's existing statute in various ways. The law replaced the requirement for "surgical treatment"[130] with a requirement that the individ-

---

125. Interview with Bill Lippert, Vermont Representative (Feb. 10, 2012); S. 15, 211-12 Leg. (2011), available at http://www.leg.state.vt.us/docs/2012/Acts/ACT035.pdf.

126. VT. STAT. ANN. tit. 18, § 5075 (West 2011).

127. Interview with Jes Kraus, Vermont Attorney (Feb. 13, 2012).

128. VT. STAT. ANN. tit. 18, § 5112(b) (West 2011).

129. *Id.* ("An affidavit by a licensed physician who has treated or evaluated the individual stating that the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition shall constitute sufficient evidence for the court to issue an order that sexual reassignment has been completed.").

130. CAL. HEALTH & SAFETY CODE § 103425 (West 2009) ("Whenever a person born in this state has undergone surgical treatment for the purpose of altering his or her sexual characteristics to those of the opposite sex . . . A petition for the issuance of a new birth certificate in those cases shall be filed with the superior court of the county where the petitioner resides.").

ual "has undergone clinically appropriate treatment for the purpose of gender transition, based on contemporary medical standards."[131]

### d.  Standard from Consular Reports of Birth Abroad

As described earlier, the 2010 U.S. Department of State policy for Consular Reports of Birth Abroad requires simply that a person's treating or evaluating physician write a letter certifying that a person "has had appropriate clinical treatment for gender transition to the new gender."[132] To be clear, the policy makes explicit that surgery is not required.[133]

### e.  Standard from the United Kingdom's Gender Recognition Act

The United Kingdom's Gender Recognition Act of 2004 requires that individuals live in their "acquired gender" for at least two years and have a diagnosis of gender dysphoria.[134] An individual must submit reports by two medical professionals, one of whom must be an expert in the field of gender dysphoria, detailing any medical treatment that the person has had. The individual must also affirm that he or she intends to continue to live in their acquired gender until death.[135]

Although this policy has the advantage of not requiring surgery or any specific medical treatment, the requirement of living in the "acquired gender" for two years is both arbitrary and burdensome, heightening one's risk of violence, discrimination, and harassment for that two-year period. Similarly, the fact that one of the medical professionals submitting their evaluation must be practicing in the field of gender dysphoria is unduly limiting for those who live in rural or other areas that do not have access to these professionals. Lastly, the requirement that there be a diagnosis is similarly arbitrary and is not particularly useful for potential inclusion in U.S. policy

---

131. CAL. HEALTH & SAFETY CODE § 1004430 (West 2012) ("The petition shall be accompanied by an affidavit of a physician attesting that the person has undergone clinically appropriate treatment for the purpose of gender transition, based on contemporary medical standards, and a certified copy of the court order changing the applicant's name, if applicable. The physician's affidavit shall be accepted as conclusive proof of gender change if it contains substantially the following language: 'I, (physician's full name), (physician's medical license or certificate number), am a licensed physician in (jurisdiction). I attest that (name of petitioner) has undergone clinically appropriate treatment for the purpose of gender transition to (male or female).'").

132. See U.S. DEP'T ST., 7 FOREIGN AFF. MANUAL 1320 app. M(b) (2011) available at http://www.state.gov/documents/organization/143160.pdf.

133. "Sexual reassignment surgery is not a prerequisite for passport issuance." Id.

134. Gender Recognition Act, 2004, c. 7 § 2 (U.K.).

135. Id.

because many people do not receive the diagnosis of gender dysphoria in the United States.[136]

### B. Issues to Consider When Modernizing the Legal Standard

When considering how to update the legal standard, policymakers should look to the modern medical understanding of transgender people, the effect of the surgical standard on transgender people, how other areas of the law have acknowledged transgender people, the constitutional impact of these policies, and the public policy justifications and implications.

### 1. A Surgical Requirement Contradicts Current Medical Understanding

Current medical thinking has rejected the one-size-fits-all mentality that was common in early treatment of transgender people. In the middle of the twentieth century, the medical community's viewpoint, developed by a small set of early practitioners, was that genital surgery was the successful culmination of a person's treatment and gender transition. Although the lived reality of transgender people never uniformly reflected this understanding, it was widely believed then and continues to persist today among the general population.[137] As more providers began treating transgender people and contributed to medical literature and practice over the past several decades, the view of transgender medicine greatly evolved and expanded.

The World Professional Association for Transgender Health (WPATH), established in 1979, is the international medical association devoted to understanding and properly treating transgender people. WPATH develops and publishes the collective understanding of the best treatment for transgender people based on "the best available science and expert professional consensus," known now as the "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People."[138] WPATH has altered its Standards of Care six times since 1979 to reflect the continually evolving medical understanding of transgender people and the efficacy of various treatment protocols.[139]

---

136. For various reasons, requiring people in the U.S. to get a diagnosis would be ill advised. First, some people cannot get a diagnosis because of limited access to doctors or counselors (less of an issue in the U.K. where socialized medicine is in place). Second, people who are deemed not "clinically distressed" enough may not receive the diagnosis. Third, some doctors and counselors have a limited viewpoint about who should receive the diagnosis. *See infra* note 153 and accompanying text.

137. Spade, *supra* note 4, at 755.

138. WORLD PROF. ASS'N FOR TRANSGENDER HEALTH, *supra* note 33.

139. *Id.*

Over this time period, WPATH increasingly encouraged and required individualized evaluation and individualized treatment, reflecting both its increasingly multi-disciplinary membership and the best available science. The Standards of Care refer to themselves as "flexible clinical guidelines"[140] and state that treatment is to be individualized.[141] As discussed earlier, the current Standards of Care are clear that changes in gender role alone may be sufficient treatment for some transgender people.[142]

Recognizing that surgery is not necessary for many transgender people, as well as the fact that many of these procedures result in sterilization, WPATH issued a statement condemning surgical requirements in 2010, stating, "[n]o person should have to undergo surgery or accept sterilization as a condition of identity recognition . . . ." The WPATH Board of Directors urges governments and other authoritative bodies to move to eliminate requirements for identity recognition that require surgical procedures."[143]

In addition to WPATH, other experts have recommended de-linking social and legal recognition of gender from specific medical treatments. The foremost organization for psychologists in the United States, the American Psychological Association, released a statement with its medical, social, and legal recommendations related to transgender people in August of 2008, which stated:

> THEREFORE, BE IT FURTHER RESOLVED THAT APA encourages legal and social recognition of transgender individuals consistent with their gender identity and expression, including access to identity documents consistent with their gender identity and expression which do not involuntarily disclose their

---

140. *Id.*, at 2.

141. "Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications." *Id.*, at 5.

142. "As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither. Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized." *Id.*, at 2 (citations omitted).

143. Press Release, World Prof. Ass'n for Transgender Health (June 16, 2010), *available at* http://www.wpath.org/documents/Identity%20Recognition%20Statement%206-6-10%20on%20letterhead.pdf.

status as transgender for transgender people who permanently socially transition to another gender role . . .[144]

Note that the basis for changing the gender markers on identity documents according to the APA is a person's "social transition," not a specific other medical event, such as hormones or surgery.

In sum, the professional medical associations that have looked at the question of gender transition and how it relates to identity documents like birth certificates have all come to the same conclusion: it is social transition, not surgery, that is medically relevant.

### 2. Surgery is Not Common and is Often Unattainable

Sex reassignment surgeries are significantly less common than is popularly believed. Transgender people have a variety of medical, personal, and practical reasons for not seeking or being able to acquire surgery. Here are common barriers and considerations:

(1)  Some individuals cannot afford the surgery they desire, especially given that a large majority of private and public health insurance plans do not currently[145] cover sex reassignment surgeries.[146]

(2)  Many people have medical conditions that make surgery risky or contraindicated.[147]

---

144. Policy Statement, Am. Psychological Ass'n, *Transgender, Gender Identity, & Gender Expression Non-Discrimination* (Aug. 2008), http://www.apa.org/about/governance/council/policy/transgender.aspx.

145. Increasingly, companies are ensuring that transgender employees do receive transition-related care through their insurance policies, and a number of colleges and universities have also ended these discriminatory exclusions. Human Rights Campaign Foundation, Corporate Equality Index 2012 27-28 (2011); Karen Aquino, *U. Adds Transgender Insurance*, THE DAILY PENNSYLVANIAN (Apr. 14, 2010), *available at* http://thedp.com/index.php/article/2010/04/u._adds_transgender_insurance.

146. Kari E. Hong, *Categorical Exclusions: Exploring Legal Responses to Health Care Discrimination Against Transsexuals*, 11 COLUM. J. GENDER & L. 88, 96–98 (2002); *see also* Jamison Green, *Introduction to Transgender Issues* in TRANSGENDER EQUALITY: A HANDBOOK FOR ACTIVISTS AND POLICY MAKERS 12 (Paisley Currah & Shannon Minter eds., 2001).

147. Editorial, *Looking Past Transgender*, THE DAILY FREE PRESS, Nov. 8, 2006, http://dailyfreepress.com/2006/11/08/editorial-looking-past-transgender/ (quoting Lorna Thorpe, Deputy Commissioner of New York's Department of Health and Human Hygiene as saying, "A smaller number undergo surgery – in part because not everyone is medically capable of undergoing the procedure."); *see also* Susan Donaldson James, *Transgender Sue Over Surgery Requirement to Alter Gender on Birth Certificate*, ABCNEWS, Mar. 24, 2011, http://abcnews.go.com/Health/transgender-yorkers-sue-

(3)  Many people who want and can afford surgery do not pursue it because they fear complications.[148]

(4)  Many individuals are unsure whether the surgery will provide the desired physical or aesthetic result, especially given individual variation and the chance of achieving an optimal result.[149]

(5)  Some are prevented by practical considerations involved in undergoing major surgery, including having difficulty in taking several weeks off from work or school, having caregiving responsibilities for family members, or lacking caregivers for themselves following surgery.[150]

(6)  Some hold sincere religious beliefs, or personal beliefs, against surgical body modification.[151]

(7)  Some have family members or other loved ones who would be upset if they had the surgery, and thus forgo surgeries to maintain these relationships.[152]

(8)  For some, maintaining reproductive capacity is important and many surgeries eliminate this possibility.[153]

---

birth-certificates-genital-surgery-requirement/story?id=13204628 ("Prinzivalli is morbidly obese and has type 2 diabetes, high cholesterol and a blood disorder that would make surgery dangerous"); *Western Australia Gender Project*, CHANGELING ASPECTS, http://www.changelingaspects.com/Advocacy/WA%20Gender%20Project. htm (last updated Jan. 22, 2008) ("Common medical contraindications for sex reassignment surgeries include: . . . mental illness, poorly controlled diabetes, hemophilia, severe hypertension and deep vein thrombosis").

148. Cameron Bowman & Joshua M.Goldberg, *Care of the Patient Undergoing Sex Reassignment Surgery*, 9 INT'L J. OF TRANSGENDERISM 135 (2006) (noting the risks of complications that may arise from various gender reassignment surgeries).

149. The aesthetic and functional results of surgeries cannot be guaranteed. Furthermore, for transgender men, there exists no surgery that will create an adult-sized erectile phallus without the assistance of an insert device.

150. BOWMAN & GOLDBERG, *supra* note 148; *FTM Genital Reconstruction Surgery (GRS)*, HUDSON'S FTM RESOURCE GUIDE, http://www.ftmguide.org/grs.html (last visited Dec. 27, 2011) (discussing the months-long recovery process for many surgeries).

151. *See* Tobin, *Against the Surgical Requirement, supra* note 4, at 400–01 (discussing religious factors as rationale for low rates of sex-reassignment surgery in some communities).

152. Joanne Herman, *Transgender Issues: The Additional Challenges of LBGT Aging*, HUFFINGTON POST, Nov. 4, 2010, http://www.huffingtonpost.com/joanne-herman/shining-the-spotlight-on-_b_777551.html (noting "opposition by family members" as one of the reasons transgender people may not have surgery).

153. Madeline H. Wyndzen, *MtF Transsexual Reproductive Option Preservation*, ALL MIXED UP, http://www.genderpsychology.org/reproduction/index.html (last visited June 27, 2011) (discussing the costs associated with attempting to maintain postoperative reproductive abilities).

(9)  Some are denied access to needed approval or diagnosis "letters" from psychologists when their life experiences do not neatly fit the "transsexual" pattern, when they do not match closely enough the stereotypes of man or woman, or when they are not sufficiently "clinically distressed."[154]

(10)  A significant percentage of transgender people have determined that surgery is not necessary for them to be comfortable living in their new gender.[155] Many transgender people determine that the alterations they make to their gendered appearance, names, and pronouns give them the well-being they need without further medical treatment.[156]

Ultimately, according to the National Transgender Discrimination Survey, less than 4% of transgender men and only 23% of transgender women have what are popularly understood as genital surgeries.[157] Given these facts, any policy that requires surgery will block the vast majority of transgender people from being able to have an accurate birth certificate.

Given the multitude and severity of the previously discussed practical and legal harms caused by an inaccurate birth certificate, combined with the statistics on the frequency that transgender people receive surgeries, the collective harm to transgender people caused by a surgical requirement must be

---

154. Dean Spade, *Resisting Medicine, Re/modeling Gender*, 18 BERKELEY WOMEN'S L. J. 15, 24–29 (2003). Because many health care professionals voluntarily follow WPATH's Standards of Care, transgender individuals need one or two letters from mental health professionals before they can have surgery, depending on the type of surgery. WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 27; *see also Choosing a Therapist*, TRANSSEXUAL ROAD MAP, http://www.tsroadmap.com/mental/therapy.html (last visited June 27, 2011) ("Some therapists require more than others before they'll recommend hormones or surgery. Some use a kind of weeding-out policy, trying to test your conviction. Some feel they are gatekeepers who must keep people from making mistakes, and require a lot of sessions. Others are much more open or easy-going.").

155. Tobin, *Against the Surgical Requirement*, *supra* note 4, at 401 n. 39; *see also* Gabriel Arkles, *Prisons as a Tool for Reproductive Oppression: Cross-Movement Strategies for Gender Justice*, SYLVIA RIVERA LAW PROJECT (Sept. 27, 2008), http://srlp.org/prisons/reproductiveoppression (noting the individualized needs of transgender people when it comes to health care); Damien Cave, *New York Plans to Make Gender Personal Choice*, N.Y. TIMES, Nov. 7, 2006, http://www.nytimes.com/2006/11/07/nyregion/07gender.html?pagewanted=all.

156. Tobin, *Against the Surgical Requirement*, *supra* note 4, at 401.

157. GRANT ET AL., *supra* note 54, at 79. What is considered genital surgery by the transgender community is more expansive than what is often considered genital surgery by government staff and others. Here, the Article refers to phalloplasty or metiodioplasty for men and vaginoplasty for women as those surgeries popularly understood as genital surgeries.

recognized for its severity, and should be taken into account when making policy.

In addition, there may be a public health harm caused by policies that require people to undergo unnecessary and unwanted surgeries. When a person undergoes surgical treatment, his or her time and resources, as well as those of others, would be spent securing and recovering from this treatment. Complications may also occur, adding new health problems. A cascade of unnecessary expenditures result from surgeries, including depleting one's personal financial resources, causing an interruption in one's school or work, being unable to complete family care-giving duties, and relying on financial or care-giving resources from family members or others.[158]

### 3. A Surgical Requirement is Inconsistent with Other Public Policies Related to Transgender People

As legal rights and recognition of transgender people have rapidly increased in the past two decades in the United States, there has been a clear trend that such rights *do not depend on whether a person has had specific medical treatments*.[159] Most pertinently, non-discrimination laws that cover transgender people prohibit discrimination on the basis of "gender identity or expression," or similar language, regardless of whether a person has had or is seeking medical treatment.[160] This implies that transgender people should have the freedom to live their daily lives consistent with their gender identities without facing discrimination or restrictions. In 2011, legislators in Maine considered a bill that would have narrowed the existing non-discrimination protections for transgender people in that state by granting the authority to businesses to limit access to sex-segregated facilities based on "biological sex." This bill was handily defeated (61-81 in the House, 11-23

---

158. All of these have potential public health consequences in direct or indirect ways, ranging from a person not having resources to be treated for other medical conditions and causing medical issues where none existed before to not being able to care for another family member because of having to recover from surgery. The collective effect has an impact on public health.

159. Interview with Mara Keisling, Executive Director, National Center for Transgender Equality, Washington D.C. (Feb. 10, 2012).

