# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,<br><br>*Defendants.* | Case No. 1-25-cv-10313-JEK<br><br>(Leave to file excess pages granted on March 17, 2025) |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO STAY AGENCY ACTION AND FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
      ADMINISTRATIVE PROCEDURE ACT ("APA") CLAIM ............................................ 1

      A.    The Policy Is Reviewable Under the APA. ................................................. 1

      B.    The Policy Is Arbitrary and Capricious and Not in Accordance with Law ............ 5

III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
      CONSTITUTIONAL CLAIMS. .............................................................................. 8

      A.    The Policy Discriminates on the Basis of Sex and Transgender Status,
            Triggering Heightened Scrutiny. ............................................................ 8

      B.    The Policy Infringes on the Rights to Privacy and Travel, Triggering
            Heightened Scrutiny. .......................................................................... 10

      C.    The Policy Fails Under Any Level of Scrutiny. ......................................... 12

IV.   THE REMAINING FACTORS WEIGH DECISIVELY IN FAVOR OF A STAY
      AND PRELIMINARY INJUNCTION. ..................................................................... 13

      A.    Plaintiffs' Motion for a Stay Is Not Moot. ............................................... 13

      B.    Plaintiffs Will Suffer Irreparable Harm Without Relief. .............................. 14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
2025 WL 485324 (D.D.C. Feb. 13, 2025) ...........................................................................2

*Arizona v. Su*,
121 F.4th 1 (9th Cir. 2024) ...................................................................................2, 6, 7

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986)................................................................................................4

*Boyle v. Bessent*,
2025 WL 509519 (D. Me. Feb. 14, 2025) ............................................................13

*California v. Bureau of Land Mgmt.*,
277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...............................................................13

*Camp v. Pitts*,
411 U.S. 138 (1973)................................................................................................6

*Career Colleges & Sch of Tex. v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .................................................................................13

*Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ...............................................................................3

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 ..........................................................................................................12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)................................................................................................4

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..............................................................................................12

*City of Taunton v. EPA*,
895 F.3d 120 (1st Cir. 2018)...................................................................................6

*Conservation L. Found. of N. Eng. v. Clark*,
590 F. Supp. 1467 (D. Mass. 1984) .......................................................................6

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)............................................................................................4, 5

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ...................................................................3

*Doe v. Austin*,
  2024 WL 4653290 (D. Me. Nov. 1, 2024)........................................................10

*Drs. for Am. v. OPM*,
  2025 WL 452707 (D.D.C. Feb. 11, 2025) ..........................................................8

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)........................................................................................2, 3

*Gore v. Lee*,
  107 F.4th 548 (6th Cir. 2024) .........................................................................11

*Griffin v. HM Fla.-ORL, LLC*,
  144 S. Ct. 1 (2023)..........................................................................................14

*Gutierrez de Martinez v. Lamagno*,
  515 U.S. 417 (1995)...........................................................................................4

*Haig v. Agee*,
  453 U.S. 280 (1981)...........................................................................................5

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004)...........................................................................................5

*Health Freedom Def. Fund, Inc. v. Biden*,
  599 F. Supp. 3d 1144 (M.D. Fla. 2022)...........................................................14

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994)...........................................................................................9

*Kent v. Dulles*,
  357 U.S. 116 (1958)....................................................................................4, 12

*Laufer v. Acheson Hotels, LLC*,
  50 F.4th 259 (1st Cir. 2022)............................................................................11

*Massachusetts v. HHS*,
  682 F.3d 1 (1st Cir. 2012).................................................................................9

*Milligan v. Pompeo*,
  502 F. Supp. 3d 302 (D.D.C. 2020)...............................................................2, 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Must. Auto. Ins. Co.*,
  463 U.S. 29 (1983).............................................................................................7

*Muth v. Voe*,
    691 S.W.3d 93 (Tex. App. 2024) ..........................................................................................15

*NAACP v. Sec'y of Hous. & Urb. Dev.*,
    817 F.2d 149 (1st Cir. 1987) ...................................................................................................8

*Nat. Res. Def. Council v. DOE*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ..................................................................................13

*Nev. Dep't of Hum. Res. v. Hibbs*,
    538 U.S. 721 (2003) .................................................................................................................9

