**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**


ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, )
CHASTAIN ANDERSON, DREW HALL,           )
BELLA BOE, and REID, SOLOMON-LANE,      )
on behalf of themselves and others      )
similarly situated,                     )
      Plaintiffs,                       )
        vs                             ) No. 1:25-CV-10313
DONALD J. TRUMP, in his official        )
capacity as President of the United     )
States; U.S. DEPARTMENT OF STATE;       )
MARCO RUBIO, in his official capacity    )
as Secretary of State; and UNITED       )
STATES OF AMERICA,                      )
      Defendants.                       )


**BEFORE THE HONORABLE JULIA E. KOBICK**
**UNITED STATES DISTRICT JUDGE**
**MOTION HEARING**


John Joseph Moakley United States Courthouse
Courtroom No. 3
One Courthouse Way
Boston, Massachusetts  02210


TUESDAY, MARCH 25, 2025
10:00 A.M.


Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3-205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com


Mechanical Steno - Computer-Aided Transcript

**APPEARANCES:**

          Li Nowlin-Sohl
          American Civil Liberties Union
          125 Broad Street
          New York, NY 10004
          Phone: 206-624-2184
          Email: Lnowlin-sohl@aclu.org
          for Plaintiffs.

          Isaac D. Chaput
          Covington & Burling, LLP
          Salesforce Tower
          415 Mission Street, Suite 5400
          San Francisco, CA 94105-2533
          Phone: 415-591-7020
          Email: Ichaput@cov.com
          for Plaintiffs.

          Jessie J. Rossman
          ACLU of Massachusetts
          One Center Plaza, Suite 850
          Boston, MA 02108
          Phone: 617-482-3170
          Fax: 617-451-0009
          Email: Jrossman@aclum.org
          for Plaintiffs.

          Sruti J. Swaminathan
          American Civil Liberties Union Foundation
          125 Broad Street, 18th Floor
          New York, NY 10004
          Phone: 848-459-1602
          Email: Sswaminathan@aclu.org
          for Plaintiffs.

          Aditi Fruitwala
          American Civil Liberties Union Foundation
          125 Broad St
          New York, NY 10004
          Phone: 214-797-9107
          Email: Afruitwala@aclu.org
          for Plaintiffs.

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

**APPEARANCES:** (Continued)

Benjamin T. Takemoto
United States Department of Justice
Ben Franklin Station, P.O. Box 883
Washington, DC 20044
Phone: (202) 532-4252
Fax: (202) 616-8460
Email: Benjamin.takemoto@usdoj.gov
for Defendants.


Rayford A. Farquhar
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
Phone: 617-748-3100
Fax: 617-748-3971
Email: Rayford.farquhar@usdoj.gov
for Defendants.

**P R O C E E D I N G S**

1

2          THE CLERK:  All rise.

3          (The Honorable Court Entered.)

4          THE CLERK:  Thank you very much.  You can be seated.

5          This is Civil Matter 25-10313, *Orr, et al versus*

6   *Trump, et al.*

7          Pursuant to Local Rule 83.3, persons granted access to

8   the courtroom and the overflow room are reminded of the general

9   prohibition against photographing, recording, and

10  rebroadcasting.  Violations of these prohibitions may result in

11  sanctions.

12         And will counsel starting with the plaintiffs please

13  state your name for the record.

14         ATTORNEY NOWLIN-SOHL:  Good morning, your Honor.  Li

15  Nowlin-Sohl for the plaintiffs.

16         THE COURT:  Good morning.

17         ATTORNEY CHAPUT:  Good morning, your Honor.  Isaac

18  Chaput, Covington & Burling for the plaintiffs.

19         THE COURT:  Okay, good morning.

20         ATTORNEY ROSSMAN:  Good morning, your Honor.  Jessie

21  Rossman for the plaintiffs, ACLU Massachusetts.

22         THE COURT:  Good morning.

23         ATTORNEY SWAMINATHAN:  Good morning, your Honor.

24  Sruti Swaminathan from ACLU for the plaintiffs.

25         THE COURT:  Good morning to you.

1          ATTORNEY FRUITWALA:  Aditi Fruitwala from the ACLU for

2     the plaintiffs.

3          THE COURT:  Okay.  Good morning.

4          And for the government.

5          ATTORNEY TAKEMOTO:  Good morning, your Honor.  My name

6     is Ben Takemoto from the Department of Justice on behalf of

7     Defendants.  And with me is Ray Farquhar from the U.S.

8     Attorney's office.

9          THE COURT:  Okay.  Good morning to you both as well.

10          Okay, so we're here for a hearing on the plaintiffs'

11     motion to stay or for a preliminary injunction.  There are

12     quite a number of issues in this case.  So the way that I want

13     to organize the hearing is I want to start by hearing from the

14     plaintiffs on their Constitutional claims, and then I'll give

15     the government an opportunity to respond.  Then I'd like to

16     keep the government on its feet and hear from the government on

17     the APA arguments and the Paperwork Reduction Act arguments.

18     And then I'll give the plaintiffs an opportunity to respond.

19     And then I'll hear from the plaintiffs on their additional

20     arguments on the scope of relief and the remaining preliminary

21     injunction factors, and then I'll give the government an

22     opportunity to respond.  So we'll ping-pong back and forth a

23     little.

24          Before we begin, I just want to express that I

25     appreciate the parties' professionalism in working on a joint

1　motion for a protective order.

2　　　　　Okay.  So, Attorney Nowlin-Sohl, are you presenting?

3　　　　　ATTORNEY NOWLIN-SOHL:  Yes.

4　　　　　THE COURT:  Okay, go ahead.

5　　　　　ATTORNEY NOWLIN-SOHL:  Good morning, your Honor.

6　Plaintiffs are seeking passports with sex designations that

7　align with the sex that they live and present to the world as.

8　For the vast majority of the time that sex designations have

9　been on passports people have been able to change their sex

10　designation in some capacity.  For the last several years,

11　people have been able to do this by self-attestation alone and

12　also to select an X marker to align with their gender identity

13　or to choose not to disclose their sex.

14　　　　　Under the State Department's prior policy, Plaintiffs

15　have and would have received passports consistent with their

16　gender identify.  But on President Trump's first day in office

17　he issued Executive Order 14168 regarding so-called gender

18　ideology extremism.  Two days later the State Department

19　implemented a policy instructing its agencies to no longer

20　issue X markers and to not allow anyone to have a sex marker

21　different than their sex assigned at birth.  As a result,

22　Plaintiffs have either received passports with the wrong sex

23　marker on it with how -- inconsistent with how they live and

24　present, have had their applications stalled, or have not been

25　able to apply for a passport or to renew it for fear of

1    receiving the wrong sex designation.

2            THE COURT:  Can I stop you?

3            So, you described what I understand to be the reversal

4    of two prior policies.  And my question for you is whether I

5    should be thinking about this case as involving one State

6    Department policy or two separate policy reversals?  That is,

7    the reversal of the ability to apply seeking an X marker and

8    the reversal of the ability to apply for a passport with a sex

9    consistent with one's gender identity?

10            ATTORNEY NOWLIN-SOHL:  We view it as one policy that

11    does two things with regard to inability to change a sex marker

12    but also the X designation, but the same kind of core is true,

13    that it doesn't allow people to reflect their sex assigned at

14    birth or to choose not to disclose their sex.  So we would ask

15    that you would consider it together, but it does do two

16    different things so it can be separated if necessary.

17            THE COURT:  Okay, go ahead.

18            Actually, so let me just ask you sort of one more

19    threshold question, and I'll ask the government as well.  But

20    how do you understand the government to be enforcing this

21    policy?  That is, I understand some of the plaintiffs have

22    birth certificates that are consistent with their gender

23    identity, but do not reflect their sex assigned at birth.  They

24    need to submit those birth certificates with a passport

25    application.  But at least one, and perhaps more than one,

1    plaintiff has received a passport that reflects their sex

2    assigned at birth rather than what's reflected on their birth

3    certificate and reflective of their gender identity.

4            So how do you understand the government to be figuring

5    this out?

6            ATTORNEY NOWLIN-SOHL:  So based on the information

7    that we have available from our plaintiffs and in talking to

8    other people, if there's any indication that the birth

9    certificate is not the person's sex assigned at birth, so if

10   they've had a previous passport, for example, that had a

11   different sex marker, they are either assigning that earlier

12   sex marker or asking for additional information.  For example,

13   Plaintiff Orr received a notification from the State Department

14   that the State Department wasn't able to determine their sex

15   assigned at birth, and asking for additional information.

16   We've not received guidance on what that additional information

17   is to show what somebody's sex is under either the State

18   Department's, HHS's, or the Executive Order's definition of sex

19   which are all slightly different.

20           THE COURT:  So you understand it to involve some

21   amount of cross-referencing earlier records, I don't know, for

22   Social Security records or other records?

23           ATTORNEY NOWLIN-SOHL:  Or within the State Department

24   itself if somebody's had a passport before, yes.

25           THE COURT:  Okay.  All right, go ahead.

1        ATTORNEY NOWLIN-SOHL:  As a result of this new policy,

2   Plaintiffs Orr and Boe have already missed important travel for

3   school and for medical care, and other plaintiffs have had

4   their travel plans put in jeopardy.

5        Plaintiffs have recounted the harms that they've

6   experienced in the past as a result of having inaccurate sex

7   designations on ID documents and also talked about the risks

8   and the harms going forward of having an inaccurate sex

9   designation on a passport.  And, therefore, we are asking the

10  Court for a stay of the agency action as well as a preliminary

11  injunction.

12        I'll turn first to the Constitutional claims.  So, the

13  Executive Order and the policy trigger heightened scrutiny

14  under both equal protection and the right to travel and strict

15  scrutiny under the right to privacy.  Defendants spend a single

16  paragraph trying to meet their burden under heightened scrutiny

17  and they failed to do so.  They've identified no legitimate

18  government interest motivating the policy change let alone even

19  a heightened important one.  And it follows, then, that it

20  cannot show that their interest is substantially related or

21  that the policy is substantially related to this interest.  So

22  turning to equal protection, this policy classifies on the

23  basis of sex.  Defendants try to downplay this by saying it's a

24  mere mention of sex, but it is no such thing.  It is a policy

25  that defines sex, defines male, defines female, and requires

1    that that, those definitions be applied across the entire

2    federal government.

3           THE COURT:  Can I stop you there?

4           I understand you rely in part on *Bostock's* reasoning

5    for this argument and -- not entirely, but in part, and the

6    logic.  You know, I think, I understand why you rely on that

7    logic.  I guess my question is, does that logic apply only to

8    the plaintiffs who are transgender rather than the plaintiffs

9    who are nonbinary?

10          ATTORNEY NOWLIN-SOHL:  No, your Honor.  I actually

11   think we're sort of one step before *Bostock* in a way, right?

12   Because their other argument was that transgender status is

13   inherently classification based on sex.  Here this is a facial

14   sex-based classification, you know, separate from transgender

15   status.  So I think, you know, it's actually a little bit

16   antecedent to even the reasoning in *Bostock* and because it is a

17   sex place classification, that applies to plaintiffs who are

18   nonbinary as well as transgender and would also apply to people

19   who are intersex.

20          THE COURT:  And am I correct, we don't have an

21   intersex plaintiff here?

22          ATTORNEY NOWLIN-SOHL:  Correct, your Honor, not at

23   this time.

24          THE COURT:  Okay.  All right, go ahead.

25          ATTORNEY NOWLIN-SOHL:  So the Supreme Court has been

1  very clear that all sex-based classifications weren't

2  heightened scrutiny.  So Defendants try to argue that

3  heightened scrutiny is not warranted here because the policy

4  treats males and females the same, but that is not what the

5  Supreme Court precedent says.  Explicit classifications do not

6  become neutral as the Supreme Court has empowers on the

7  assumption that all persons suffer them in equal degree.  And

8  also, the Supreme Court has been clear that, you know, the

9  Fifth Amendment and Fourteenth Amendment protect individuals

10  not groups.  That you evaluate whether there's a classification

11  at the individual level, and this was affirmed in _J.E.B._ and

12  _Loving_.  So at that level males and females are not treated the

13  same here.  So, for example, I mentioned earlier Plaintiff Orr,

14  right, who was assigned female at birth and seeks a male marker

15  on a passport.  They are not able to get one under this policy,

16  but somebody who is assigned male at birth can.  And that is

17  the differential treatment that triggers heightened scrutiny as

18  a sex classification.

19        THE COURT:  So just hearing your presentation and I

20  think, you know, looking at equal protection cases, they tend

21  to assume a sex binary, you know, looking at VMI and

22  Morales-Santana, they're talking about men and women.  And I

23  guess I just ask you to elaborate on how you think equal

24  protection jurisprudence, I think could be expanded or applies

25  to nonbinary or intersex individuals.

1          ATTORNEY NOWLIN-SOHL:  Yeah.

2          So equal protection has kind of two components, right?

3   So the first question is is there a classification, and does it

4   warrant heightened scrutiny?  And I think here even with

5   nonbinary people, it's clear that there is a sex

6   classification.  It might be that in the second component the

7   justifications for heightened scrutiny could be different.  We

8   don't think that they are.  But this is a sex classification

9   and that includes nonbinary individuals as well, and intersex

10  individuals that we don't have somebody here at that time.  So

11  the policy is still trying to force somebody into a sex box

12  against their consent.