160. Of the 150 local non-discrimination laws in the U.S., only three currently have any references to surgery. Passed in 1999 and 2000, laws in Boulder and Denver in Colorado, and Lexington-Fayette Urban County in Kentucky have references to surgery (although their coverage is not limited to only those who had surgery). BOULDER ORD. No. 7040, Title 12 Human Rights, Section 12-1-1 Definitions (2000), DENVER ORD. No. 934-01, Article IV, Section 28-92 Definitions (2001); LEXINGTON-FAYETTE URBAN COUNTY ORD. No. 201-99, Article II, Chapter 2, Section 2-33 (1999).

in the Senate) by the majority Republican Legislature.[161] As a result, there are no surgical or hormonal lines drawn by any of the 16 state laws that currently protect transgender people from discrimination.[162] As a further example, in proposed federal non-discrimination legislation such as the Employment Non-Discrimination Act even the provision related to sex-segregated shower facilities does not include language requiring surgery as a prerequisite for admittance, but instead speaks of "gender transition."[163]

In fact, many of these laws have already been explicitly interpreted to require access to sex-segregated facilities such as restrooms based on a person's gender identity without regard to medical treatment.[164]

Driver's license policies related to corrections of gender markers, which vary by state, have also moved away from surgery requirements.[165] Although the events of September 11, 2001 and the resulting enactment of

161. L.D. 1046. 2011 Leg., 125th Sess. (Me. 2011), *available at* http://www.mainelegislature.org/legis/bills/bills_125th/billtexts/HP078101.asp ("It is not unlawful public accommodations discrimination, in violation of this Act, for a public or private entity to restrict rest room or shower facilities that are part of a public accommodation to the use of single-sex facilities to members of a biological sex regardless of sexual orientation. Unless otherwise indicated, a rest room or shower facility designated for one biological sex is presumed to be restricted to that biological sex.").

162. *See* CAL. GOV'T CODE § 12926(q) (West 2011); COLO. REV. STAT. § 24-34-401(7.5) (2011); CONN. GEN. STAT. § 46A-51(21) (West 2011); HAW. REV. STAT. §§ 515-2, 489-2 (West 2011); 775 ILL. COMP. STAT. 5/1-102 (West 2011); IOWA CODE § 216.2(9A) (2011); ME. REV. STAT. ANN. tit. 5, § 4553(9-C) (2011); MINN. STAT. ANN. § 363A.03(44) (West 2011); N.J. REV. STAT. § 10:5-5(rr) (2011); N.M. STAT. ANN. § 28-1-2(Q) (West 2011); OR. REV. STAT. § 174.100(6) (2011); R.I. GEN. LAWS § 11-24-2.1(l) (2011); VT. STAT. ANN. tit. 1 § 144 (West 2011); WASH. REV. CODE § 49.60.040 (15) (2011); A.B. 211, 2011 Leg., 76 Sess. (Nev. 2011); H.B. 502, 2011 Leg., 187 Sess. (Ma. 2011).

163. Employment Non-Discrimination Act, H.R. 1397, 112th Cong. § 8(a)(3) (2011) ("Nothing in this Act shall be construed to establish an unlawful employment practice based on actual or perceived gender identity due to the denial of access to shared shower or dressing facilities in which being seen unclothed is unavoidable, provided that the employer provides reasonable access to adequate facilities that are not inconsistent with the employee's gender identity as established with the employer at the time of employment or upon notification to the employer that the employee has undergone or is undergoing gender transition, whichever is later.").

164. *See, e.g.,* COLO. CODE REGS. § 708-1 Rule 81.11 (2011); WASH. STATE HUMAN RIGHTS COMM'N, GUIDE TO SEXUAL ORIENTATION, GENDER IDENTITY, DISCRIMINATION AND WASHINGTON STATE LAWS: SELF-ASSESSMENT CHECKLIST FOR COMPLIANCE AND SUGGESTED BEST PRACTICES FOR EMPLOYMENT 6, *available at* http://www.hum.wa.gov/Documents/Publications/SelfAssessments/Self-Assessment-Employment2ndEdition.pdf; IOWA CIVIL RIGHTS COMMISSION, SEXUAL ORIENTATION AND GENDER IDENTITY: AN EMPLOYER'S GUIDE TO IOWA LAW COMPLIANCE, *available at* http://www.state.ia.us/government/crc/docs/SOGIEmpl.pdf; D.C. MUN. REGS. tit. 4 § 802 (2006).

165. Tobin, *Fair and Accurate Identification, supra* note 4.

the Real ID Act initially caused some state agencies to be concerned about any changes to driver's license data, stricter, surgery-based policies on gender markers were not promulgated.[166] Despite the terrorism scare, the trend in the last decade has been away from surgery-based policies and toward gender identity-based policies.[167] The District of Columbia currently has a model policy because it provides a corrected gender marker upon (1) signed documentation from the license holder that they are seeking to have the gender on their license corrected to reflect their gender identity, and (2) the signature of a health or social service professional who attests, in their professional opinion, that the person's gender is as stated.[168] Slightly modified versions of D.C.'s policy have been adopted in New Jersey, Maine, Massachusetts, Pennsylvania, Rhode Island, and Virginia. Although not modeled on the D.C. policy, new policies that eliminated surgery requirements have also been adopted in Colorado, Florida, Nevada, New Mexico, and Ohio. Many other states have long maintained non-surgery based policies.[169]

Furthermore, although not yet adopted nationally, the trend with regard to homeless shelter policies is increasingly to house people based on their self-identified gender, regardless of whether a person has had any medical treatments. Because most homeless shelters are segregated by gender and

---

166. One state to roll its policy back was Michigan, which had a policy of self-identification a decade ago. Under the old policy, a person only had to sign a generic form (used for many purposes), writing a sentence that stated that he or she wished the gender on his or her license changed, and the correction was granted, with questions by the staff prohibited. The policy stated: "DO NOT ASK THE APPLICANT TO SPECIFY THE REASON FOR THE REQUEST." MICH. DEP'T OF STATE, TR-34, CHANGING GENDER (1995) (on file with author). The policy was ended in 2003 and changed to a surgery-based policy, due to a change in Secretary of State—not due to any problem caused by the policy, according to state advocates. The policy has changed two more times at least. Dawn Wolfe Gutterman, *Secretary of State Reverses Pro-Trans Policy*, PRIDE SOURCE, May 12, 2005, http://www.pridesource.com/article.html?article=14010; Interview with Jay Kaplan, Attorney, ACLU of Michigan, Detroit, MI (Oct. 2, 2012).

167. Tobin, *Fair and Accurate Identification, supra* note 4.

168. The D.C. DMV has an easy-to-use and easy-to-process form developed specifically for gender marker corrections. Gender Designation on a License or Identification Card (D.C. Dep't of Motor Vehicles, 2006), *available at* http://dmv.dc.gov/info/forms/gcp-app_pdf.shtm; *see also* Tobin, *Fair and Accurate Identification, supra* note 4; Mara Keisling et. al., *Gender Identity and the Driver Licensing Process*, AM. ASS'N OF MOTOR VEHICLE ADM'RS, Aug. 3, 2011, *available at* http://www.aamva.org/largefiles/webinars/GenderIdentityAndDLProcess_08032011.wmv; Tom Manuel, *Transgender Drivers: New Norms in Customer Service*, MOVE MAG., Spring–Summer 2011, at 29.

169. *See, e.g.*, Memorandum from Patricia D. Aducci, Comm'r N.Y. Dep't Motor Vehicles b(April 29, 1987), *available at* http://rnytg.org/DMVGenderChangeMemo.pdf (noting that "[p]roof that an operation occurred is no longer necessary."); *see also Driver's License Policy By State, supra* note 71.

many do not have private areas for changing or bathing, historically there
had been a policy of housing people according to their genitals. In 2003, the
National Coalition for the Homeless adopted a resolution urging shelters to
house people according to their "self-identified gender."[170] Shelter systems,
such as those in Boston, New York City, San Francisco, and Washington,
D.C., have had formal policies to this effect for years and the implementa-
tion has not caused any problems.[171]

    In sum, legislatures and policymakers in a variety of arenas have deter-
mined that surgical treatment is immaterial to whether a person should be
recognized in accord with the person's gender identity.

### 4. Reasons Given for a Surgical Requirement are Not Valid

    Originally, recognizing that surgery changed a person's gender was a
progressive idea—it provided a way for transgender people to correct their
gender markers on official government documents whereas before, there was
no option to correct the gender marker at all. Generally, courts and agencies
have not articulated a state interest in a surgery requirement, presumably
because the choice of surgery was so obvious as the dividing line between
male and female that the reason it had been used was not seen as necessary
to articulate. Thus, it is difficult to locate arguments in favor of a surgery
requirement. The few examined below are taken mostly from driver's license
and marriage recognition contexts, and one policy debate on birth certifi-
cates in New York City. The arguments can be understood best as three
separate concerns; as such, they are each explained and analyzed in turn.

#### a.  Fraud or Security

    On the rare occasions when a court or agency tries to justify a surgical
standard, the government sometimes articulates an interest in "fraud pre-

---

170. Broader best practices were described in a joint publication of the National Coalition
    for the Homeless and the National Gay and Lesbian Task Force, which also includes
    the National Coalition for the Homeless resolution in its Appendix. LISA MOTTET
    & JOHN M. OHLE, TRANSITIONING OUR SHELTERS: A GUIDE TO MAKING HOME-
    LESS SHELTERS SAFE FOR TRANSGENDER PEOPLE, app. A (2003).
171. Interview with Mara Keisling, *supra* note 158.

vention."[172] This issue often arises in reference to same-sex marriage,[173] and sometimes is presented more generally and vaguely as a potential security problem. For example, there has been the suggestion that terrorists[174] could take advantage of the ability to alter gender markers on birth certificates.

With regard to marriage, most states do not require a person to show a birth certificate when applying for a marriage license; instead, they typically require a driver's license,[175] which, as discussed above, often allow people to change their gender markers without proof of surgery. There have been no reported cases of same-sex couples made up of two non-transgender people where one person changes the gender marker on a driver's license for the purpose of receiving a marriage license.[176]

With regard to the claim that people may disguise their gender to be better able to commit crimes or terrorist acts, one prominent transgender advocate has commented that the last thing a person who is trying to blend in and escape notice should do is dress in the opposite gender.[177] Furthermore, federal policy implicitly indicates that gender marker changes do not impair national security interests. For example, in implementing the Real ID Act, the Department of Homeland Security decided to "leave the deter-

---

172. Daniel Trotta, *Being Transgender No Longer About Surgery in N.Y.*, REUTERS, Nov. 22, 2006, http://uk.reuters.com/article/2006/11/23/lifestyle-life-transgender-dc-id UKN2020431620061123 ("Opponents are concerned about the possibilities for fraud."). Kenji Yoshino, notes a potential objection: "[P]revention of fraud: Lowering the barriers to sex reassignment increases the incentive for individuals who have no sincere desire to change their sex to do so for opportunistic reasons." Kenji Yoshino, *Sex and the city: New York City Bungles Transgender Equality*, SLATE, Dec. 11, 2006, http://www.slate.com/articles/news_and_politics/jurisprudence/2006/12/sex_and_the_city.html.

173. Interview with Reverend Moonhawk River Stone, M.S., LMHC, to author (confirmed Feb. 11, 2012).

174. Yoshino, *supra* note 172 ("[N]ational security: Permitting individuals to make any alterations to their birth certificates makes those records less useful to Homeland Security.").

175. This determination was made after a review of requirements for the 50 states and DC listed on *Marriage License Requirements By States*, USMARRIAGELAWS.COM, http://usmarriagelaws.com/ (last visited Dec. 28, 2011).

176. The implausibility that non-transgender people would fraudulently seek a gender correction on their birth certificate in order to receive a marriage license is easily rebutted when analogized to different situations. For example, typically people understand that fraudulent manipulations, such as a 13 year-old pretending to be 18, would not require the government to recognize a marriage involving a 13 year old. Similarly, non-transgender gay and lesbian people generally understand that they will not receive a legally valid marriage by fraudulently changing the gender marker on their government identity documents.

177. Interview with Mara Keisling, *supra* note 158; GRANT ET AL., *supra* note 54, at 163 (noting that seven percent of participants "reported being arrested or held in a cell strictly due to bias of police officers on the basis of gender identity/expression").

mination of gender up to the States."[178] Further, the State Department allows individuals to update gender markers on their passports without surgery.[179] These should be taken as indications that gender was not an important classification related to prevention of terrorism in the federal government's view.

In fact, there are particularly strong arguments that security and law enforcement agencies' ability to protect the public is *enhanced* by having gender marker policies that are not based on surgeries, but are instead based upon the gender to which a person has transitioned. Transgender people often report being delayed, detained, or otherwise harassed by law enforcement officers because the gender marker on their ID does not match their external gender expression.[180] Sometimes officers are concerned the ID is fraudulent and take various steps to determine the legitimacy of the document. This extra scrutiny consumes law enforcement resources that are better spent identifying truly counterfeit identity documents or dealing with other law enforcement duties.

A second advantage for law enforcement of accurate, up-to-date gender markers involves situations in which police officers respond to crimes, identify witnesses, or attempt to locate persons of interest. The officer attempting to locate someone is better served by knowing the gender that the person is known as by friends and acquaintances, who may be confused or unhelpful when the officer asks about the "woman" or "man" who lives next door. Similarly, when the officers interact with a victim or a witness, they are more likely to alienate a transgender man, with a female designation on his license, by using the terms "ma'am" and "Ms.," or by using "sir" or "Mr." for a transgender woman. This alienation could make the transgender person, or others aware of the disrespect shown, less likely to trust, inform, and work with police in the instant case or in future situations.

In conclusion, there are no realistic fraud or security concerns that are addressed by maintaining a surgery requirement. On the contrary, federal

---

178. 6 C.F.R. § 37.17 (2008) ("Requirements for the surface of the driver's license or identification card. To be accepted by a Federal agency for official purposes, REAL ID driver's licenses and identification cards must include on the front of the card (unless otherwise specified below) the following information: . . . (c) Gender, as determined by the State."). In the explanatory notes that accompany the rule, DHS explains that it "will leave the determination of gender up to the States since different States have different requirements concerning when, and under what circumstances, a transgendered [sic] individual should be identified as another gender." Minimum Standards for Driver's Licenses and Identification Cards Acceptable by Federal Agencies for Official Purposes, 73 Fed. Reg. 5272, 5301 (Jan. 29, 2008) (to be codified at 6 C.F.R. pt. 37).

179. *See supra* notes 132–133 and accompanying text.

180. Interview with Mara Keisling, *supra* note 159.

security experts at the U.S. Department of Homeland Security and U.S. Department of State have instead established or changed policies to allow gender markers to be updated without surgery.

### b.    Permanence of the Correction

Occasionally, an administrator or judge will state the desire for permanence or irreversibility as a requirement for granting a correction of gender.[181] Presumably, the concern is that someone could "switch back" after changing their gender. The harm to society if a person undergoes a gender correction more than once is never explicitly identified.[182]

A policymaker misses the mark if he or she focuses on avoiding multiple corrections. The proper agency aim should be to maintain *accurate* records. A record should be updated to maintain accuracy as often as there is a change to relevant data. For example, if a person changes his or her name four times over their life due for various reasons, and seeks to amend their birth certificate each time, updating the birth certificate several times maintains an accurate record for them throughout his or her entire life.

In addition, research proves that a concern about impermanence is unsupported by the evidence. Data show that a return to previous gender happens extremely rarely and is generally a result of discrimination and rejection from family, friends, and colleagues.[183] A person is no less likely to transition back to the originally assigned gender after surgery as opposed to before surgery.[184]

There is another reliable way in which people can indicate to the agency that they have undergone medically-recognized gender change: namely, an evaluation by a medical professional. An evaluation from a medical professional should be sufficient to determine if an individual has un-

---

181.  Cave, *supra* note 155 (quoting the city's health commissioner as saying "[s]urgery versus nonsurgery can be arbitrary[.] . . . Somebody with a beard may have had breast-implant surgery. It's the permanence of the transition that matters most."). Maryland's highest court, in considering whether the judicial system has authority to grant a legal order of gender change, decided that the court's equitable jurisdiction did cover such orders, and remanded for the courts below to determine whether the petitioner had "completed a permanent and irreversible change from male to female." *In re* R.W. Heilig, 816 A.2d 68, 87 (Md. 2003).

182.  Although the administrative burden of having to process multiple changes may be a cause for concern, this could be addressed by charging fees for corrections. It is difficult to imagine what other harms may exist without resorting to concerns about maintaining sex stereotypes or differences between the sexes.

183.  *See* M. Landen et al., *Factors Predictive of Regret in Sex Reassignment*, 97 ACTA PSYCHIATRICA SCANDINAVICA 284 (1998).

184.  Even a surgical requirement does not eliminate the possibility of a person changing gender a second time. Relevant surgical procedures could be reversed or undertaken to change a person's body again.

dergone a gender transition and that the gender marker should be changed. Because no method can guarantee that a person may not elect to transition their gender a second time, the method of deferring to a medical professional should be sufficient.

A policy allowing a larger majority of people to have accurate birth certificates should not be dismissed due to conjecture concerning outliers who may change their gender more than once, especially because there is no articulation of the harm to society caused by multiple gender corrections. Instead, the focus should remain on maintaining accurate records.