*NRDC v. EPA*,
    824 F.2d 1258 (1st Cir. 1987) .................................................................................................7

*Olsen v. United States*,
    414 F.3d 144 (1st Cir. 2005) ...................................................................................................6

*Pacito v. Trump*,
    2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ....................................................................2

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...............................................................................................................10

*Powers v. Ohio*,
    499 U.S. 400 (1991) .................................................................................................................9

*Pub. Citizen, Inc. v. Lew*,
    127 F. Supp. 2d 16 (D.D.C. 2000) .........................................................................................8

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) ....................................................................................................2

*Salem v. Pompeo*,
    2024 WL 1364320 (E.D.N.Y. Mar. 31, 2024) ......................................................................5

*Sampson v. United States*,
    724 F.3d 150 (1st Cir. 2013) .................................................................................................11

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ...................................................................................................................9

*In re Soares*,
    107 F.3d 969 (1st Cir. 1997) ...................................................................................................4

*Talbott v. United States*,
    2025 WL 842332 (D.D.C. Mar. 18, 2025) .......................................................................9, 12

*Teague v. Lane*,
    489 U.S. 288 (1989) ................................................................................................11

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) ...................................................................13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................................12

*West Virginia v. EPA*,
    577 U.S. 1126 (2016) ..............................................................................................13

*Whalen v. Roe*,
    429 U.S. 589 (1977) ................................................................................................10

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ...............................................................................5

**Statutes**

5 U.S.C. § 705 ..............................................................................................................13

5 U.S.C. § 706 ................................................................................................................5

44 U.S.C. § 3506 ............................................................................................................8

**Other Authorities**

89 Fed. Reg. 93,390 (Nov. 26, 2024) ............................................................................8

Fed. R. Civ. P. 65 ...........................................................................................................6

## I.    PRELIMINARY STATEMENT

The Government seeks to deny usable passports to Plaintiffs in a discriminatory, unreasoned policy shift.  Defendants' Opposition contains little substance and fails to rescue their unconstitutional and dangerous actions.  It all but ignores Plaintiffs' central point: this policy targets and attempts to erase transgender, nonbinary, and intersex people—and exposes them to grave harm.  Instead, to justify their actions, Defendants offer little beyond the conclusory assertion that this Administration believes there are only two immutable sexes; but that is an unconstitutional sex classification, contradicts the scientific and medical evidence Plaintiffs submitted, and is unsupported by any countervailing record evidence.  And Defendants concede that a "core" purpose of the policy is the "outing of transgender, intersex, and nonbinary individuals," Opp. 13, an explicit admission of improper animus.  The remainder of the Opposition is equally deficient: attempting to raise inapplicable barriers to judicial relief and hand-waving about unspecified, unsupported, and irrelevant foreign policy concerns.  Indeed, Defendants largely copy their arguments from other recent cases—arguments other courts have rightly rejected, as shown below.

The reality is straightforward: this policy is arbitrary and capricious, violates the guarantee of equal protection, infringes rights to travel and informational privacy, and has caused—and will continue to cause—irreparable injury.  The Court should grant a stay of agency action and preliminary injunction.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADMINISTRATIVE PROCEDURE ACT ("APA") CLAIM.

### A.    The Policy Is Reviewable Under the APA.

After conceding that that the State Department has "changed its policy" to implement the Executive Order (the "EO"), Opp. 1, Defendants immediately about-face and maintain that there is, in fact, no agency action for the Court to review.  Their arguments on this point are meritless.

*First*, Defendants claim that when the President directs an agency to implement a particular policy, that direction effectively insulates it from APA judicial review, since "it cannot be arbitrary and capricious for the agency to act as the President instructs." Opp. 10. This argument lacks any support. Defendants ask the Court to abandon decades of established administrative law by allowing "the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025). The APA contains no carve-out for agency actions that implement executive orders, and neither the Supreme Court nor any court of appeals "has []ever excepted a final rule from APA review because it carried out a presidential directive." *Arizona v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). "That Defendants allege these extraordinary actions were taken to carry out the President's Executive Orders does not immunize them from APA review." *Pacito v. Trump*, 2025 WL 655075, at *15 (W.D. Wash. Feb. 28, 2025).