13          THE COURT:  And is that based on the prior policy that

14  did allow for nonbinary and intersex individuals to select an X

15  marker?  Is that kind of how you're understanding that the

16  government once acknowledged a third option I guess?

17          ATTORNEY NOWLIN-SOHL:  Yes.  And also the government

18  acknowledged that people didn't need to classify themselves

19  based on male or female, right?  Like the X marker could also

20  mean that you didn't need to identify or disclose that and that

21  therefore, there is not a need to force people into this binary

22  box.

23          THE COURT:  Okay.  Go ahead.

24          ATTORNEY NOWLIN-SOHL:  And the Court in *Talbott* in the

25  District Court of D.C. recently reached the same conclusion.

1    The policy there was -- recognized only two sexes and argued

2    that sex was immutable for purposes of service.  And the Court

3    rejected Defendants' argument there that it did not trigger

4    heightened scrutiny.  And we would encourage the Court to adopt

5    the same reasoning here.

6         THE COURT:  Sorry, just to be clear.  Did *Talbott*

7    involve -- I know there was transgender plaintiffs in that

8    case.  But did it also include nonbinary plaintiffs?

9         ATTORNEY NOWLIN-SOHL:  To the extent that I think

10   transgender is understood sometimes as an umbrella term and

11   somebody who does not identify with their sex assigned at

12   birth, yes, it did.  But it was not explicit to nonbinary

13   folks.

14        THE COURT:  Okay.

15        ATTORNEY NOWLIN-SOHL:  Yeah.

16        Similarly the policy is a form of sex stereotyping.

17   It is trying to force people to live and identify and express

18   themselves as their sex assigned at birth.  And the defendants

19   have said its admitted core purpose of the policy to out them

20   if they fail to do so.  So that is a reason why this triggers

21   heightened scrutiny.  And then we would also argue that this is

22   transgender status classification.  That is a separate reason

23   for why heightened scrutiny is as triggered.  The policy and

24   the Executive Order are explicit about that the goal is

25   refuting, "The false claim that males can identify and thus

1  become women and vice versa."

2          The people who are considered male under the policy

3  and identify as women are transgender people.  And so even

4  though the policy doesn't say transgender, it is still

5  targeting transgender people.  It prohibits sex markers on

6  passports different than a person's sex assigned at birth and

7  that is, that is transgender people who are seeking that.

8          And similarly, the Court in _Talbott_ found that that

9  policy, the military Executive Order was classifying on the

10  basis of transgender status even though it didn't necessarily

11  use that word, because it was aimed squarely at transgender

12  people.

13          The Court in _Talbott_ undertook a lengthy analysis of

14  why the four factors that go to quasi suspect class were met

15  and we agree with those and want to encourage the Court --

16          THE COURT:  So that's a very factually intensive

17  undertaking as, you know, analyzing those factors, and I don't

18  have a lot before me on the record here.  So I guess what I'd

19  ask you to do is point me to what in the record you think

20  supports each of those factors.  And I'll just say, you know, I

21  think there's evidence of current discrimination against

22  transgender people, but I don't see evidence of past

23  discrimination and it's not that I don't think it exists, but

24  there's not any argument on that or record developed on that

25  prong.  And I guess I'll just ask you to walk through each of

1    those four factors and tell me what you think best supports

2    your argument.

3              ATTORNEY NOWLIN-SOHL:  Okay.

4              And in -- our briefing incorporates other cases that

5    have kind of analyzed that record in more detail.

6              THE COURT:  Right, but I mean cases go both ways as

7    you know across the country, and I'm not -- you know, here I'm

8    in the First Circuit, and it's a factually intensive inquiry

9    whether a group of people qualifies as a quasi suspect class.

10             ATTORNEY NOWLIN-SOHL:  It is a fact intensive one, and

11   due to page limits we weren't able to kind of include all of

12   that.  We would be happy to provide supplemental briefing on

13   that if necessary.  But walking through that, you know, with

14   regard to a history of discrimination, I think it is relatively

15   undisputed that there is a long history of discrimination

16   against transgender people, limitations on how they can

17   identify, and, you know, access to care.  And then that

18   discrimination has become very apparent particularly in the

19   last several years.  And in the last couple of months

20   especially, we've seen a litany of Executive Orders against

21   transgender people.

22             THE COURT:  So that seems to go to the fourth prong,

23   right, political powerlessness?

24             ATTORNEY NOWLIN-SOHL:  As well, yes, your Honor.

25             THE COURT:  Yes.

1          As to the first, is there anything in the record that

2   describes the history of discrimination?

3          ATTORNEY NOWLIN-SOHL:  Not currently in this record,

4   other than incorporating the cases that have also evaluated

5   that and made a similar finding.  And then also Doctor Shim's

6   declaration also lays out some of the history of discrimination

7   for that.

8          THE COURT:  Okay, all right.

9          Do you want to talk about the other factors?

10         ATTORNEY NOWLIN-SOHL:  Yes, your Honor.

11         So, I don't think that Defendants are disputing that

12  the -- that this characteristic of being transgender or not

13  identifying with their sex at birth bears any relation to the

14  ability to perform or contribute to society.  So I think that

15  factor is met.

16         Regarding whether they are a discrete group defined by

17  obvious immutable or distinguishing characteristics, we would

18  argue that, you know, to the extent that Defendants are saying

19  this is not an immutable characteristics because some people

20  might change their identity at some point.  Immutability is not

21  an explicit requirement.  It is an or.  The real question is

22  whether or not somebody can -- whether it's a discrete group.

23  Plaintiffs meet that.  Transgender people --

24         THE COURT:  Can I just stop you?

25         So is your theory that transgender and nonbinary

1    people are one quasi suspect class or that they are distinct

2    quasi suspect classes?

3             ATTORNEY NOWLIN-SOHL:  To the extent that being

4    transgender means that you don't identify with your sex

5    assigned at birth, we would say that nonbinary people kind of

6    fits within that umbrella, that they don't identify with their

7    sex assigned at birth, and so they would fall within one quasi

8    suspect class.

9             THE COURT:  Okay.

10            So let me just ask you about the Corathers'

11   declaration, which, you know, like at paragraph 49 it says:

12   Some nonbinary people identify as transgender and some

13   transgender people consider themselves nonbinary.  And then

14   looking at paragraph 52, describes there's considerable

15   scientific evidence demonstrating a duralogical biological

16   element of gender identity.  How do you reconcile those?

17            ATTORNEY NOWLIN-SOHL:  I'm not sure I understand the

18   question, your Honor.

19            THE COURT:  So I understand paragraph 49 to kind of

20   describe -- there's some transgender people identify as

21   nonbinary and vice versa.  There's some -- people identify

22   differently.  And, of course.  But then on the one hand that

23   might support a finding under prong 3 that there are

24   discrete -- well, excuse me, that it might not support a

25   finding under prong 3 that they're a discrete identifiable

1    group.  But paragraph 52, which describes more of a biological

2    element, might support your prong 3 argument.  So I'm just

3    asking you to reconcile those two paragraphs.

4           ATTORNEY NOWLIN-SOHL:  Yes, your Honor.

5           So I think the biological component suggests that,

6    well -- I think goes to the immutability part but shows that,

7    you know, there's something within people biologically that

8    maybe makes them not identify with their sex assigned at birth.

9    What they call it can vary.  And there's a large kind of range

10   of how people might identify.  But the reality is it comes back

11   to the fact that they're not identifying with their sex

12   assigned at birth.  And transgender status kind of includes a

13   lot of folks within that, and including nonbinary people.  And

14   so I don't see them as inconsistent.

15          THE COURT:  So it sounds to me like the way you define

16   the quasi suspect class that you're asking the Court to

17   identify as individual who do not identify with their sex

18   assigned at birth rather than transgender individuals, or

19   perhaps correct me if you would define it differently.

20          ATTORNEY NOWLIN-SOHL:  To the extent that they're

21   somewhat -- we would say that they're synonymous for these

22   purposes.  I think other people might use them differently and

23   how they understand the word transgender to be.  But for us,

24   transgender means that you're not identifying with your sex

25   assigned at birth.

```
 1            THE COURT:  Okay, all right.  Go ahead.

 2            ATTORNEY NOWLIN-SOHL:  So going back to the

 3   immutability component, we would argue that it's not required.

 4   That there is evidence showing that it is immutable.  That it

 5   has a biological component.  And that the Court in _Grim_ and

 6   _Talbott_ have said similar things, but also that, you know, the

 7   Ninth Circuit in the concurrency said, you know, Supreme Court

 8   had never meant strict immutability.  That you can't actually

 9   change that characteristic.  For example, alienage and

10   illegitimacy are not strictly immutable.  It's really about

11   describing those traits that are so central to a person's

12   identity that it would be abhorrent for government to penalize

13   a person for refusing to change them.  So for all of those

14   reasons we think that immutability and the discrete group

15   factor is met.

16            And with regard to the last factor with regarding

17   political power, Defendants cite to one law providing

18   protections for people who are transgender.  That is not

19   sufficient to show that people have political power, that this

20   factor is not met.  If that were the case, you know, sex and

21   race would have never been considered suspect or quasi suspect

22   classes.  And I think the kind of the rash of laws and

23   Executive Orders targeting trans people in the last several

24   years shows that they do not have the political power to

25   protect themselves right now.
```

1        And, in fact, Iowa just removed gender identity from

2    their antidiscrimination laws.

3        So for those reasons we would argue that the policy

4    and the Executive Order classify on the basis of transgender

5    status and sex on their face.  If the Court were to find that

6    they are not facial classifications, under _Feeney_, we would --

7    this would still warrant heightened scrutiny because it is

8    clear that the policy was adopted at least in part because of,

9    not in spite of, the effects on transgender people and

10   invidious discrimination towards transgender people.

11       So turning to application of heightened scrutiny, the

12   Supreme Court has been very clear that the government needs an

13   exceedingly persuasive justification for the policy, must serve

14   an important governmental objective, and must be substantially

15   related to achieving that objective.  As I discussed earlier,

16   the defendants spend a single paragraph in their brief trying

17   to satisfy heightened scrutiny and failed to do so.  The three

18   interests that they identify are what -- the first one is

19   uniformity.  They have not explained why uniformity is

20   necessary, particularly after decades of not requiring it.

21   People have been allowed to change their sex marker on a

22   passport for decades.  There's not been a uniformity

23   requirement.  You would think if there were problems, over all

24   that time, they would be able to identify them.  They have not

25   done so.

1        THE COURT:  They do point to the _Zzyym_ case from the

2  Tenth Circuit which did recognize uniformity of data across the

3  government as at least legitimate government interest.

4        ATTORNEY NOWLIN-SOHL:  Yes.  And in _Zzyym_ in that

5  case, the government had put forward five interests.  And the

6  Tenth Circuit said that three of them could not support it.

7        THE COURT:  Right.

8        ATTORNEY NOWLIN-SOHL:  They said two could.  One of

9  them was uniformity, but then remanded to see if it actually,

10  you know, kind of met the requirement.  So uniformity can be,

11  but the government has given no reason why it is here.  Nor do

12  they explain why they chose this particular policy, right?

13  They could have simply chosen a policy that if you change your

14  sex marker on your passport, you also have to change it with

15  Social Security or in other parts of the government.  So simply

16  saying uniformity alone is not enough here to show that it is

17  an important governmental interest or that it was

18  substantially --

19        THE COURT:  Can I ask, was there uniformity before

20  this policy in the federal government?  That is, you know, did

21  the prior policy of being able to identify with, you know, to

22  select a sex, consistent with your gender identity apply across

23  government agencies before this policy was adopted?

24        ATTORNEY NOWLIN-SOHL:  That is not my understanding,

25  your Honor.  But you can -- it was separate processes.  For

1    example, to change your passport you didn't necessarily then

2    have to also change your sex with Social Security.

3            THE COURT:  So it was uniform across the government

4    before this change of policy?

5            ATTORNEY NOWLIN-SOHL:  I believe it was not.

6            THE COURT:  It was not.  So you would have to

7    separately go to the Social Security administration and --

8            ATTORNEY NOWLIN-SOHL:  Right.

9            THE COURT:  I see.

10           ATTORNEY NOWLIN-SOHL:  And I don't think there was any

11   requirement that you actually go to Social Security and change

12   it, but you could have them be different for an indefinite

13   period of time.

14           THE COURT:  Okay.

15           ATTORNEY NOWLIN-SOHL:  Second, the government argues

16   that a passport would not be usable or passport data would not

17   be usable.  They provide no citation for this.  The declaration

18   they cite does not say that.  And similarly this policy has

19   been in place, or the former policy has been in place for many

20   years, not requiring uniformity and they give no justification

21   why the data would not be usable or how it wasn't usable in the

22   past.

23           And third, they say that the interest in federal

24   agencies verifying an individual, but they don't explain how

25   this policy furthers that.  And, in fact, Plaintiffs have put

1    forward an argument that it actually makes it harder to

2    identify an individual, this new policy, and defendants have

3    not refuted that.  So that interest cannot be.