### c.  Concerns About Sex-Specific Facilities and Situations

Sometimes government actors, or others who favor surgical requirements, claim that sex-segregated institutions need to know people's anatomical structure, either to ensure bodily privacy or for the prevention of assault.[185] Or, they may assert that for sex-specific jobs or job duties, such as those that might exist in a nursing or medical facility (although increasingly rare), bodily privacy of clients would be violated if a staff member of one anatomical structure observes or treats an unclothed client of another anatomical structure.[186] Yet, on a daily basis and in almost all social situations, a

---

185. Yoshino, *supra* note 171 (describing reservations "voiced by institutions like hospitals, jails, and schools, which routinely segregate according to sex" and explaining others' potential objections). Yoshino also notes that:

"Another moment of reflection suggests at least four interests that a person or the state might have in another person's gender. First, personal safety: Many communal spaces, like prison cells and public bathrooms, are segregated by sex to protect women, who are generally physically weaker than men, from assault or rape. Second, privacy: As employment-discrimination law recognizes, individuals have an interest in ensuring that their sexual privacy is not invaded by members of the opposite sex in contexts like nursing or medical care. . . . There is little evidence that transgender individuals present a security risk to women, while there is a great deal of evidence that transgender individuals themselves are at immense risk if they are not given accommodations. To the extent that privacy concerns rest on a fear of sexual objectification, they rely on a specious assumption of universal heterosexuality." *See also* Daniel Trotta, *New York Rejects Transgender Birth Certificate Law*, REUTERS, Dec. 5, 2006 (quoting a health department official as saying "how can you send a person with a penis to a women's prison?").

186. "As employment-discrimination law recognizes, individuals have an interest in ensuring that their sexual privacy is not invaded by members of the opposite sex in contexts like nursing or medical care." Yoshino, *supra* note 171. However, it should be noted that the case law on this question is quite old and modern nursing practices, for example, do not include dividing tasks by sex. *See, e.g.*, Backus v. Baptist Med. Ctr., 510 F. Supp. 1191, 1193 (E.D. Ark. 1981), *vacated as moot*, 671 F.2d 1100 (8th Cir. 1982). Telephone Interview with Allyson Pearlman, 2010 graduate from the Simmons College of Nursing (July 30, 2011) (noting that in her recent education and previous multi-year experience as a volunteer at UCLA Jonsson Cancer Center, she has never seen jobs or job duties divided by gender, and the only instruc-

person's genitals remain entirely private, even inside sex-segregated facilities or in work situations where a person is performing gender-specific duties.[187]

Increasingly, it is rare that people find themselves in environments that involve potential observation of another person's genitals (such as in a shared showering facility inside an institution, like a homeless shelter or prison). Within these contexts, before or at the relevant moment, a person will generally disclose to the authorities that he or she has a different anatomical structure than is typical for that facility. As a general rule, transgender people who have not had genital surgery are very likely to go to great lengths to avoid having other people observe their unclothed bodies. If they are able to do so, their bodily characteristics should not be considered relevant. If one is not able to keep their body private, the facility will learn of the person's bodily anatomy as a practical matter, typically through voluntary verbal disclosure.[188]

Individuals who believe that transgender people should complete surgery before being allowed to change their birth certificates often cite the protection of women as their main goal. More specifically, these individuals feel that transgender women who have not undergone surgery will enter women's bathrooms and locker rooms to sexually assault non-transgender women who also frequent those facilities. However, this concern is based on several incorrect assumptions, including that access to these facilities is currently based on the gender marker listed on a person's birth certificate.

---

tion that she received related to this was during cultural competence training, where she was instructed that some Muslim patients may request nurses of the same gender). Also relevant to the issue of gender-specific tasks related to bodily privacy are studies done on whether women prefer male or female gynecologists. Data suggest that gender is not particularly important when women choose gynecologists. *See* Michael Zuckerman et al., *Determinants of Women's Choice of Obstetrician/Gynecologist*, 11 J. WOMEN'S HEALTH & GENDER-BASED MED. 175, 175–76 (2002) (finding that 62% of women did not feel strongly about the gender of their provider and that "almost as many women with a female provider indicated a preference for a male provider (46%) as women with male providers indicated a preference for a female provider (54%)"); Amy M. Johnson, et. al., *Do Women Prefer Care From Female or Male Obstetrician-Gynecologists? A Study of Patient Gender Preference*, 105 J. AM. OSTEOPATHIC ASS'N 369, 369 (2005) ("[t]he majority of patients (66.6%) had no gender bias when selecting an obstetrician-gynecologist, and an even larger majority (198, 80.8%) felt that physician gender does not influence quality of care. There was no statistical difference in patient satisfaction based on physician sex.").

187. "[P]reoccupation with the appearance of body parts that are already hidden from public view has no justification." Tobin, *Against the Surgical Requirement*, *supra* note 4, at 420.

188. It is difficult to imagine an instance where a transgender woman, who still has male genitalia and who has struggled all her life to be seen as a woman by others, would walk into an open women's shower without attempting to conceal that area of her body.

In fact, the large majority of sex-segregated facilities do not maintain written policies with regard to restroom access. Although this is changing, the default rule is essentially a social one: if you look like a man, you can use the men's room and if you look like a woman, you can use the women's room.

When a person's gender is challenged, a person is likely to receive access only if they can present identification with a matching gender marker. An entity will sometimes ask for additional information, such as surgical status, before allowing access. Those who do not have the correct gender on their ID (which is more likely for those whose birth certificates are inaccurate) may be asked to show documentation of their surgical status, a letter from their health care provider, or other official documentation.

The stated concerns are further undermined by the fact that a wide range of companies, organizations, and public places *already* have in place best practices dictating use of facilities by transgender people. These policies explain that transgender people may and should use the restroom and/or locker rooms according to their *gender identity*, not their anatomical structure.[189] As explained above, non-discrimination laws, which cover 45 percent of the U.S. population,[190] are regularly interpreted to ensure that transgender people can access restroom and shower facilities based on their gender identity, regardless of their anatomical status. Moreover, there are no reported cases of these laws being used to gain improper access to a facility for criminal purposes.

Thus, allowing transgender individuals to correct the gender marker on their birth certificates would not markedly alter the existing trend to base access to facilities on self-identity.

The alleged importance of a surgical standard is also sometimes asserted when discussing placement of individuals who are incarcerated. The fear is that non-transgender women in jail, prison, or juvenile justice facilities will be sexually assaulted by transgender women who have not yet had surgery. First, it is important to understand that gender markers on birth certificates have almost no influence on where people are placed in prison, juvenile justice facilities, and longer-term jail stays.[191] The only cognizable

---

189. Mottet & Ohle, *supra* note 169; *see also* ERNST & YOUNG, WORKPLACE GENDER TRANSITION GUIDELINES (2006) *available at* http://www.hrc.org/files/assets/resources/ErnstYoung_TransitionGuidelines_2006.pdf.; Peter Likins, *Statement on Restroom Access*, UNIV. OF ARIZ. (June 26, 2006), http://equity.arizona.edu/restroom_access.

190. NAT'L GAY & LESBIAN TASK FORCE, *supra* note 77.

191. In addition to the strip search conducted to identify contraband that often precedes incarceration, prisons and juvenile justice facilities generally do medical exams of incoming prisoners. Transgender individuals are then classified/housed by their ex-

situation in which a birth certificate gender marker could become relevant would be for the initial twenty-four to seventy-two hours after arrest while in a jail or holding cell. Second, for a variety of reasons,[192] police are likely to know that the person they arrested is transgender. Thus, even if a person's birth certificate had been altered to reflect their identified gender prior to surgery, the police are unlikely to make housing decisions based on the certificate. As a result, birth certificate policies could only potentially affect an extremely small percentage of transgender women's placement.[193]

Furthermore, just as in homeless shelters and sex-segregated spaces generally, there is a new standard related to the placement of transgender people in jails and prisons. This standard makes a transgender person's physical anatomy only one consideration in housing determinations. The recently promulgated Prison Rape Elimination Act regulations which apply to all prisons, jails, and lockups in the U.S., set forth exactly this policy: that housing classification, including whether a person is to be housed in the male or female facility, be made on a case-by-case basis.[194] Notably, gender

---

ternal genitalia, regardless of documentation. *See* Farmer v. Haas, 990 F.2d 319, 320 (7th Cir. 1993) ("The practice of the federal prison authorities . . . is to incarcerate persons who have completed sexual reassignment with prisoners of the transsexual's new gender, but to incarcerate persons who have not completed it with prisoners of the transsexual's original gender.").

192. Strip searches when being placed in a cell or holding area with others are common for those who are arrested for violent crimes or drug-related activity so that police can look for weapons, drugs, or other contraband. *See* Brief of the A.B.A. as Amicus Curiae in Support of Petitioner, Florence v. Board of Chosen Freeholders of the County of Burlington (June 27, 2011) (No. 10-945), 2011 WL 2578557, at *8, *12–*14. Furthermore, if people have been arrested before, their arrest or criminal record should disclose their transgender status to arresting police. Finally, police, depending on what is available to them from the driver's license database, are likely to be able to quickly determine whether the arrestee has undergone a name change by examining their driving record, so unless the person had a gender-neutral name at birth, the name change would likely disclose to officers that the arrestee is transgender.

193. In order for the police not to determine that a transgender woman arrestee is transgender, she would have to (1) be arrested for the first time, (2) be arrested for a non-violent crime not involving drugs, (3) not be visibly transgender, and (4) have a driver's license record that does not indicate that a gender or name change occurred.

194. National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115) (mandating that transgender and intersex inmates, who may be especially vulnerable, receive an individualized assessment on whether the inmate should be housed in a male or female facility). In making the assessment, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. *Id.; see* WASHINGTON D.C. DEP'T OF CORRECTIONS, INMATE MANAGEMENT RULE 4020.3C, PROGRAM STATEMENT: GENDER CLASSIFICATION AND HOUSING (2011) (explaining that for inmate housing classification, the Transgender Committee makes the assessment and

markers on birth certificates are not considered in placing inmates. These new policies are being established because of the very real levels of sexual violence transgender women face when housed in male areas of jails, prisons, and juvenile justice facilities. According to a University of California-Irvine study in 2007, transgender women in male units experience thirteen times more sexual assault than non-transgender men in the unit.[195]

Last, it is also important to note that one court has found that a female inmate had no right to a different cellmate after she had been placed with a transgender woman who had not had genital surgery. In this case, the court considered whether the inmate possessed a clear constitutional right to be housed with someone having the same anatomical structure and concluded that they did not.[196] Thus, the only court to consider whether there was a right for an inmate to be housed with an anatomically similar inmate has concluded that no such right exists.

Ultimately, transgender women using or living in sex-segregated facilities do not create or increase threats to non-transgender women, regardless of whether those facilities are bathrooms, jails, prisons, homeless shelters, foster care group homes, or college dormitories. In fact, many of these facilities long ago voluntarily abandoned surgical or anatomy-based requirements, recognizing that safety and fairness dictate that transgender people be provided access to the facility that matches their gender identity. Thus, while updating the legal standard for correcting birth certificates will have some positive effects for some transgender people who are currently denied access to sex-segregated facilities because of their lack of government identity documents, overall, there will be little to no noticeable effect on the

---

recommendation after interviewing the transgender inmate based on safety/security needs, housing availability, gender identity, and genitalia); KING COUNTY, WASHINGTON DEP'T OF ADULT AND JUVENILE DETENTION, ADULT DIVISIONS, GENERAL POLICY MANUAL 6.03.007 TRANSGENDER INMATES (2006) (assigning inmates' housing based on their safety/security needs, housing availability, gender identity, and genitalia).

195. VALERIE JENNESS ET AL., VIOLENCE IN CALIFORNIA CORRECTIONAL FACILITIES: AN EMPIRICAL EXAMINATION OF SEXUAL ASSAULT, UNIV. OF CALIFORNIA-IRVINE 3 (2007), *available* at http://ucicorrections.seweb.uci.edu/pdf/FINAL_PREA_REPORT.pdf.

196. "Expert medical opinion informed Jail officials that housing Lamson [a transgender woman] with the female population would best satisfy Lamson's unique psychological needs and that there was *no risk to the female inmates.* . . . Although it is clear that there is a constitutional right to privacy, I conclude that the contours of that right are not clear when it comes to the determination of where to house transsexuals. Such a constitutional right was not 'clearly established in its more particularized sense' under these circumstances." Crosby v. Reynolds, 763 F. Supp. 666, 669–70 (D. Me. 1991) (emphasis added).

safety of sex-segregated facilities for non-transgender people if birth certificate laws and policies are modernized to eliminate the surgical standard.

### 5. Surgical Requirements Raise Serious Constitutional Concerns

The surgical requirement for gender correction raises both Equal Protection and Substantive Due Process concerns.

There is a well-founded Equal Protection Clause argument to be made that a surgical requirement discriminates against the class of transgender people—who all must have surgery or else be denied an accurate birth certificate—compared to non-transgender people who have accurate birth certificates without being required to undergo surgery.[197] Depending on which level of scrutiny the court would apply to the class of transgender people, at minimum, there would have to be a legitimate state interest that the surgical policy was rationally related to advancing. None of the policy reasons related to fraud, permanence, and sex-segregated facilities, which were articulated and dismissed in this Section, should be considered rationally related to a legitimate[198] state interest.[199]

---

197. A second approach under the Equal Protection Clause would be to compare transgender people who have had surgery versus those who have not had surgery. This type of distinction, based on surgical status, is more likely to receive rational basis review.

198. Interests of prevention of fraud and security, and safety, may all be legitimate, however, the surgical rule fails because it is not *rationally related* to advancing these interests.

199. Presumably, the government might also make an argument that a surgical standard is simply easier to administrate than other options. Given the multitude of different surgeries that a person may receive, as well as the fact that the way most agencies determine that surgery has been undergone is through a letter or other document from a health care provider, it should not be *more* difficult to process a letter or other document from a provider stating that the person has had appropriate treatment for the purpose of gender transition. Thus, the argument that surgery is an easier standard to administrate is faulty.

Moreover, there is a sound argument that transgender people deserve either heightened[200] or strict scrutiny[201] in Equal Protection analysis. If the former, the reasons for the policy would need to be "important" and the policy would need to be "substantially related" to forwarding that interest. If the latter, the policy reasons would need to be "compelling" and the policy would need to be "narrowly-tailored" to advancing that interest. Even if a court was to declare that the state interests were "legitimate" and the classification was rationally related to meeting that interest, which would enable it to pass rational basis review, these policy justifications should certainly fail under heightened review or strict scrutiny.

There are also a series of rights implicated by surgical requirements that could be protected by the Substantive Due Process protections of the

200. Heightened or "intermediate" scrutiny is provided for all classifications based on gender. *See* United States v. Virginia, 518 U.S. 515 (1996). A good argument can be made that this issue qualifies for heightened scrutiny because at its most basic level, the government is making a classification based on gender when it is determining which gender marker is appropriate and it is potentially judging or classifying a person based on their sexual characteristics, which may be related to sex stereotypes about what makes a man and a woman. *See* Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir. 2011) (reasoning that a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes" and therefore that discrimination against transgender individuals on the basis of their gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause, which receives heightened scrutiny). In addition, the Department of Justice released a report saying that all LGBT people should receive heightened scrutiny. U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE NEW ORLEANS POLICE DEPARTMENT 33 (2011) *available at*, http://www.justice.gov/crt/about/spl/nopd_report.pdf ("[W]e note that a number of factors weigh in favor of applying heightened scrutiny in the context of discrimination by law enforcement on the basis of sexual orientation and gender identity, including a long history of animus and deeply-rooted stereotypes about lesbian, gay, bisexual, and transgender ('LGBT') individuals.").

201. In determining whether to apply a heightened level of scrutiny, the Supreme Court has set forth two requirements: (1) that the group affected have been historically victims of discrimination by the government, and (2) that the characteristics that differentiate the group bear "no relation" to the ability of members of that group to contribute to society. *See* Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313 (1976); Frontiero v. Richardson, 411 U.S. 677, 686 (1973). In addition, courts have sometimes considered whether the characteristics that define the group are immutable and whether the group is politically powerless. *See* Nyquist v. Mauclet, 432 U.S. 1, 9 n.11 (1977) (demonstrating the flexibility of immutability by holding that classifications based on alienage warrant heightened scrutiny even though they can naturalize); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (finding that poor families are not politically powerless). Transgender people should be able to meet the two required factors and also satisfy the two other characteristics that courts have considered. Therefore, they should be deemed a "suspect class" for purposes of applying Equal Protection analysis.

Constitution. First, there is a long-established right to be free of unwanted medical treatment.[202] Second, there is a long line of cases establishing the right to choose parenthood and control one's reproductive capacity.[203] Third, there is a right to be free of sterilization.[204] The latter two rights are restricted by surgical requirements because sterilization and other effects on one's reproductive capacity are inherent in many sex reassignment surgeries. In addition, a good argument can be made for a previously unrecognized right to gender self-determination.[205] Thus, if the government desires to limit any of these rights—which a surgical requirement does[206]—the government action would need to be justified by a compelling state interest, with the policy narrowly tailored to forwarding that interest.[207] As previously discussed, however, the articulated policy reasons for a surgical requirement do not meet that standard.

All of the Substantive Due Process arguments should also be considered valid public policy concerns, even if a court would not accept them as constitutionally guaranteed freedoms. For example, some would argue that the highly personal and private nature of a person's decisions regarding surgical options should not be interfered with by the government, that an individual's bodily integrity should be protected against government intrusion, and finally, that sterilization should not be required of any citizen without a serious public policy justification.