*Second*, Defendants argue that because the Passport Act grants the President "broad discretional authority," the Agency Defendants' abrupt changes in passport policy and practices are unreviewable presidential actions. *See* Opp. 6–7 (citing *Franklin v. Massachusetts*, 505 U.S. 788 (1992)). They are wrong twice over. Most fundamentally, courts have repeatedly held that this narrow *Franklin* doctrine only bars APA review of discretionary presidential actions, not agency actions, even when they implement the President's directives. *See, e.g.*, *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 313–14 (D.D.C. 2020) (collecting cases). *Franklin* is thus limited to those rare situations in which "the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties"—situations like submission of a treaty to Congress. *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 553 (D.C. Cir. 1993). That is not the case here. The EO was, by its terms, merely the first step of the

2

process, not the last.  It purports to exercise no authority over passports directly, instead directing various agencies, including the Department of State, to "implement changes" to their prior operations to effectuate the Government's definition of sex.  Moreover, the doctrine is limited to situations where the President's role is "essential" to the "'integrity of the process' at issue."  *Id.* (quoting *Franklin*, 505 U.S. at 799).  Here, where the President's authority under the Passport Act has been delegated to the Secretary of State for close to sixty years, his role in the rulemaking process can hardly be described as "essential," and "APA review of otherwise final agency actions may well be available."  *See id.*; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA.").

Defendants' further reliance on *Detroit International Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016), is misplaced.  "In that case, Congress had delegated to the President power over final approvals of [certain] bridges, the President approved the bridge [being challenged], and State's actions were mere ministerial implementation of presidential action." *Milligan*, 502 F. Supp. 3d at 314 (distinguishing *Detroit Int'l Bridge*) (cleaned up).  Here, in sharp contrast, the Agency Defendants have taken—and will continue to take—any number of their own actions with direct consequences, from policy formulation to adjudication of individual passports. Underscoring this point, Defendants' own evidence proves that the State Department's Policy is not a mere "ministerial" implementation of an otherwise final presidential act (like selecting a specific bridge to permit).  After the EO was issued, the Agency Defendants first "evaluat[ed] how to implement" it.  Pierce Decl. ¶ 19.  After conducting that evaluation, the Agency Defendants promulgated a Policy reflecting the agency's independent determination of the meaning of "sex" (*i.e.*, "biological sex at birth," rather than belonging, "at conception," to a particular sex, even

3

though these are not always the same, *see* Corathers Rebuttal Decl. ¶¶ 6, 17), a change motivated by seemingly pragmatic reasons (*i.e.*, that Defendants do "not have the capacity to adjudicate 'sex at conception'") untethered from the text of the EO.  Pierce Decl. ¶ 14.  These actions make clear that the Policy cannot satisfy the "ministerial implementation" test.  *See In re Soares*, 107 F.3d 969 (1st Cir. 1997) (a "ministerial" act is one in which "nothing is left to the exercise of the official's discretion or judgment").

**Third**, Defendants are wrong that all decisions relating to the State Department's processing of passports are committed to agency discretion by law.  Opp. 8–9.  There is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), and the agency-discretion exception is thus "very narrow," applicable only in "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (cleaned up).  If any doubt exists, courts must "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review."  *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).

Here, none of the circumstances that typify actions committed to agency discretion are present.  The Supreme Court has long recognized that, while the authority granted by the Passport Act "is expressed in broad terms," the Secretary of State does not have "unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose."  *Kent v. Dulles*, 357 U.S. 116, 127–28 (1958).  Rather, his decisions are subject to judicial review and may be struck down if contrary to law.  *Id.* at 128–29.  The Agency Defendants' actions are therefore reviewable under the APA.  *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019).

Throughout their brief, Defendants gesture at hazy "foreign affairs" concerns, or the

President's authority over foreign relations, without fitting them into any legal framework—or, indeed, ever actually explaining what precisely the concerns are. While certain issues related to passports may implicate foreign relations, Defendants never explain how using accurate sex designations and X designations could possibly do so. Courts have repeatedly examined rules regarding passports under the APA. *See*, *e.g.*, *Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020); *Salem v. Pompeo*, 2024 WL 1364320 (E.D.N.Y. Mar. 31, 2024); *cf. Dep't of Com.*, 588 U.S. at 772 (concluding, based on courts' prior willingness to entertain census-related challenges, that "[t]he taking of the census is not one of those areas traditionally committed to agency discretion"). This case is a far cry from the cases Defendants cite that concerned, for instance, the revocation of an individual passport due to national security concerns about a former CIA officer exposing CIA activities. *Haig v. Agee*, 453 U.S. 280, 288 (1981). This aside, courts have rejected the idea that merely invoking the President's foreign-affairs powers requires unthinking judicial deference. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."). And in exercising foreign-affairs powers, as others, the President cannot order constitutional violations, and agencies cannot violate the APA.