4          So, they have identified no important governmental

5    interest, but they also fail to identify a legitimate

6    government interest.  And for that reason, we would argue that

7    the policy fails any level of scrutiny.  There's no rational

8    relation to a legitimate state interest, and the policy is also

9    inexplicable by anything other than animus.

10         THE COURT:  Can I just -- I just want to make sure I

11   understand your argument.  You're not disputing that the

12   uniformity of data across the federal government is a

13   legitimate interest, you're just disputing whether there's a

14   relationship between this policy and that interest?

15         ATTORNEY NOWLIN-SOHL:  We are saying that uniformity

16   could be a legitimate interest.  They have given no explanation

17   for why it is here.  We think that it's somewhat situational

18   based.  It could be.  I don't think they met the requirement to

19   show that it is here, and also the policy is not substantially

20   related to that interest, even if it were.

21         THE COURT:  Okay, all right.

22         ATTORNEY NOWLIN-SOHL:  So going back to rational

23   basis.  So the Executive Order is very clear, and the state

24   says that it is implementing the Executive Order, that the

25   purpose is to impose the view that sex is not changeable and

therefore that transgender people are not to be recognized for

any federal purpose.  The Supreme Court in Windsor has said a

policy intended to injure, stigmatize, demean, and degrade does

not survive scrutiny.  Any level of scrutiny.  And in previous

cases where the Court has struck down regulations for -- on the

basis of rational basis, have not necessarily had animus on the

face of those regulations.  For example, in _Cleburne_ it was

when you looked at the policy and the failure to provide any

kind of interest, the Court struck that down.  Here, the policy

is very explicit that it is animus based.  And we think of the

argument as even stronger that in prior cases finding that

there was no rational basis, that this is an animus-driven

policy and inexplicable.

THE COURT:  So, can you address the government's

argument that at least as _Trump versus Hawaii_ frames it, to

find a policy as motivated by animus, a court needs to conclude

that it's not explicable by anything else?  That is, you know,

rule out any other possible explanation and therefore all

that's left is animus.

ATTORNEY NOWLIN-SOHL:  So the _Talbott_ court also

discussed this.  And there's also kind of two paths to reaching

the conclusion that a policy doesn't survive rational basis.

So one of them is that it's inexplicable by anything

other than animus.  The second is that there's no rational

relation to a legitimate state interest.  We think both are

satisfied here.  The government has put forward no kind of even

legitimate state interest here and that there's -- or that the

policy is rationally related to them.  But also not only is

this policy inexplicable by anything other than animus, but the

Executive Order goes to great lengths to explain why it is

animus-driven.  It affirmatively explained the animus here.

THE COURT:  Okay.

ATTORNEY NOWLIN-SOHL:  Unless your Honor has any other

questions about equal protection, I'd like to move on to the

right to travel.

THE COURT:  Sure, go ahead.

ATTORNEY NOWLIN-SOHL:  So the policy here denies

Plaintiffs a usable passport.  It is harmful for them to have

to show a passport that outs them as transgender or nonbinary,

and it makes it unsafe for many people to do so.  Several of

our Plaintiffs, as I mentioned earlier, have already missed

travel plans as a result of receiving passports with the wrong

gender marker, and other plaintiffs have, you know, have their

travel plans either put in jeopardy or put on hold.

The case law here is a little bit messy.  There's no

kind of clear mandate from the Supreme Court about what level

of scrutiny to apply.  But the Supreme Court has been very

clear that the right to travel is an important, you know, kind

of longstanding liberty within our country, and has used

language when describing, you know, evaluating under the right

1    to travel that is consistent with a heightened scrutiny.  And

2    Judge Lucero in the *Maehr* case in its concurrence gives a very

3    detailed history of the case law regarding the right to travel,

4    and concludes that intermediate scrutiny is the best way to

5    remain faithful to both the full spectrum of Supreme Court case

6    law and the rule of international travel in the history of our

7    nation and its well conception -- and its conception

8    well-ordered liberty.  And we think that that is accurate.

9    That is consistent with the case law.

10         THE COURT:  Can you just address -- and so I take the

11   *Haig versus Agee* case from 1981 as one of the key cases in this

12   area, and it doesn't, you know, adopt rational basis but it

13   does say the freedom to travel abroad is subject to reasonable

14   government regulation.  And that sounds in the nature of a

15   rational basis, like, test.  So why do you think that's not

16   controlling here?

17         ATTORNEY NOWLIN-SOHL:  Yeah, and in *Haig* -- so it did

18   use that language, and I think at that time, you know, it

19   wasn't trying to suggest that rational basis applied, because

20   in that case later the court upheld the kind of revocation of a

21   passport only after finding that, you know, "There is no

22   governmental interest more compelling," than national security.

23   And that limiting, you know, AG's foreign travel was "The only

24   avenue open to the government to limit his activities."

25         And so that language and that holding is not

1    consistent with rational basis, and suggests a heightened level

2    of scrutiny.  And so we think that that case is actually

3    consistent with a requirement of some more demanding level of

4    review.

5            THE COURT:  Okay.

6            So let me just also ask you, you know, in many of

7    these passport cases, someone's been denied a passport or had

8    their passport revoked.  That's not what's happening here.  I

9    think you've, you know, put in evidence that there's a

10   meaningful burden on the right to travel abroad.  But people

11   can still travel abroad with passports that don't reflect their

12   gender identity.  So why should the -- why shouldn't I apply a

13   lower level of scrutiny given that there's not a denial or

14   revocation at issue here?

15           ATTORNEY NOWLIN-SOHL:  We don't think that a denial of

16   revocation is necessary to restrict the right to travel.  And,

17   for example, in _Zemel_ the limitation was that people couldn't

18   travel to Cuba, right?  One country out of over 100.  And that

19   was still restriction on the right to travel and it implicated

20   that burden.  Another hypothetical would be if the government

21   put a, you know, $10,000 application fee on a passport, right,

22   you could still get one, but it would really restrict the right

23   to travel and make it inaccessible to many folks.  Plaintiffs

24   here are not able to travel with the passports they have.  You

25   know, Bella Boe missed an important trip for school.  Plaintiff

1    Orr missed -- was not able to go to his medical care abroad.
2    And so this is basically denying them --

3            THE COURT:  Just to clarify.  Was that because they
4    don't yet have their passports or is that because they
5    received -- I know some of the plaintiffs were waiting for
6    their passports.

7            ATTORNEY NOWLIN-SOHL:  Plaintiff Orr did not yet have
8    a passport, had not yet received it, but could have gone in to
9    get one.  And so was not willing to travel with one that did
10   not have the correct gender marker.

11           And then Bella Boe had received her passport and chose
12   not to travel, because it was not a usable passport.  And so it
13   doesn't need to be an outright denial.  And in some of the
14   cases, right -- so defendant cites the *Califano* case as saying
15   that that's not, you know, not necessarily a restriction on
16   travel.  But in that case that involved SSI payments.  And the
17   limitation was that if you were traveling abroad for more than
18   30 days, that you wouldn't get your SSI payments.  And there
19   the Court said, okay, that's really about payments.  That's not
20   a direct impact on the right to travel.  And here this is a
21   direct impact on Plaintiffs' ability to travel.

22           THE COURT:  Okay.

23           ATTORNEY NOWLIN-SOHL:  Unless your Honor has any more
24   questions about the right to travel, I'll move on to the right
25   to privacy claim.

```
 1            THE COURT:  Yes.

 2            ATTORNEY NOWLIN-SOHL:  The Supreme Court has long

 3   recognized there's a right to informational privacy about

 4   personal matters.  Defendant's framing of the right is almost

 5   comically granular, right?  It's not just about the type of

 6   information, but they say the fundamental right also has to be

 7   about passports, about your gender identity on passports.  And

 8   if we frame rights with that level of specificity, we wouldn't

 9   have any rights left.  And so what this really is is this is an

10   application of a constitutional principle, the right to

11   informational privacy to a different set of facts.  This policy

12   forces this disclosure of Plaintiffs' transgender status every

13   time they use their passports.  Defendants don't dispute that.

14   They say that it's core to the policy.  And so -- and we would

15   also say that, you know, being out in other aspects of your

16   life doesn't negate the privacy interest here.  The fact that

17   some people may be open with their friends and family or on the

18   internet about the fact that they're trans, is very different

19   than having to disclose that information -- forcibly disclose

20   that information while handing someone your passport, you know,

21   at a border entry or try to open a bank account abroad.

22            THE COURT:  You cited a lot of district court cases,

23   but is there any Supreme Court case recognizing this right or

24   First Circuit case?  Especially applying the *Glucksberg*

25   analysis that I think in this, you know, certainly post-ops is
```

1    an important component of the analysis and whether this right

2    exists.

3         ATTORNEY NOWLIN-SOHL:  And do you mean specific to

4    kind of a sex designation on an ID document?

5         THE COURT:  As you frame it, the right to

6    informational privacy.

7         ATTORNEY NOWLIN-SOHL:  So we believe that Wayla

8    recognizes the right to informational privacy.  And in the

9    district court cases that we cite, apply that in the context of

10   ID documents and forceable outing.

11        THE COURT:  Okay.

12        ATTORNEY NOWLIN-SOHL:  I think that's all I have on

13   the constitutional claims.

14        THE COURT:  Okay.  That sounds good.

15        So I'll go to Attorney Takemoto and then we'll come

16   back to the plaintiffs.

17        ATTORNEY NOWLIN-SOHL:  Yes, your Honor.

18        ATTORNEY TAKEMOTO:  Good morning.

19        THE COURT:  Good morning.

20        ATTORNEY TAKEMOTO:  Good morning, your Honor.

21        A passport is, as the Supreme Court has described it,

22   a letter of introduction in which the issuing sovereign vouches

23   for the bearer and requests other sovereigns to aid the bearer.

24   It is thus more than just an identity document, it is a

25   communication between sovereigns.

1          This case boils down to whether a group of individuals
2    can require the United States to communicate to foreign
3    sovereigns in a particular way about their gender identity.
4    They cannot.  The United States can, as it had from 1976 to
5    2021, communicated passport bearer's sex rather than their
6    gender identity.  From this simple fact for all of the many
7    reasons why Plaintiffs are unlikely to succeed on the merits of
8    this case, and as your Honor asked, I'll begin with the
9    constitutional claims in responding to some of the claims the
10   plaintiff raised here.

11          THE COURT:  Can I actually, before you dive into that,
12   the same question I had for Attorney Nowlin-Sohl, which is
13   should I be thinking of this as involving two policies?  That
14   is, a reversal of the policy allowed for people to select X on
15   their passports and the policy that allowed people to choose
16   male or female consistent with their gender identity?

17          ATTORNEY TAKEMOTO:  Your Honor is correct that those
18   are two different policy changes in this.  So I think when
19   thinking about this case, it is important to think about those
20   two different decisions.

21          THE COURT:  Okay.

22          And then, again, the same question which is just
23   logistically, how is the State Department enforcing this where
24   a person submits a passport application, their birth
25   certificate is consistent with their gender identity but not

```
 1   their sex assigned at birth, what is the State Department
 2   doing?
 3           ATTORNEY TAKEMOTO:  Right.  I would point your Honor
 4   to paragraph 18 of the State Department's Declaration.  The
 5   State Department relies on birth certificates or other evidence
 6   that's closest in time to the passport applicant's birth.
 7           THE COURT:  And where is it getting that other
 8   evidence?
 9           ATTORNEY TAKEMOTO:  The applicant can submit that
10   evidence, or as my friend on the other side pointed out, it
11   could be from prior passports.
12           THE COURT:  Okay.
13           So just a -- I think Plaintiff Perysian did submit a
14   birth certificate consistent with her gender identity and was
15   given a male-designated passport.  So how did that work in that
16   circumstance?
17           ATTORNEY TAKEMOTO:  I don't know the facts -- how that
18   particular applicant received their passport.
19           THE COURT:  Okay.  But in your view the State
20   Department is consulting prior records within the State
21   Department but maybe not prior records from other government
22   agencies?
23           ATTORNEY TAKEMOTO:  It may.  I'm not sure about
24   whether it consults other agencies when adjudicating passports.
25   What I do know is that it uses birth certificates or other
```

1    documentation that's closest in time to the applicant's birth.

2    And of course the purpose of that is to implement the

3    President's directive to use biological sex.

4         THE COURT:  Okay.  All right, thank you.

5         ATTORNEY TAKEMOTO:  Yes.

6         So first the Court should apply rational basis review

7    to Plaintiffs' constitutional claims because the policy does

8    not discriminate on the basis of sex or transgender status.

9    And Plaintiffs have not identified another fundamental right

10   that would trigger heightened scrutiny.

11        The policy does not discriminate based on sex.  It is

12   not a sex-based classification, which is required to trigger

13   heightened scrutiny.  At most the policy uses biological sex to

14   identify people, but that is not enough to trigger heightened

15   scrutiny.  From the time passports began, the sex -- from the

16   time the passports began until 2021, the State Department used

17   biological sex to identify bearers.  And biological sex has

18   been used as an identifying piece of information in

19   identification documents around the country from birth

20   certificates.  The *Gore* opinion from the Sixth Circuit points

21   out that birth certificates have included biological sex

22   beginning in the 1800s.