---

202. *See, e.g.*, Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261 (1990).

203. *See, e.g.*, Griswold v. Connecticut, 381 U.S. 479 (1965); Roe v. Wade 410 U.S. 113 (1973); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992).

204. *See, e.g.*, Skinner v. Oklahoma, 316 U.S. 535 (1942).

205. This argument would be based on *Lawrence* and, more generally, existing Substantive Due Process jurisprudence that recognizes a person's intimate and personal decisions should be respected absent government need to the contrary. Lawrence v. Texas, 510 U.S. 538 (2003). There is also international support for the existence of this right. *See* Goodwin v. United Kingdom, Eur. Ct. H.R. 1 (2002).

206. A surgical requirement can interfere with these rights for several reasons. First, for many, surgery is unwanted medical treatment. Second, a side effect of surgery is often sterilization, which would interfere with one's ability to parent and control one's reproductive capacity. Third, a person's right to gender self-determination is interfered with when the government insists upon providing official government documents that contradict one's self-determination and disclosing this information to third parties.

207. The rights listed are typically referred to as *fundamental* rights, although the Court may be shifting to a "liberty interest" frame, where the requirement that rightsbe connected to or established by our nation's history is no longer present. In addition, the test for the restriction of fundamental rights may be becoming less rigid. For a discussion of the evolution of substantive due process analysis, see Laurence H. Tribe, Lawrence v. Texas: *The "Fundamental Right" That Dare Not Speak Its Name*, 117 HARV. L. REV. 1893, 1897–98 (2004).

Regardless of the strength of these arguments, state governments should be concerned that they will be subject to litigation, potentially based on state or federal constitutional provisions. Two lawsuits were filed in 2011 challenging surgical requirements for updating birth certificates and driver's licenses.[208]

### C. Specific Recommendation for Legal Standard for Gender Correction

Individuals should be permitted to correct the gender marker on their birth certificates if they make a gender transition that is medically recognized, using a modern medical understanding of transgender people. As official government records, birth certificates must remain reliable documents; therefore, it is important to establish a process to ensure that the amendments are reliable. Usually, agencies require external verification when individuals wish to make other corrections to their birth certificates (e.g. name, paternity, etc.). In order to put forth a statute that will be acceptable by government agencies, some compromise[209] in the form of external verifica-

---

208. In Alaska, the state ACLU challenged the driver's license / state identification card policy of requiring surgery on the grounds that it violated substantive/fundamental rights protected by the Alaska Constitution. *See* Brief of Appellant, K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431 (Alaska Super. Ct. July 18, 2011), *available at* http://www.akclu.org/InTheCourts/KLvAlaska.AppellantsBrief.pdf. In a Memorandum of Decision, the judge determined that the surgery-based policy was not enacted with appropriate procedure, thus struck it down, not reaching the larger constitutional claims brought by the plaintiffs. However, the judge did determine that the agency not having a gender correction policy at all constituted a breach of the right to privacy of the transgender licensee. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision). In New York, the New York City birth certificate policy of requiring proof of surgical treatment was challenged on the basis that it violated the city's Administrative Procedure Act, was an arbitrary and capricious agency action, and was a violation of numerous provisions of the New York City Human Rights Law. *See* Press Release, Transgender Legal Defense and Education Fund, Transgender Rights Group Files Lawsuit Against New York City Over Refusal to Correct Transgender Birth Certificates (March 22, 2011), *available at* http://tldef.org/press_show.php?id=327.

209. Some may favor a self-identity based policy. *See, e.g.*, TRANSGENDER EQUAL. NETWORK IR., A TIME FOR RECOGNITION: RESPECT, RECOGNITION AND EQUALITY FOR TRANSGENDER PEOPLE 9, *available at* http://www.teni.ie/attachments/714a4ffb-3240-496b-8905-06002a24d6c7.pdf ("TENI would propose that a statutory declaration rather than an affidavit would be appropriate for gender recognition and that the person swear that they have given the matter careful consideration and declare their wish to change their gender and have this recognized legally."). In Argentina, a self-identity based policy, with no external verification, is now national law. *See supra* notes 38–40 and accompanying text. Yet, given the lack of even any U.S. driver's license policies, seen as less legally meaningful, being based entirely on self-identity with no external verification, it seems unlikely that a jurisdiction would

tion is necessary. However, it can be done without obstructing a person's constitutional rights and can be done in a way that comports with contemporary medical understanding.

Although the complete model law is presented in Part V.,[210] the relevant portion regarding the standard of proof is the following:

> A notarized statement from the registrant's licensed treating or evaluating physician or health care provider stating that the registrant *has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition, based on contemporary medical standards*, or stating that the registrant has an intersex condition, and that in the *provider's professional opinion* the registrant's gender designation should be changed accordingly.

There are seven important features to this model language:

(1) First, the language uses the term "licensed physician or health care provider" because, as the Standards of Care recognize, a number of physicians and non-physician health care providers can be appropriately involved in a person's gender transition and have the requisite knowledge to make a competent evaluation. This language is broad enough to include therapists, psychologists, psychiatrists, social workers, as well as other physicians who are licensed to provide health care.

(2) Second, there is no requirement that the provider personally conducted or supervised the person's treatment—a provider

---

agree to a solely self-identity based policy for birth certificates. In addition, there are some that want gender removed entirely from the birth certificate. *See* Spade, *supra* note 4, at 805–08. This is more feasible than one might think because the government health statisticians who want gender data can get it on the more detailed health questionnaire that is filled out at the same time with the birth certificate. For example, the health questionnaire typically asks race, whether or not pre-natal care was received, and the health of the baby as delivered. While I am sympathetic to this way of thinking, at this point it is not politically realistic to suggest to state legislatures to remove gender entirely. Also, as discussed in *supra* Part I.D.2., there are important practical and legal reasons that a person may need to have some official record of gender to present to authorities. A gender-less birth certificate cannot meet that need.

210. *See infra* Part V.

who has completed an evaluation should be considered qualified.[211]

(3) Third, the language uses the phrase "has undergone" as opposed to "complete," which is sometimes found in existing statutes and implies that the treatment has ended.

(4) Fourth, the language is clear that it is an *individual* standard and no specific medical treatment is required. This is due to the use of the conjunctive in "surgical, hormonal, *or* other treatment" as well as the important phrase "appropriate for that individual."

(5) Fifth, the reference to "contemporary medical standards" in the statute is included to help ensure that as medicine evolves, so does the statute.[212]

(6) Sixth, the language ensures that providers are exercising their professional judgment, based on the treatment they provided or based on their evaluation, with the phrase "in the provider's professional opinion."

(7) Seventh, the language has an alternative standard for those with intersex conditions so that they do not have to demonstrate treatment of gender transition. For people with intersex conditions, it is sufficient to only require that their provider deem it appropriate for the gender marker on their birth certificate to be corrected.[213]

## III. DEVELOPING AN ACCESSIBLE AND EFFICIENT PROCEDURE FOR GENDER MARKER CORRECTIONS

The procedure for correcting gender markers on birth certificates must be examined in light of two primary goals. First, the process for gender

---

211. This is in large part about convenience and practicality. Some people receive treatment from doctors in other countries. Also, occasionally, the specific provider who treated a person retires, dies, or is otherwise not easily locatable. Thus, any doctor who can evaluate the person should be eligible to provide the information about the person's treatment.

212. The inclusion of this "contemporary medical standards" phrase should also help legislators support the measure because they know that what they are endorsing is supported by modern medicine, which otherwise may not be obvious.

213. This is similar to the U.S. Department of State policy related to Consular Reports of Birth Abroad and Passports, which requires only the provider review the gender-related history of the applicant to determine which gender marker should be male or female. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL 1300, App. M, Intersex Conditions (2011) *available at* http://www.state.gov/documents/organization/1431 60.pdf.

correction should be as accessible as possible so that transgender people who warrant the correction can access it, regardless of their income or other personal factors. Relevant to this inquiry is primarily whether a court order process is used or whether a person can go directly to the agency with a provider's statement. Second, the process should be as efficient as possible to conserve government resources.

## A.  Existing Laws and Policies Related to Process

While the MSVSA requires a court order, only twenty-two states, the Commonwealth of Northern Mariana Islands, District of Columbia, and U.S. Virgin Islands require court orders.[214] In nineteen states, New York City, and Guam, a doctor's affidavit or other documentation submitted directly to the vital statistics agency is sufficient evidence of a gender transition.[215] Three states allow a person to use either process.[216] Procedures are unclear in several other jurisdictions.[217]

One of the consequences of using a court order system, especially when the statutory standard is nonexistent or vague, is that individual judges are likely to establish or apply their own standards of eligibility for a gender correction based on their individual knowledge. Even if the word "surgery" is used in the statute, some judges may distinguish between the types of surgery they deem would make a petitioner eligible for the correction. This problem is exacerbated in states where people are required to go to court in their county of birth or residence, and thus are not able to go to an area of the state where judges might be more familiar with, and less biased against, transgender people and gender transition.[218] Similarly, if

---

214. The states are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, Nevada, New Hampshire, Oregon, South Dakota, Utah, Virginia, Vermont, Wisconsin, and Wyoming. *See infra* app. A

215. The nineteen states are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kansas, Kentucky, Massachusetts, Maine, Michigan, North Carolina, North Dakota, Nebraska, New Jersey, New Mexico, New York, Rhode Island, and Washington. *See infra* app. A.

216. These are Minnesota, Pennsylvania, and West Virginia. *See infra* app. A.

217. These are Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

218. For example, in Vermont, people have to go to the probate judge in their county of birth. VT. STAT. ANN. tit. 18, § 5075 (West 2011). Each county has one elected probate judge. Although Vermont's probate judicial system is relatively easy to access and can be utilized without an attorney, this system remains highly restrictive because it increases the potential for someone having to appeal (and hire an attorney) if the elected judge in the county of birth denies the correction. Anecdotally, we know that the ability to go to certain judges or to the courts in a large geographic area, where most judges are more educated about and less biased toward transgender people, is an important survival technique. A system that forces a person to go to a

judges are attempting to determine what treatment is "appropriate" for the individual, one can imagine that different judges will come to different conclusions.

In an attempt to mitigate the problems of judicial inexpertise, both California[219] and Vermont adopted statutory language to limit judges' ability to determine what qualifies as appropriate medical treatment. In Vermont, the statute says that the documentation from the medical provider is "sufficient evidence,"[220] and in California, the documentation should be considered "conclusive proof" of the change in gender.[221] Furthermore, in California, the gender change process is already facilitated by a series of court-created, consumer-friendly forms that reduce the need for an attorney.[222]

In the twenty-four states without requirements for a court order, typically a doctor's statement (nine states), certificate (two states), letter (two states), or affidavit (nine states) must be provided directly to the vital statistics agency. Two jurisdictions require that the documentation be "sworn"[223] and seven require that the documentation be notarized.[224] Nine states require that the physician signing the letter or statement is the actual surgeon who performed the surgery.[225] Two states have more burdensome require-

---

specific judge or area of the state makes it more likely a person will be unable to steer away from discrimination. Interview with Kristina Wertz, *supra* note 114 (noting variation on outcome based on judge when California had a surgical requirement).

219. The new law could still be improved by eliminating the requirement of receiving a court order entirely. Conversations with transgender advocates in California indicate that they decided to address primarily the surgical requirement with this legislation. Additional, they have already attempted to minimize the burden of needing to go to court by creating a combined process for name and gender corrections and easy-to-use forms. Interview with Kristina Wertz, *supra* note 115.

220. Vt. Stat. Ann. tit. 18, § 5112(b) (West 2011).

221. Ca. Health & Safety Code § 103430 (West 2012). However, the strength of the "conclusive proof" statement is somewhat tempered by a later statement that "[a]t the conclusion of the hearing the court shall grant the petition if the court determines that the physician's affidavit shows that the person has undergone clinically appropriate treatment for the purpose of gender transition." *Id.*

222. The Judicial Council of California promulgates a variety of forms, including forms for the applicant, medical affidavits, and judicial orders and decrees. *See Browse All Forms*, California Courts, http://www.courts.ca.gov/forms.htm?filter=NC (last visited Dec. 27, 2011) (including relevant forms for name and gender changes: NC-200, NC-210, NC-220, NC-230, NC-300, NC-310, NC-320, and NC-330).

223. These are Kentucky and Guam. *See infra* app. A.

224. These are Iowa, Massachusetts, Maine, Nebraska, North Carolina, Rhode Island, and West Virginia. *See infra* app. A.

225. These are Connecticut, Illinois, Maine, North Dakota, Nebraska, New Mexico, Pennsylvania, Virginia, and West Virginia. *See infra* app. A.

ments for post-surgical reports or descriptions of procedures.[226] For Consular Reports of Birth Abroad, a letter on letterhead is required to be given directly to the State Department.[227]

Although it is not found as a written part of these policies, presumably these documents are examined for authenticity by agency staff. Requiring only a letter or notarized statement, as opposed to an "affidavit," should be easier for a non-lawyer to understand how to produce.[228] In addition, both the Consular Reports of Birth Abroad policy and the new California statute provide suggested language for the medical provider to include in a letter or statement. This also can be helpful for a non-lawyer to navigate the system.

Another important feature, which currently only exists in Connecticut, is a provision relating to the jurisdiction of judges to issue court orders to correct a current resident's gender on his/her birth certificate when they were born in a different state that requires a court order. Because of the time, money, travel, and other costs associated with traveling to the place of birth to hire an attorney and appear in court, it is significantly easier for individuals to file for a court order from their current state of residence. Connecticut's statute provides:

> In the case of a person who is a resident of this state and was born in another state or in a foreign jurisdiction, if such other state or foreign jurisdiction requires a court decree in order to amend a birth certificate to reflect a change in gender, the probate courts in this state shall have jurisdiction to issue such a decree.[229]

---

226. For New York, this involves "a letter from the surgeon specifying date, place, and type of sex reassignment surgery performed; an operative report from the sex reassignment surgery; and some additional medical documentation." For Virginia, the applicant needs a "preoperative diagnosis, postoperative diagnosis and description of procedure." *See infra* app. A.

227. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29, at 1320 app. M(b).

228. Affidavits, depending on the state law, can require additional formatting or other requirements that a lay person would have to research in order to complete properly. However, most non-lawyers know what a "notarized" statement is; thus, this is more accessible.

229. CONN. GEN. STAT. ANN. § 19a-42b(1) (West 2011).

This clarification is important because it reduces the likelihood that courts[230] will express concern about lack of jurisdiction over an executive agency in another state or country.[231]

## B. Issues to Consider When Designing a Correction Process

Approximately half of jurisdictions currently have a court order process instead of a direct-to-agency process. These jurisdictions need to consider the various consequences of this policy. For many, the court order process can be an insurmountable practical or financial barrier to obtain a corrected birth certificate. It also compromises privacy, leads to problems caused by lack of judicial inexpertise and bias, as well as raises serious constitutional questions.

### 1. Practical Concerns with the Court Order Process

Administrative processes are a critical feature of government record keeping and daily life. The government keeps records on our lives in many ways. If people had to hire attorneys or visit judges for all of the government record-keeping features of their lives, the cost of running the government would exponentially increase. Imagine if everyone had to hire an attorney and go to court for every interaction they had with the government, such as having a child and needing to establish a birth record, getting a driver's license, registering the ownership of a car, getting married, recording a death, etc. Because of their easy accessibility, efficiency, and lower cost, administrative processes are often used in lieu of judicial action for record-keeping functions. The judicial process is utilized when there is a need for judicial oversight to prevent fraud or for an investigation where facts are contested.

Requiring people to get court orders to correct the gender markers on their birth certificates is typically a significant burden. There are many expenses associated with it: hiring an attorney competent in the matter, taking time off work or school to meet with an attorney and appear in court, traveling to the courtroom and attorney's office (the cost of which, especially for non-residents of the state, may be significant and time consum-

---

230. *In re* Heilig, 816 A.2d 68, 84 (Md. 2003) (noting that a lower court in Maryland had held that it did not have power over the Secretary of State of Pennsylvania to order a change in the individual's birth certificate and, in dicta, stating "[o]bviously, the Legislature cannot direct officials in other States to change birth certificates issued in those States but may deal only with birth certificates issued or issuable in Maryland . . . ").

231. Of course, the receptive state or country may not accept the order, but many states are known to do so as a practical matter.

ing), and court fees. Although court forms may be created to simplify the process somewhat and court fee waivers may be available to those with low incomes, in general, a court order process is significantly more burdensome than an administrative process.

Thus, to reduce costs to both the government and the individual, states should provide an administrative process for birth certificate gender corrections.

### 2. Privacy Concerns with the Court Order Process

There is no public policy reason to require a person to discuss their intimate feelings regarding their birth sex, gender identity, or the medical treatments they have received in open court. Privacy of the details of one's sex, gender identity, and medical treatment, or the facts surrounding one's gender transition or transgender status, should not depend on the happenstance of who is in the courtroom[232] or whether the judge agrees to seal or redact the judicial records.