### B.    The Policy Is Arbitrary and Capricious and Not in Accordance with Law.

Defendants do not dispute that the Policy is a "final" action for purposes of APA review. Opp. 6–15. It must, therefore, be set aside if the Court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (D).

As a preliminary matter, Defendants are wrong that this Court's review is limited to the administrative record before the agency. *See* Opp. 6. It is well-settled that a court may "consider supplemental evidence to facilitate [its] comprehension of the record or the agency's decision,"

5

*City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018), particularly in cases where (like here) there are "factors the agency should have considered, but did not."  *Conservation L. Found. of N. Eng. v. Clark*, 590 F. Supp. 1467, 1475 (D. Mass. 1984).  More fundamentally, though, Defendants cannot challenge the use of extra-record evidence in this case when, despite their claim "the Passport Policy was the product of reasoned decision making," Opp. 1–2, they have produced ***no*** administrative record whatsoever.  Limiting this Court's review to a non-existent record would serve no purpose except "to frustrate effective judicial review."  *Olsen v. United States*, 414 F.3d 144, 155–56 (1st Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).[1]

On the merits, Defendants cannot meet their burden of showing that the Policy was the product of reasoned decision making.  Defendants identify only three rationales purportedly justifying the Policy: (i) the State Department's interest in "reasonably adopt[ing] the Policy to implement the President's directive," (ii) uniformity, as "[p]assport data would not be useful for other agencies if the State Department adopted definitions inconsistent with the policy of the United States," and (iii) the Government's desire to "out[] transgender, intersex, and nonbinary individuals."[2]  Opp. 11–13.  Defendants offer no support for the first explanation, because none exists: blind compliance with an executive order does not justify agency action.  *Supra* at 2.  To hold otherwise "would allow presidential administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first."  *Su*, 121 F.4th at 16.

---

[1] In any event, Plaintiffs' evidence may be properly considered when evaluating their motion for a preliminary injunction.  *See* Fed. R. Civ. P. 65(a)(2).

[2] In a brief, entirely unsupported sentence, Defendants also appear to suggest that the Policy was adopted to improve passport screening efficiency.  Opp. 13.  But even if true, Defendants do not even attempt to rebut Plaintiffs' evidence that the Policy will directly undermine that goal by leading TSA and border agents to question the validity of passports listing a sex designation that differs from the bearer's appearance and the sex designation on the bearer's other identity documents.  *See* Mot. 13.

Even in response to presidential diktat, the APA requires informed policy-making, as "[t]here is []
nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options
when issuing a rule that implements an executive order." *Id.*

Defendants' second supposed rationale—their alleged need to produce "useful" passport
data—fares no better.  Most troublingly, this claim appears to mischaracterize the declaration
Defendants cite as evidence.[3]  While that document states that the Policy "support[s] the goal of
uniformity," Pierce Decl. ¶ 19, it says nothing about the usefulness of passport data, and
Defendants point to no other source for this statement, Opp. 12.  Perhaps as a result, Defendants
do not even attempt to explain how other agencies rely on passport data or why "uniformity" is
useful, particularly in light of the State Department's longstanding practice of allowing changes to
passport sex designations.  Nor do they offer any rationale explaining why ***this*** definition of sex in
particular was adopted as opposed to any other.  And there is no meaningful attempt to engage
with ***any*** of Plaintiffs' evidence showing that the Policy's definition of sex is illogical and
unscientific.  Opp. 12–15.[4]  Any one of these flaws, independently, is fatal under APA review.  *See
Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Must. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)
(an agency action is arbitrary and capricious if it fails to "explain the evidence which is available"
and offer a "rational connection between the facts found and the choices made").