23        THE COURT:  So let me stop you there.  I mean that

24   might go to the nexus argument, but just moving a step back to

25   whether there's a classification on the basis of sex.  I didn't

1    see *Bostock* addressed in the government's brief.  And of course

2    it's a Title VII case, not equal protection, but I'd like you

3    to just explain to me why you don't think the logic holds here.

4    That is, if you have two women who identify as female, one was

5    assigned male at birth, the other's assigned female at birth.

6    Under the State Department's policy the former will get an M on

7    their passport, the latter will get an F, and change the sex

8    assigned at birth and change the outcome.  How is that not a

9    facial classification on the basis of sex?

10           ATTORNEY TAKEMOTO:  Right.

11           In the first instance I would point out, your Honor,

12   that the Supreme Court is in the process of addressing these

13   questions right now in the *Skrmetti* case.

14           THE COURT:  I understand.  It's just I've got a case

15   in front of me here, and I don't know when *Skrmetti* will be

16   decided.

17           ATTORNEY TAKEMOTO:  Yes, of course.  And we didn't ask

18   to hold this case in abeyance because of that.  But I just want

19   to point out that of course these issues are pending before the

20   Supreme Court.

21           THE COURT:  Yes.

22           ATTORNEY TAKEMOTO:  Yes.  So as numerous courts of

23   appeals have held from the Sixth Circuit to the Eleventh

24   Circuit, the reasoning of *Bostock* is based on that but for

25   causation in Title VII which doesn't exist in the equal

1    protection --

2        THE COURT:  But doesn't it, though?  Isn't it the same

3    but for?  Like, but for the change, but for the difference in

4    sex assigned at birth, the outcome would be different here?

5        ATTORNEY TAKEMOTO:  Well, the equal protection clause

6    is framed in terms of, you know, all citizens are guaranteed

7    equal protection under the law.  Which is different from Title

8    VII's explicit but for causation.

9        THE COURT:  Right, but it still applies at the

10   individual level, right?

11       ATTORNEY TAKEMOTO:  I think the important thing here

12   is that in this sense, yes, it may be in the common sense usage

13   of language like labelling someone as male or female might be

14   classifying based on sex.  But I think one of the

15   distinguishing features of the equal protection jurisprudence

16   as your Honor pointed out, that's kind of baked into the cases.

17   I think all of the case -- the Courts that decided from *Craig*

18   *versus Boren* to up until present would be surprised to learn

19   that merely by labelling someone male or female, they're

20   triggering heightened scrutiny based on that classification.

21   The classification cases, I think, are more to is an individual

22   being denied a benefit, a government benefit, based on a

23   classification of their sex.

24       THE COURT:  Well, so then let me stop -- I mean, the

25   Supreme Court rarely spends a lot of time on is there a sex

1    classification, right?  It was sort of obvious in VMI.  It was,

2    again, it was sort of obvious in Morales-Santana, and all the

3    work was in applying the heightened scrutiny.  It just seems,

4    you know, on the face of this policy is about sex, and you

5    change someone's sex and the outcome changes.  I just don't see

6    a world in which how is that not a sex classification?  I

7    understand that, you know, there are certainly arguments about

8    nexus and what, you know, whether heightened scrutiny is met or

9    not, but usually it's just kind of straightforward.  You look

10   at the policy, is there a sex classification or not, and then

11   you move on.

12         ATTORNEY TAKEMOTO:  Well, the language of sex is used

13   but as the Supreme Court has pointed out, you know, it's, it's

14   possible to use the terminology of sex, but I think the

15   cornerstone of the equal protection cases is that an individual

16   is being denied something because of that classification.  And

17   here that isn't the case.

18         THE COURT:  Well, they're being denied a passport

19   consistent with their gender identity because of their sex.

20         ATTORNEY TAKEMOTO:  Well, but that sort of restates

21   the problem.  The passport says it just designates someone

22   based on the sex that's, based on the evidence before the State

23   Department that's closest to their birth sex.  That's, you

24   know, issuing a passport on that basis is kind of doing the

25   same thing.  It's just classifying someone based on male or

1    female.  They still receive a passport.  Both men and women

2    receive passports equally.

3            THE COURT:  Okay.

4            ATTORNEY TAKEMOTO:  Discrimination on the basis of

5    transgender status also doesn't trigger heightened scrutiny.

6    And the policy does not discriminate on that basis in any

7    event.  Neither the Supreme Court nor the First Circuit has

8    recognized transgender status as a suspect class subject to

9    heightened scrutiny.  In fact, the Supreme Court has not

10   recognized a new suspect class in nearly 50 years, and that's

11   because the bar to recognizing a new suspect class is

12   exceedingly high.

13           The plaintiff must show that the asserted class is a

14   discrete group defined by immutable characteristics, that is

15   politically powerless and has suffered a history of

16   discrimination.

17           THE COURT:  Can I just stop you?

18           ATTORNEY TAKEMOTO:  Yeah.

19           THE COURT:  Does the government argue that

20   immutability is required at, I think as I read the case law,

21   it's obvious immutable or distinguishing characteristics that

22   define the group?

23           ATTORNEY TAKEMOTO:  Yes.  I think all of the cases

24   involving suspect classes use the immutability analysis.

25           THE COURT:  So how is religion immutable?

1        ATTORNEY TAKEMOTO:  I think that -- I'm not familiar

2   with the religion cases involving suspect classes.

3        THE COURT:  I guess, you know, and you can point to

4   alienage, too.  Like, there are some suspect classes that have

5   been recognized that you wouldn't typically think of as

6   immutable characteristic.

7        ATTORNEY TAKEMOTO:  Right, yeah.  I agree with your

8   Honor's statement of that standard of discrete and immutable,

9   but the government's position is that this is none of those

10  factors.  And so I think in talking about how this is an

11  immutable characteristic, that's one of those -- it's not one

12  of those.

13       THE COURT:  Can I just ask does the government dispute

14  that there is a history of discrimination against transgender

15  and nonbinary people?

16       ATTORNEY TAKEMOTO:  I think as that term is

17  interpreted under the Equal Protection Clause, yes.  I mean,

18  the Supreme Court has dealt with a number of groups that have

19  been subject to historical discrimination and has nevertheless

20  declined to recognize them as a suspect class.  That --

21       THE COURT:  Why here?  Like, why does the government

22  deny that here?

23       ATTORNEY TAKEMOTO:  Right.

24       So in the first instance, it's Plaintiffs' burden, as

25  your Honor pointed out, to produce evidence of historical

```
 1    discrimination which the government believes has not been done
 2    here.  I would also point out as was raised in Skrmetti that
 3    one of the key issues here is historical discrimination.  And
 4    in many of the cases raising this claim, there has been a
 5    dearth of evidence of historical discrimination against
 6    transgender people that would trigger the heightened scrutiny
 7    that's required.  As was discussed at the oral argument in the
 8    Skrmetti case, there's also a question of whether, whether
 9    there needs to be a history of du jour discrimination rather
10    than simply private discrimination, and that's also lacking in
11    this case.
12         THE COURT:  How about on the politically powerless
13    prong?  You pointed to Title VII, that is one law.  I think,
14    you know, there have been a slew of government actions against
15    transgender and nonbinary people recently.  Tell me why do you
16    still dispute the political powerless prong?
17         ATTORNEY TAKEMOTO:  Yes.  And, again, these terms can
18    sound charged in the abstract.  But under the equal protection
19    jurisprudence, suspect classes -- as I said, a new suspect
20    class hasn't been identified in nearly 50 years, and that's
21    because the standard is exceedingly high to, as the Supreme
22    Court has put it to constitutionalize these issues.  And so I
23    think the evidence of Title VII and recognizing protections for
24    transgender people and the general movement of transgender
25    people asserting their rights demonstrates that they are not
```

1    politically powerless to the same extent that the very few

2    numbers of suspect classes which have been identified have

3    experienced.

4         THE COURT:  I mean, do you dispute the recent

5    Executive Orders in fact take away rights or, you know, take

6    away things that transgender people had, like the ability to

7    participate in the military?  Do you dispute that?

8         ATTORNEY TAKEMOTO:  Well, the government does dispute

9    that characterization of that case.  But I think the important

10   thing to keep in mind in this case is that this doesn't

11   involve -- the Executive Order at issue here and State's

12   policy, in fact, doesn't even mention transgender people.  And

13   so --

14        THE COURT:  But clearly it affects transgender people.

15   I mean, right?  That is what's going on here.

16        ATTORNEY TAKEMOTO:  Of course it affects -- but in the

17   same way that it affects a lot of different people.  I think to

18   the point that your Honor was making about taking away

19   transgender people's rights, that's not what this Executive

20   Order is designed to do.  And that's not what this policy is

21   designed to do.  And those are discrete Executive Orders that

22   your Honor is pointing to that are different from this case.

23        THE COURT:  I mean can I -- and so, maybe this gets to

24   animus, but on the face of the Executive Order, it describes it

25   as a false claim that males can identify as, and thus become

1    women and vice versa.  It denies the possibility that it denies

2    that it's possible for a person to be born in the wrong sexed

3    body.  How is -- I mean, that is directly speaking to whether

4    transgender people exist as a group, right?

5         ATTORNEY TAKEMOTO:  I think that relates to the

6    government's definition of sex.  But the Executive Order also

7    leaves room for people to identify as -- to use the gender

8    identity that they identify with.  And the point of the

9    Executive Order is to establish a uniform definition of

10   biological sex.

11        THE COURT:  But I mean just the language of that, can

12   you explain to me why it doesn't deny the existence of

13   transgender people as a group?

14        ATTORNEY TAKEMOTO:  It doesn't because of the clause

15   in the Executive Order that recognizes gender identity.  All

16   that clause does is execute the exact same policy that has been

17   historically used in passports and in identity documents around

18   the country to recognize only male or female biological sex.

19        THE COURT:  I mean it -- and the clause on gender

20   identity says it does not provide a meaningful basis for

21   Identification and cannot be recognized as a replacement for

22   sex.  It seems to deny that gender identity is something that

23   is worth recognizing.

24        ATTORNEY TAKEMOTO:  In identity documents like

25   passports, which is the issue of this case, and contrary to

1    Plaintiffs' assertion that a number of courts have recognized

2    that as a legitimate government interest.  That's in the *Gore*

3    case.  That's also in the driver's license case from the

4    Eleventh Circuit.  So insofar as, you know, simply identifying

5    someone as male or female in an identity document based on

6    biological sex can be construed as animus or a law that's

7    taking away something from a transgender person, that would

8    undo a whole history of such identity documents.

9         THE COURT:  Okay.

10        And I just ask you one more -- I mean, does the

11   government think it, as the law says, a false claim that males

12   can identify and thus become women and vice versa?

13        ATTORNEY TAKEMOTO:  That is what the Executive Order

14   states.

15        THE COURT:  And the government believes that?

16        ATTORNEY TAKEMOTO:  Yes, that is the policy of the

17   United States.

18        THE COURT:  Okay, all right.

19        ATTORNEY TAKEMOTO:  Turning to the other substantive

20   due process claims, the plaintiffs raise.

21        THE COURT:  Well --

22        ATTORNEY TAKEMOTO:  Oh, yeah.

23        THE COURT:  Maybe before you get there, I have a --

24   some other questions.

25        ATTORNEY TAKEMOTO:  Sure.

```
 1              THE COURT:  I'll hear you on your argument on animus,

 2    or why you don't think the CO shows indicia of animus.

 3              ATTORNEY TAKEMOTO:  Yes.  And I welcome the Court's

 4    question on that.

 5              Plaintiffs have made a lot of the assertions in their

 6    reply brief about this portion of the brief that states -- that

 7    identifies a core aspect of the policy.  That's not an accurate

 8    portrayal of the purpose of the policy.  It's quoting

 9    Plaintiffs' brief where they identify various problems that

10    they perceive with the policy as that -- as the full context of

11    that brief indicates.  The purpose of the policy is merely to

12    identify people based on their biological sex.  As I pointed

13    out, numerous identity documents have done historically.  And

14    that's, that was what was meant there.  Otherwise there's no,

15    there's no evidence in the face of the Executive Order of

16    evidences animus.

17              THE COURT:  So I just want to take you to the

18    government's brief.  It says Plaintiffs' point to three

19    purported problems:

20              One, interference with efficient screening of passport

21    bearer's identity.

22              Two, outing of transgender, intersex, and nonbinary

23    individuals.

24              And three, the harms to third parties.  And then it

25    says the first two are actually core to the policy.
```

1          How is that not just the government's statement that

2     those two interference with efficient screening and outing of

3     transgender intersex and nonbinary individuals are just baked

4     in, part of the purpose of the policy?

5          ATTORNEY TAKEMOTO:  Right.

6          I think the full context of that paragraph is

7     important, because by that sentence, what the Department was

8     saying is if by outing Plaintiffs mean that, you know, it

9     simply constitutes identifying the applicant's biological sex,

10    then, yes, that is core to the policy, because that's the whole

11    point, is to identify the applicant's sex.

12         THE COURT:  I think they mean outing as in the sex

13    that's listed on their passport is inconsistent with their

14    gender presentation and, therefore, it discloses to, you know,

15    foreign governments or whoever else they're interacting with,

16    that they're transgender.