Furthermore, depending on the system, the very instigation of the court proceeding can create permanent court records that document the proceeding in some way regardless of attempted confidentiality.[233] The future availability of court records to members of the public can also cause psychological distress.

As will be discussed fully in Part IV-B, the mere disclosure of a person's transgender status, or his or her medical treatment related to being transgender, is likely to be a constitutional privacy violation. One effective

---

232. This concern may be mitigated in systems in which the person only appears before the judge, not in open court. However, at the minimum, the judge and potentially a clerk will be listening to these intimate details. In a direct-to-agency procedure, less private and intimate details are disclosed by the medical provider's statement, and there may be only one person who examines the provider's statement. In California, the Transgender Law Center has recommended to people worried about disclosures in open court that they ask to go last or ask to speak with the judge in closed court if questions come up that they would prefer not to answer in open court. TRANS-GENDER LAW CENTER, ID PLEASE. . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

233. This concern may be mitigated if the record is sealed by the judge, which, depending on the system, may only be allowed at the judge's discretion. However, in some states even a sealed record will be available in the court index. See, e.g. LEGAL VOICE, Family LAW COURT RECORDS AND YOUR PRIVACY 5 (2008) *available at* http://www.legalvoice.org/pdf/self_help/Family_Law_Court_Records_%20and_Your_Privacy.pdf ("When the court seals a file or a document, the court means to protect it from examination by the public. The existence of the sealed file can be found on a court index with the case number and the names of the parties and the notation 'case sealed'. However, the contents of the case will not be available to the public.").

way to deal with this potential privacy violation is to avoid it by not going through the court system in the first place.[234]

### 3. Concerns about Lack of Judicial Education and Bias Toward Surgery

Judges are often called upon to make a factual determination with regard to medical facts, including in the most complicated cases of medical malpractice, and they do so competently. However, to do so, they rely in large part on medical and scientific experts. When it comes to transgender medicine, judges' views may be similar to those of the general public. Absent testimony from medical experts, judges may not be aware of the current well-accepted Standards of Care or how inaccessible surgical treatment can be. There is a greater risk that a judge will misapply the standard "appropriate treatment . . . based on contemporary medical standards" than there is in having a medical professional apply the standard.

That judges are not fully educated on transgender medical issues has been documented in other areas of the law. Judges often have required surgery as a condition for gender recognition, especially in cases related to marriage, even when there is no medical or legal basis for that requirement.[235] Moreover, certain judges have required proof of surgery for *name* changes for transgender people, which according to longstanding common law principles are to be granted except in the narrowest circumstances. The fact that many judges have applied a surgical standard where none exists indicates that many share the belief that anatomical presentation is what determines gender. Battles over proof of surgery in the name change context have bubbled up to appellate courts in New Jersey, Pennsylvania, and New York,[236]

---

234. Another alternative would be to require in the statute that the court proceeding be conducted in private and to be sealed afterwards. This lessens some of the confidentiality concerns but does not entirely eradicate them.

235. *See* Tobin, *Against the Surgical Requirement, supra* note 4, at 413–17.

236. Longstanding common law principles establish a person's right to change their name, with an affirmative right to do so absent harm to another person, fraud, or other public policy interest. Judges may consider whether the name would create other fraudulent issues, such as someone adopting the name of a well-respected professional in order to get business fraudulently, whether or not the name is overly long or ridiculous, or profane. *In re* Falcucci, 50 A.2d 200, 202–03 (Pa. 1947). Some judges in New York required documentation of sex reassignment surgery before granting a simple name change from a traditionally male name to a female name. This happened throughout New York until a series of appellate decisions appear to have definitively declared that proof of medical treatment was not required. *In re* Winn-Ritzenberg, 891 N.Y.S.2d 220, 221 (N.Y. App. Term 2009) (per curiam) ("There is no sound basis in law or policy to engraft upon the statutory provisions an additional requirement that a transgendered-petitioner present medical substantiation for the desired name change."); *see also In re* Guido, 771 N.Y.S.2d 789 (N.Y. Civ. Ct. 2003) (reversing the court's own decision after initially requiring medical

and include a case where a judge denied a transgender woman a name change from "Brian" to "Lisa" who had been living as Lisa for 22 years.[237] In other areas of the country, denials of name changes based on lack of medical evidence still happen on a regular basis.[238] That this continues to be a problem, despite clear case law that surgery should not be required, demonstrates the persistence of the judges' views that surgery is properly required before recognizing a person's gender.

In order to remedy a judge's possible lack of education about transgender medicine, an applicant would potentially need to hire a medical expert, or experts, to provide this expertise to the judge.[239] This is a costly burden. In the alternative, the judge could defer to the physician who provides a statement that the person in question has undergone appropriate medical treatment, in the way suggested by California and Vermont's statutes. In that scenario, the judge is not performing any fact-finding beyond determining that the physician is a real person who signed the paper. The role that judges play in these places could be filled as competently, or more competently, by an official in the vital records office who regularly inspects documents for authenticity.

It is helpful to analogize this situation to one where a person with epilepsy had to obtain a court order to drive. Certainly a judge is capable of determining that the person has been adequately medicated by examining the testimony of experts or that person's doctor. However, a more efficient system is one that allows the DMV to process the provided medical infor-

---

evidence). Appellate courts in Pennsylvania and New Jersey have also overruled lower judges on this question. *See In re* McIntylre, 715 A.2d 400, 402–03 (Pa. 1998) ("Here, it was undisputed that Appellant was judgment free and was not seeking a name change to avoid any financial obligations or commit fraud. The fact that he is a transsexual seeking a feminine name should not affect the disposition of his request."); *In re* Eck, 584 A.2d 859, 860–61 (N.J. Super. Ct. App. Div. 1991) ("Absent fraud or other improper purpose a person has a right to a name change whether he or she has undergone or intends to undergo a sex change through surgery, has received hormonal injections to induce physical change, is a transvestite, or simply wants to change from a traditional "male" first name to one traditionally "female," or vice versa.").

237. *In re* Harris, 707 A.2d 225 (Pa. Super. Ct. 1997).

238. Interview with Dru Levasseur, *supra* note 115.

239. The highest court in Maryland appeared to realize its limitations in knowledge of transgender medical issues in *In re Heilig*, 816 A.2d 68, 72 (Md. 2003). The court asserted it is not qualified to write a medical text on the subject of transgender medicine and noting that it is unable to evaluate that field "unguided by expert testimony." *Id.* Despite this statement, the court then wrote ten pages summarizing medical research into transsexualism and intersex conditions, presumably showing willingness to venture into areas of scientific knowledge despite being unguided by expert testimony. *Id.* at 71–79.

mation; in fact, this is generally how this issue is handled.[240] It is simply inefficient—a waste of judicial resources—and prone to error to have a judge make or supervise the medical determination instead of a person's doctor.

### 4. Constitutional Problems with a Court Order Process

There is a novel argument that requiring a court order is a substantial, and therefore invalid, burden upon a person's right to determine his or her gender. First, the court would need to recognize that there is a right to self-determination of gender, discussed previously in Section II.B.5.

Once the right is established, the burden of going to court must be analyzed. Certainly, as previously discussed, the process of getting a court order typically requires money for court fees, hiring an attorney, time to prepare for and make a court appearance, and potentially travel to one's state or county of birth. Furthermore, it may compromise the privacy of one's transgender or medical status. Thus, going through the court process is legitimately considered a real burden for those attempting to update the gender on their birth certificate. If the burden is considered significant or substantial,[241] the court order process is unconstitutional, unless it is justified by sufficiently important government interests and closely tailored to meet them.[242]

### C. Specific Recommendation for the Gender Correction Process

In order to maximize both the accessibility of the gender marker change and the efficiency of the government in making the change, an administrative process in which an individual goes directly to the agency with the relevant documentation should be the standard method for gender

---

240. DMVs have slightly different rules on how to determine when a person with epilepsy should be cleared to drive, but none of the states have any judicial involvement. *See* Robert S. Fisher, *Driving and Epilepsy*, EPILEPSY THERAPY PROJECT, (Mar. 2009) http://www.epilepsy.com/epilepsy/newsletter/mar09_driving.

241. *See* Zablocki v. Redhail, 434 U.S. 374 (1978).

242. *See Zablocki*, 434 U.S. at 388 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."); *See also* Bullock v. Carter, 405 U.S. 134, 144 (1972) (finding that a law infringing on a constitutional right "must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster"). I plan to explore this argument further in a future article.

marker corrections on birth certificates.[243] A notarized statement from a doctor, with the relevant information, should be sufficient documentation to ensure that the applicant has a bona fide need for a corrected gender marker. Using the term "notarized statement" is more desirable than "affidavit" because the general public is more aware of how to get a statement notarized than how to write an affidavit, the format of which may be highly technical and differs from state-to-state.

In the case of bias or misapplication of the relevant standard by the agency official, the statute should make clear that there is an appeals process through the courts that an individual may pursue if denied a gender marker correction. The MSVSA has such language relating to all potential corrections, and a number of states have also adopted it.[244]

In addition, the statute should give courts of that state clear authority to provide court orders that residents can use in their state or country of birth where court orders are still required. This is relatively straightforward and should be included as a matter of course until there are no longer states or countries that require court orders. If this provision is not included, judges may be concerned that they lack authority to issue such an order.[245]

---

243. My proposed statute dictates that the administrative process is the only process. In joint recommendations to the U.S. Department of Health and Human Services, organizations have recommended that the statute allow that an individual can either submit a court order to the agency or submit a statement from the physician. *See* Harper Jean Tobin, Nat'l Ctr. for Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). I have omitted the court order option from this proposed statute in large part to avoid suggesting that states should choose which option to include in their statute. In reality, including both court order and administrative processes as options for an individual to use in the state's statute or policy, is also an acceptable outcome. In that case, a person who finds that the court order process is a burden can use the administrative process. The benefit of also including a court order option is that people who need a court order declaring their legal gender for other reasons may potentially be able to avoid the difficulties of acquiring statements from their health provider.

244. MODEL STATE VITAL STATISTICS ACT § 21(e) (Ctr. for Disease Control & Prevention 1992). *See* ARK. CODE ANN. § 20-18-307 (West 2005) ("When an applicant does not submit the minimum documentation required in the regulations for amending a vital record or when the state registrar has cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence and if the deficiencies are not corrected, the state registrar shall not amend the vital record and shall advise the applicant of the reason for this action. The state registrar shall advise the applicant of his or her right of appeal to a court of competent jurisdiction."); COLO. REV. STAT. ANN. §25-2-115 (West 2010); IDAHO CODE ANN. § 39-250 (2010); OR. REV. STAT. § 432.235 (2007).

245. *See In re* Heilig, 816 A.2d 68.

## IV. ESTABLISHING COMPREHENSIVE PRIVACY PROTECTIONS

The state may be violating an individual's right to privacy if it reveals information regarding a person's gender assigned at birth, gender transition, or transgender status. In creating a policy related to privacy, policymakers should consider the impact of government disclosure on transgender people as well as constitutional privacy rights that may be implicated.

The transgender person's right to privacy can be implicated by a birth certificate policy in three ways. First, if the agency refuses to provide a transgender person an updated gender marker, then the individual is "outed" as transgender to all who inspect the certificate. Second, in the process of pursuing and executing the gender correction, there are records created and altered that may leave a publicly available paper trail, including a visibly amended birth certificate. Here, how the gender marker correction is dealt with is only part of the issue, since policies related to how a change of name is recorded also matter. Third, the government staff involved in the process may learn of and disclose a person's transgender status to others. This Section deals primarily with the latter two issues—i.e. how to avoid privacy violations in the process and recording of gender correction as well as the role that government officials play. The first was fully addressed by recommendations in Sections II and III.

### A. Existing Privacy Protections

#### 1. Privacy Protections in the MSVSA

##### a. New Versus Amended Certificates

The MSVSA provides a general rule for any kind of amendment: it should be shown on the face of the document unless otherwise provided for by regulation.[246] Thus, unless a state adopts a regulation setting forth a different policy, the fact that an amendment has been made will be plain *on the face* of the certificate in some way.

The Model Regulations that accompany the MSVSA list the various ways in which a birth certificate can be amended so that the amendment, or the fact that an item was amended, is visible (or not) to those who inspect it: (1) by preparing a new certificate with a note that the item number was amended and on what date; (2) by drawing a single line through the incorrect information (without obliterating the underlying entry) and writing the

---

246. "A certificate or report that is amended under this section shall indicate that it has been amended, except as otherwise provided in this section or by regulation." MODEL STATE VITAL STATISTICS ACT § 21(e) (Ctr. for Disease Control & Prevention 1992).

correct data above or to the side; (3) by creating a special amendment form that includes the correct information and is attached to the original, unaltered certificate; and, (4) for electronic records, by changing the item, noting the date, and retaining the original information. The MSVSA Model Regulation provides these in brackets, indicating that they are all "optional,"[247] with the implication that states choose the provision(s) that they prefer. At the end of the list of options, there is a provision that specifically applies to gender correction, which is indicated through cross-referencing Section 21(d), the gender correction provision:

> (f) A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a *new* certificate. *The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.*[248]

Thus, the MSVSA Model Regulations treat gender correction as an amendment that *should* be kept private from those who are permitted to inspect the certificate. However, the provision could go unnoticed as an option to be used, or alternatively, policymakers could assume that it is one option of many when viewed in conjunction with the other options listed in this section. This is compounded by the fact that this optional provision's application to gender markers was only indicated through cross-referencing.

In fact, presumably because of the lack of clarity caused by the cross-referencing used in subsection (f), or otherwise lack of attention to detail by state policymakers, some states have adopted the MSVSA statutory language related to gender corrections *without* adopting the accompanying regulation in (f). Of course, some states may have also intentionally not adopted the provision because they wanted gender marker corrections to be visible. Yet, remarkably, some jurisdictions (such as Alabama, the Commonwealth of the Northern Mariana Islands, Kentucky, and Oregon)[249] have the exact MSVSA language that directs gender on one's birth certificate to be "amended as provided by regulation" but do not have *any* regulation instructing how amendments are to be made. Thus, in many states following part of the MSVSA, gender corrections are processed and marked as amended in the same way that other amendments are processed and marked, whether through a single-line cross out or another method.

---

247. "In cases where recommendations were considered optional, brackets, '[ ],' have been placed around the word or phrase." *Id.* at 1.

248. *Id.* at §11.8(f) (emphasis added).

249. For citations of these statutes, see *infra* app. A.

### b.  Treatment of Name Changes in the MSVSA

How a policy treats name changes is an important part of privacy analysis since the revelation of a name change has the potential to disclose that someone is transgender, even if the gender marker correction is kept private. The MSVSA requires a court-ordered name change to amend a name on the birth certificate.[250] Except in cases of adoption, or for name changes before the age of one, names will be amended visibly on the face of the document itself, following whichever amendment process the state chooses.[251]

However, the MSVSA's gender correction provision, Section 21(d), also refers to name changes that occur due to a change in gender. Accordingly, the fact and details of a transgender person's name change presumably should remain confidential on the certificate if the MSVSA Model Regulation's provision related to privacy is adopted.[252] However, the MSVSA's lack of clarity on this point renders it insufficient to ensure adequate privacy protections.

### c.  Records Storage and Accessibility in the MSVSA

The MSVSA generally limits access to copies of birth certificates to registrants; the registrant's spouses, children, parents or guardians; the legal representatives of any of them; or a person who is able to show that the certificate is necessary to determine or protect a property interest.[253]

---

250. "Upon receipt of a certified copy of an order of (a court of competent jurisdiction) changing the name of a person born in this State and upon request of such person or his or her parents, guardian, or legal representative, the State Registrar shall amend the certificate of birth to show the new name." MODEL VITAL STATISTICS ACT, *supra* note 1, § 21(c), at 10.

251. The Model State Vital Statistics Act's Regulations list possible options states could choose. *Id.* at §11.8.

252. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

253. *Id.* at § 24(a) ("The State Registrar [and other custodian(s) of vital records authorized by the State Registrar to issue certified copies] shall, upon receipt of an application, issue a certified copy of a vital record in his or her custody or a part thereof *to the registrant, his or her spouse, children, parents, or guardian, or their respective authorized representative. Others may be authorized to obtain certified copies when they demonstrate that the record is needed for the determination or protection of his or her personal or property right.* The State Agency may adopt regulations to further define those who may obtain copies of vital records filed under this Act.") (emphasis added).

The MSVSA also ensures that the documents used to justify an amendment, including the correction of gender or name, must be kept by the vital statistics agency:

> A record shall be maintained which identifies the evidence upon which the amendment was based, the date of the amendment, and the identity of the person making the amendment.[254]

There is some ambiguity with regard to the documentation that must be preserved. It could be argued that, at a minimum, the official must make a note identifying the type of documentation received (physician's letter, court order, etc.). However, this language may also be read to mean that the documents themselves must be preserved as well.