Defendants' final rationale is mentioned only in passing but worth pausing on.  According

---

[3] For all Defendants' protestations regarding extra-record evidence, their arguments are supported
not with citations to facts and findings in the administrative record, but rather by citations to a
declaration that was prepared solely for this litigation.  *See NRDC v. EPA*, 824 F.2d 1258, 1286
n.18 (1st Cir. 1987) ("Reviewing courts will not rely on appellate counsel's *post hoc*
rationalizations in lieu of adequate findings or explanations from the agency itself.").

[4] Defendants admit that the State Department lacks expertise on these issues and asserts that it
defers to HHS's Guidance, Opp. 14, but that Guidance itself is scientifically insupportable and
internally inconsistent.  *See* Corathers Rebuttal Decl. ¶¶ 6–7.

to Defendants, "outing . . . transgender, intersex, and nonbinary individuals" is "core to the Policy." Opp. 13. Defendants offer no explanation for how imposing the harms of outing people was, or could possibly be, the product of reasoned decision making.

Finally, no authority supports Defendants' contention that the Paperwork Reduction Act (the "PRA") "forbids review" here. Opp. 16. Defendants' cited cases stand only for the proposition that the PRA lacks a private right of action, but the existence of a private right of action is not a prerequisite for APA review. Courts regularly review government compliance with laws lacking a private right of action. *See NAACP v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 152 (1st Cir. 1987) ("[F]ederal action is nearly always reviewable for conformity with statutory obligations without any such 'private right of action'"). Accordingly, federal courts regularly consider APA claims based on PRA violations. *E.g.*, *Drs. for Am. v. OPM*, 2025 WL 452707, at *7 (D.D.C. Feb. 11, 2025) (finding plaintiffs likely to succeed on merits of APA claim premised on PRA violation); *Pub. Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1, 7, 22–26 (D.D.C. 2000) (granting summary judgment to plaintiff on PRA-based APA claim). This Court should do likewise.[5]

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

### A. The Policy Discriminates on the Basis of Sex and Transgender Status, Triggering Heightened Scrutiny.

The Policy draws an explicit classification based on sex. It facially defines an applicant's

---

[5] Defendants are incorrect to suggest that they complied with the PRA because the forms removed from the website were in the renewal process and the substituted (and expired) forms had been approved previously. Opp. 4–5. The renewals sought to continue the language on the forms then in place permitting self-designation of sex and X designations. *See, e.g.*, 60-Day Notice of Proposed Information Collection: U.S. Passport Renewal Application, 89 Fed. Reg. 93,390 (Nov. 26, 2024). The mandatory 60-day notice and comment process is required whenever forms are "substantially modif[ied] or terminat[ed]," which occurred when the forms were removed, regardless of what might have been substituted for them. 44 U.S.C. § 3506(c)(2)(A), (d)(3). That forms must be renewed every three years is further evidence of Defendants' PRA violation: the old forms that are now on the website have long-since expired and fallen out of PRA compliance.

sex and then requires that the sex designation on a passport conform to that classification. "Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective." *Massachusetts v. HHS*, 682 F.3d 1, 9 (1st Cir. 2012).

Defendants claim that heightened scrutiny does not apply because the Policy "does not prefer one sex over the other" or "apply one rule for males and another for females," Opp. 17, but that argument runs counter to decades of precedent. Explicit classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994) (rejecting "equal application" argument in the context of sex classifications). Since the Motion was filed, another court has agreed—striking down the Administration's ban on military service by transgender people as a deprivation of equal protection based both on sex and on transgender status. *See Talbott v. United States*, 2025 WL 842332, at *24–25 (D.D.C. Mar. 18, 2025). Defendants are also wrong on the facts: at the level of the individual, there is nothing "equal" about how the Policy applies. Plaintiff Ashton Orr, for example, who lives his life as a man, has been denied a passport containing an "M" sex designation that would have been available to an applicant who was assigned male rather than female at birth. Orr Decl. ¶ 12. That is different treatment based on sex.

Still further from the mark is Defendants' argument that the Policy's overbroad generalizations about men and women are not "an independent basis for triggering heightened scrutiny." Opp. 18. To the contrary, laws premised on "overbroad generalizations about the way men and women are" must be "subject to review under the heightened scrutiny that now attends 'all gender-based classifications.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (quoting *J.E.B.*, 511 U.S. at 136); *accord Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 730 (2003) ([I]nvalid gender stereotypes . . . cannot justify the States' gender discrimination in this area.").