17         ATTORNEY TAKEMOTO:  Right.  And that's not -- that's

18    clearly not the purpose of this policy.  It is not to reveal

19    someone's gender identity without their consent.  But if

20    they're applying for a passport as has been done from 1976 to

21    2021, with the, you know, the passports included biological

22    sex.

23         I do want to point out, and we can get this to the

24    arbitrary and capricious arguments, too, but there have been

25    changes throughout the history of passports where an applicant

1    can change the sex marker on the passport.  In 1992 it was

2    changed to allow an applicant to submit evidence of gender

3    reassignment surgery to change their sex.  And in 2010 evidence

4    of appropriate clinical treatment was allowed in order to

5    change the bearer's sex.  But throughout that time, biological

6    sex was used.  And so in that sense, you know, that's, that's

7    been the purpose of the passport policy is to identify the

8    applicant's biological sex.

9            THE COURT:  Okay.

10           Can I just ask, the plaintiffs have pointed to a

11   number of other Executive Orders that affect transgender

12   individuals.  And why shouldn't I also look to those Executive

13   Orders as potentially -- at least in support of their animus

14   argument?

15           ATTORNEY TAKEMOTO:  Well, in the first instance -- in

16   support of their animus argument -- in the first instance, this

17   policy is not based on those other Executive Orders.  So, as

18   the _Trump versus Hawaii_ case illustrates, you know, there has

19   to be evidence -- it has to be shown that there can't be any

20   explanation but animus that impacts the policy.  And that's not

21   the case here.  There is a legitimate government interest in

22   using consistent biological sex.  But in addition, the animus

23   that's being pointed to from other Executive Orders didn't bear

24   on the development of this policy, so it's hard to imagine how

25   that could affect this particular policy.

1          THE COURT:  I mean it seems to me that this was the

2    original Executive Order, right, on the government's definition

3    of sex.  And then those other Executive Orders followed soon

4    after.  Kind of maybe not exactly based on this order, but it

5    is part of the same package of policies, right?

6          ATTORNEY TAKEMOTO:  Dealing with different issues such

7    as participation in the military.

8          THE COURT:  And then I guess I also wanted to, you

9    know, you look at the purpose section of the Executive Order

10   and it doesn't say, you know, uniformity and data across the

11   federal government.  It lists three purposes.  You know, it

12   says, the policy is aimed because it disagrees that men who

13   self-identify as women can gain access to intimate single-sex

14   bases and activities designed for women from women's domestic

15   abuse shelters to women's workplace showers.

16          Is that purpose furthered by this passport policy?

17          ATTORNEY TAKEMOTO:  No, but the purpose section of

18   this Executive Order relates to a lot of different aspects of

19   federal government policy.  I think the important aspect of the

20   Executive Order that illuminates the purpose for the passport

21   policy is in Section 3(d) which states that numerous parts of

22   the federal government shall implement changes to require the

23   government-issued identification documents, including

24   passports, visas, and corporal entry cards accurately reflect

25   the holder's sex as defined under Section 2 of this order.

1          THE COURT:  Right.

2          So I mean that's the implementation provision.  But I

3    guess I'll just ask you about the other two purposes identified

4    in the order.  Which it seems to suggest that the order's

5    related to a prior policy of depriving cis gender women of

6    dignity, safety, and well-being.  Does this passport policy

7    further that purpose?

8          ATTORNEY TAKEMOTO:  Well, I should take a step back

9    and say -- just correct what I previously said.  I can't

10   imagine all the scenarios where this policy could be useful.

11   So it may be useful for that purpose.  But I think the key

12   purpose of this passport policy is that it creates uniform

13   standards and, that is one of the purposes of the executive --

14   identified in the Executive Order that's in the second

15   paragraph.

16         THE COURT:  Okay.

17         So the government is not relying on any of the

18   purposes that are identified in the purpose section?

19         ATTORNEY TAKEMOTO:  In the first paragraph.  I think

20   the second paragraph is where it says the invalidating the true

21   and biological category of women improperly transforms laws and

22   policies designed to protect sex-based opportunities into laws

23   that undermine them replacing longstanding cherished legal

24   rights and values with an identify-based and co-ette social

25   concept.

1          I think that last part goes to why Section 3(d)
2   exists.
3          THE COURT:  Okay.
4          So you're relying on that paragraph but not the first
5   paragraph of the purpose section?
6          ATTORNEY TAKEMOTO:  Well, I wouldn't go that far, your
7   Honor, I don't -- I mean, it may be that having this passport
8   policy could serve those purposes.  I don't have a particular
9   idea in mind today, but it may be.
10         THE COURT:  Okay.
11         Just one other question.  There's an Executive Order
12  keeping transgender women -- excuse me, keeping transgend --
13  keeping men out of women's sports.  And it could have been
14  titled keeping transgender women out of women's sports.  It
15  seems to intentionally misgender transgender women.  And why
16  does that also not reflect animus?
17         ATTORNEY TAKEMOTO:  Yeah, again, your Honor, that's a
18  separate issue from the policymaking in this case or the
19  decision-making in this case.
20         THE COURT:  Oh, I understand.  But to the extent I'm
21  looking at the broader context.
22         ATTORNEY TAKEMOTO:  I think the government would just
23  refute that the -- that that Executive Order informs this
24  decision.
25         THE COURT:  Okay.  All right.

1          All right, you were moving on to the nexus arguments.

2          ATTORNEY TAKEMOTO:  Yes.  Just very briefly on the

3     right to international travel, the Supreme Court has confronted

4     this asserted right on several occasions and has held that that

5     right is merely an aspect of liberty under the due process

6     clause and is subject to, as your Honor pointed out, reasonable

7     government regulation.  That's essentially a rational basis

8     standard.  And Plaintiffs can't point to a single court that

9     has recognized an international right to travel.  Once again,

10    the Supreme Court hasn't recognized -- well, it hasn't

11    recognized a fundamental right in a very, very long time and it

12    has a very high bar to do that.  And it would be surprising if

13    after the Supreme Court has confronted this issue on a number

14    of occasions without stating that heightened scrutiny applies,

15    that all of a sudden it does apply.

16         THE COURT:  Can I just ask you, you also raise a

17    standing argument --

18         ATTORNEY TAKEMOTO:  Yes.

19         THE COURT:  -- with respect to the right to travel

20    claim.  And I guess my question to you is, it's true that the

21    plaintiffs are not being denied passports or having their

22    passports revoked, but there's clearly a burden on , you know,

23    their ability to use their passports.  So why isn't that enough

24    to establish standing?

25         ATTORNEY TAKEMOTO:  I think it's standing with respect

1    to this claim that they, that the right to international travel

2    in particular is prohibited.  In those cases, the injury is the

3    government restricting the plaintiffs' ability to travel

4    abroad, but here it's a subjective decision not to travel

5    abroad.

6            THE COURT:  Right.  But it's still based on, you know,

7    change in government policy.  That is, you don't have to have a

8    total denial of a right to have standing to bring a

9    constitutional claim, right?  Like, for speech, you can

10   challenge time, place, and manner of restrictions even though

11   they might limit your ability to speak, not deny the right to

12   speak.  But here it seems somewhat analogous.

13           ATTORNEY TAKEMOTO:  Actually, your Honor, I think the

14   government's position is that it's too attenuated to establish

15   an injury of a restriction on an international right to travel.

16   So it's -- I think at that level of subjectivity most anything

17   to trigger an infringement of that right and that just simply

18   isn't the case here.

19           THE COURT:  I mean, they've put in a ton of evidence

20   on the harms that flow from having a passport that does not

21   reflect your gender identity or your appearance.  The

22   government hasn't disputed any of those declarations or that

23   data.  I mean, it's not just a subjective decision.  Many of

24   the -- at least some of these plaintiffs have experienced

25   additional screening in airports because their documents don't

1    reflect their gender identity and their appearance.

2         ATTORNEY TAKEMOTO:  Right.  That's the government's

3    position.  I understand, you know, if your Honor disagrees with

4    it, that's -- of course, fine.

5         THE COURT:  All right.

6         ATTORNEY TAKEMOTO:  On the zone of privacy issue that

7    Plaintiffs have raised, the Supreme Court has recognized a

8    constitutionally protected zone of privacy in certain contexts,

9    such as revealing whether an individual was prescribed certain

10   drugs.  But Plaintiffs seek a privacy right far afield from

11   these contexts.  They want to establish a constitutional right

12   that would restrict the government's ability to indicate their

13   biological sex on an identity document, and this goes against a

14   long history of including biological sex on identity documents

15   dating back to the 1800s.  So there's no implicated privacy

16   right here.

17        THE COURT:  Okay.

18        Now, just taking you back to the nexus argument.  You

19   said there's -- the government's interest is uniformity of data

20   and consistency across the government.  Are there -- what

21   government agencies use passport data?

22        ATTORNEY TAKEMOTO:  This is in the *Zzyym* opinion, but

23   there's a number of law enforcement agencies that use passport

24   data.

25        THE COURT:  But just which ones?  I don't have --

1    like, I don't have a record before me of any of that.

2          ATTORNEY TAKEMOTO:  Yeah.  I don't -- off the top of

3    my head, I don't have it.  It's in the *Zzyym* case that

4    identifies them, but -- I also litigated that case, so I recall

5    the declaration from that case listing them.  But I know that a

6    number of law enforcement agencies use sex as a field to

7    triangulate the identity of who a person is.  And so, it is

8    difficult when, for example, you know, gender identity is used

9    or something else is used that has different meaning to

10   triangulate that person.  Of course that's a balance that the

11   government weighs, and it weighed differently in the context of

12   the prior policy.  But the Passport Act authorizes the

13   President's broad discretion to determine the contents of

14   passports.  And in this instance he's determined that it would

15   be more important to have a consistent biological sex on

16   passports.

17         THE COURT:  Okay, all right.

18         All right, did you want to -- I know you've been on

19   your feet for a while, but move into the APR arguments?

20         ATTORNEY TAKEMOTO:  Sure.

21         So first on reviewability, as an initial matter,

22   Plaintiffs' APA claims are unreviewable.  They're unreviewable

23   because in the first instance this challenge policy was

24   presidential, not agency action.

25         And second, even if the policy was deemed to be agency

1    action, determining the contents of passports is committed to

2    agency discretion by law.  On the first point Section 704 of

3    the APA permits judicial review of "agency action."  It does

4    not permit judicial review of presidential action.  The

5    Passport Act confers on the President, broad discretionary

6    authority to designate and prescribe rules for passports.  The

7    act allows the Department of State to issue passports "under

8    such rules as the President shall describe and prescribe."

9         Exercising this authority, the President directed the

10   Department to issue passports using a particular definition of

11   sex.  There is accordingly nothing for the court to review.

12   State was simply following the President's directive which he

13   is authorized to undertake because of the Passport Act and his

14   inherent Article II powers.

15        THE COURT:  So the Department of State has implemented

16   the President's directive, right, and, you know, it's described

17   in the Pierce declaration, but in a somewhat different way than

18   the Executive Order, right?  The Executive Order defines sex

19   based on the large and small reproductive cell.  And I

20   understand the State Department to have not used that

21   definition of sex and rather look to the definition of sex that

22   HHS uses.  So there's sort of an agency level change in the

23   policy.

24        ATTORNEY TAKEMOTO:  Your Honor, the state is still

25   using the definitions in the Executive Order which it's been

1  instructed to do.  In following the President's directive, it

2  used the best available evidence to it in order to determine

3  sex based on that definition.  And the best available evidence

4  to it was either a birth certificate or some other document

5  that's closest to birth.

6          THE COURT:  Right.  But that's not -- so I guess my

7  point is, that's a different agency determination than what's

8  in the Executive Order.  That is, the Executive Order doesn't

9  say anything about what documents states can look to in

10  determining someone's sex.

11          ATTORNEY TAKEMOTO:  In that sense, your Honor, it's

12  not -- courts have remarked on this, that merely because the

13  President issues an order to an agency and then the agency is

14  the one that's actually implementing it, doesn't mean that it

15  isn't presidential action.  That's the *Detroit International*

16  *Bridge* case for example.  It's still presidential action,

17  because the President, as those courts have put it, should have

18  the ability, the decision-making ability to come up with a

19  decision and then instruct agencies to do something.

20          THE COURT:  I mean, that argument would insulate all

21  kinds of agency action from APA review, right?  As long as

22  there's an Executive Order that you can tie the agency action

23  to.

24          ATTORNEY TAKEMOTO:  Well, it may as a general matter,

25  but I think with respect to this narrow case, the passport --

1    we're dealing with a unique situation whereas the Supreme Court

2    put it as in *Haig versus Agee*, that this is, it is inherent to

3    presidential authority to issue and determine the contents of

4    passports.  And Congress codified that authority in the

5    Passport Act without providing any meaningful standard for

6    courts to review.

7         THE COURT:  I mean, but courts review this all the

8    time, right?  Like as you said, the *Zzyym* case, right, is an

9    example of a court conducting APA review of the passport policy

10   of the Department of State, and you've got different flavors of

11   judicial review in that whole string of Supreme Court cases:

12   *Kent* and *Zemel* and *Haig*.  Like, the Supreme Court's not saying

13   we can't review these claims at all.  They're going in and

14   they're exercising muscular review.  And in some cases they say

15   it's, you know, committed to the President's and agency's

16   discretion, in other cases not.  But there's review happening.