Whether these records are sealed or available to those authorized to receive a copy of the certificate is not clear because the topic is not explicitly addressed by the MSVSA or Model Regulation. If a state also adopts the Model Regulation provision related to privacy,[255] which states that individuals requesting a copy of a birth certificate should only be given the *new* birth certificate, then that state has at least demonstrated evidence of the intent to protect privacy in the context of gender corrections. Potentially, then, all of the retained records should be kept confidential as well.[256]

## 2. State Laws and Policies Related to Privacy

Of the fifty-three jurisdictions that allow gender marker corrections to documentation, seventeen states,[257] the District of Columbia, and Guam have procedures that allow for amending the original birth certificate but do

---

254. *Id.* at Reg. 21(b).

255. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

256. Although the regulations do not specify that these records will be sealed, other provisions regarding instances where "new" birth certificates are issued very clearly indicate that the old certificate and its information will be sealed and not available to anyone without a court order. MODEL STATE VITAL STATISTICS ACT § 12(g) (Ctr. for Disease Control & Prevention 1992) ("When a new certificate of birth is established by the State Registrar, all copies of the original certificate of birth in the custody of any other custodian of vital records in this State shall be sealed from inspection or forwarded to the State Registrar, as he or she shall direct.").

257. These are Alaska, Alabama, Arkansas, Arizona, Colorado, Kansas, Kentucky, Massachusetts, Maryland, Missouri, North Dakota, New Mexico, Oregon, South Carolina, Utah, and West Virginia. *See infra* app. A.

not allow issuance of a new birth certificate. Sixteen states[258] and New York City issue a new certificate. In seventeen jurisdictions, it is unclear what is done or it depends on instructions in the court order.[259] Only eighteen jurisdictions clearly seal their records, blocking access to the original certificate and ensuring the privacy of the medical records related to the gender correction.[260]

Name changes are generally allowed on birth certificates when an individual produces a court-ordered[261] name change directly to the state vital statistics agency. For name changes unrelated to gender transition, often the previous and new names both appear on the certificate. In thirteen jurisdictions, there is a clear statute or policy that a name change related to a gender correction should not appear on the face of the certificate.[262] In addition, at least one jurisdiction appears to *require* that people change their name when changing gender.[263]

States vary in their policies regarding access to birth certificates and other records. Most states have a policy similar to the MSVSA, which restricts access to immediate family members, their legal representatives, and those that have a proven property interest.[264] However, at least ten states allow either certified or informational copies of birth certificates to be provided to members of the public.[265]

---

258. These are California, Connecticut, Georgia, Hawaii, Iowa, Illinois, Louisiana, Maine, Michigan, Minnesota, North Carolina, Nebraska, New Hampshire, New Jersey, Nevada, and Vermont. *See infra* app. A.

259. These are Delaware, Florida, Indiana, New York, Pennsylvania, Rhode Island, South Dakota, Texas, Virginia, Washington, American Samoa, the Northern Mariana Islands, and the U.S. Virgin Islands. *See infra* app. A. In Montana, Oregon, Wisconsin, and Wyoming, it depends on the order. *See id.*

260. These are Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Louisiana, Maine, Michigan, Minnesota, Nebraska, New Jersey, New York City, North Carolina, North Dakota, South Dakota, Vermont, and Wisconsin. *See infra* app. A.

261. In Hawaii, official name changes are processed by the office of Lieutenant Governor, not the judicial system. *Name Changes*, HAW. OFFICE OF THE LIEUTENANT GOVERNOR, http://hawaii.gov/ltgov/office/name (last visited Dec. 28, 2011).

262. These are Arkansas, California, Connecticut, Delaware, Georgia, Kansas, Maine, Minnesota, Nebraska, New Jersey, New York, State, Vermont, and New York City. *See infra* app. A.

263. D.C. CODE § 7-217(d) (2011) ("Upon receipt of a certified copy of an order of the Court indicating that the sex of an individual born in the District has changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended as prescribed by regulation.").

264. MODEL STATE VITAL STATISTICS ACT § 24 (Ctr. for Disease Control & Prevention 1992).

265. The public can receive certified copies in Kentucky, Ohio, Massachusetts, Vermont, and Washington. *See Kentucky Birth Certificates*, KY. CABINET FOR HEALTH & FAMILY SERVS., http://chfs.ky.gov/dph/vital/birthcert.htm (last visited June 24, 2011); *Obtaining Certified Copies of Vital Records*, MASS. DEP'T OF HEALTH & HUMAN

One of the states with the strongest policy of protecting privacy is Nebraska. Although other features of Nebraska's policy are in need of updating, the privacy protections are comprehensive.[266] The statute states that:

> [T]he department shall prepare a new certificate of birth in the new name and sex of such person in substantially the same form as that used for other live births. The evidence from which the new certificate is prepared and the original certificate of birth shall be available for inspection only upon the order of a court of competent jurisdiction.[267]

There are three important features of this policy. First, a new, not amended, certificate is prepared. Second, only the new certificate, not the former one, is available for viewing. Third, the documentation that the registrant provided, as well as the old certificate, are both confidential and only available by a court order. These privacy protections could be marginally improved if the word "sealed"[268] was used; however, the meaning is clear in the statute.

---

SERVS., http://www.mass.gov/eohhs/consumer/basic-needs/vitals/obtaining-certified-copies-of-vital-records.html (last visited Feb. 3, 2011); OHIO DEP'T OF HEALTH, FREQUENTLY ASKED QUESTIONS CONCERNING VITAL RECORDS, *available at* http://www.odh.ohio.gov/~/media/ODH/ASSETS/Files/vs/general/frequentlyaskedquestionsonvitalrecords.ashx (last updated Sept. 29, 2010); VT. DEP'T OF HUMAN SERVS., ACCESS TO BIRTH AND DEATH CERTIFICATES: RECOMMENDATIONS FOR LEGISLATIVE CHANGES 9 (2010), *available at* http://healthvermont.gov/admin/legislature/documents/VitalRecords_legislative_recommendations_091310.pdf; WASH. DEP'T OF HEALTH, Center for Health Statistics Mail-In Request Form, *available at* http://www.doh.wa.gov/Portals/1/Documents/Pubs/422-044-MailinRequestForm.pdf (last visited Dec. 4, 2012). The public can receive "informational" or "uncertified" copies in California, New Jersey (unclear if it includes gender), North Carolina, South Dakota, and Wisconsin (except in limited cases). *See* CAL. HEALTH & SAFETY CODE § 103526 (West 2011); *Frequently Asked Questions,* N.J. DEP'T OF HEALTH & SENIOR SERVS., http://www.state.nj.us/health/vital/faq.shtml#BIR (last visited June 24, 2011); N.C. GEN. STAT. § 130A-93(c) (2011); *Data, Statistics and Vital Records,* S.D. DEP'T OF HEALTH, http://doh.sd.gov/vitalrecords/order.aspx#Eligibility (last visited June 24, 2011); WISC. STAT. § 69.21 (2011).

266. Nebraska requires sex reassignment surgery and a court order. NEB. REV. STAT. § 71-604.01 (2011). Also, the fact that the physician signing the affidavit has to be the surgeon that "performed" the surgery is unduly limiting.

267. *Id.*

268. I use, as is custom, "sealed" to refer to the process of blocking from public view unless a party has a court order to open the record. Depending on the state, "confidential" may have the same implication and "sealed" may not. *Compare* BLACK'S LAW DICTIONARY 1467 (9th ed. 2009) (defining sealing of records as "[t]he act or practice of officially preventing access to particular . . . records, in the absence of a court order.") *with id.* at 339 (defining confidential as "meant to be kept secret").

Similarly, under the policy in Washington State, a new birth certificate is prepared, rather than amending the original.[269] The policy further stipulates that the medical documentation submitted by the individual in support of the gender marker correction, including the doctor's letter, will be sealed.[270] However, the policy does not specify that the original birth certificate must be kept confidential, nor does it explain how name changes would or would not show on the face of the new certificate.

In Vermont, a new certificate is also prepared, with a requirement that the information about the correction be kept "confidential."[271] In California, the new statute retained the existing privacy protections, ensuring that the new certificate does not show the previous gender or name and that records related to the correction are "sealed."[272]

### 3. Privacy for Consular Reports of Birth Abroad

With regard to Consular Reports of Birth Abroad, the serial number is slightly modified to indicate that it is an amended document, but it does not indicate the previous gender or name of the registrant.[273] The documents that are submitted to the agency and retained by the agency are considered confidential, covered by the Privacy Act.[274]

### 4. Privacy Protections in the U.K. and Argentina

The Gender Recognition Act in the United Kingdom also ensures privacy, as does the recently-passed law in Argentina. The U.K. disallows disclosure of the information presented in the application for a Gender Recognition Certificate.[275] In Argentina, original birth certificates are un-

---

269. WASH. DEP'T OF HEALTH, *supra* note 121.

270. "The department retains documentation from the physician or hospital in a sealed file." *Id.*

271. VT. STAT. ANN. tit. 18, § 5112(c) (2011).

272. CAL. HEALTH & SAFETY CODE § 103430 (West 2012) .

273. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29 at 1447.4 ("The serial number assigned to an amended Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, will be the same as the number on the original, but will be followed by a dash and a number indicating it is not the original issuance (e.g., -1 for the first amendment).").

274. *Id.* at 1449.3-1 ("Information contained in the Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, including Form DS-2029, Application for Consular Report of Birth Abroad of a Citizen of the United States of America, the Form FS-240, as well as data in the ACS System, is subject to the Privacy Act."). The Privacy Act is a federal statute that protects against the disclosure of records without the consent of the "individual to whom the record pertains." Privacy Act of 1974, 5 U.S.C. § 552a (2006).

275. Gender Recognition Act, 2004, c. 7, § 22 (U.K.).

available except by court order.[276] The Gender Recognition Act specifically notes that with regard to birth certificates, the new birth certificate is the only version available to the public. There is also no note or other information indicating that the person has a previous version of the certificate or went through the gender recognition process.[277]

### B. Issues to Consider When Developing Privacy Policies

#### 1. The Individual Importance of Privacy

Given the risk of violence and discrimination that comes with being known as transgender, it is understandable that some people desire to keep information about their transgender status limited to only those whom they choose to tell. Of course not all transgender people want to be "closeted" all of the time, but generally, people do want to have control over how they present and manage information related to being transgender. Even if the risk of violence is not present, being able to decide with whom and when to have a "coming out" conversation should be a matter of individual choice. The harms discussed above from having an incorrect gender marker can also result from being "outed" by an insufficiently private procedure for correcting gender. The person whose gender transition is revealed may be subject to increased scrutiny because of the possibility of fraudulent documents, often being subjected to questioning about his or her body and identity.[278]

#### 2. Constitutional Right to Privacy

If a governmental entity does not protect the privacy of a transgender person and reveals his or her status—either through issuing visibly amended birth certificates or by providing access to records that indicate a person is transgender—it may be in violation of the right to privacy guaranteed by the U.S. Constitution.[279] Whether the U.S. Supreme Court has officially recognized a constitutionally derived right to privacy that guarantees people to be free of governmental "disclosure of personal matters" is not entirely

---

276. Regime for Recognition and Respect for Gender Identity (File 8126-D-2010) (Argentina), *available at* http://www1.hcdn.gov.ar/proyxml/expediente.asp?fundamentos=si&numexp=8126-D-2010. (An English translation is available at http://www.msmgf.org/files/msmgf//Advocacy/Argentina_GenderIdentity_Law.pdf).

277. Gender Recognition Act, 2004, c. 7 § 10 sch. 3 (U.K.).

278. Spade, *supra* note 4, at 738.

279. This right to privacy should not be confused with the other well-established right to privacy, generally understood as the right to make decisions about intimate details of one's life. "[T]his right to privacy can be characterized as a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making for personal matters." Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994).

clear.[280] While the Court has considered the issue, and has "assumed without deciding" that such a right exists, it has only done so in limited contexts that are not directly applicable to privacy claims related to birth certificate records.[281]

However, while the Supreme Court has not yet definitively ruled on the existence of this privacy right and certainly has not made a decision regarding disclosure of transgender status by a government actor, the Second Circuit has done so. In *Powell v. Shriver*,[282] the Court of Appeals held that the constitutional right to privacy protects transgender people from unnecessary government disclosure of their transgender status.[283] The appellate court concluded that, "[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."[284]

Thus, the only court to rule on this question has decided that there clearly is a privacy right to protect information regarding transgender status, and other judges have cited this decision with approval.[285] In addition, although less dispositive on a federal constitutional right to privacy claim, a judge in Alaska determined it was a violation of a transgender person's right to privacy under the Alaska Constitution to not be able to update the gender on one's driver's license.[286] Accordingly, policymakers should recognize

---

280. Whalen v. Roe, 429 U.S. 589, 599 (1976) (describing one type of privacy protection apparently protected by the Constitution as "the individual interest in avoiding disclosure of personal matters").

281. In a recent case, the Court assumed that there was such a privacy right. NASA v. Nelson, 131 S. Ct. 746, 751 (2011) ("We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon."); *see also Whalen*, 429 U.S. 589 (1976) (relating to a state statutory scheme mandating confidential reporting of prescriptions of certain controlled substances to the state department of health, which was monitoring for fraud and abuse); Nixon v. Adm'r of Gen. Services, 433 U.S. 425, 457 (1977) ("We may agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity. . . . In sum, appellant has a legitimate expectation of privacy in his personal communications.").

282. 175 F.3d 107 (2d Cir. 1999) (finding a violation of a constitutional right to confidentiality when corrections officers revealed an inmate's transgender identity and HIV status to other inmates).

283. The court determined that there was no "legitimate penological interest" in disclosing this information to fellow inmates as well as staff members. *Powell*, 175 F.3d at 113.

284. *Powell*, 175 F.3d at 111.

285. *See, e.g.*, Franklin v. McCaughtry, 110 F. App'x 715, 719 (7th Cir. 2004); Moore v. Prevo, 379 F. App'x 425, 428 (6th Cir. 2010).

286. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision).

the potential legitimacy of this constitutional right on the federal level and develop privacy policies to protect it.

### C. Specific Recommendations Related to Privacy Protections

In order to protect a person's privacy, a new birth certificate should be issued with no markings of any kind indicating that it was amended.[287]

Both the original birth certificate and the documents related to the gender marker correction should be sealed and only made available upon court order or upon request of the individual. The original birth certificate and the documents related to the gender marker correction should be available to the individual because the person may need to establish continuous identity.[288]

The statute should provide privacy protections for related name changes, regardless of whether the name change is acquired simultaneously, before, or after the gender correction. If the agency's policy is to make visible amendments for name changes, an exception should be made for name changes related to gender corrections. Thus, although a change of name that precedes a gender correction will be visible, at the time of gender correction, the name change should become confidential. Similarly, a gender-related name change occurring after the gender correction should also be made confidential. The statute needs to explicitly discuss each of these situations so the determination is made correctly regardless of timing.

The statute should also prohibit further inquiry into medical information. To respect the individual's medical privacy, staff should not either officially or casually ask the applicant for additional medical or other information beyond what is required by the statute. In addition to protecting privacy concerns, this also streamlines the administrative process and ensures that staff will treat applicants respectfully and consistently with how other applicants for documentation corrections are treated. Furthermore, any information received about a gender correction should be kept confidential, unless disclosure is necessary in the course of conducting official business.

---

287. Spade, *supra* note 4, at 770 (discussing the importance of having a "clean" birth certificate).

288. Name change orders may also be helpful to show continuous identity, but not everyone changes names or has those records easily available. Where exactly one might need the original copy of one's birth certificate is not entirely clear, but it does appear to be in rare situations where multiple forms of proof are required. For example, a bank may request multiple forms of identification from a customer who seeks to use his or her funds, to ensure that the person is the same customer with a different name. Interview with Alison Gill, D.C. Trans Coalition, in Washington, D.C. (Confirmed Oct. 12, 2012).

Lastly, the statute should ensure that those who hold an amended certificate that was acquired *before* the new statute came into effect are able to receive a new certificate with the same privacy protections (i.e. sealing of the original certificate and the associated documents from public inspection). In states that have had a policy of issuing "amended" certificates and/or not sealing the records related to correction of gender in the past, this provision is necessary to afford these individuals the same privacy protections that are afforded to individuals who process their gender correction under the new statute. Thus, upon application and payment of appropriate fees,[289] a person who previously received an amended certificate should be able to receive a new certificate.

Ideally, the vital statistics agency should go through old records and seal those related to all of the previously executed gender corrections as well, regardless of whether the person has asked for sealing of records; however, as a practical matter, this may not be feasible. Therefore, at the minimum, the sealing of old records related to gender correction should be completed at the request of the applicant.

## V. RECOMMENDED LANGUAGE AND POLICY

### A. The Model Provision

This Section proposes new language that should be easy to insert into any vital statistics code to comprehensively address gender marker corrections.[290] For the new version of the MSVSA, this would be its own section and Section 21(d) would need to be deleted. This model statutory provision incorporates all of the features needed in a statute to have a clear, comprehensive policy with regard to gender corrections and associated name changes. It would be based on current medical consensus, sound policy considerations, and in compliance with applicable constitutional requirements. This model language is based on, and borrows heavily from, the statutory language in Vermont and California, as well as the policy of both Washington and the U.S. Department of State relating to Consular Reports of Birth Abroad.