None of the cases cited by Defendants hold otherwise.

Finally, Defendants' conclusory assertion that the Policy does not classify on the basis of transgender status strains credulity. *See* Opp. 18, 20. The Policy requires transgender people, including those who are nonbinary, but not cisgender people, to have a sex designation on their passport that is inconsistent with their gender identity. This facial classification triggers heightened scrutiny. *See* Mot. 19–20 (collecting cases).[6] But even if the Policy were deemed facially neutral, Defendants admit that its purpose is in part to out transgender, nonbinary, and intersex people, triggering heightened scrutiny under *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Courts in this Circuit have repeatedly held that similar policies discriminate on the basis of being transgender—regardless of facial classifications—and repeatedly held them subject to heightened scrutiny. *Doe v. Austin*, 2024 WL 4653290, at *12 & n.22 (D. Me. Nov. 1, 2024) (collecting cases).

### B.    The Policy Infringes on the Rights to Privacy and Travel, Triggering Heightened Scrutiny.

Defendants' straw-man arguments on the Policy's infringement of Plaintiffs' rights to privacy and travel are unresponsive, unpersuasive, and should be rejected.

***First***, Defendants deny the existence of a fundamental right to obtain a passport with a particular gender marker. Opp. 23–24. This defines the right at far too granular a level. Plaintiffs object that the Policy violates their right to informational privacy, a right the Supreme Court has long recognized as fundamental and which protects against the "disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). Courts both in and out of this Circuit have concluded that this right is implicated in circumstances highly relevant here, such as when the disclosure may

---

[6] Defendants' arguments to the contrary ignore the caselaw on immutability and discreteness, put forth a test of political powerlessness that would have meant that sex and race would not receive heightened scrutiny given laws prohibiting those forms of discrimination, and are misguided given the onslaught of anti-transgender laws and policies adopted in this country in the past several years.

"invite stigma or harassment," "invite bodily harm," or "reveal personal details of an intimate nature." *See* Mot. 24 (citing cases). Defendants' focus on *Glucksberg* thus misses the point entirely: a case does not call for "a new constitutional rule . . . when it is 'merely an application of the principle that governed' a prior decision to a different set of facts." *Sampson v. United States*, 724 F.3d 150, 169 (1st Cir. 2013) (quoting *Teague v. Lane*, 489 U.S. 288, 310 (1989)). *Gore v. Lee*, 107 F.4th 548 (6th Cir. 2024)—Defendants' primary authority on this point—commits the same fallacy, as persuasively explained by its dissent. *See id.* at 582 & n.8 (White, J., dissenting).

***Second***, Defendants contend that despite the State Department's refusal to issue usable passports to transgender and nonbinary individuals, no Plaintiff has standing to challenge the Policy. Opp. 21. Each of the standing requirements is easily met. The Policy subjects Plaintiffs to unlawful discrimination, and "[d]ignitary harm or stigmatic injuries caused by discrimination have long been held a concrete injury in fact, even without informational injury." *Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 274 (1st Cir. 2022), *vacated as moot*, 601 U.S. 1 (2023). Defendants also concede they have refused to issue Plaintiffs passports that contain the sex designation identified in their applications. Opp. 21. As Plaintiffs explain, using these passports puts them at risk of harassment and violence, and for many plaintiffs, renders them unusable. *See* Mot. 28. Even ***before*** the Policy, as Defendants acknowledge, several Plaintiffs suffered harassment or violence at the hands of TSA, CBP, or foreign agents due to inconsistent sex designations on their identity documents. *See id.* at 28–29. The Policy makes these unsafe events much more likely to occur when Plaintiffs travel abroad. These credible threats of dignitary harms—not to mention physical harms—are precisely those that have been recognized as conferring Article III standing. *See Laufer*, 50 F.4th at 274 (collecting cases).

***Third***, while Defendants suggest that Plaintiffs confuse the right to interstate travel with

the right to international travel, Opp. 22, it is Defendants who misapprehend Plaintiffs' argument and the law. Plaintiffs' right-to-travel claim does not rise and fall on the existence of case law recognizing a fundamental right to travel, as Defendants suggest. Cases like *Kent*, *Aptheker*, and *Zemel* demonstrate a long tradition of recognizing the "deeply rooted value" that a right to international travel holds in our nation's history and tradition. *See* Mot. 21–22. They make clear "that at least some form of heightened scrutiny must apply" when this right is implicated. *Id.* 24.