17        ATTORNEY TAKEMOTO:  Right.

18        I think that different courts take -- as the D.C.

19   Circuit has pointed out, the lines in this area can be kind of

20   vague, and different courts take different standards to it.

21   But what we're dealing with is the one level, one end of the

22   extreme where there is an inherent authority.  And the statute

23   explicitly authorizes the President to prescribe rules.  Under

24   those previous passport policies the President has not

25   necessarily been as specific.  So, for example, President

1    Johnson's Executive Order that generally delegated the state's

2    authority to issue passports and the contents of them, doesn't

3    really prescribe any rules.  It just kind of says State, you

4    know, determine the contents yourself.  But here the President

5    is issuing a very specific instruction to State.  That it uses

6    the particular definitions that he has instructed.  And that is

7    pursuant exactly to what the Passport Act says.  It says that

8    the President shall prescribe rules.  And here he's chosen to

9    do that.

10           THE COURT:  Okay, all right.

11           Go ahead.  I'll hear you on your other arguments.

12           ATTORNEY TAKEMOTO:  Right, on -- just on -- briefly on

13    reviewability.  Even if your Honor disagrees on the

14    presidential action point, it's hard to see what meaningful

15    standards can be used to evaluate this policy because of the

16    authorization under the Passport Act is so broad.  It doesn't

17    really provide any standards for review.  That's very

18    different, for example, from the _Su_ case that Plaintiffs rely

19    on from the Ninth Circuit, where actually in the first instance

20    the Ninth Circuit said that the President didn't even have the

21    authority to instruct agencies to adopt a minimum wage in their

22    contracts.  Here there is a clear authorization of authority.

23           And even if the plaintiffs' APA claims are reviewable,

24    Plaintiffs are unlikely to succeed because the passport policy

25    was reasonable and not arbitrary and capricious.

1          Under the deferential arbitrary and capricious

2     standard, the reviewing court has "only a narrow role to play"

3     under the First Circuit standard.

4          The Court must decide if the agency action, which is

5     presumed to be valid, is supported by any rational view of the

6     record.  Review is particularly narrow here where the President

7     has broad discretion to designate rules governing the issuance

8     of passports.  Here the President designated rules governing

9     sex designations in official documents including passports, and

10    directed state to follow those rules.  It cannot be arbitrary

11    and capricious for states to act as the President instructed.

12         THE COURT:  So let me stop you.  There is no

13    administrative record here, right?

14         ATTORNEY TAKEMOTO:  Not at the moment because we're on

15    a preliminary injunction motion.  Of course at summary

16    judgment, State would produce an administrative record.

17         THE COURT:  So what would be -- you know, I understand

18    from the declaration that the State Department implemented the

19    EO two days after it was signed, right?  What would, what would

20    go into the administrative record?

21         ATTORNEY TAKEMOTO:  I don't know at this moment

22    because it's so early on in the case.  And I would not want to

23    speculate about what would be in the administrative record at

24    this point.  But, of course, it's any documentation that -- I

25    mean, it's the standard for any administrative record --

1          THE COURT:  Right.

2          ATTORNEY TAKEMOTO:  -- you know, what the agency

3    considered, directly or indirectly.

4          THE COURT:  I guess my question is did it consider

5    anything?  I mean other than the EO?  The policy was adopted

6    two days later.  What, what did it consider in those two days?

7          ATTORNEY TAKEMOTO:  Right.  Again, I hesitate to

8    insert now what the administrative record would say.  I think

9    your Honor can still decide that Plaintiffs are unlikely to

10   succeed on the APA claims based on the facts that are before it

11   and the record that's before it, which is the Executive Order

12   directing State to use biological sex.

13         THE COURT:  And just to be clear, you're not aware of

14   any consideration within the State Department of the policy

15   other than just a straightforward implementation of the

16   Executive Order?

17         ATTORNEY TAKEMOTO:  Well, I'm not aware or unaware

18   because there is no record to produce at this point.  It's too

19   early in the case.

20         THE COURT:  Did the State Department consider any

21   alternatives to the passport policy?

22         ATTORNEY TAKEMOTO:  Again, that's, it's too early.  I

23   don't, I don't have the record before me to --

24         THE COURT:  All right, I know.  But I need to

25   decide -- we're here on an API motion.  I need to decide this

1   arbitrary and capricious claim.  So you've got to give me

2   something or else there's nothing.

3         ATTORNEY TAKEMOTO:  No, I understand, your Honor.  And

4   actually on that particular point as is pointed out in the

5   Pierce declaration, State was aware of the prior policy and

6   that that was an option.  But of course it determined that is

7   not a possible option based on the President's directive.

8         THE COURT:  Okay.

9         So it's your view that they consider the prior policy

10   and just rejected it because it was inconsistent with the

11   Executive Order?

12         ATTORNEY TAKEMOTO:  Right.

13         THE COURT:  Okay.

14         Was there any consideration of any scientific data?

15         ATTORNEY TAKEMOTO:  Again, your Honor, it's too early

16   in the process for me to know the answer to that question.

17         THE COURT:  Okay.

18         I mean, just as a matter of timing, right --

19         ATTORNEY TAKEMOTO:  Yeah.

20         THE COURT:  -- the policy was implemented within two

21   days.  It seems pretty unlikely that State had much time to

22   consider any kind of data other than what was in the EO.

23         ATTORNEY TAKEMOTO:  I think, your Honor, in this, in a

24   situation like this where the President's directive is so clear

25   and where the President has the broad discretion to determine

1   the contents of passports and issue rules to State, it is

2   perfectly reasonable for State to rely on that and not

3   necessarily consult other items.  I don't know if they have or

4   haven't.  When it comes to scientific data, for example,

5   though, I would reiterate the point we made in our brief, which

6   is that the scientific data that Plaintiffs are producing in

7   their declarations should be deemed irrelevant here on the

8   likelihood of success on the merits, because that wasn't before

9   the agency when it --

10          THE COURT:  Right, but I don't have an administrative

11  record here.  I mean, I know you say I should look to the

12  administrative record, but there isn't one.  And you have

13  submitted a declaration that you're asking me to consider.  So

14  I don't see why I should not consider the plaintiffs'

15  declarations, too.

16          ATTORNEY TAKEMOTO:  Well, your Honor, the declaration

17  is to elucidate what the Department's decision-making process

18  was.  But the key that in all of the administrative procedure

19  act cases, is for the Court to adjudicate what was the record

20  that was before the agency when it made its decision.  If your

21  Honor feels that certain scientific data should have been

22  considered, the response to that is not to consult evidence

23  that wasn't before the agency.  It's to determine under the

24  Administrative Procedure Act whether the action was valid or

25  invalid on that basis.

1              THE COURT:  Okay.

2              And so just another related question which is, there's

3      no evidence at least before me, that State looked at the

4      reliance interest before reversing the policy?  And I guess

5      just to put a finer point on it, a lot of people, I think, you

6      know, understandably relied on the prior policy that they could

7      select a sex consistent with their gender identity or the X

8      marker.  And as I understand it, you know, there are criminal

9      penalties involved with making a false statement on a passport

10     application.  And it strikes me in that context the reliance

11     interests are huge.  You know, where you've understood there is

12     a prior policy that allows you to select a sex consistent with

13     your gender identity, and then now under the current policy,

14     there's a potential for criminal penalties if you don't.  So

15     why -- shouldn't State have considered that?

16             ATTORNEY TAKEMOTO:  Again, it may have.  I don't want

17     to speculate.  But I would say just on that point that State

18     has changed its policy on the contents of passports with

19     respect to sex in at least four occasions now.  And to my

20     knowledge, this issue has not been raised previously.  I think

21     that there's also no evidence of the government ever, you know,

22     pursuing criminal sanctions against someone for indicating a

23     sex on their passport application that's inconsistent with

24     other documentation and without evidence of, of a threat of

25     that, I don't think that that necessarily warrants overriding

```
 1    the broad discretion that the President has in this area to

 2    determine the contents of passports.

 3              THE COURT:  Okay.

 4              So another related question is the Department of State

 5    has a regulation for when you want to apply and receive a

 6    passport with a name that's inconsistent with your name

 7    assigned at birth.  And it's a detailed regulation.  And why is

 8    this any different?  Like, why shouldn't this go through rule

 9    making in the same way that the name regulation did?

10              ATTORNEY TAKEMOTO:  You're asking whether the

11    Department's required to undergo notice and comment rule

12    making?

13              THE COURT:  Yes.

14              ATTORNEY TAKEMOTO:  So when previous policy changes

15    have occurred, there also was not notice and comment rule

16    making, so --

17              THE COURT:  But why not?  I mean, just -- like, I

18    don't see much difference between a policy governing your name

19    assigned at birth versus your sex assigned at birth, and the

20    types of documents that the government would look to to make

21    those determinations.  So why, why is sex different than name?

22              ATTORNEY TAKEMOTO:  Well, I think the key thing here

23    is that, again, the President has been granted the authority by

24    Congress to set these rules and procedures, and he's done so

25    here.  And of course the President doesn't need to undergo
```

 1    notice and comment rule making when they issue a rule like

 2    this.

 3              THE COURT:  Okay.

 4              So you're just relying of the fact of the EO?

 5              ATTORNEY TAKEMOTO:  The EO's direction to State, yes.

 6    I mean, the APA doesn't cover presidential action.

 7              THE COURT:  I mean -- well, I'll just come back to --

 8    I think that's a very sweeping argument than when the President

 9    issues an Executive Order and the agency implements it with

10    some changes, but implements it that that insulates the agency

11    from any kind of APA review.

12              ATTORNEY TAKEMOTO:  Right.  I think that the response

13    to that, which -- and courts have -- I think this was addressed

14    in the *Detroit International Bridge* case, that line of

15    argument, the Court's response there -- Judge Collier's

16    response there was that, you know, there are certain limited

17    contexts where the President himself is charged by Congress

18    with doing something.  And so it would be different than say,

19    for example, the *Su* case where the President was not granted

20    the authority to set a minimum wage.  And so that's why the

21    Court rejected the argument there.

22              THE COURT:  Okay, all right.  Go ahead.

23              If you want to -- I don't mean to move you along, but

24    if you want to address the Paperwork Reduction Act arguments,

25    too, I'll hear you on those.

1          ATTORNEY TAKEMOTO:  Right.

2          Your Honor, the section of the Paperwork Reduction Act

3     that is relevant in this case, which relates to forms and the

4     collection of information, makes it very clear that any

5     argument that -- that that section was not followed is raised

6     in a defensive posture and not in an affirmative posture.  And

7     numerous courts have held that that's the case.

8          THE COURT:  And can I just ask you, I haven't read

9     every one of these cases, but, you know, my understanding is I

10    appreciate the argument that doesn't create a private right of

11    action.  The APA does create a private right of action.  And

12    you can bring an APA claim for failure to comply with required

13    procedures.  There are cases that review whether an agency's

14    complied with the Paperwork Reduction Act.  So why isn't that

15    just, you know, this is just one of those cases that brings

16    another flavor of an APA claim?

17         ATTORNEY TAKEMOTO:  I think because it would undue, I

18    mean, it's -- the more specific governs the general.  And in

19    this case I think Congress was more specific than the general

20    standards that are set in the Administrative Procedure Act.  I

21    also believe that this section -- I believe that this section

22    was passed after the Administrative Procedure Act.  Section

23    3512(b).

24         THE COURT:  Okay.  All right.

25         Okay, anything further on either that or the APA

1    claims?

2            ATTORNEY TAKEMOTO:  Nothing, your Honor.

3            THE COURT:  Okay.  All right, thank you.

4            ATTORNEY TAKEMOTO:  Well, actually, sorry, one more

5    item that I wanted to raise.

6            THE COURT:  Sure, yes.

7            ATTORNEY TAKEMOTO:  I think that -- so under the

8    Administrative Procedure Act, there is a standard of review for

9    arbitrary and capricious claims, is that there doesn't need to

10   be a perfect fit between the policy choice and how it works in

11   the real world.  And so Plaintiffs have identified a number of

12   individuals who are, for example, nonbinary or intersex who

13   they claim don't fit the definitions under the Executive Order.

14   But that would still survive arbitrary and capricious review,

15   because the general policy of the policy which is to implement

16   standards on this facial challenge, is still satisfied.  And

17   those exceptions don't undermine it.

18           THE COURT:  Okay.  Thank you, Attorney Takemoto.

19           Attorney Nowlin-Sohl.

20           ATTORNEY NOWLIN-SOHL:  I have a couple of points of

21   kind of rebuttal on the constitutional claims.  Would you like

22   me to address those first or kind of stay on the APA for now?

23           THE COURT:  Go ahead and briefly address those, but

24   then we'll move -- we're coming on an hour and half, so let's

25   move to the APA fairly quickly.

1          ATTORNEY NOWLIN-SOHL:  So quickly, you know, opposing

2     counsel mentioned that there's been a long history of

3     somebody's biological sex being on identification documents.

4     I'd like to point out that sex was not included on passports

5     until the 1970s.