Although it is drafted in the style of statutory language, this language can instead be adopted by the vital statistics agency, in whole or in part, as regulations or as written policy. This would be most applicable in jurisdic-

---

289. Throughout this article, no recommendation is made with regard to the appropriate amount of fees. As guidance, fees should not be prohibitively costly and should be waivable, without significant delay, with a showing of indigence.

290. Of course, any such legislation should delete the existing language related to gender corrections, if it exists.

tions with no statute on the issue of gender correction or a gender correction statute that would not conflict with such regulations. Here is the recommended text:

*Section X. Changes to Birth Certificate Related to a Change of Gender*

*(a) The State Registrar shall issue a new birth certificate to a person who was born in [this state] and who has a gender different from the gender denoted on that person's birth certificate when the State Registrar receives:*

*1) A written request by the registrant, his or her parents, guardian, or legal representative signed under penalty of law, that the State Registrar issue a birth certificate with a gender designation that differs from the gender designated on the registrant's original birth certificate;*

*2) A notarized statement from the registrant's licensed treating or evaluating physician or health care provider stating that the registrant has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition, based on contemporary medical standards, or stating that the registrant has an intersex condition, and that in the provider's professional opinion the registrant's gender designation should be changed accordingly; and*

*3) If the registrant or his or her legal representative is also requesting a name change on the certificate, an original or certified copy of a name change order issued by a court of competent jurisdiction.*

*(b) The State Registrar shall not request any additional information or records other than those required by subsection (a)(2). The State Registrar shall not disclose information relating to a gender correction, including to other government employees, unless required in order to conduct official business.*

*(c) When the State Registrar receives the documentation described in subsection (a) of this Section, the State Registrar shall issue a new birth certificate reflecting the new gender designation and, if applicable, new name of the registrant. The new birth certificate supersedes the original as the official public record. The new certificate shall not be marked as amended and shall in no way disclose the original information. When such a birth certificate is issued, the State Registrar shall cause the registrant's original birth certificate and all documentation received pursuant to subsection (a) of this Section to be placed under seal and kept in a confidential file. The State Registrar shall provide access to the*

*original birth certificate and/or documentation received pursuant to subsection (a) of this Section only upon order of a court of competent jurisdiction or written request of the registrant.*

*(d) The State Registrar shall issue, upon request, a new birth certificate reflecting the new gender designation or new name (or as previously amended), and shall seal relevant records, as described in subsection (c) in these additional circumstances:*

*(1) when a birth certificate is amended to reflect a change in gender designation at any point in time after that birth certificate has been amended to reflect a name change*

*(2) when a birth certificate is amended to reflect a name change at any point in time after the birth certificate has been amended to reflect a change in gender designation, or*

*(3) if a person holds an amended birth certificate related to change of gender and/or name issued under [a previous version of this Section].*

*(e) The State Registrar shall not amend the vital record if: (1) an applicant does not submit the minimum documentation required in this Section for amending a vital record; or (2) when the Registrar has reasonable cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence, and the deficiencies are not corrected. The State Registrar shall state in writing the reason for this action. Upon the State Registrar's refusal to amend the vital record, the applicant shall have a cause of action in court to amend the vital record. The Registrar shall give the applicant written notice of this right.*

*(f) In the case of a person who is a resident of this state and was born in another state or in a foreign jurisdiction, if such other state or foreign jurisdiction requires a court decree in order to amend a birth certificate to reflect a change in gender, the [courts/probate courts] in this state shall have jurisdiction to issue such a decree.*

Legislative drafters from a state considering adopting this language should also contemplate how these new provisions related to privacy and procedures for gender marker corrections would affect the meaning of any other existing provisions related to privacy or procedures for to other corrections.[291] While subsequently amended or adopted statutes would not nor-

---

291. For example, the precision and specificity in a new gender correction provision may cause a question about how an existing privacy provision regarding other corrections or amendments should be interpreted. For example, if the adoption provision refers to records being "confidential," and the gender correction provision refers to records being "sealed," the agency or courts may think that different meaning was intended, when in actuality, the same meaning was likely intended. In this case, the adoption provision's language should also be changed to "sealed" to avoid this confusion.

mally be read to create confusion with prior provisions, the legislative drafter ought to review carefully the structure and text of the entire existing statute to avoid future confusion or unintended consequences from the potentially different wording introduced into the statute by this provision. Also, if not already clear from the existing statute, it should be made clear that "State Registrar" refers to relevant staff of the vital records agency that have been authorized by the Registrar to execute these corrections.

### B. Implementation

This model statute was designed to avoid the need for additional clarification in the form of regulations or written policies. Eliminating vagueness in statutory language increases the efficiency of the process by not requiring deliberation and determination of what processes need to be established and followed by the state agency. However, there are also important implementation items that would greatly increase the efficiency and success of the new statute.

First, it would streamline the process for staff, as well as the holder of the birth certificate, if there were a form promulgated by the vital statistics agency for gender corrections. The use of forms for updating gender on driver's licenses has become a best practice.[292] In what is considered the model policy and has been adopted for use in several states, the Washington, D.C. Department of Motor Vehicles has a one-page form where the applicant fills out the top part (which requests the correction) and the medical or social service authority fills out and signs the bottom part (which indicates their professional opinion).[293] A similar form could be used by vital statistics agencies.

Second, providing staff with training for implementation is an essential part of successfully effectuating any policy change. Staff training should include not only the policies and procedures to process the correction of gender and/or name on birth certificates, but should also provide basic cultural competency so that transgender people interacting with staff are treated respectfully throughout the process.

Third, the practical instructions of how old records are removed from the files and new ones inserted, as well as how to seal the documents used in updating gender may need to be developed. Furthermore, the issue of whether the agency has the ability to go back to previous gender corrections and seal the records without a request by each individual needs to be ex-

---

292. Tobin, *Fair and Accurate Identification, supra* note 4.

293. District of Columbia Dept. of Motor Vehicles, Gender Designation on a Driver's License or Identification Card (2006), *available at* http://dmv.dc.gov/pdf/Gender_Change_Policies.pdf.

amined. Whether these privacy concerns will need to be dealt with by new regulations or written policy will depend on the state's existing policies and practices. Accordingly, there could be a need to update existing regulations or policies to ensure that confidentiality is maintained.

CONCLUSION

Laws and policies related to birth certificates need to be updated to keep up with advances in the medical, legal, and public policy fields. By recognizing the needs of its citizens, responding in a low-cost, efficient manner, and making policies based on careful legal and scientific analysis, the government can improve transgender people's access to vital services and take steps toward eliminating discrimination, harassment, and violence. The statute recommended by this Article results in four significant goals: 1) that vital records will be accurate and in accord with contemporary medical standards, 2) that government resources are used efficiently, 3) that constitutional rights are respected, and 4) that proper consideration was given to the human and legal impacts of having an inaccurate birth certificate.

Any state, local, or territorial government that adopts the recommended statutory language (via statute, regulation, or written policy) can be sure that it has improved its own functioning and has enabled transgender people to live their lives with one less burden imposed on them by the government.

As birth certificate statutes and policies are modernized, the birth certificate's legal relevance should increase because judges will be better able to defer to those documents when they have been corrected. However, until then, their legal weight in cases where a person has been unable to receive a corrected certificate should not be controlling. Eventually, the hope is that both executive agencies and the judicial system will be able to rely on birth certificates as an accurate indicator of gender.

While these changes in vital statistics laws may seem technical in nature, modernizing these laws will have important and positive human impact, and should not be avoided or delayed any longer. Given the solid legal and medical foundation for updating these laws discussed in the Article, these changes should be viewed as cost-neutral or cost-saving, based on the best science available, and rooted in the constitution. Policymakers interested in good government should take these developments seriously and make the necessary amendments immediately. ⚝

APPENDIX: LAWS AND POLICIES REGARDING GENDER CORRECTIONS FOR THE 57 U.S. JURISDICTIONS
that ADMINISTER BIRTH CERTIFICATES

| Jurisdiction / Citation | Statute, Regulation or Policy Available Relating to Gender Corrections?[293] | Similar to MSVSA?[294] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[295] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Alabama ALA. Code §§ 22-9A-19, 22-9A-21 | Gender Correction in Statute | Exact Standard and Process, But Absent Privacy Protections | "sex . . . has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | No | |
| Alaska Alaska Stat. § 18.50.290 | No Specific Gender Correction Provision and No Publicly Available Policy | No | None (Judge Determines) | In practice, Court orders are accepted | Amended | Single-Line Cross Out. Alaska Administrative Code 7 AAC 05.895. | Single Line Cross Out. See Alaska Administrative Code 7 AAC 05.895 | No. | See *Sources of Authority to Amend Sex Designation on Birth Certificates*, Lambda Legal, http://www.lambdalegal.org/publications/sources-of-authority-to-amend (last updated Oct. 3, 2012) (hereinafter, Lambda, *Sources of Authority*). |
| American Samoa Am. Samoa Code Ann. Ch. 5 § 13.0530 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | A call to the Registrar of Vital Records office indicated that they do not have a policy with regard to gender corrections. The clerk suggested a court order would likely be sufficient. Telephone Interview with the American Samoa Governor's Office Registrar of Vital Records, Pago Pago, AS (December 20, 2011). |

293. Gender is used here interchangeably with sex, as explained in note 44 *supra*.
294. This indicates whether the exact language of the MSVSA is used, with regard to three aspects: procedure, standard, and privacy, measured by the issuance of a new certificate.
295. Unless the statute or policy refers to "sealing" the old certificate or says it is available only by court order, it is presumed that the certificate is not sealed.