### C. The Policy Fails Under Any Level of Scrutiny.

Defendants all but concede that the Policy fails heightened scrutiny. Their sole argument to the contrary—that the Policy is necessary to produce "useful" passport data to the rest of the federal government, *see* Opp. 26—appears nowhere in the text of the EO or the Policy (or even in the declaration they cite for this proposition, *see id.* 12 (citing Pierce Decl. ¶ 19)).

Though heightened scrutiny is warranted, the Policy fails under any standard of review because "a bare . . . desire to harm a politically unpopular group" is not a "legitimate state interest[]." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985). While Defendants weakly protest that the Policy is not motivated by animus, *see* Opp. 20, 26, they simultaneously admit a core purpose of the Policy is to "out" transgender people.[7]

As explained, Defendants contend that the government has a legitimate interest "in

---

[7] Defendants are also wrong that, when assessing animus, this Court should put its head in the sand and ignore this Administration's numerous other policies restricting legal protections for transgender people. *See* Opp. 20. "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534–35 (considering a resolution adopted at same time as challenged ordinances as evidence of discriminatory intent). This Administration's other executive orders and federal agency actions targeting transgender and nonbinary people are strong evidence of discriminatory intent and animus. *See Talbott*, 2025 WL 842332, at *36 ("[T]he flurry of government actions directed at transgender persons . . . must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus.").

maintaining a consistent definition of sex throughout the federal government," Opp. 25, but they offer no explanation for why *this* particular definition of "sex" was chosen. *Supra* at 7. In any event, the Policy cuts directly against this purported interest in uniformity since, as previously explained, the Policy jettisons the EO's definition of sex (premised on belonging, at conception, to a sex that produced a certain size reproductive cell) in favor of its own definition (premised on an applicant's sex assigned at birth). *See supra* at 3–4. Even assuming the Policy had consistent definitions, it would not achieve Defendants' asserted government interest in sex uniformity. Indeed, the Policy actually creates confusion and delay at border crossings, a concern Defendants also claim is "core to the Policy." *See* Opp. 13; *supra* at 6 n.2. Defendants cannot plausibly claim that the Policy is rationally related to a governmental interest that it directly undermines.

## IV.    THE REMAINING FACTORS WEIGH DECISIVELY IN FAVOR OF A STAY AND PRELIMINARY INJUNCTION.

### A.    Plaintiffs' Motion for a Stay Is Not Moot.

Defendants' argument that Plaintiffs cannot seek a stay of agency action because Defendants have already taken action ignores established law. The APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, with no temporal limits. "Though it may seem odd to speak of 'staying' the effective date of a rule already in effect, [c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Boyle v. Bessent*, 2025 WL 509519, at *4 n.5 (D. Me. Feb. 14, 2025) (cleaned up); *e.g.*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.).[8]

---

[8] Two of Defendants' authorities—*Nat. Res. Def. Council v. DOE*, 362 F. Supp. 3d 126 (S.D.N.Y. 2019), and *California v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)—are entirely inapposite, as those cases involved an agency's authority under Section 705 to stay a previously implemented action. Defendants' final case, *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022), is an unpersuasive departure from an overwhelming judicial consensus.

Defendants' other arguments in this vein confuse the standard for obtaining a nationwide injunction with the relief available under the APA.  Opp. 28–29.  These remedies are not the same.  *See, e.g.*, *Career Colleges & Sch of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (noting distinction).  As Justice Kavanaugh has explained:

> [The propriety of nationwide injunctions is] distinct from the issue of a court's setting aside a federal agency's rule under the [APA] . . . .  Judicial review of agency action presents a different situation because the [APA] instructs a reviewing court to "hold unlawful and set aside" agency rules and orders that it deems unlawful or unconstitutional.  Therefore, unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA goes further by empowering the judiciary to act directly against the challenged agency action.