6          Similarly, he mentioned that, you know, this, you

7     know, if we were to reverse this new policy, it would undo a

8     whole history of identity documents.  I'd like to point out

9     that in 46 states people are allowed to change their sex marker

10    on their driver's licenses, and in 44 states they're allowed to

11    do so on their birth certificates.  And almost half of them

12    also allow for X markers.  So that is not actually correct that

13    it will undo a whole history.  That it is this policy that is

14    kind of out of sync with most of the rest of the country.  This

15    policy also makes people's identity documents less consistent.

16    Plaintiffs have said in their declarations that they have

17    updated all of their other identity documents, at least some of

18    them have.  And having a passport with a sex marker that

19    doesn't align with the sex that they present would actually

20    make their identity documents less consistent.

21          I also wanted to point out that the policy itself is

22    internally inconsistent to the extent that Defendants keep

23    referring to biological sex.  That's not actually what they're

24    relying on.  They're relying on birth certificates to the

25    extent that they can.  But there's three different definitions

1    of kind of sex floating around.  There's the Executive Order

2    definition.  There's HHS's definition.  And then there's what

3    the State Department's using.  And, you know, to the extent

4    that they're relying then on birth certificates.

5    Doctor Corathers talks about how that's not actually the same.

6    That that relies on, for the most part, external genitalia and

7    it's not consistent with the EO's definition.

8            Quickly kind of, you know, to the animus point, you

9    know, I wanted to point out that the Executive Order regarding

10   the military, and this goes also to opposing counsel's point,

11   that people are still allowed to kind of live in their gender

12   identity.  The military Executive Order says, "Adoption of a

13   gender identity inconsistent with an individual's sex,"

14   conflicts with a "commitment to an honorable, truthful, and

15   disciplined lifestyle."

16           And then the last point I wanted to make was to the

17   extent that opposing counsel said that, you know, sex markers

18   are used for purposes of law enforcement and that this came up

19   with the *Zzyym*, right?  You know, opposing counsel has a burden

20   to put the record here before the Court.  The Court needs to

21   look at this case and the record that they put before it.  They

22   provided no examples of how anybody uses passport data or why

23   that's not possible.  This case is also distinguishable from

24   *Zzyym*, because unlike *Zzyym*, this policy has been in place for

25   several years now where people can change their sex marker or

1    have an X marker.  And defendants have identified no problems

2    with that prior policy.

3         Turning to the APA claims.  So the government argues

4    that it's too early to know what the administrative record is,

5    but they don't explain why that is, right?  The actions have

6    already happened.  They happened two months ago.  And it is,

7    you know, their burden to produce that record.  Their failure

8    to produce any sort of record can only lead to the conclusion

9    that there is no record.

10         So as the Supreme Court said in _Bowen_, we begin with

11   the strong presumption that Congress intends judicial review of

12   administrative action.  The government here tries to argue that

13   there's several reasons why that doesn't apply.  But, you know,

14   the APA contains no carveouts for agency actions implementing

15   an Executive Order, and the Supreme Court has never found one.

16         THE COURT:  If the Department of State had implemented

17   the Executive Order precisely, that is, like, use the same

18   definition of sex that's in the Executive Order, large and

19   small reproductive cell rather than as you say, they're looking

20   to HHS's definition of sex and then also looking to birth

21   certificates and other documents, would your argument be

22   different?

23         ATTORNEY NOWLIN-SOHL:  No, your Honor.  I think the

24   argument is still the same.  That the APA does not contain a

25   carveout for Executive Orders.  There's no case law to support

1    that.  And I think as you mentioned, this would kind of result

2    in sweeping undermining of the APA.  That all an agency would

3    have to do or the Executive would have to do is issue an

4    Executive Order to insulate it from review.  To the extent that

5    Defendants try to kind of argue that the presidential

6    discretion exception applies here, that is a very narrow

7    doctrine.  I mean, there's limited to when the President has

8    final constitutional or statutory responsibility for the final

9    step necessary in a decision-making process.

10        So, for example, the *Detroit International Bridge* case

11   was -- the President got to say yes or no to a bridge, right?

12   That was the discretionary decision that was insulated from

13   review, was the yes or no of the bridge.  That's not the case

14   here.  Another example that falls into that narrow doctrine is

15   the President designating a national monument.  Here this is a

16   kind of large sweeping policy.  There's nothing to say that

17   that's not reviewable.

18        You know, I just want to touch on to the extent that

19   they're arguing that this is also a foreign affairs decision

20   and that's why it's not reviewable.  They don't actually

21   explain the foreign affairs concerns or why, you know, having a

22   sex marker, you know, different than your sex assigned at birth

23   or an X designation would cause foreign affairs concerns.  They

24   have not pointed to problems in the past, and they still accept

25   passports from other countries that allow people to change

1    their sex markers and to have X designations.  And as your

2    Honor pointed out in *Zzyym*, the Court reviewed passport policy

3    under the APA.

4         To the extent that they're also arguing that the

5    policy falls within agency discretion, that is also a very

6    narrow exception to the strong presumption of judicial review.

7    There's nothing to suggest that a policy like this falls within

8    the types of decisions kind of traditionally regarded as

9    committed to agency discretion.  So Defendants cite three

10   cases.  They're all very distinguishable.

11        So the *Webster* case was about a decision on whether or

12   not to terminate an employee.

13        The *Heckler* case was a decision about not bringing an

14   enforcement action.  And I think, you know, *Heckler* noted that

15   nonenforcement decisions involve a complicated balancing of

16   factors which are peculiarly within the agency's expertise.

17   And the factors they listed were, you know, assessing if a

18   violation occurred, agency resources, prioritizing violations

19   to enforce, the odds of success, and whether it fitted within

20   the agency mission.  So that's kind of why that exception

21   exists is for the Court can't step in and kind of evaluate

22   those factors.  For a policy like this, it is amenable to

23   review, according to the general requirements of reasoned

24   agency decision-making under the APA as well as complaints with

25   the Constitution and other laws.

1            So, now it's kind of turning to the arbitrary and

2    capricious standard.  So there's no support for that argument

3    that review is narrower here or that the only question is

4    whether the agency reasonably implemented a presidential

5    directive.  This is contrary to the text of the APA and the

6    entire body of APA case law.  You know, kind of as we touched

7    on in talking about the constitutional arguments and heightened

8    scrutiny, the agency defendants have given no reasoned

9    explanation for this policy.  They've admitted that they were

10   really just implementing the Executive Order.  It happened

11   within two days.  You know, they argue about kind of uniformity

12   and that passport data will not be useful otherwise.  Again,

13   there's been no support at all for the argument that passport

14   data won't be useful.  And, you know, again, with regard to

15   uniformity, they haven't explained why that's necessary here.

16   They haven't explained why it's not a problem that now people's

17   documents are no longer consistent with other documents that

18   states issue, particularly to the extent that, you know, the

19   State Department relies on state-issued documents to make these

20   decisions.

21           THE COURT:  So my understanding is that, you know, the

22   laws vary across the states.  There isn't uniformity across the

23   states in how they -- in policies dealing with birth

24   certificates and other identification documents.  So I'm not

25   sure it favors either side in that respect.  Like, there's kind

1    of inherently going to be disuniformity no matter what policy

2    State adopts, right?  The Department of State I should say.

3         ATTORNEY NOWLIN-SOHL:  Yes, I think there will be some

4    lack of uniformity regardless.  We would argue that this

5    actually creates less uniformity.  But also the uniformity

6    interest fails to explain why this policy was chosen.  Again,

7    they could have left in place the old policy and said if you

8    change your marker on your passport, you also have to do it on

9    other documents and create --

10        THE COURT:  I mean, they could have adopted different

11   policies.  But sort of the point of arbitrary and capricious

12   review is that where there is, you know, a reasoned

13   explanation, the agencies really considered

14   an issue.  Courts are quite differential to the ultimate

15   policymaking choice that an agency makes.  And I understand

16   your argument here that, you know, there's a lack of

17   explanation.  But at least as to they could have adopted other

18   policies, why isn't that something that I would just need to,

19   on arbitrary and capricious review, defer to?

20        ATTORNEY NOWLIN-SOHL:  I think, you know, that I would

21   argue first, that they haven't actually shown that uniformity

22   is an important interest.  But even if they do, I think they

23   still need to justify the underlying decision that has been

24   made, right?  The underlying decision still can't be arbitrary

25   and capricious just because they've implemented it, you know,

1    for uniformity.

2         THE COURT:  And by "justifying" you mean providing an

3    explanation for why they considered this policy --

4         ATTORNEY NOWLIN-SOHL:  Yes.

5         THE COURT:  -- and other polices and rejected other

6    policies?

7         ATTORNEY NOWLIN-SOHL:  Yes, yes, your Honor.

8         THE COURT:  All right.

9         Can I, just on the uniformity argument, I mean, it

10   seemed from what you were saying, there was some amount of

11   disuniformity across the federal government before this policy

12   was adopted, and this Executive Order does create a uniform

13   policy across the federal government.  So why don't those facts

14   just alone support the government's interest here?

15        ATTORNEY NOWLIN-SOHL:  I mean, the government has

16   given no explanation for why uniformity is important or what

17   benefits are afforded by that.  They've identified no problems

18   as a result of that lack of uniformity before.  So it's not

19   simply enough to invoke the word uniformity.  They have to give

20   some explanation for why that is.

21        THE COURT:  Okay.

22        ATTORNEY NOWLIN-SOHL:  You know, so in addition to not

23   providing a reasoned explanation, they've also failed to

24   consider pertinent aspects of the problem.  For example, that

25   this definition of sex doesn't actually help identify people.

1   That it makes it harder.  They don't dispute that.  And they,

2   they simply say that's a question for the Executive.

3        And third, the policy is so implausible that it cannot

4   be attributed to agency expertise.  Again, I don't know that

5   the agency defendants are even claiming that it is a result of

6   agency expertise.  They're saying they're simply implementing

7   the Executive Order.  But, you know, it kind of raises the same

8   problems that it's undermining the ability to identify people.

9   Allowing X markers and self-attestation is not inherently

10  problematic.  They've done it before.  They've identified no

11  issues, and they continue to allow that from people from other

12  countries coming in.

13       The policy also fails to explain how to classify

14  people who are intersex.  It says that there's, you know, the

15  Executive Order, and HHS says that there's no third sex, but

16  they don't explain how those people are going to be classified.

17  And failing to account for that kind of really highlights the

18  lack of agency expertise that's at play here.

19       THE COURT:  Can I just ask, where I don't have a

20  plaintiff who is intersex in this case, can those arguments

21  come into play here?

22       ATTORNEY NOWLIN-SOHL:  I believe so, your Honor, in

23  conjunction with the other ones as well.  Because it really,

24  again, highlights the lack of agency expertise at play.

25       THE COURT:  Okay.

1          ATTORNEY NOWLIN-SOHL:  And lastly, Defendants argue

2     that the arbitrary and capricious standard must allow them to

3     adopt a policy that had been in place previously, but this is a

4     policy of no changes to sex markers that was last in place over

5     30 years ago, and that's not what the APA requires.

6          You know, going quickly to the Paperwork Reduction

7     Act, you know, as your Honor has explained, the APA allows the

8     Court to look at whether the agency followed other laws.  It

9     doesn't necessarily matter if the laws were enacted before or

10    after the APA.  The agency is still required to abide by the

11    laws.  As we noted in our briefing, multiple courts have

12    considered, you know, violations of the PRA as under the APA.

13    You know, on the substance of it, defendants don't dispute that

14    they put up old forms.  These forms on their face say that they

15    expired two to three years ago.  They also explain that, you

16    know, that there's a renewal requirement for forms every three

17    years.  These forms were not renewed, which really just

18    emphasizes that they're expired and can't be put up again.  You

19    can't just kind of grab any old form that just because it was

20    once approved.  Right?  You either have to renew it, and they

21    did not do so here.  They've also kind of started the process

22    now for PRA approval, which, again, highlights the fact that

23    that was not kind of granted before they changed the forms.

24    But even that process is flawed.

25          So back in November, they started the process to renew

1   the forms that were in place at that time.  So the ones that

2   allowed for X markers and self-attestation, that process went

3   on.  Now, they started the process for the new forms, but only

4   started at the 30-day period.  They can't tack that on to the

5   renewal of the new forms.  They've substantively changed the

6   forms, so even the new process is flawed and incomplete.

7        THE COURT:  So if they were to reissue a notice in the

8   federal register that allowed for 60 days of comments, would

9   you at that point say that your PRA claim is moot?

10       ATTORNEY NOWLIN-SOHL:  Not at the time that they

11  initiate notice, but maybe after the process was complete.

12       THE COURT:  Okay.

13       ATTORNEY NOWLIN-SOHL:  And then quickly with regard to

14  the extra record evidence.  Again, Defendants have put forward

15  no administrative record here.  And while it might be true that

16  the administrative record is typically the focal points of the

17  review, there are exceptions.  And one of those exceptions is

18  where there's a failure to explain administrative action, has

19  to frustrate effective judicial review.  There is no

20  explanation here which frustrates judicial review.  And we

21  would argue that exception is applicable.  And even if your

22  Honor were to find that the exception is not applicable here

23  for purposes of APA review, those declarations are still maybe

24  considered for Plaintiffs' constitutional claims and Defendants

25  have not argued otherwise.