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections? | Similar to MSVSA? | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed? | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Arizona Ariz. Rev. Stat. §§ 36-337, 36-323, 36-322 | Gender Correction in Statute | No | "a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different [than on original certificate]" must provide "a written statement by a physician that verifies the sex change operation or chromosomal count" | Administrative | Amended | Unclear | Unclear | Yes | "For a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate, both of the following: a) A written request for an amended birth certificate from the person or, if the person is a child, from the child's parent or legal guardian; b) a written statement by a physician that verifies the sex change operation or chromosomal count." Ariz. Rev. Stat. §§ 36-337. |
| Arkansas Ark. Code Ann. §§ 20-18-307, 20-18-304, 20-18-305 | Gender Correction in Statute | Standard and Procedure Exact, Privacy Similar | "sex . . . has been changed by surgical procedure" | Court | Amended | Kept Private | Kept Private | Unclear | "The original certificate shall be removed to a special file" Department of Health Regulation for Registration of Vital Statistics 14.7(d). |
| California Cal. Health & Safety Code §§ 103425-103445 | Gender Correction in Statute | No | "has undergone clinically appropriate treatment for the purpose of gender transition, based on contemporary medical standards" | Court | New | Kept Private | Kept Private | Yes | |
| Colorado Colo. Rev. Stat. § 25-2-115, 25-2-117 | Gender Correction in Statute | Exact | "sex . . . has been changed by surgical procedure" | Court | Amended | Kept Private | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[20] | Similar to MSVSA?[24] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[2x] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Connecticut Conn. Gen. Stat. §§ 7-51, 19a-42, Reg. 19a-41-9(e) | Gender Correction in Both Statute and Regulations | No | From Regulations: (1) Affidavit from a licensed psychiatrist, psychologist, or clinical social worker performing a psycho-social evaluation, attesting to the fact that the registrant is socially, psychologically and mentally the designated sex; (2) Affidavit from the surgeon performing the sex change operation, attesting to the fact that the surgery was performed | Administrative | New | Kept Private | Kept Private | Yes | Standard appears in regulations, statute only refers to "gender change" |
| Delaware Del. Vital Statistical Regulation 10.9.4 | Gender Correction Provision in Regulation only | Exact for Standard and Procedure, Differs for Privacy | "sex ... has been changed by surgical procedure" | Court | Unclear | Kept Private | Kept Private | Unclear | |
| District of Columbia D.C. Code §§ 7-217, 7-219 | Gender Correction in Statute | Exact for Standard and Procedure, Differs for Privacy | "sex ... has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | No | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections? | Similar to MSVSA? | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Select? | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Florida Fla. Stat. Ann. §§ 382.016, 382.025 | No Specific Gender Correction Provision and No Publicly Available Policy | No | "sex reassignment surgery" See Lambda, Sources of Authority. | Administrative ("sworn affidavit" of the physician) | Unclear | Unclear | Unclear | Unclear | "Florida Office of Vital Statistics policy allows for the change of sex designation on birth certificates upon the provision of: a completed Application for Amended Birth Certificate and a notarized Affidavit of Amendment to Certificate of Live Birth; a certified copy of a court order of name change; a sworn affidavit from the physician who performed sex reassignment surgery, containing the medical license number, stating that you have completed sex reassignment in accordance with appropriate medical procedures and that you are now considered to be a member of the reassigned gender; and the required fee." Lambda, Sources of Authority. |
| Georgia Ga. Code Ann. §§ 31-10-23, 31-10-25 | Gender Correction in Statute | Exact for Standard and Procedure, Minor Differences for Privacy | "sex ... has been changed by surgical procedure" | Court | New | Kept Private | Kept Private | Unclear | "A certificate of birth amended pursuant to the provisions of Section 31-10-23(e) of the Official Code of Georgia Annotated shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate. A new State file number shall be assigned to the new certificate. The original certificate shall be removed from the active files and placed with the order in the confidential files." Ga. Comp. R. & Regs. 290-1-3-.31. |
| Guam Guam Code Ann. tit. 10, § 3222 | Gender Correction in Statute | No | "a sworn statement from the physician performing the surgery certifying the sex of an individual has been changed by surgical procedure" | Administrative | Amended | Single Line Cross Out. See 26 Guam Admin. R. & Regs. § 2111 (i) (3). | Unclear | No | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections | Similar to MSVSA? | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed? | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Hawaii Haw. Rev. Stat. §§ 338-17.7, 338-18 | Gender Correction in Statute | No | "affidavit of a physician" that the person "had a sex change operation and the sex designation on the birth registrant's birth certificate is no longer correct" | Administrative | New | Kept Private | Unclear | Yes | "Upon receipt of an affidavit of a physician that the physician has examined the birth registrant and has determined the following: . . . The birth registrant has had a sex change operation and the sex designation on the birth registrant's birth certificate is no longer correct; provided that the director of health may further investigate and require additional information that the director deems necessary" Haw. Rev. Stat. § 338-17.7(4). |
| Idaho Idaho Code Ann. §§ 39-250, 39-270 | No | No | n/a | n/a | n/a | n/a | No | n/a | Idaho does not permit gender corrections |
| Illinois 410 Ill. Comp. Stat. Ann. 535/17 | Gender Correction in Statute | No | "affidavit by a physician that he has performed an operation on a person, and that by reason of the operation the sex designation on such person's birth record should be changed" | Administrative | New | Kept Private | Unclear | Yes | |
| Indiana Ind. Code Ann. §§ 34-28-2, 16-37-2-10, 16-37-1-10 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In Practice: Judge Determines. See Lambda, Sources of Authority. | In Practice: Court. See Lambda, Sources of Authority. | Unclear | Unclear | Unclear | Unclear | Lambda Legal indicates that a court order is required. See Lambda, Sources of Authority. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[89] | Similar to MSVSA?[90] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[91] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Iowa<br>Iowa Code §§ 144.23, 144.39, 144.24 | Gender Correction in Statute | No | "notarized affidavit by a licensed physician and surgeon or osteopathic physician and surgeon stating that by reason of surgery or other treatment by the licensee, the sex designation of the person has been changed" | Administrative | New | Kept Private. See also, IA Admin. Code 641-100.7. | Likely Private but Unclear. See IA Admin. Code 641-100.7 | Yes. IA Admin. Code 641-100.7 | "The original certificate and the evidence upon which it was based are to be sealed and placed in a special file. The state registrar may inspect such sealed information for purposes of properly administering the vital statistics program. IA Admin. Code 641—100.7. Note that information provided over the phone indicates that surgery is required, despite the broader statutory language. See also, Iowa Code 144.24; Iowa Admin. Code r. 641-100.7. |
| Kansas<br>Kan. Stat. Ann. §§ 65-2422a, 65-2422d; Kan. Admin. Regs. § 28-17-20(b)(1)(A)(ii) | Gender Correction in Regulation only | No | Regulation: "with a medical certificate substantiating that a physiological or anatomical change occurred" | Administrative | Amended | Unclear | Kept Private | Unclear | |
| Kentucky<br>Ky. Rev. Stat. Ann. §§ 213.121, 213.136 | Gender Correction in Statute | Standard Exact, Process Different, No Privacy Provision | "sworn statement by a licensed physician indicating that the gender of an individual . . . has been changed by surgical procedure" | Administrative | Amended | Unclear | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[...] | Similar to MSVSA?[...] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[...] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Louisiana La. Rev. Stat. Ann. §§ 40:41, 40:60, 40:62 | Gender Correction in Statute | No | "such proof as [the court] deems necessary to be convinced that the petitioner was properly diagnosed as a transsexual or pseudo-hermaphrodite, that sex reassignment or corrective surgery has been properly performed upon the petitioner, and that as a result of such surgery and subsequent medical treatment the anatomical structure of the sex of the petitioner has been changed" La. Rev. Stat. Ann. §§ 40:62. | Court | New | Kept Private | Unclear | Yes | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections[...] | Similar to MSVSA?[...] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[...] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Maine Me. Rev. Stat. Ann. §§ 2705, 2706, 10,146.2 Me. Code R. § 6-11 | Gender Correction in Regulation only | No | "sex has been changed by surgical procedure" and "a notarized affidavit by the physician who performed the surgical procedure" | Administrative | New | Kept Private | Kept Private | Yes | "1. A new birth certificate shall be prepared when a legal change of sex has been established in accordance with section 11 of this chapter. [...] 3. When a new certificate is prepared pursuant to this subsection, the original certificate shall be held confidential and only the registrant or his or her other legal representative shall have access to the original record, except by court order. [...] Certificates established under this section shall not be regarded as amended." 10,146.2 Me. Code R. § 6-11. |
| Maryland Md. Code Ann., Health-Gen. §§ 4-214, 4-217, 4-224 | Gender Correction in Statute | Exact for Standard and Procedure, Differs for Privacy | "the sex . . . has been changed by surgical procedure" | Court | Amended | Single-line cross out | Single-line cross out | No | "D. (1) To amend or correct data other than the name on a birth certificate, the following documents and information shall be submitted: [...] (d) For sex changed by surgery, a court order shall be submitted specifying that the sex of the individual has been changed and directing the Secretary to change the data concerning the sex of the individual, and any other relevant data. E. (1) Amendments and corrections under this regulation shall be made by: (a) Placing a line through the original data and entering new data in black ink; or (b) Entering the amendment or correction on electronic media." Md. Code Regs. 10.03.01.02 |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[290] | Similar to MSVSA?[291] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[292] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Massachusetts Mass. Gen. Laws Ch. 46, §§ 13, 17C | Gender Correction in Statute | No | "has completed sex reassignment surgery, so-called," and "a physician's notarized statement that the person named on the birth record has completed sex reassignment surgery" | Administrative | Amended | Unclear | Unclear | Unclear | |
| Michigan Mich. Comp. Laws §§ 333.2831, 333.2862, 333.2872 | Gender Correction in Statute | No | "an affidavit of a physician certifying that sex-reassignment surgery has been performed" | Administrative | New | Kept Private | Unclear | Yes | |
| Minnesota Minn. Stat. §§ 144.218, 144.225 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Judge determines for Court order. Agency requires surgery if no court order | Either | New | Kept Private | Kept Private | Yes | Changing Gender on a Minnesota Birth Record, Minnesota Dep't of Health (on file with author). |
| Mississippi Miss. Code Ann. §§ 41-57-21, 41-57-2; 15-4 Miss. Code R. §1:106. | Gender Correction in Regulation only | No | "Gender reassignment" | Court | Amended | Not Private | Not Private | No | "Gender reassignment shall be added to the birth certificate as a marginal notation, upon receipt of a medical statement that attests to the reassignment." 15-4 Miss. Code R. §1:106. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections[...] | Similar to MSVSA?[...] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[...] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Missouri Mo. Rev. Stat. § 193.215 | Gender Correction in Statute. | Exact for Standard and Procedure, Differs for Privacy | "sex . . . has been changed by surgical procedure" | Court | Amended | Single-Line Cross Out | Single Line Cross Out | No | "The original certificate/office working copy of the birth, death or fetal death shall have the correction entered on its face by interlineation with a line drawn through the incorrect entries. It shall be marked amended. The date of amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made part of the record." 19 Mo. Code Regs. 10-10.110. |
| Montana Mont. Code Ann. §§ 50-15-204; Mont. Admin. R. 37.8.111(5) | Gender Correction in Regulation only | Exact for Standard and Procedure, Differs for Privacy | "sex of an individual born in Montana has been changed by surgical procedure" | Court | Depends on Instructions in Court Order | Depends on Instructions | Depends on Instructions | Unclear | "(5) The sex of a registrant as cited on a certificate may be amended only if the department receives a certified copy of an order from a court with appropriate jurisdiction indicating that the sex of an individual born in Montana has been changed by surgical procedure. The order must contain sufficient information for the department to locate the record. If the registrant's name is also to be changed, the court order must indicate the full name of the registrant as it appears on the original birth certificate and the full name to which it is to be altered. If the order from the court directs the issuance of a new certificate that does not show amendments, the new certificate will not indicate on its face that it was altered. If the sex of an individual was listed incorrectly on the original certificate, refer to ARM 37.8.108." Mont. Admin. R. 37.8.311. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[29] | Similar to MSVSA?[30] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[31] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Nebraska Neb. Rev. Stat. §§ 71-604.01, 71-602 | Gender Correction in Statute | No | "a notarized affidavit from the physician that performed sex reassignment surgery" | Administrative | New | Kept Private | Kept Private | Yes | "Upon receipt of a notarized affidavit from the physician that performed sex reassignment surgery on an individual born in this state and a certified copy of an order of a court of competent jurisdiction changing the name of such person, the department shall prepare a new certificate of birth in the new name and sex of such person in substantially the same form as that used for other live births. The evidence from which the new certificate is prepared and the original certificate of birth shall be available for inspection only upon the order of a court of competent jurisdiction." Neb. Rev. Stat. § 71-604.01. |
| Nevada Nev. Admin. Code § 440.130 | Gender Correction in Regulation only | No | "having a sexual transformation" | Court | New | Depends on Instructions in Court Order | Depends on Instructions | Unclear | "1. The State Registrar may prepare a new certificate of birth for a person having a sexual transformation only upon order of a court of competent jurisdiction. 2. The court order must specify those facts to be changed on the new certificate. All other items must remain as on the original certificate. |
| New Hampshire N.H. Rev. Stat. Ann. §§ 5-C:87, 5-C:88, 5-C:9 | Gender Correction in Statute | No | "such individual . . . has had a sex change" | Court | New (in effect) | Kept Private | Unclear | Likely, in effect | "II. The clerk of the town or city shall: replace the original record with the amended birth record; retain the originally assigned file number; retain the original record attached to the amended record; prepare an amended birth record using the form appropriate for the year of birth; and forward the amended birth record to the division. III. The clerk of the town or city shall use the amended record for all future inquiries to the record." N.H. Rev. Stat. Ann. § 5-C:88. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[201] | Similar to MSVSA?[202] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[203] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| New Jersey N.J. Stat. Ann. §§ 26:8-40.12, 26:8-40.23 | Gender Correction in Statute | Exact in Standard, Different in Procedure, Similar in Privacy | "a medical certificate from the person's licensed physician which indicates the sex of the person has been changed by surgical procedure" | Administrative | New (in effect) | Kept Private | Kept Private | Yes | "The State registrar shall issue an amended certificate of birth to a person born in this State who undergoes sex reassignment surgery and requests an amended certificate of birth which shows the sex and name of the person as it has been changed. The State registrar shall place the original certificate of birth and all papers pertaining to the amended certificate of birth under seal. The seal shall not be broken except by order of a court of competent jurisdiction. Thereafter, whenever a certified copy of the certificate of birth is prepared, it shall be made from the amended certificate of birth, except when an order of a court of competent jurisdiction requires that a certified copy be made of the original certificate of birth." N.J. Stat. Ann. §§ 26:8-40.12. |
| New Mexico N.M. Stat. Ann. §§ 24-14-25, 24-14-27 | Gender Correction in Statute | Exact for Standard Differs for Process, Absent Regulations on Privacy | "a statement signed under penalty of perjury by the person in charge of an institution or from the attending physician indicating that the sex of an individual born in this state has been changed by surgical procedure" | Administrative | Amended | Unclear | Unclear | No | "A certificate or report that is amended under this section shall be marked 'amended', except as otherwise provided in Subsection C of this section. The date of the amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made a part of the record. The department shall prescribe by regulation the conditions under which additions or minor corrections may be made to certificates or records within one year after the date of the event without the certificate or record being marked 'amended'." N.M. Stat. Ann. § 24-14-25. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections[?] | Similar to MSVSA?[?] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[?] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| New York N.Y. Pub. Health Law § 4138 | Gender Correction in Written Policy | No | "sex reassignment surgery" | Administrative | Unclear | Unclear | Kept Private | Unclear | "The New York State Department of Health, Vital Records Division has a policy providing for the change of sex designation on birth certificates upon the receipt of a completed application, a letter from the surgeon specifying date, place, and type of sex reassignment surgery performed; an operative report from the sex reassignment surgery; and some additional medical documentation." Lambda, Sources of Authority. |
| New York City 24 RCNY Hlth. Code § 207.05(a)(5) | Gender Correction in Regulations only | No | "proof satisfactory to the Department has been submitted that such person has undergone convertive surgery" | Administrative | New | Kept Private | Kept Private | Yes | |
| North Carolina N.C. Gen. Stat. §§ 101-2, 130A-118, 130A-93 | Gender Correction in Statute | No | "a notarized statement from the physician who performed the sex reassignment surgery or from a physician licensed to practice medicine who has examined the individual and can certify that the person has undergone sex reassignment surgery" | Administrative | New | Kept Private | Unclear | Yes | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[##] | Similar to MSVSA?[##] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[##] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| North Dakota N.D. Cent. Code §§ 23-02.1-25, 23-02.1-27; N.D. Admin. Code 33-04-12-02(1) | Gender Correction in Regulation only | No | "has undergone a sex conversion operation" and "an affidavit by a physician that the physician has performed an operation on the person, and that by reason of the operation, the sex designation of such person's birth record should be changed" | Administrative | Amended | Unclear | Unclear | Yes | |
| Northern Mariana Islands 2006 N. Mar. I. Pub. L. 15-50 | Gender Correction in Statute | Exact for Standard and Process, Unclear for Privacy | "sex . . . has been changed by surgical procedure" | Court | Amended | Unclear | Unclear | Unclear | Northern Mariana Islands adopted much of the MSVSA in whole in 2006, including the gender correction provisions, but not the Model Regulations, which would specify how the amendments are executed and whether they are kept private. Telephone interview with Northern Mariana Islands Dep't of Public Health in Saipan, MP. (Dec. 20, 2011). |
| Ohio Ohio Rev. Code Ann. §§ 3705.13, 3705.22, 3705.23 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | Ohio does not permit gender corrections on certificates. Lambda, Sources of Authority. |
| Oklahoma Okla. Stat. Ann. §§ 1-321, 1-323 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[99] | Similar to MSVSA?[100] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[101] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Oregon Or. Rev. Stat. §§ 432.235, 432.121 | Gender Correction in Statute | Exact for Standard and Process, Absent Regulations on Privacy | "sex . . . has been changed by surgical procedure" | Court | Amended or New, in Discretion of Agency | Unclear | Unclear | Unclear | "Although not specifically mentioned in the statute, the Division of Vital Records will issue a revised birth certificate upon court order or submission of a letter from the treating physician stating that reassignment surgery has been performed." Lambda, *Sources of Authority*. |
| Pennsylvania 35 Pa. Cons. Stat. §§ 450.603, 450.601, 450.804 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery if going to the agency directly, and for a court order, the judge determines | Either | Unclear | Unclear | Unclear | Unclear | |
| Puerto Rico P.R. Laws. Ann. tit. 3 § 177 | No | n/a | n/a | n/a | n/a | n/a | n/a | n/a | Puerto Rico does not permit gender corrections. See *Ex Parte Alexis Delgado*, 2005 TSPR 095, in which the Puerto Rico Supreme Court denied a corrected gender marker. |
| Rhode Island R.I. Gen. Laws §§ 23-3-21; 23-3-23 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery | Administrative | Unclear | Unclear | Will be marked Amended, but old name will not appear | Unclear | "For changes to the sex designation on birth certificates, the Office of Vital Records has a policy requiring a notarized statement from the hospital or clinic where surgery was performed, signed by the physician in charge of the surgery. The amended certificate will state only that the name has been amended; it will not show the former name." Lambda, *Sources of Authority*. |
| South Carolina S.C. Code Ann. §§ 44-63-150, 44-63-80 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Amended by Attaching a Special Form | Not Private | Not Private | No | "South Carolina will issue an amendment as an attachment to the original birth certificate." Lambda, *Sources of Authority*. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[295] | Similar to MSVSA?[296] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[294] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| South Dakota S.D. Codified Laws §§ 34-25-51, 34-25-16.5, 34-25-52, 34-25-52.6 | No Specific Gender Correction Provision and No Publicly Available Policy | No | None (In practice, Judge determines) | In Practice, Court | In practice, generally new | In practice, generally kept private | In practice, generally kept private | Yes | "South Dakota's Registrar will follow any instructions in a court order. The general practice of the registrar is to issue a new certificate with no indication of amendment." Lambda, Sources of Authority. |
| Tennessee Tenn. Code Ann. § 68-3-203(d) | Gender Correction Prohibited in Statute | n/a | n/a | n/a | n/a | n/a | n/a | n/a | "The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." |
| Texas Texas Health & Safety Code Ann. §§ 192.010, 192.011 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Unclear | Unclear | Unclear | Unclear | Unclear | Unclear | "Anecdotal reports now indicate that some officials refuse to correct the sex designation on transgender people's birth certificates, although† judges may order such a change." Lambda, Sources of Authority. |
| U.S. Virgin Islands V.I. Code Ann. tit. 19 § 806 | No Specific Gender Correction Provision and No Publicly Available Policy | No | Judge Determines | Court | Unclear | Unclear | Unclear | Unclear | Telephone interview with US Virgin Islands Department of Health in Christiansted, VI. (Dec. 21, 2011). |
| Utah Utah Code Ann. § 26-2-11, 26-2-22 | Gender Correction in Statute | No | "has a . . . sex change approved by an order of a Utah district court or a court of competent jurisdiction" | Court | Amended | Unclear | Unclear | No | "the state registrar shall review the application, and if complete, register it and note the fact of the amendment on the otherwise unaltered original certificate" Utah Code Ann. § 26-2-11. |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[286] | Similar to MSVSA?[287] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[288] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Vermont Vt. Stat. Ann. tit. 18 § 5112 | Gender Correction in Statute | No | "the individual has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition" | Court | New | Kept Private | Kept Private | Yes | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections?[**] | Similar to MSVSA?[**] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[**] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Virginia Va. Code Ann. §§ 32.1-269, 32.1-271; 12 Va. Admin. Code § 5-550-320 | Gender Correction in Statute and Regulations | No | Statute: "sex . . . has been changed by medical procedure." Regulations: "upon presentation of acceptable evidence (preoperative diagnosis, postoperative diagnosis and description of procedure) and a notarized affidavit from the physician performing the surgery, a new certificate of birth may be prepared by the State Registrar for a person born in this Commonwealth whose sex has been changed by surgical gender reassignment procedure" as well as "A certified copy of the court order changing the name of the registrant as well as designating the sex of the registrant" | Court with additional reqs. from the Registrar | Amended according to Statute, although Regulation indicates that a New certificate will be issued | Unclear | Unclear | Unclear | |

| Jurisdiction / Citation | Statute, Regulation or Publicly Available Policy Relating to Gender Corrections[20] | Similar to MVSA?[20] | Legal Standard | Process | New or Amended | Method of Gender Amendment | Method of Name Amendment | Sealed?[20] | Relevant Excerpt or Note |
|---|---|---|---|---|---|---|---|---|---|
| Washington State Dep't of Health, Center for Health Statistics Procedure CHS-55, pursuant to Wash. Rev. Code § 43.70.150 | Gender Correction in Written Policy | No | Policy: "a letter, on letterhead, from the requestor's medical or osteopathic physician stating that the requestor has had the appropriate clinical treatment" | Administrative | Unclear | Unclear | Unclear | Medical letter is sealed, unsure regarding original certificate | This procedure was developed by the Washington Secretary of Health pursuant to Wash. Rev. Code § 43.70.150. |
| West Virginia W. Va. Code §§ 16-5-25, 16-5-27 | No Specific Gender Correction Provision and No Publicly Available Policy | No | In practice, surgery is required if going directly to the agency, and the judge determines in the case of a court order | Either | Amended | Unclear | Unclear | Unclear | "The practice of the State Registrar is to issue an amended birth certificate upon submission of either a court order or a notarized statement from the treating physician that reassignment surgery has been completed." Lambda, Sources of Authority. |
| Wisconsin Wis. Stat. Ann. §§ 69.15, 69.20, 69.21 | Gender Correction in Statute | No | "a surgical sex-change procedure" | Court | Depends on Instructions in Court Order | Depends on Court Order | Depends on Court Order | Yes, if new certificate issued | |
| Wyoming Wyo. Stat. Ann. §§ 35-1-424, 35-1-426; 10 Wyo. Code R. § 4(e)(iii) | Gender Correction in Regulation only | No | "when the sex of an individual has been changed" | Court | Amended (Unless Court Order Specifies Otherwise) | Not Private (Unless Court Order Specifies Otherwise) | Not Private (Unless Court Order Specifies Otherwise) | No | "Unless other specified by court order, the amended certificate will show all changes that have been made." Lambda, Sources of Authority. |