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., respecting the denial of application for stay) (cleaned up).  Even courts that "share[] some of the skepticism about" nationwide injunctions recognize that "the weight of authority and judicial practice instructs" that APA relief is appropriate as to the entirety of the agency action.  *Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp. 3d 1144, 1176 (M.D. Fla. 2022), *vacated as moot on other grounds*, 71 F.4th 888 (11th Cir. 2023).

### B.    Plaintiffs Will Suffer Irreparable Harm Without Relief.

The Policy inflicts irreparable injuries through the deprivation of Plaintiffs' constitutional rights.  And it forces Plaintiffs into a Hobson's choice: sacrifice their freedom to travel internationally or use a passport that does not align with their identity, outing them at every use and exposing them to harm.  Defendants' cursory irreparable-harm argument barely disputes any of this, and it is ***entirely silent*** on the argument that deprivation of constitutional rights and protections is, in and of itself, an irreparable injury that warrants relief.  *See* Opp. 26–27.  Defendants instead make three other misguided arguments.

***First***, Defendants claim that the injuries at issue are conjectural.  Opp. 26.  The harm from being forced to use identity documents with sex designations required by the Policy is far from

speculative: substantial harm results from using incorrect sex designations on identification documents, multiple Plaintiffs have been subjected to these precise harms in the past due to incorrect sex designations, and "outing" Plaintiffs as transgender or nonbinary is the inevitable, harmful result of the Policy. *See* Scheim Decl. ¶ 16; Perysian Decl. ¶ 8; Orr Decl. ¶ 10; Anderson Decl. ¶ 13. Defendants offer ***no*** evidence rebutting the substantial record of likely harm. To the contrary, they admit that the Policy is ***intended*** to harm Plaintiffs by "outing" them, Opp. 13. *See Muth v. Voe*, 691 S.W.3d 93, 137 (Tex. App. 2024) (affirming trial court's recognition that "outing an adolescent as transgender" can constitute "irreparable injury" for granting injunctive relief).

***Second***, Defendants argue that because Plaintiffs are able to obtain passports that reflect the Policy's definitions of sex, they are not irreparably injured. Opp. 26. That single-sentence argument is also wrong: the injuries occurred when Plaintiffs were denied their constitutional rights and discriminatorily barred from obtaining usable passports and such injuries will continue as long as the Policy is in effect. *See* Mot. 28–29; *supra* at 14.

***Third***, though not particularly clear, Defendants suggest that Plaintiffs should have applied for passports before the Administration abruptly overhauled settled policy. Opp. 27. Defendants cite no cases supporting the argument. *See id.* That is unsurprising: injuries do not evaporate merely because the injured party did not foresee the Government acting to harm them.[9]

\* \* \*

For the foregoing reasons, the Court should grant Plaintiffs' motion for a stay of agency action and for preliminary injunction.

---

[9] Defendants also suggest that Plaintiffs do not face irreparable injury from having inconsistent identity documents because they could seek state identity documents that list their sex assigned at birth. Opp. 7. That is absurd: Plaintiffs would only be injured twice-over because ***all*** of their identity documents would be inaccurate and invite the types of harms described in the Motion.

Respectfully submitted,

March 19, 2025

*/s/ Isaac D. Chaput*
Isaac D. Chaput (*pro hac vice*)
William P. Kasper (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: 415-591-6000
Facsimile: 415-591-6091
ichaput@cov.com
wkasper@cov.com

Jessie J. Rossman (BBO # 670685)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
Telephone: 617-482-3170
jrossman@aclum.org

Jon W. Davidson (*pro hac vice*)
    (admitted only in California)
Li Nowlin-Sohl (*pro hac vice*)
    (admitted only in Washington)
Sruti J. Swaminathan (*pro hac vice*)
Malita V. Picasso  (*pro hac vice*)
James D. Esseks (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org
sswaminathan@aclu.org
mpicasso@aclu.org
jesseks@aclu.org

Aditi Fruitwala (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Ansel F. Carpenter (*pro hac vice*)
Gavin W. Jackson (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

Jonathan Thompson (*pro hac vice*)
Sean M. Bender (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-5891
Facsimile: 202-778-5891
jothompson@cov.com
sbender@cov.com

Yuval Mor (*pro hac vice*)
Alyssa L. Curcio (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-841-1000
Facsimile: 212-841-1010
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs*

17

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 19, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

*<u>/s/ Isaac D. Chaput</u>*
Isaac D. Chaput