1          THE COURT:  Okay.

2          Do you want to turn to the other PI factors and the

3   relief for request in -- under Section 705?

4          ATTORNEY NOWLIN-SOHL:  Yes, your Honor.

5          So, you know, with regard to the other PI factors, so

6   I think Plaintiffs have made a very strong showing of their

7   likelihood of success on the merits.  They've also made a very

8   strong showing with regard to irreparable harm.  And so harms

9   have already occurred, and Plaintiffs have been very clear

10  about harms that will continue to happen.

11         First, as a matter of law, violations of Plaintiffs'

12  constitutional rights constitute irreparable harm.

13         Second, the safety concerns here are very real.

14  Plaintiffs Boe and Orr have already missed travel because of

15  the harms that are flowing from having passports with the wrong

16  sex markers.

17         Plaintiff Orr would like to reschedule his trip for

18  healthcare travel, and is not able to do so at this time given

19  the uncertainty with the policy.  And Plaintiff Chastain

20  Anderson has an important work conference coming up in the fall

21  that she's not able to plan for now.

22         They've also detailed the harms with regard to being

23  forcibly outed and, you know, concerns about allegations of

24  fraud, violence, harassment, discrimination.  So for those

25  reasons, I think Plaintiffs have met the requirement for a

1    showing of irreparable harm.

2         And lastly --

3         THE COURT:  And can I just ask about Plaintiff

4    Solomon-Lane I think has a passport that reflects his gender

5    identity and expires in 2028?

6         ATTORNEY NOWLIN-SOHL:  Correct.

7         THE COURT:  How is it to him is there irreparable harm

8    here?

9         ATTORNEY NOWLIN-SOHL:  So I think he would like to be

10   able to renew the passport.  It's not kind of immediate in this

11   moment, but to the extent that he has upcoming travel and needs

12   to plan in the future.  And then also passports often require

13   that you have a certain amount of time, often six months of

14   validity left on the passport to be able to use it.

15        THE COURT:  Okay.  All right.

16        So I guess I'll just kind of pose to you my question

17   about your request for relief under Section 705, which is, you

18   know, a stay of -- there's not a lot of case law in Section

19   705.  There's some.  To the extent that a court is considering

20   a request for a postponement of an effective date or a stay of

21   agency proceedings, it seems to apply the same four-part test

22   that applies to preliminary injunction motions.  But a stay of

23   an agency action is just inherently different than a

24   preliminary injunction, right?  Like a stay of an agency action

25   and the agency issues a rule perhaps requiring a regulated

1  party to do something, a court might stay that rule pending

2  judicial review.  And then the regulated party doesn't have to

3  do the thing.  Here it seems to me that you are requesting more

4  in the nature of injunctive relief that is an affirmative order

5  from the court instructing the State Department to issue

6  passports to these plaintiffs consistent with their gender

7  identities.  So I, just with that framing, and I'm thinking

8  about the _Nken versus Holder_ case, why is this an appropriate

9  case for a stay under 705 rather than just a traditional

10  request for preliminary injunction?  Which you've also filed as

11  to these plaintiffs but not beyond these plaintiffs.

12      ATTORNEY NOWLIN-SOHL:  So, yes, your Honor.  I think

13  the relief that we're requesting is, you know, very typical

14  under 705.  We're asking the Court to stay the agency action.

15  And the agency action is this new policy.  And so we're asking

16  the Court to require them to maintain the status quo as it

17  existed on January 19, 2025, and to apply its policies at that

18  time.  So people will still have to apply for the passport and

19  the State Department has, you know, the kind of the normal

20  discretion in assessing those applications.

21      THE COURT:  That's just the key thing.  I think what

22  you're asking or envisioning, that the State Department reverts

23  back to its prior policy.  But a stay doesn't accomplish that,

24  right?  It would have to be an affirmative order extracting the

25  State Department on if this policy is stayed, what next?  Is it

1    you revert to your prior policy?  What do you do?  And that

2    strikes me as an affirmative order from a court rather than

3    just a stay.

4         ATTORNEY NOWLIN-SOHL:  I mean, I think to the extent

5    that the defendants have implemented a new policy and that that

6    policy is stayed, it is kind of, therefore, removed from being

7    operational and, therefore, what it had in effect before would

8    continue going on.  So it is --

9         THE COURT:  Is there any case that under 705 that

10   stands for the proposition that where a court has state agency

11   action under 705 or postponed the effective date.  That the

12   agency reverts back to a prior policy?

13        ATTORNEY NOWLIN-SOHL:  I don't necessarily have one

14   off the top of my head, your Honor.  But I think that was just

15   kind of as we were reading the cases, how it generally

16   operated.  If the action has been stayed, then it's no longer

17   in effect.  And it kind of would revert back to the status quo

18   from before it tried to go into effect.

19        THE COURT:  But wouldn't -- I mean, I think what you

20   would require or request is an order saying, saying as much.

21   That is you have to re-substitute the old forms on the

22   Department's website.  I mean it's affirmative relief.

23        ATTORNEY NOWLIN-SOHL:  Yes, your Honor.  I mean, to

24   the extent that it's stayed and we would ask as part of that,

25   your Honor, kind of explain what that means.  But I think the

```
1    core of it is still staying, the new policy.

2            THE COURT:  Okay.  All right, go ahead.  I'll hear you

3    if there's anything further on the 705 piece.

4            ATTORNEY NOWLIN-SOHL:  Okay.

5            So I think just kind of real quick then, you know, the

6    balance of harms in the public interest kind of, you know,

7    combine here.  It's always in the public interest to prevent

8    the violation of a parties' constitutional rights.  And the

9    harm to Defendants, they haven't really identified any.  And so

10   we think those factors weigh in favor of Plaintiffs.

11           And then kind of going again to the nature of the

12   relief like we just discussed the stay, but also, you know,

13   Plaintiffs are also asking for a preliminary injunction that

14   would apply to our plaintiffs and would ask this court to ask

15   the State Department to reissue the passports to Plaintiffs

16   with the sex marker that they applied for.

17           THE COURT:  Okay.  All right.

18           Thank you, Attorney Nowlin-Sohl.

19           ATTORNEY NOWLIN-SOHL:  Thank you.

20           THE COURT:  Attorney Takemoto.

21           And, Attorney Takemoto, before you get to the PI

22   factors and the request for a stay, I did want to take you back

23   to the Paperwork Reduction Act and just ask you to respond to

24   the plaintiffs' argument that the old forms that the Department

25   of State put back on its website have expired.  The Department,
```

1    I know, has issued a notice of the Federal Register for a

2    30-day comment period but not a 60-day comment period.

3            So No. 1, why can the Department rely on expired

4    forms?

5            And, No. 2, why is it issuing a 30-day comment period

6    rather than a 60-day comment period?

7            ATTORNEY TAKEMOTO:  Right.

8            On the first question, these forms, as your Honor

9    pointed out, were -- did undergo the notice required under the

10   Paperwork Reduction Act.  And so to the extent that Plaintiffs

11   are concerned that there wasn't sufficient notice for those

12   forms, the Department's position was that there was notice

13   provided previously for those forms.

14           THE COURT:  Right.  And then they expired right after

15   that notice was provided.  So it can't -- I mean, I don't

16   understand.  Is the government arguing that any time an agency

17   has ever taken an action in compliance with the Paperwork

18   Reduction Act and then that action has expired, that that

19   action is sort of valid forever more?

20           ATTORNEY TAKEMOTO:  I don't know as it applies to

21   other contexts, but at least in this case that's what the

22   Department's position is.

23           THE COURT:  Why would it be different in this case

24   than in other contexts?

25           ATTORNEY TAKEMOTO:  You know, your Honor, I really do

1    feel like this gets into the merits of the claim.  And, you

2    know, I think the Department's position is that it's given

3    notice previously to these forms but fundamentally it's not

4    reviewable by this court.

5         THE COURT:  All right.

6         And just as to the 30 days rather than 60 days, why

7    did they issue a 30-day comment period?

8         ATTORNEY TAKEMOTO:  Right.

9         I don't, I don't have a specific answer to the

10   question of why 30 rather than 60.  I would point out that the

11   Executive Order requested that the Department take this action

12   expeditiously and that's what the Department did.

13        THE COURT:  Okay.  All right, go ahead.

14        ATTORNEY TAKEMOTO:  On the irreparable harm factor, it

15   would point out that Plaintiffs remain free to travel and all

16   have -- as confirmed, the five non-pseudonymous plaintiffs have

17   received passports at this point.  We still are -- we just

18   received the -- last week we've received the information about

19   the non -- about the pseudonymous plaintiffs.  And so, we're

20   still looking into that.  But the point is the plaintiffs

21   remain free to travel.  Plaintiffs have -- may not have

22   received a passport with their preferred sex marker, but they

23   haven't shown that any harm stemming from that is irreparable.

24        THE COURT:  Well, so let me just stop you there.  They

25   have a lot of evidence that they've put in on the harms that

1   can flow from travelling to a foreign country that might have

2   laws discriminating against transgender people or nonbinary

3   people, and where the passport reflects a sex that's different

4   than the plaintiff's gender identity or appearance, as the

5   government has knowledge -- acknowledged that can out them.

6   And then there's, you know, as I said before, some of these

7   plaintiffs have already experienced additional screening, strip

8   searches because their appearance didn't match their

9   identification documents.  And how is that not irreparable

10  harm?

11      ATTORNEY TAKEMOTO:  I think some of the allegations in

12  the declarations demonstrate that the harm that's incurred is

13  not -- based on those allegations is not sufficiently urgent to

14  necessitate a preliminary injunction.  So, for example, as we

15  pointed out in our brief, Plaintiff Anderson allegedly

16  underwent an invasive search because of the sex marker on their

17  driver's license in 2017.  But then they chose not to have an

18  updated sex on their driver's license until 2019, and then on

19  their passport until 2024.  And so the amount of time that

20  elapsed between those decisions, we think, shows that there's

21  not the sufficient urgency that's required for preliminary

22  relief.

23      We also believe that the balance of the equities

24  weighs in the government's favor here.  Issuance of passports

25  is a core executive function, and the President has determined

1  that the sex field on passports should reflect the bearer's

2  biological sex.  He is entitled to communicate in that way with

3  foreign sovereigns, as Presidents have for most of the history

4  of passports.  And it would run against the public interest to

5  override the wishes of the President in this respect.

6         Finally, on the appropriate relief, I would agree with

7  your Honor that a stay is not an appropriate form of relief

8  here.  To the extent that your Honor is inclined to issue

9  injunctive relief, I would say that as courts have pointed out,

10  the relief should be limited to the parties and it should also

11  be limited to the areas in which the Court has found there to

12  be improper action.  So, for example, as we were talking about

13  at the very beginning of argument today, these are discrete

14  policy decisions.  One of the discrete policy decisions that I

15  take -- Plaintiff takes particular exception with is State's

16  decision not to allow individuals to change the sex marker on

17  their passports.  If your Honor felt that that was

18  unreasonable, then the proper action -- but only that was

19  unreasonable, then the proper action would be to issue

20  injunctive relief as to that aspect of the policy, not the

21  entire policy.

22         THE COURT:  Okay.

23         Anything further?

24         ATTORNEY TAKEMOTO:  Nothing, your Honor.

25         THE COURT:  Okay.  Thank you, Takemoto.

1          Attorney Nowlin-Sohl, did you have anything further

2    you wanted to raise?

3          ATTORNEY NOWLIN-SOHL:  Just a couple of things, your

4    Honor.

5          So real quickly on the harm not being immediate

6    enough, you know, opposing counsel mentioned Plaintiff Anderson

7    and the incident that she had in 2017.  And then the fact that

8    she, you know, did not update her passport for many years.  She

9    hasn't been travelling internationally for many years.  And as

10   other plaintiffs have said, that, you know, they weren't

11   travelling because of COVID or for other reasons.  So I don't

12   think that that time lapse indicates a lack of urgency around

13   the harm.  And Plaintiff Anderson has made very clear that she

14   has her first kind of international work trip coming up in

15   October, and that that is urgent.  Again, to the extent that

16   Plaintiffs are argue -- sorry, Defendants are arguing about the

17   foreign policy piece, taken to the logical conclusion,

18   Defendants are arguing that all passports' policies would be

19   insulated from judicial review.  And that cannot be the case

20   and has not been the case.

21         And I think that's everything that I have, your Honor.

22         THE COURT:  Okay.  All right.

23         So thank you to both sides.  And I'm going to, as you

24   probably expect, take the motion under advisement and we will

25   stand in recess.

1          So thank you, both sides.

2          THE CLERK:  All rise.

3          (The Honorable Court Exited.)

4          (Whereupon, at 11:53 a.m., Court Stood in Recess.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4    **UNITED STATES DISTRICT COURT )**

5    **DISTRICT OF MASSACHUSETTS     )**

6

7

8          I, Catherine L. Zelinski, certify that the foregoing

9    is a true and accurate transcription of my stenographic notes

10   from the record of proceedings taken Tuesday, March 25, 2025,

11   in the above-entitled matter to the best of my skill and

12   ability.

13

14

15        /s/ Catherine L. Zelinski

16        Catherine L. Zelinski, RPR, CRC      __3/28/2025__
          Official Court Reporter                  Date
17

18

19

20

21

22

23

24

25