## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, REID SOLOMON-LANE, VIKTOR AGATHA, DAVID DOE, AC GOLDBERG, RAY GORLIN, and CHELLE LeBLANC, on behalf of themselves and others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No.1:25-cv-10313-JEK |

## AMENDED CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This is an action for declaratory and injunctive relief arising out of the Trump Administration's abrupt, discriminatory, and dangerous reversal of settled United States passport policy.  The United States previously issued passports to transgender, intersex, and nonbinary people that reflected the sex they live as and express, rather than the sex they were assigned at birth.  Under the government's new arbitrary and unlawful policy (the "Passport Policy"), the United States now refuses to issue passports to otherwise eligible Americans because they are transgender, intersex, or nonbinary—except on terms that expose them to grievous harms and violate their constitutional rights to equal protection, travel, privacy, and speech and flout the Administrative Procedure Act (the "APA").

2.     The State Department previously permitted all people—including those who are transgender, intersex, and nonbinary—to obtain passports with sex designations that reflected the

sex they live as. This included permitting individuals to use the male or female sex designation that reflected the sex they live as and an "X" designation on passports available to individuals who do not identify as female or male or who did not want their sex specified on their passport. The previous State Department policy enhanced consistency across identification documents: most U.S. states permit transgender residents to have a sex designation on their driver's licenses that match the sex they live as and increasingly allow "X" designations as well. The federal Passport Policy rashly requires passports to list only either female or male based on newly concocted and scientifically inaccurate definitions of an individual's sex determined by whether they "belong[], at conception, to the sex that produces" either "the large" or "the small reproductive cell."

3.    The Passport Policy is unlawful and unconstitutional. It discriminates against individuals based on their sex and, as to some, their transgender status. It is motivated by impermissible animus. It cannot be justified under any level of judicial scrutiny, and it wrongly seeks to erase the reality that transgender, intersex, and nonbinary people exist today as they always have.

4.    The inevitable, immediate, and direct result of the Passport Policy is that transgender, intersex, and nonbinary people have been injured. Passports are critical documents for international travel and other purposes. For many of the people now barred from receiving a passport unless they accept one with the Trump Administration's inaccurate sex designation, they are forced to "out" themselves over and over again, harming them and imposing wrongful barriers to travel. Those who look at the passport—including anyone hostile to transgender people, as the Trump Administration is and officials in many countries are—may discern that a passport holder is transgender from a perceived mismatch between the sex designation on their passport and their appearance and may question the validity of their passport. The results may be catastrophic, including causing serious psychological harm, denial of the ability to enter or leave a country, physical violence from people who despise transgender people, and even the passport holder being arrested and imprisoned by border control agents in foreign countries.

5.    The Passport Policy was the product of an animus-filled executive order issued by President Trump on the first day of his term, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order") (attached as Exhibit A).  On its face, the Executive Order declares that it is the policy of the federal government that there are only two sexes and that, for all federal legal purposes, sex is unalterably fixed at conception; it thus attempts to impose a government-wide policy that transgender, nonbinary, and some intersex people do not exist.  The Executive Order also asserts without basis or evidence that individuals claim to be transgender only to invade women's private spaces.  The Executive Order is transparently unlawful and unconstitutional.  It also is unmoored from scientific and medical reality: Transgender people, intersex people, and people who do not identify as either (or exclusively) male or female exist. Scientific and medical authorities have recognized that fact, as have courts across the country, including the U.S. Supreme Court.  In a stroke, the Executive Order seeks to rewrite those realities and replace them with the sole options of "male" or "female" as defined in the Executive Order based on no science, no evidence, and no meaningful explanation aside from empty, dehumanizing rhetoric.

6.    Though publicly silent, the State Department has already implemented its new Passport Policy.  On information and belief, and according to many news reports, the Secretary of State has ordered the State Department to suspend processing of passport applications that seek to change the sex designation on a person's passport or that selected an "X" sex designation—sowing chaos and causing immediate irreparable harm.  As further proof of implementation, after Plaintiff Zaya Perysian requested a new passport reflecting that she is a woman, she received her passport back on January 28, 2025 with an "M" sex designation, along with a form stating that the sex on her passport application had been "corrected."

7.    Without complying with its statutory obligation to provide a 60-day notice and comment period, the State Department has also changed its passport application forms to exclude the "X" sex designation option that has existed on the form for years.

8.      The Passport Policy and Executive Order are part of a broader assault against transgender and nonbinary people by this Administration and are part of a historical pattern of federal and state governments attacking and seeking to erase transgender, intersex, and nonbinary people.  The Executive Order's tortured definition of sex is already being implemented across the federal government to deny transgender people's rights, including in military service, education, other identification documents, and healthcare.  It comes on the heels of similar attacks by various states—and by the first Trump Administration.  And it is the latest in a decades-long line of governmental actions seeking to further oppress transgender and gender-nonconforming people.

9.      Plaintiffs are transgender or nonbinary Americans who have been harmed, and will continue to be harmed, by the Passport Policy.  Because of the Passport Policy, as noted, one plaintiff had her passport returned by the State Department with a male sex designation despite the fact that she lives and expresses herself as a woman and her other identification documents correctly have a sex designation of female.  Other plaintiffs have submitted their passports for renewal or to change their passport sex designation, which the State Department will deny under the Passport Policy.  Still others are afraid to do so for fear the State Department will suspend their application and hold their passport or will send back an unusable passport with the wrong sex designation.  All have faced prior mistreatment due to their gender identities, and they fear that having incorrect sex designations on their passports will cause them further mistreatment—including putting them in danger.

10.     This suit seeks a declaration that the Passport Policy and Executive Order as applied to passports are unconstitutional, a declaration that the Passport Policy violates the APA, and a permanent injunction restoring the status quo ante.  Declaratory and injunctive relief are needed to remedy the many constitutional and statutory violations the Passport Policy inflicts.  Relief is needed on a class-wide basis to prevent class-wide harm to the hundreds of thousands, if not millions, of transgender, nonbinary, and intersex people in the United States who need a passport they can use without suffering harm.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States).

12.    This Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

13.    This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.

14.    Defendants are subject to personal jurisdiction in this Court.

15.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are the United States, its agencies, and its officers sued in their official capacities. Plaintiffs Bella Boe, Sawyer Soe, Reid Solomon-Lane, and AC Goldberg are residents of this District.  A substantial part of the events or omissions giving rise to this Complaint occurred in this District.

## PARTIES[1]

### A.    Plaintiffs

16.    Ashton Orr is a United States citizen and a resident of Morgantown, West Virginia.

17.    Zaya Perysian is a United States citizen and a resident of Santa Clarita, California.

18.    Sawyer Soe is a United States citizen and a resident of Salem, Massachusetts.

19.    Chastain Anderson is a United States citizen and lives near Richmond, Virginia.

20.    Drew Hall is a United States citizen and a permanent resident of Wisconsin.

21.    Bella Boe is a United States citizen and a resident of Cambridge, Massachusetts.

---

[1] Bella Boe," "Sawyer Soe," and "David Doe" are pseudonyms used in this Amended Complaint to refer to three of the plaintiffs.  The Court issued an order on March 18, 2025 (ECF 60) permitting Bella Boe and Sawyer Soe to proceed under pseudonyms.  A motion for leave for David Doe to proceed under a pseudonym will be filed shortly with the Court.  "AC Goldberg" is the name that this Plaintiff uses publicly as a professor, speaker, and consultant, and in his day-to-day life, but is not his legal name.  Defendants do not oppose his appearing in this action as "AC Goldberg." Plaintiffs will provide his legal name to the Court and to Defendants, subject to the Protective Order entered by the Court on March 18, 2025 (ECF 59).

22.    Reid Solomon-Lane is a United States citizen and a resident of North Adams, Massachusetts.

23.    Viktor Agatha is a United States citizen and a resident of Dallas, Texas.

24.    David Doe is a United States citizen and a resident of Van Nuys, California.

25.    AC Goldberg is a United States citizen and a resident of Cambridge, Massachusetts.

26.    Ray Gorlin is a United States citizen and a resident of Minneapolis, Minnesota.

27.    Chelle LeBlanc is a United States citizen and a resident of Colorado Springs, Colorado.

**B.    Defendants**

28.    Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  By statute, the President has authority to prescribe certain rules for the issuance of passports.  *See* 22 U.S.C. § 211a.

29.    Defendant Department of State (the "State Department") is a federal executive department responsible for implementing the Executive Order.  It is an agency within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

30.    Defendant Marco Rubio is the Secretary of State.  He is responsible for supervising and directing the State Department.  He is sued in his official capacity.  By statute, the Secretary of State has authority to issue passports under rules prescribed by the president.  *See* 22 U.S.C. § 211a.  By executive order, the president has delegated the authority to prescribe those rules for passport issuance to the Secretary of State.  *See* Executive Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

31.    Defendant United States of America is the government of the United States and includes all government agencies and officials responsible for implementing the Passport Policy and the Executive Order as applied to passports.

32.    The State Department and Secretary Rubio are collectively referred to as the "Agency Defendants."

**ALLEGATIONS**

**A.    Gender Identity, Transgender People, Nonbinary People, and Intersex People**

1.    <u>Gender Identity</u>

33.    "Gender identity" refers to a person's core, internal sense of belonging to a particular sex.  There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

34.    The concept of "sex" refers to multiple physiologic attributes, such as chromosomes, gonads (glands that produce hormones and gametes), and anatomy (internal and external reproductive parts), secondary sex characteristics that usually develop during puberty, and gender identity.  "Sex assigned at birth" refers to the designation of sex generally noted on a birth certificate shortly after birth, almost always based solely on the appearance of an infant's external genitalia.  The term "biological sex" is less precise than "sex assigned at birth" because it does not account, for example, for intersex conditions and gender identity.

35.    A person's gender identity is an essential part of their identity and very frequently predicts how they will be identified by others more accurately than their sex assigned at birth.  For purposes of identity documents, including passports, a person's gender identity is the most important and accurate characteristic for determining what their sex is and what their sex designation should be.

36.    According to the American Medical Association, the American College of Physicians, the American Psychiatric Association, and 25 other major U.S. medical and psychological professional associations, "variations in . . . gender identity are a normal part of human development" and "research and experience shared by scholars, clinicians, and patients have shown that . . . efforts [to change someone's gender identity have not succeeded] and are harmful."[2]

---

[2] United States Joint Statement Against Conversion Efforts (completed Aug. 23, 2023), available at https://d3dkdvqff0zqx.cloudfront.net/groups/apaadvocacy/attachments/USJS-Final-Version.pdf.

2.     Transgender People

37.     Transgender people have a gender identity different from their sex assigned at birth. According to one set of surveys, more than 1.6 million Americans are transgender.[3]

38.     When a person's sex assigned at birth and gender identity align, the person is "cisgender."

3.     Nonbinary People

39.     "Nonbinary" people have a gender identity that is not exclusively male nor exclusively female.  According to one set of surveys, more than 1.2 million Americans identify as nonbinary.[4]

4.     Intersex People

40.     "Intersex" is a term used to describe a wide range of natural bodily variations, which some medical professionals refer to as "differences of sexual development."  Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated "male" or "female."  Intersex variations differ; some intersex traits may be discovered at birth, some may not be discovered until puberty, and some may never be discovered.  For example, intersex people can have certain variations in chromosomes, external genitals, internal reproductive organs, and hormone production and response that cause these variations in their bodies.  According to estimates by the United Nations, between 0.05% and 1.7% of the population is born with intersex traits—meaning there are potentially as many as 5.6 million intersex people in the United States.[5]

---

[3] Jody Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute, UCLA School of Law 1 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last accessed Feb. 6, 2025).

[4] Bianca D.M. Wilson et al., *Nonbinary LGBTQ Adults in the United States*, Williams Institute, UCLA School of Law 2 (June 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last accessed Feb. 6, 2025).

[5] United Nations Free & Equal, "Intersex People," Office of the United Nations High Commissioner for Human Rights 1 (2024), https://www.unfe.org/sites/default/files/download/Intersex%20factsheet%202024%20EN%20-%20CLEARED.pdf (last accessed Feb. 6, 2025)

41.     During the initial gestation period, embryos with XX chromosomes and embryos with XY chromosomes appear the same in terms of their biological makeup.  Various aspects of the embryos later typically begin to develop differently depending on whether the embryo has XX or XY chromosomes.  This binary differential development is not always what occurs, however, and there are many variations in genitals, internal reproductive organs, hormones, and other aspects of the body that do not align with a strict sex binary.

42.     Some intersex people do not produce either (and some may produce both) the "large reproductive cell" or "small reproductive cell"—that is, the ovum and sperm—that are at the core of the definitions of female and male in the Executive Order.  Further, some intersex people may produce either sperm or ovum but have genitalia or chromosomes typically associated with the different sex (e.g., a person with testes who is assigned female at birth based on genitalia).

43.     Some intersex people are transgender because their gender identity is different from the sex they were assigned at birth.  Some intersex people, however, were assigned a sex at birth that is the same as their gender identity, meaning that they are cisgender.

5.     Gender Dysphoria and Gender-Affirming Care

44.     Gender dysphoria is a medically recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth, when accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[6]  Many transgender people (including transgender people who are nonbinary or intersex) experience gender dysphoria.  Gender dysphoria is a serious medical condition that, if left untreated, can lead to debilitating depression and even suicidal ideation and acts.

45.     The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons and (ii) the World Professional

---

[6] *See, e.g.*, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR* at 512–13 (2022).

Association for Transgender Health ("WPATH") Standards of Care ("SOC") for the Health of Transgender and Gender Diverse People, which was initially published in 1979 and is now in its eighth version, which was released in 2022. These guidelines are supported by all major U.S. medical associations and reflect the professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria. These clinical guidelines are comparable to clinical guidelines used to treat other medical conditions.

46. It is the recognized standard of care to address gender dysphoria with social affirmation as well as medical treatment designed to bring a person's body and expression of their sex in line with their gender identity. This course of treatment has different components depending on the particular needs and age of each person.

47. Treatment for gender dysphoria brings a person's social interactions, appearance, and body into greater alignment with the person's gender identity, which helps alleviate distress. Treatment for gender dysphoria may involve social transition, hormone treatment, and/or gender-affirming surgery or surgeries.

48. Social transition involves shifting one's presentation and social functioning so that it is consistent with one's gender identity. Typically, it involves some or all of the following:

   a. Change in clothing, hair, or appearance;

   b. Change of name;

   c. Change in pronouns (e.g., "she," "he," or "they");

   d. Change in participating in gender-specific activities, events, or spaces; and

   e. Change of the sex designation on identifying documents, including an individual's driver's license and passport.

49. Treatment for gender dysphoria typically includes living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity.

50. While social transition is adequate to treat gender dysphoria for some people, others may need other forms of treatment as well.

51.     Hormone treatment is used to help a person develop secondary sex characteristics consistent with their gender identity, which may affect how the person receiving such treatment physically presents and is perceived by others.

52.     Gender-affirming surgeries may include a wide variety of surgeries, many of which also affect how the person undergoing surgery physically presents and is perceived by others, such as augmentation mammoplasty, chest reconstruction surgery, and facial feminization surgery.

      6.    <u>Violence and Discrimination Against and Harassment and Mistreatment of Transgender, Nonbinary, and Intersex People</u>

53.     Transgender, nonbinary, and intersex people often experience violence, harassment, discrimination, and social stigma when others learn that they are transgender, nonbinary, or intersex.

54.     For decades, transgender, nonbinary, and intersex people have been subject to numerous and varied attempts by both private individuals and government actors to discriminate against and oppress them, and to attempt to erase their existence.

55.     Transgender people are more likely to suffer harassment, discrimination, and violence than the population at large.  According to the National Center for Transgender Equality's U.S. Transgender Survey:

    a.   Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people thought they were transgender.

    b.   In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or presentation.

    c.   Nearly half (47%) of respondents had been sexually assaulted during their lifetime.

    d.   Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment.

e.  Twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or sex designation that did not match their gender presentation.

56.  For transgender people of color, these forms of mistreatment are even more common.

57.  As a result of these forms of mistreatment, 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population as a whole.  Moreover, 40% percent of respondents attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population as a whole (4.6%).

58.  Nonbinary people are also subject to violence and discrimination, and many of the statistics regarding violence against transgender people include nonbinary people.[7]

59.  Intersex people also are more likely to suffer violence, discrimination, harassment, and mistreatment.  For instance, surveys indicate that anywhere from one quarter to half of intersex people had been subjected to violence.[8]

**B.    The Importance of Passports Consistent with the Sex a Person Lives As**

60.  A passport is an essential government-issued document that individuals use for various important purposes throughout their lifetime.

---

[7] *See, e.g.*, Human Rights Campaign Foundation, *The Epidemic of Violence Against the Transgender & Gender-Expansive Community in the U.S.: The 2024 Report* (Nov. 2024), https://reports.hrc.org/an-epidemic-of-violence-2024 (last accessed Feb. 6, 2025); Skylar Davidson, *Gender inequality: Nonbinary transgender people in the workplace*, Cogent Social Sciences (2016).

[8] The Trevor Project, *The Mental Health and Well-being of LGBTQ Youth who are Intersex* at 4 (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/12/Intersex-Youth-Mental-Health-Report.pdf (last accessed Feb. 6, 2025); ILGA-Europe and OII Europe, Diving Into the FRA LGBTI II Survey Data: Intersex Briefing (2023), https://www.ilga-europe.org/report/intersections-intersex-diving-into-the-fra-lgbti-ii-survey-data/ (last accessed Feb. 6, 2025).

61.     Passports are necessary for travel outside of the country and for reentry into the United States.  *See* 8 U.S.C. § 1185(b).  Foreign countries generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport.

62.     When traveling or living abroad, U.S. passports often are necessary for numerous purposes and often are the only form of identification carried by a U.S. citizen that is recognized or acknowledged by foreign authorities or private citizens.  A passport often is needed in other countries to check in to a hotel, to use a bank, to receive medical services and for many other purposes.

63.     If there is an emergency while abroad, passports are the primary way for a U.S. citizen to identify themself to U.S. officials, such as those at an embassy or consulate.

64.     Passports can also be useful or necessary for travel within the United States.  If a person does not have another valid form of identification, they generally cannot board a plane.  Under the REAL ID Act, certain state identification documents will no longer be able to be used for domestic travel when the Act comes into effect on May 7, 2025.

65.     Passports are used in a wide variety of contexts as identification documents, such as determining eligibility for employment, enrolling in government programs, and engaging in a wide range of financial transactions.  Passports are also used to obtain other important forms of identification and can be used as an "identification of last resort" due to their widespread acceptance and the weight accorded a federal government document.  For instance, passports can often be used to obtain driver's licenses, as proof of age, as proof of citizenship, and for educational registration.

66.     Forcing transgender, nonbinary, and intersex people to carry and use identity documents that do not align with the sex they live and present themselves as, or denying them necessary identity documents, is inconsistent with protocols regarding social transition.  It can cause anxiety and distress to individuals who are transgender and result in discrimination and violence against them.  Additionally, for those who have struggled for years with the impact of

external invalidation of their identity, the knowledge that their identification documents label them with a sex different from the sex they live as can, by itself, cause serious psychological injury.

67.     Recognizing the importance of identification documents, the American Medical Association "supports every individual's right to determine their gender identity and sex designation on government documents" and urges that governments "allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."[9]

68.     Forcing transgender people to carry and present identification that lists their sex as defined by the Executive Order can out them to officials and private citizen strangers as transgender, a profoundly private piece of information in which they have a reasonable expectation of privacy.  Such a policy deprives transgender people of significant control over the circumstances surrounding disclosure of their transgender identity, including when, where, how, and to whom their identity is disclosed.

69.     The Passport Policy also harms intersex people who are not transgender and who want an "M" or "F" sex designation on their passport.  If, for example, someone who is intersex lives their life as a woman and presents to others as a woman and therefore wants an "F" on their passport, but the Passport Policy would require them to have an "M" on their passport, that will wrongly suggest that they are transgender or will out them as being intersex.  Their being intersex is a profoundly private piece of information in which they have a reasonable expectation of privacy. The Passport Policy therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they are intersex, including when, where, how, and to whom their identity is disclosed.

70.     The Passport Policy also harms nonbinary people who are not transgender and who want an "M" or "F" sex designation that is inconsistent with how the Executive Order defines their

---

[9] Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967, Am.         Med.         Ass'n         (2021),         https://policysearch.ama-assn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-5096.xml (last accessed Feb. 6, 2025).

sex.  Someone who meets the Executive Order's definition of male but who is nonbinary and lives their life and presents as a woman and wants an F on their passport will have it disclosed against their will that they meet the Executive Order's definition of male.  That is a profoundly private piece of information in which they have a reasonable expectation of privacy.  The Passport Policy therefore deprives them of significant control over the circumstances surrounding disclosure of the fact that they fall within the Executive Order's definition of male, including when, where, how, and to whom that is disclosed.

71.    Further, requiring people who want an "X" sex designation on their passport to instead have an "M" or "F" designation forces them to disclose whether they meet the Executive Order's definition male or female.  That is a profoundly private piece of information in which they have a reasonable expectation of privacy.  Such a policy deprives these people of control over the circumstances surrounding disclosure of that information, including when, where, how, and to whom that information is disclosed.

72.    Disclosure that someone is transgender, nonbinary, or intersex when they do not want that information disclosed subjects that person to harm, including an invasion of privacy.  It also subjects them to significant risks of discrimination and harassment in a variety of settings, including employment, travel, financial transactions, and in interactions with government employees, including, but not limited to, law enforcement personnel.  Disclosure of that information can seriously jeopardize a person's safety and subject the person to risk of bodily harm.

73.    In other countries and in the United States, violence, harassment, and other mistreatment of transgender, nonbinary, and intersex people is common and/or accepted, including at the hands of government officials.  If a transgender, nonbinary, or intersex person's passport displays a different sex designation on their passport than the person's gender identity and/or presentation, that mismatch could cause officials to question whether the person's passport is valid and interfere with their ability to travel.  It could also disclose that the person is transgender, nonbinary, or intersex to foreign officials and private citizens against the person's will.  In turn,

that disclosure could result in violence, harassment, arrest, imprisonment, and other mistreatment of the person. According to reports, hundreds of transgender people were killed around the world in 2023, and similar figures exist for prior years.[10]

74. Having a sex designation on a passport that involuntarily discloses someone is transgender, nonbinary, or intersex can also cause harassment and discrimination while traveling within the United States.

**C.    The Passport Application and Issuance Process**

75. A U.S. passport is a travel document issued under the authority of the State Department attesting to the identity and nationality of the bearer. As noted, to travel out of or into the country, a U.S. citizen must carry a U.S. passport. *See* 8 U.S.C. § 1185.[11]

76. Before a U.S. passport can be issued, the applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. A passport application must be signed under penalty of perjury. It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. § 1542.

77. A U.S. citizen applying for a passport for the first time must submit an Application for a U.S. Passport (DS-11). A U.S. citizen applying for a renewal of an existing passport must submit a Renewal Application (DS-82). Citizens can also submit a form to make corrections or name changes, including, until the Passport Policy prevented it, changes in the sex designation on one's passport (the DS-5504).

---

[10] *See* Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023 - New Monitoring Report*, Forbes (Nov. 13, 2023), https://www.forbes.com/sites/jamiewareham/2023/11/13/beaten-stabbed-and-shot-320-trans-people-murdered-in-2023 (last accessed Jan. 30, 2025).

[11] Certain people who are not U.S. citizens may also utilize U.S. passports, such as residents of American Samoa.

78.    The DS-11 contains various fields, including for "Sex."  "M" in this field indicates male and "F" indicates female.

79.    From 2010 until 2021, including throughout the first Trump Administration, the State Department permitted individuals to apply to change the sex designation on their passport with certification of a physician that they were being treated for a gender transition.

80.    Starting in 2021, the State Department permitted individuals to change the sex designation on their passport without a physician's certification.

81.    In 2021, the State Department announced it would permit individuals to select an "X" sex designation on their passport, which the State Department form described as denoting "unspecified or another gender identity."  This designation generally signifies that the bearer does not identify as male or female, identifies as both, or does not wish to specify their sex.  It is important to many transgender, intersex, and nonbinary people to have an "X" sex designation on their passport because that is most consistent with how the identify and/or present themselves or for privacy reasons, since a person reviewing a passport with an "X" sex designation will not know *why* the individual has an "X" sex designation.

82.    A United Nations agency, the International Civil Aviation Organization ("ICAO"), sets international standards for air transport, including for travel documents.  ICAO specifications for machine-readable travel documents have for decades required passports to display the "[s]ex of the holder, to be specified by . . . the capital letter 'F' for female, 'M' for male, or 'X' for unspecified."[12]

83.    Numerous other countries permit individuals to select the sex designation on their passport most appropriate for themself, including Australia, Denmark, Argentina, Greece, Brazil, Norway, Portugal, Ireland, and others.  Many other countries also permit "X" designation on their

---

[12] *Doc 9303, Machine Readable Travel Documents*, International Civil Aviation Organization at IV-14 (8th ed. 2021), https://www.icao.int/publications/documents/9303_p4_cons_en.pdf (last accessed Feb. 6, 2025).

passports, including Germany, Pakistan, Taiwan, Austria, Canada, Colombia, and many of the countries that permit self-selection of designation.

**D.    The Executive Order**

84.    Donald J. Trump was inaugurated for the second time as President of the United States on January 20, 2025.

85.    That same day, President Trump signed the Executive Order, purporting to rely solely on 5 U.S.C. § 7301, which generally permits the President to issue regulations for employee conduct in the Executive Branch.

86.    The Executive Order states in its "Purpose" section that it is targeted against those it calls "ideologues who deny the biological reality of sex [who] have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  Executive Order § 1.  It declares that transgender people simply existing—or in its words, "[e]fforts to eradicate the biological reality of sex"—"fundamentally attack women by depriving them of their dignity, safety, and well-being."  *Id.*  It claims that "[t]his unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts."  *Id.* And it calls gender identity an "inchoate social concept."  *Id.*

87.    The Executive Order explicitly references transgender people by suggesting that the government can prevent people from obtaining legal rights if they "self-identify" as a sex different from their sex assigned at birth—that is the definition of being transgender.

88.    The Executive Order attempts to invalidate the existence of transgender, intersex, and nonbinary people by wrongly proclaiming that there are only two sexes, definable and binary at conception.  Despite the order's insistence that it is communicating "biological truth," it is in fact inconsistent with science.

89.    To accomplish the Trump Administration's apparent goal of ending all legal recognition of and protections for transgender, nonbinary, and intersex people, the Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female.  These sexes are not changeable and are grounded in fundamental and incontrovertible reality."  *Id.* § 2. It declares that the "Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy."  *Id.*  Among the definitions are:

a.    "Sex" shall refer to an individual's immutable biological classification as either male or female.  "Sex" is not a synonym for and does not include the concept of "gender identity."

b.    "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

c.    "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

d.    "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

e.    "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

f.    "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

g. "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

90. The Executive Order directs the Secretary of State, as well as the Secretary of Homeland Security and Director of the Office of Personnel Management, to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* § 3(d).

91. The Executive Order requires that, "[w]ithin 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order." *Id.* § 3(a). It requires that all federal agencies and employees "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b).

92. The Executive Order also requires that all agencies "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages" and that agencies' "forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* § 3(e).

93. The Executive Order imposes various other rules related to gender, including with respect to federal employees' records, interpretation of various federal laws, recission of various agency policies, and proposals for legislation on the topic. *See id.* §§ 3–7.

E.    **The State Department Implements the Executive Order Through the Passport Policy**

94.    On January 23, 2025, news outlets began reporting that Secretary Rubio had directed the State Department to implement the Executive Order as applied to passports.[13]   In particular, Secretary Rubio instructed in an internal State Department cable that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall be used" on passports.[14]   As a result, State Department staff were ordered to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker."[15]

95.    Since then, numerous other news outlets have reported on this directive, including that it was made explicitly to implement the Executive Order.[16]

96.    The State Department has not published any public notices or other guidance on this change.

97.    As of February 7, 2025, the DS-11 (initial application) available online does not permit users to select an "X" in the Sex field.[17]   It includes only two boxes that can be checked, for "M" and "F."  The online fillable form that populates the Application likewise permits selecting only "M" or "F" in the Sex field and provides no "X" option.  The posted DS-11 states that it has

---

[13] *See* Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, Guardian (Jan. 23, 2025), https://www.theguardian.com/us-news/2025/jan/23/trump-rubio-x-gender-passport (last accessed Feb. 6, 2025).

[14] *Id.*

[15] *Id.*

[16] *See, e.g.*, Jo Yurcaba *et al.*, *State Department To Suspend Passport Applications Seeking Sex-Marker Changes*, NBC News (Jan. 24, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/rubio-passport-sex-marker-changes-paused-trump-order-rcna189222 (last accessed Feb. 6, 2025); Shannon K. Kingston *et al.*, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178 (Jan. 30, 2025) (last accessed Feb. 6, 2025).

[17] *See* U.S. Department of State, Application for a U.S. Passport, OMB Control No. 1405-0004 (exp. Dec. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-11%20(12-31-2023)%20revision%20date%2012-2020.pdf (last accessed Feb. 7, 2025).

21

an expiration date of December 31, 2023, implying that the State Department has replaced the currently-approved version of the form with an older version. The same is now true of the DS-82 (renewal form) and DS-5504 (corrections and name changes), which include only "M" and "F" and have expiration dates of March 31, 2023 and November 30, 2022.[18, 19]

98.    Prior to changing the forms DS-11, DS-82, and DS-5504, the State Department did not issue a 60-day notice of its intent to make any changes to such forms, depriving the public of the opportunity to comment on such changes.

99.    The State Department has also removed references to transgender individuals from its public webpages. For instance, the webpage previously entitled "LGBTQI+ Travelers" has been retitled "LGB" travelers and removed travel information related to transgender people.[20] The Transportation Security Administration ("TSA") previously had webpages discussing screening procedures for transgender people and whether nonbinary individuals could apply for TSA

---

[18] *See* U.S. Department of State, U.S. Passport Renewal Application for Eligible Individuals, OMB Control No. 1405-0020 (exp. Mar. 31, 2023), https://travel.state.gov/content/dam/passports/forms-fees/DS-82%20(3-31-2023)%20revised%203-2020.pdf (last accessed Feb. 7, 2025); U.S. Department of State, Application for a U.S. Passport for Eligible Individuals, Correction, Name Change to Passport Issued 1 Year Ago or Less, and Limited Passport Replacement, OMB Control No. 1405-0160 (exp. Nov. 30, 2022), https://travel.state.gov/content/dam/passports/forms-fees/DS-5504-%202021.pdf (last accessed Feb. 7, 2025).

[19] The State Department has also, according to public reports, begun implementing the Executive Order in other ways, such as with a direction from the Acting Undersecretary for Management that all employees remove gender pronouns from their email signatures. *See* Carla K. Johnson, Health info wiped from federal websites following Trump order targeting transgender rights, PBS (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-wiped-from-federal-websites-following-trump-order-targeting-transgender-rights (last accessed Feb. 6, 2025).

[20] *Compare* U.S. Department of State, Bureau of Consular Affairs, LGB Travelers, https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/lgb.html (last accessed Feb. 6, 2025), *with* Michael K. Lavers, *Transgender people removed from State Department travel page*, Washington Blade (Jan. 31, 2025), https://www.washingtonblade.com/2025/01/31/transgender-people-removed-from-state-department-travel-page/ (reporting on prior version of webpage).

PreCheck.[21]   Those pages appear to no longer be online, but they have been captured by web archives and still appear in indexed search results as of January 30, 2025.[22]

100.    The State Department Foreign Affairs Manual (the "FAM") previously recognized that there were individuals that "do[] not fit typical definitions of male or female,"[23] but, although the FAM generally is available online, that section of the FAM is no longer accessible.[24]

101.    The Passport Policy includes at least (a) issuing new passports, renewing existing passports, and making changes to existing passports to comply with the Executive Order's definitions of male and female, including no longer issuing "X" designations on passports, and (b) refusing to grant or suspending processing of applications to issue new passports, renewed passports, and changes to passports that would not comply with the Executive Order's definitions of male and female, including no longer granting applications for "X" designations on passports.

### F.    President Trump and His Administration's Longstanding Animus Against Transgender People

102.    On its face, the Executive Order reflects animus against transgender people, as does the broader context in which it was adopted.

---

[21] *See, e.g.*, "What Are the Screening Procedures for Transgender Persons?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/what-are-screening-procedures-for-transgender-persons (not accessible as of Jan. 30, 2025); "Can I Apply for TSA Precheck® with a Nonbinary Gender and Gender Non-conforming Identity Document on the TSA Precheck Application?," *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions/can-i-apply-for-tsa-precheckr-nonbinary-gender-and-gender-non (not accessible as of Jan. 30, 2025).

[22] *See, e.g.*, *Frequently Asked Questions*, Transp. Sec. Admin., https://www.tsa.gov/travel/frequently-asked-questions (Jan. 17, 2025 22:19:17 GMT) [https://web.archive.org/web/20250117221917/https://www.tsa.gov/travel/frequently-asked-questions] (last accessed Feb. 6, 2025) (WebArchive version as of January 17 providing guidance to transgender and nonbinary people that has since been removed).

[23] *See* 7 Foreign Affairs Manual, 1350 Appendix M (as of 2015).

[24] *See* 7 Foreign Affairs Manual, https://fam.state.gov/Volumes/Details/07FAM (1300s section is inactive).

103.    For instance, President Trump has referred to transgender identities as "transgender insanity"[25] and has repeatedly referred to transgender people using derogatory labels, describing them as "deranged," "sick," and drug users.[26]

104.    In just his first two weeks in office, President Trump has issued a series of orders targeting transgender people.[27]

105.    He issued an executive order stating that being transgender while serving in the military "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[28]  He issued another executive order referring to women who are transgender as "men" and calling their participation in women's sports "demeaning, unfair, and dangerous," asserting that it "results in the endangerment, humiliation, and silencing of women."[29] He issued yet another executive order falsely referring to medical treatment of transgender adolescents supported by evidence-based research and by every major professional health

---

[25] Bill Barrow, *Trump and Vance Make Anti-Transgender Attacks Central to Their Closing Argument Before Election Day*, PBS (Nov. 1, 2024), https://www.pbs.org/newshour/politics/trump-and-vance-make-anti-transgender-attacks-central-to-their-closing-argument-before-election-day (last accessed Feb. 6, 2025).

[26] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[27] In addition to the Executive Order and the orders discussed in the remainder of this section of the Complaint, other executive orders include: Exec. Order 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools).

[28] Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 § 1 (Jan. 27, 2025).

[29] *Keeping Men Out of Women's Sports* (Feb. 5, 2025) (number and Federal Register entry not yet assigned) (available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/).

association in the country as "chemical and surgical mutilation" and said that such treatment "will be a stain on our Nation's history."[30]

106.    President Trump has referred to those who support transgender rights as "pushing the transgender cult."[31]

107.    Secretary Rubio, who is tasked with implementing the Executive Order as applied to passports and overseeing the Passport Policy, has referred to the existence of transgender people as "a harmful ideology" and stated that being transgender is "not real."[32]

108.    The Executive Order is deeply rooted in this same animus.

109.    As noted above, the Executive Order refers to transgender people as "ideologues who deny the biological reality of sex." Executive Order § 1. It inaccurately and offensively states that transgender people live as their true gender to "gain access to intimate single-sex spaces," with the implication that they do so for nefarious reasons, and to "depriv[e] [women] of their dignity, safety, and well-being." *Id.* It says that merely existing as a transgender person is to "attack women." *Id.*

G.    **Harm to Plaintiffs**

1.    Ashton Orr

110.    Ashton uses the pronouns "he" or "they." Ashton has lived in West Virginia his entire life and is thirty-four years old.

111.    Ashton is the Press Relations Manager for a national LGBTQ+ organization, advocating for transgender rights and equality.

---

[30] Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, title and § 1 (Jan. 28, 2025).

[31] *See Fact Sheet: Donald Trump on LGBTQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://glaad.org/fact-sheet-trump-transgender (last accessed Feb. 6, 2025).

[32] Ken Scheck, *JD Vance Adds to Anti-LGBTQ+ Track Record with Census Letter*, Buckeye Flame (Nov. 13, 2023), https://thebuckeyeflame.com/2023/11/13/jd-vance-adds-to-anti-lgbtq-track-record-with-census-letter (last accessed Feb. 6, 2025) (letter co-written by then-Senator JD Vance and then-Senator Rubio).

112.    Ashton is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

113.    He was diagnosed with gender dysphoria in 2015, when he was twenty-five years old.

114.    Ashton has lived as a male in all aspects of his life since 2020.  He is known only as a man to his family, his workplace, and in his community in West Virginia.  It has not always been easy for Ashton to be himself in public spaces, and he has experienced significant discrimination and harassment as a result of being open about his transgender identity.  Having accurate identification documents helps Ashton navigate this world safely, as he is perceived as male by those who see him, and a male sex designation affirms his gender identity.

115.    Ashton was able to update his West Virginia driver's license in 2023 and his Social Security Administration record in 2024 to reflect an accurate name and male sex designation.  He typically travels by plane with multiple forms of identification in case he misplaces or loses either his passport or his driver's license.  However, this has recently presented issues for Ashton, as the information on his passport does not match his updated and accurate driver's license.

116.    For example, in early January 2025, Ashton flew from West Virginia to New York City.  Because his REAL ID has a male sex designation, and his passport had a female sex designation, he was flagged by the TSA and accused of presenting a fake identification document.  When TSA screened his REAL ID, they claimed it didn't match the documents they had on record for him.  He offered his passport to confirm his identity, and TSA accused him of presenting a fake identity document.  They repeatedly scanned his ID and took his photo multiple times before pulling him aside for further questioning.  It wasn't until Ashton was forced to explain in detail that he is a transgender man that they finally allowed him through.

117.    This experience prompted Ashton to take steps to update his passport.

118.    On January 16, 2025, Ashton sent his passport, renewal application, birth certificate, and marriage license to apply for an updated passport with an accurate sex designation of male and paid for expedited shipping and servicing given that he had imminent travel plans.  He

was informed that his application arrived on January 18 and began processing on January 22.  The passport that Ashton sent with his application had a female sex designation, and his application requested an updated name and sex designation.

119.    On February 18, Ashton received a letter from the State Department stating that it was unable to issue a U.S. passport containing the sex marker he requested because the documents he submitted did not match his "biological sex" at birth.

120.    On March 27, Ashton received a new passport in the mail, which was marked with an "F" sex designation.  However, the documents he submitted in support of his updated passport application were not returned in the manner he expected.  Despite receiving his passport and documents in an envelope that looked undisturbed, his marriage license was returned to him ripped, and his birth certificate was never returned.

121.    Prior to receiving this new passport, Ashton had to cancel a trip  to Ireland on March 13, 2025, because he did not have a passport to travel with. He is planning to reschedule that trip as soon as possible because he is traveling for a medical purpose. His ability to access medically indicated care has already been delayed, and he does not wish to have it delayed any further.

122.    Ashton is terrified that having an inaccurate sex designation on his passport will cause TSA agents, border officials, or airline staff to single him out for invasive questioning, scrutiny, or mistreatment.  Ashton's past experiences of having his identity challenged, his passport refused, and being subjected to additional security screenings have led to extremely uncomfortable circumstances for him.  Not having a passport with a sex designation of male could cause travel delays, missed flights, or even denial of entry to certain countries.  Being forced to explain discrepancies in his documentation could out him as transgender in unsafe situations.

123.    Ashton is devastated that his country is trying to erase his identity and remove his ability to access accurate identification documents.  Without an accurate passport, he will not feel safe traveling outside of the United States for any reason, let alone to make his medical appointment in March.

2.    Zaya Perysian

124.    Zaya Perysian is twenty-two years old and uses the pronouns "she" and "her." Zaya has lived in California since October of 2023, when she moved from New Jersey. Zaya was born in Michigan and left when she was twenty years old.

125.    Zaya is a transgender woman. Her sex assigned at birth was male, but she has a female gender identity.

126.    Zaya was diagnosed with gender dysphoria in 2020.

127.    Zaya has lived as a female in all aspects of her life since 2020, and she has been known since then only as female to her family, friends, her community in California, and her social media followers online. Today, she feels more like herself than ever. It has been a long road for Zaya to feel safe and authentic in her body, and she is grateful to be living her truth in all aspects of her life.

128.    Zaya is a social media content creator, and her content focuses mainly on her life as a proud transgender woman. She has documented her transition journey and has been able to connect with a community of LGBTQ+ individuals across the globe. Zaya's content has also allowed her to connect with millions of people who are not LGBTQ+ and she has helped educate them on what it means to be transgender in today's society.

129.    Having accurate identification is extremely important to Zaya's safety and her ability to navigate the world. During the first few years after coming out as transgender, before her identification documents were updated, Zaya faced significant harassment and was often put in uncomfortable situations while traveling. She was subjected to intolerant gazes when airport personnel viewed her identification with an inaccurate, male sex designation but observed her female gender expression. She has been patted down by TSA agents expressing their interest in confirming her sex, and she has had agents say that she was the "prettiest boy" they had ever seen. It was devastating for Zaya to endure experiences like this, and it wasn't until she was able to update her driver's license that these occurrences became less frequent.

130.    Zaya updated her Michigan driver's license to her accurate female sex designation in June of 2021 and her accurate name in February of 2022.  She is in the process of getting a California driver's license, which will also reflect her accurate name and female sex designation.  In addition, Zaya has been able to update her sex designation with the Social Security Administration.  Because the passport she had in her possession had an inaccurate male sex designation, she knew that she needed to update her passport to be able to travel for work opportunities abroad.  Zaya was filled with anxiety when she learned about the Executive Order.

131.    Zaya had planned to travel outside of the United States in early February 2025 and submitted an expedited application to update the sex designation on her passport to female on January 23, 2025.

132.    On January 24, Zaya received notice via email that her passport application was being processed.  On January 28, her passport was returned to her through the mail with a notice stating: "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red.  The stated reason was "to match our records."

133.    Angered, Zaya posted about the incident on her social media.  A representative from CNN who heard about Zaya's situation called the State Department on her behalf to understand why this occurred, and the representative was told that the sex designation on Zaya's passport must be male in accordance with the Passport Policy.  Zaya's passport now has a male sex designation, and the new expiration date is January 24, 2035.  Unless Zaya is issued a correction, she will effectively have an unusable passport and will be unable to leave the country safely or comfortably for at least ten years.  Zaya is perceived as female by those who see her, and using this passport will out her as transgender to people who would not otherwise have known.

134.    This is particularly harmful to Zaya because she has been invited to many opportunities to connect and collaborate with other influencers abroad. Without accurate identification, she will not be able to engage in income-generating opportunities outside of the United States.

135.    Zaya cannot practically travel with her current passport that does not reflect who she is.  If Zaya were to present the current passport with a male sex designation, it could cause problems while interacting with TSA agents and other officers.  She is even more afraid of encounters with officers in countries outside of the United States, where her passport may be the only identity document that would be accepted or recognized by officials, and where there is significant hostility towards the transgender community.

136.    Zaya is devastated that her government would target her community with a policy that takes away her and other members of that community's ability to move around the world safely.

### 3.    Sawyer Soe

137.    Sawyer Soe is thirty-five years old and primarily uses the pronouns "they" and "them."

138.    Sawyer works for a company that is a leader in video game development.  Sawyer designs games and leads a creative team.  They love what they do for work, as it allows them to express themselves creatively and build experiences that engage people of all ages.  Sawyer's company has a global presence, with colleagues in the United States, Canada, South America, and Europe.

139.    Sawyer is a nonbinary person.  Their sex assigned at birth was female, but they do not identify with a binary sex. The term "nonbinary" accurately captures their identity.

140.    Sawyer has lived as a nonbinary person in all aspects of their life since 2019.  They have always known their gender identity to some degree, as they are naturally an androgynous person and that is typically how others perceive them.  Today, Sawyer is fully themselves at work and among friends and family.

141.    Sawyer was able to obtain a Massachusetts driver's license with an "X" sex designation in July of 2023, and this has allowed them to navigate travel and daily interactions safely and comfortably.  Having an "X" sex designation on their identity documents allows them to escape the arbitrary enforcement of an identity projected on them solely based on their sex

assigned at birth. The "X" designation provides Sawyer with freedom and privacy that allows them to exist in a way that is free of a label that they did not choose for themselves and that is inconsistent with how they live.

142. Sawyer has not been able to update their United States passport, which expired in 2019, in a similar manner. This was not something Sawyer sought to do during the earlier days of the COVID-19 pandemic that occurred soon after the passport's expiration because Sawyer did not travel then. Recently, Sawyer has begun traveling more. Sawyer's design team at work is planning an on-site collaboration with their colleagues in Canada, and Sawyer will be required to travel internationally to Canada within the next three months, and potentially several more times in the coming year.

143. Sawyer would feel safer if they had an "X" sex designation on their passport because it would be consistent with their identity, it would protect their privacy as it would prevent disclosure of their sex assigned at birth to strangers, and it would match the other identity documents that they currently carry. Due to the Passport Policy, Sawyer will no longer be able to obtain an "X" sex designation on their passport that accurately reflects who they are, how they express their identity, and how others perceive them.

4. Chastain Anderson

144. Chastain Anderson has lived in the Richmond area since 2018, when she moved from Louisiana. Chastain uses the pronouns "she" or "they."

145. Chastain holds a Ph.D. in Molecular and Cell Biology and is a board-certified toxicologist. She works as a Principal Scientist with a global consumer product company, where she has been employed for six years. Chastain loves her job, and she loves working in the consumer toxicology space, specifically with respect to applying new and emerging technologies to issues impacting human health.

146. Chastain is a transgender woman. Her sex assigned at birth was male, but she has a female gender identity.

147. She was diagnosed with gender dysphoria in 2015.

148.    Chastain has lived as a female in all aspects of her life since 2015.  Since then, she has been known only as a female to her family, to her workplace, and in her community.  Chastain legally changed her name to "Chastain" in September of 2016 via court order in Louisiana.

149.    When Chastain interacts with others, they perceive her as a female.  This is not only affirming for her, it keeps her safe.

150.    As Chastain's career has progressed, she now needs to travel internationally for work with increasing frequency.  She has a work conference in France in October that is sponsored by CORESTA, an organization whose mission is to promote and facilitate international cooperation and best practices in scientific research related to tobacco.  It is important for Chastain's career and for her company that she attend this conference, as she has the requisite subject matter expertise to represent her company globally among scientists in her field of work.

151.    Chastain was able to update her Virginia driver's license in 2019 to an accurate, female sex designation, but her passport has a male sex designation.  She sent her passport in for expedited processing on December 27, 2024 to a passport agency in Philadelphia to receive an accurate, female sex designation.

152.    Having a female sex designation on her driver's license has been very important to Chastain, as it has resulted in her rarely being misgendered when presenting her driver's license, which ensures her safety as she navigates local and domestic travel.  Before having an accurate driver's license, she would face issues carrying out everyday tasks.  For example, providing a driver's license with an inaccurate sex designation has outed Chastain as transgender when trying to attend concerts, order drinks, open a bank account, and lease an apartment.

153.    Chastain is terrified that having an inaccurate sex designation on her passport will place her in uncomfortable and unsafe circumstances.  Her fears are justified: in 2017, prior to updating her driver's license to her accurate sex designation, she had a harrowing experience going through a TSA security checkpoint at the Richmond Airport.  Two agents isolated Chastain in a holding area, where she was left alone for thirty minutes, until a manager entered and conducted a

32

strip search of her body.  She believes that this was a direct result of the perception that her outward appearance did not match the sex designation on her license.

154.    Chastain has reached a stage in her career that requires her to travel internationally more frequently, and traveling with an inaccurate passport is not a viable option for her.  Chastain is suffering from anxiety knowing that a document that is supposed to help identify her will now not only make it harder to identify her, but will also likely put her safety at risk when she uses it, both abroad and during her return to the United States.

155.    Chastain is further concerned that having an inaccurate passport will lead to confusion and increased processing times when traveling internationally, and may result in missed calls, meetings, or flights, and in lost opportunities, creating a financial burden.  She is also disheartened that she will potentially lose out on advancement potential at her company given the fact that her cisgender colleagues will be able to attend important international meetings and conferences that she cannot.

### 5.    Drew Hall

156.    Drew Hall is twenty-five years old and use the pronouns "they" and "them."

157.    Drew is currently a Ph.D. candidate in Botany at the University of British Columbia ("UBC") in Vancouver, British Columbia in Canada.  Drew is a United States citizen who has lived in Vancouver since August 2022 when their program began, and they will live there until approximately 2027–2028 when their program concludes.  In addition to studying at UBC, Drew works as a Research Assistant and Teaching Assistant at their university.

158.    Drew's sex assigned at birth was male, but they do not have a male gender identity.

159.    Drew was diagnosed with gender dysphoria in August of 2024.

160.    Drew identifies as a nonbinary femme person, which means that even though their sex assigned at birth was male, they do not live as or identify as a man and instead express themselves in a feminine manner.

161.    Drew has lived as a nonbinary person in all aspects of their life since 2024, and they have known that their gender identity was different than their sex assigned at birth since 2022.

Drew is known as a nonbinary person to their family, to their classmates and professors, and in their community. Drew finally feels like themself and that those around them see them for who they are.

162. Drew is frequently required to travel internationally because they have been studying and living full time in Canada for over two years and will be in Canada for several more years. Drew's family lives in Wisconsin, and Drew travels back to the United States at least four to five times a year. Two to three of those visits are typically to see their family in Wisconsin, and the other visits are to see close friends in Washington and Oregon, given their proximity to those two states. Most pressingly, Drew needs to travel to Wisconsin for a family wedding in May and for a botany conference in July.

163. Drew legally changed their name by court order in Wisconsin in December 2024, and has updated their sex designation with the Social Security Administration and on their driver's license, which now both accurately reflect the name "Drew" and an "F" for their sex designation. Drew's birth certificate has an updated name but not an updated sex designation because Wisconsin requires proof of surgical sex change procedure, which Drew cannot provide at this time.

164. When Drew interacts with government officials, they do not perceive Drew as a man. Instead, Drew is perceived as a femme person. This is not only affirming for Drew, it keeps them safe.

165. Drew's United States passport (which is their only passport) still reflects an inaccurate name and a male sex designation. On January 9, 2025, Drew mailed their passport to the State Department's national processing center and requested an updated female sex designation and name change on their passport. Drew was notified by email that their passport arrived at the center on January 17. After the Complaint was filed in this case, Drew received an email from the State Department on February 11 stating that their application for a passport was approved and that they should receive the passport in the mail around February 17, 2025. On February 19, they received their renewed passport with an inaccurate "M" marker, along with a letter stating that the State Department had changed the gender marker on their passport.

166.     Drew relies on their passport frequently to travel back to the U.S. to see their family and friends.  There are also many other reasons Drew uses their passport while living in Canada. To open a bank account in Vancouver, Drew is required to present their U.S. passport.  Drew's employer (UBC) requires Drew's passport for their employment at the university.  Any time Drew interacts with the Canadian government, they need to present their U.S. passport, as it is the only form of identification that Canada recognizes for non-citizens and non-permanent residents. Without their passport, Drew is facing many struggles residing in Canada.

167.     Drew is deeply concerned that continuing to have a male sex designation on their passport will lead to negative and invasive interactions with border agents and TSA employees as a result of the increased hostility in the United States and elsewhere toward gender-nonconforming people like Drew—hostility that the Executive Order and Passport Policy embrace and cause. Given that their other identity documents have been updated, Drew is also worried that continuing to carry a passport with a name and sex designation that does not match their other identity documents will lead to even more confusion and distress each time they must present their passport.  Additionally, continuing to have non-matching documents may present other challenges for Drew, including with respect to their temporary status documents in Canada, and when they visit places where multiple forms of identification are required.  Drew's most recent encounters with border agents underscore these fears: border agents have regarded Drew with more suspicion due to their gender nonconformity.

168.     If Drew were to have to continue to carry a passport with a male sex designation, they are afraid that they will encounter additional, invasive scrutiny and harassment every time they use it, including because hostility toward gender nonconforming people like Drew has increased and continues to grow.  Drew is not perceived as a man given their feminine expression, and they would not feel safe traveling in the future, especially internationally, with documentation that inaccurately indicates a male sex designation.  Given how they express their identity and the way they are perceived by other people, continuing to have a male sex designation on their passport will indicate to any person who looks at Drew's passport that they are transgender.  This causes

Drew significant anxiety, especially because of the recent increase in anti-transgender rhetoric and violence in the United States and elsewhere.

169.    Drew feels alienated knowing that the U.S. government refuses to recognize them for who they are.  Having a passport that does not match who they are makes them afraid to return to the United States, knowing that they will receive suspicious looks when they present their passport solely based on the fact that they are nonbinary and do not live in accordance with their sex assigned at birth. Drew is devastated that their country has implemented a policy that interferes with their ability to have an accurate and usable passport.

      6.    <u>Bella Boe</u>

170.    Bella Boe has lived in Cambridge since 2024, when she moved from New Jersey. Bella is 19 years old and uses the pronouns "she" or "her."

171.    Bella is a freshman in college studying government.

172.    She is a transgender woman.

173.    She was diagnosed with gender dysphoria in 2017.

174.    Bella has lived as female in all aspects of her life since she was 11 years old. Today, she feels fully herself.  Bella is currently known only as female to her family, to staff and peers at her school, and in her communities in New Jersey and Cambridge.

175.    Bella is active on campus.  She is passionate about theater and the arts, and her school offers many opportunities for her to participate in international programs and theater productions.  Bella is currently the stage manager for her theater group at school, which means she manages and runs productions.  Bella loves being a stage manager because it provides her with an opportunity to build leadership skills and it allows her to be fully immersed in an art that she has loved and engaged in since she was six years old.  Bella's theater group travels around the world to put on shows for a range of audiences.  For example, her theater group had a production in Bermuda the week of March 16, 2025.  She was eager to go on that trip to manage that production, and  would have attended had she been able to obtain a new passport with an "F" sex designation.

176.    Bella similarly hopes to study abroad while obtaining her undergraduate degree, and she plans on doing so in England.

177.    Bella is only able to partake in these opportunities when she has travel documents, like her passport, that accurately reflect who she is.  That safety allows her to fulfill her educational dreams and goals.

178.    When Bella travels and interacts with government officials, they perceive her as a female.  This is not only affirming for Bella, it keeps her safe.

179.    The passport that Bella received in 2021, had a female sex designation.  Having a female sex designation on her passport afforded her safety and comfort when traveling.  She sent her passport in for renewal on January 23, 2025, to ensure that her current passport would remain usable for as long as possible.  On February 26, 2025, she received a new passport with an "M" sex designation.  Under the new Passport Policy, Bella no longer has the safety afforded to her by a female designation on her passport.

180.    Bella feels very uncomfortable traveling with a passport that inaccurately reflects a male sex designation.  Not only does it erase who she is, it will be confusing for government officials who would otherwise identify her as female based on her gender expression and invite additional, stressful scrutiny.  Bella does not want her passport to out her as transgender every time she uses it, especially when traveling outside of the United States in countries that are not accepting of transgender people.

181.    Without an accurate passport, Bella will be forced to miss out on many educational opportunities that her cisgender peers are afforded, including opportunities that would advance her own passions, education, and future career.  Without an accurate passport, Bella will not be able to leave the United States without anxiety and fear for her safety.

7.    Reid Solomon-Lane

182.    Reid Solomon-Lane is thirty-seven years old and uses the pronouns "he" and "him."  He has lived in Massachusetts since July of 2022, when he moved there from Austin, Texas.  Reid lives in North Adams with his wife and three young children.

37

183.    Reid was a flight attendant for more than eight years and now serves as a senior flight coordinator for a volunteer pilot organization.

184.    Reid is a transgender man.  His sex assigned at birth was female, but he has a male gender identity.

185.    Reid was diagnosed with gender dysphoria in 2007.

186.    Reid has lived as a man in all aspects of his life since 2007.  Since then, he has been known only as male to his family, his workplace, and in his community in Massachusetts, and he is perceived only as male by people who see him.  This allows Reid to feel safe in interactions with new people and prevents him from having to come out as transgender with each encounter.

187.    This safety is especially essential for Reid while he is traveling.

188.    Reid is frequently required to travel internationally because his mother-in-law purchased a home in Ireland three years ago and spends a lot of her time there.  Reid and his family travel to Ireland so that Reid's mother-in-law can see her grandchildren.  Reid also visited Montreal in 2022 and has plans to return to Montreal with friends in the next year given that he and his family are just across the border from Canada.

189.    Reid legally changed his name in 2007 via court order in Texas.  His name and sex designation have been updated with the Social Security Administration and on his driver's license, which now both accurately reflect his name and his being male.

190.    Reid's United States passport also reflects an accurate name and male sex designation and expires in 2028.  Having an accurate passport provides Reid comfort, especially when traveling with three young children outside of the United States.  If Reid did not have a passport that reflects who he is, it would dramatically impact the way he travels.  Reid would be less secure leaving the country with his children, as having a sex designation that so flagrantly does not match his outward gender expression would potentially put him and his children at risk. Because Reid's passport serves as an identity and citizenship document that accurately reflects his gender identity and presentation. He uses it for dentification and citizenship verification.

Removing access to an accurate passport will cause Reid repeated stress and risk serious problems from it outing himself in routine interactions.

191.    Reid is very nervous about traveling with his passport because if it is stolen or lost and he has to replace it, the Passport Policy would require the State Department to issue him a new, inaccurate passport with a female sex designation.  Because of that risk, he wants to apply for a passport card instead of seeking a new passport book at this time so that he can carry proof of citizenship on his person when he travels, while keeping his passport book safely at home or at a hotel so that it is not at risk of being stolen or lost and needing replacement.  A passport card is a smaller, plastic passport that is proof of U.S. citizenship and identity and has the same length of validity as the passport book but is not valid for all international travel by air.  Reid is unwilling to submit an application for a passport card at this time given that it would likely be returned to him with a female sex designation under the Passport Policy and related Executive Order 14168.  Reid thought he was at the point in his life where he could live his life with safety and dignity, as an adult, as a husband, and as a parent.  If his passport were to reflect a sex designation that is inconsistent with who he is, that safety and dignity will be taken away from him.

8.    Viktor Agatha

192.    Viktor Agatha is a twenty-three-year-old United States citizen and resident of Dallas, Texas. Viktor has lived in the Dallas area since 2009, when he moved there from Japan where his mom was stationed while serving in the U.S. Navy.  Viktor was born in Virginia.

193.    Viktor is a college student studying social work.  He also works as a sales associate and personal shopper.

194.    Viktor is a transgender man, intersex, and comfortable being referred to by many pronouns.

195.    He was assigned female at birth based on his doctor's examination of his external genitalia at birth, but he has a male gender identity.

196.    Viktor's parents told him that they were under the impression that he would be born a boy because his mother's ultrasound scans while pregnant with him showed the presence of what

was thought to be a phallus.  But given that he was assigned a female sex at birth by the treating physician, he was raised as female by his family until he was 13 years old.

197.    Viktor discovered his intersex condition when he began puberty around the age of ten.  As he entered puberty, he began developing masculine sex traits that were inconsistent with the female sex he had been assigned at birth.  Viktor began developing an Adam's apple and pronounced body hair. When he turned eleven, he realized that his body did not look like the images of men or women in his biology textbooks at school, and that his genitalia was more ambiguous than anything he saw in his science books.

198.    In 2014, when Viktor turned thirteen, he came out as male. He and his family sought out a medical provider who could help them better understand Viktor's pubertal development. After running several blood tests, the doctor informed Viktor that he had very high levels of testosterone and diagnosed him with hormonal imbalance.

199.    Viktor has openly lived as male since 2015. His family and community are aware of his intersex condition.

200.    Viktor is also transgender.  He was diagnosed with gender dysphoria in 2019, when he turned eighteen years old.

201.    A court granted Viktor a legal name change in August of 2023, and he updated his Texas state ID card in 2023 to reflect an "M" sex designation, which is consistent with who he is. Having this accurate identification allows Viktor to navigate daily interactions with greater safety and ease. Viktor also took steps in 2023 to update his records with the Social Security Administration to reflect his court-ordered legal name change and male sex designation.  Viktor's Virginia birth certificate is in the process of being updated.

202.    Viktor's previous passport, with a female sex designation, expired in 2010.  From the time his passport expired until now, Viktor did not need to travel internationally.

203.    His imminent travel needs stem from the fact that his sister was recently stationed in Italy as a part of her deployment with the U.S. Navy, and she will live there for the next two

years.  Viktor wants to visit his sister in Italy with his mother in the next year, and he will need a valid and usable passport to do so.

204.    Under the State Department's current policy, it is Viktor's understanding that he will be unable to get a new passport with an "M" sex designation that accurately reflects who he is.

205.    Viktor is also uncertain as to whether he would be considered male or female—or both or neither—under the definition of the terms "male" and "female" in Executive Order 14168 or the State Department's current policy.  Based on the information reflected on his original birth certificate, he believes that any renewal request that he submits will result in him receiving a passport with an inaccurate "F" sex designation.

206.    Traveling with a passport with an "F" sex designation is not an option for Viktor. Such a passport would likely out him as transgender and/or intersex at every use and could potentially lead him to unsafe situations when he travels, including when traveling abroad to countries that are hostile towards transgender and intersex individuals.

207.    Viktor is deeply disappointed that this policy and Executive Order attempt to erase who he is and prevent him from obtaining a usable passport to see his family abroad.

9.    David Doe

208.    David Doe is a forty-one-year-old United States citizen and resident of Van Nuys, California.  David uses "he" and "him" pronouns.

209.    David lives in Van Nuys with his husband and child.  David has lived in the Los Angeles area since 2011, when he moved there from New York.

210.    David is a lawyer and has worked in entertainment law for about six years.  His work involves managing labor relations for film and television productions, including productions in Canada, Mexico, Latin America, and Australia.

211.    David is a transgender man.  His sex assigned at birth was female, but he has a male gender identity and has lived as a man since 2014.

212.    In 2014, when David first realized that his gender identity did not match his sex assigned at birth, he sought out a healthcare provider to address his dysphoria and began receiving medical care shortly after.

213.    To live as and be recognized as a man, David took steps to update his identity documents to reflect both his legal name change and male gender identity.

214.    David changed his sex designation to male in 2015 with both the Social Security Administration and on his California driver's license.   In 2016, he updated his passport to accurately reflect an "M" sex designation.  He was born in Texas, a state that does not permit him to change his birth certificate, so that document remains inaccurate.

215.    David travels for work as he manages productions abroad.  In January 2025, he traveled to Vancouver, Canada for his work, and he anticipates potentially needing to travel to Ontario, Canada this year as well.

216.    David also travels internationally with his family.  Both he and his spouse have friends and family abroad. Most imminently, he and his family anticipate needing to travel to Scotland for a family wedding in the summer of 2026.

217.    Having a male sex designation on his passport and other identity documents is integral to David's ability to move through the world safely and without distress.

218.    However, that safety is no longer afforded to him.  His previous passport with an "M" sex designation was set to expire in February 2026.  David submitted an online application to renew his passport in February of 2025, and on March 21, he received his renewed passport back, but with an "F" sex designation.

219.    On approximately April 17, 2025, David received a letter stating that the "sex" was changed on his passport "to match [his] biological sex at birth."

220.    David will not travel to the wedding in Scotland with a passport that reflects an "F" sex designation.

221.    David is worried as international travel for work is part of his job but is potentially dangerous and harmful to his physical and emotional well-being, putting him in an impossible situation.

222.    He is anxious about traveling abroad with a passport with an "F" sex designation that outs him as transgender at every use and could put him at risk of being attacked or singled out by someone who holds prejudices against transgender people.

223.    Before David was able to update his driver's license (when it still displayed his birth name and sex), he would experience problems while carrying out even the simplest of tasks, such as purchasing wine at the grocery store or going to an R-rated movie when he was younger. People often accused him of presenting a fake ID when they saw an "F" sex designation on an identity document.

224.    Since updating his identity documents, David has been able to avoid a lot of these problems.  Now, with inconsistent documentation once again, he is terrified that he will be subjected to similar accusations of fraud when traveling abroad or be at increased risk of discrimination and violence.

10.    AC Goldberg

225.    AC Goldberg is a forty-five-year-old United States citizen living in Cambridge, Massachusetts.

226.    AC lives with his wife and two children.  He is a professor of speech pathology at a university in Massachusetts.  AC has been teaching since 2022.  He is also a practicing speech/language pathologist and has been practicing since 2004.

227.    AC is a transgender man.  AC was assigned female at birth based on a physician's external evaluation of his genitalia but has a male gender identity and has lived as a male since 2002.  AC first sought out a provider to address his gender dysphoria in 2002 and was diagnosed soon thereafter.  Almost a decade later, in 2012, AC discovered that he is also intersex.  AC had always felt uncomfortable in his body, like there was an inconsistency between his genitalia and how he knew himself to be, but he did not know the cause of this discomfort.  In the summer of

2012, AC received a call from a genetic counselor who told him that he has Congenital Adrenal Hyperplasia ("CAH"), which is a condition that can cause hormone imbalances and genital abnormalities. At first when AC received this call, he was shocked and confused. He did not know much about being intersex, so he was quick to seek out community and arrange meetings with other intersex individuals who could provide him with support as he navigated this new medical information.

228.    It was also important to AC to have a conversation with his parents about what they were told when he was born with respect to his sex and genetic composition. AC's parents told him that, at birth, the doctors told them that he was born with "deformities," and that certain procedures had been conducted on him as an infant. AC's parents, however, were never told what those procedures were, and they did not have an opportunity to consent to those procedures on his behalf.

229.    AC's discomfort with certain aspects of his physical body persisted long after the call from the genetic counselor in 2012. In May 2024, after experiencing severe physical discomfort and menstrual bleeding, AC sought out a provider and underwent a procedure to remove his uterus. In the process of conducting the hysterectomy, AC's provider discovered that he had some kind of cyst, later identified as an ovotestis, and removed both the ovotestis and his ovary during his hysterectomy while AC was under general anesthesia.

230.    AC has updated all his documentation to reflect a male sex designation, which feels true to who he is and how he lives and presents to the world. In 2016, AC obtained a court-ordered legal name change from a court in Massachusetts and updated his New Jersey birth certificate to reflect his name and male sex designation. That same year, AC updated his Massachusetts' driver's license and his records with the Social Security Administration to reflect his name and male sex designation.

231.    In 2017, AC updated his passport to reflect an "M" sex designation. That passport is currently in his possession and expires in January 2027.

232.    AC is a frequent traveler.  He typically travels abroad about three to five times a year for work and recreation.  AC also travels domestically one to two times a month for work, and he uses his passport as his primary method of identifying himself for all travel.

233.    This year, AC has canceled several international trips for both work and leisure out of concern about reentering the country as a transgender and intersex person and fear of subjecting himself to potential detainment and invasive scrutiny upon reentry to the United States.  AC has had difficult experiences with TSA in the past as a transgender and intersex man, including experiences of being sexually assaulted and violated by officers conducting searches on his body.

234.    Having an accurate passport that aligns with who AC is provides him with the ability to travel safely and comfortably with his wife and children, with less fear of experiencing harassment and physical violence when traveling abroad.

235.    AC is terrified about the prospect of losing his current passport or having it stolen and being forced to obtain a new passport under the State Department's current policy, which would contain an inaccurate female sex designation because that is the sex designation on his original birth certificate.

236.    AC has no idea whether he would be considered "male" or "female"—or neither or both—under definition of those terms in Executive Order 14168 or the State Department's current policy because he had the presence of both ovaries and an ovotestis for most of his life.

237.    Traveling with an "F" sex designation on his passport is not an option for AC because it would create safety risks and deeply uncomfortable situations.  To AC, this policy feels like an attempt to erase who he is and dictate how he is perceived by those around him.

238.    Massachusetts has been his home for 18 years, and AC does not want to be forced to move his family to another country to ensure that they are safe and that he is afforded the ability to live as the man, husband, and father that he is.

11.    <u>Ray Gorlin</u>

239.    Ray Gorlin is a thirty-year-old United States citizen residing in Minneapolis, Minnesota. Ray was born in Hopkins, Minnesota, so Minnesota has always been home to them. Ray uses "they" and "them" pronouns.

240.    Ray is a full-time artist, and their work includes drawing caricatures at amusement parks, festivals, conventions, parties, and more.

241.    Ray travels all over the United States for their work and has recently received international work. He was recently invited to tour with Karikaturen Berlin, a German caricature company. Ray hopes to take more international work, including to be part of a caricature convention in Japan, where caricature art is celebrated.

242.    Ray is a nonbinary person. Their sex assigned at birth was female, but they do not identity with a binary sex. The term "nonbinary" accurately captures their gender. Although Ray does not identify with a particular gender, they feel more comfortable in their body with a masculine presentation.

243.    When Ray started college in 2013, they were aware of nonbinary as a gender identity, but felt very self-conscious about self-identifying that way. Ray was afraid of experiencing harassment and drawing unwanted attention and was also afraid of how identifying as nonbinary would impact and be received by the people close to them.

244.    After leaving college, Ray sought out transgender and nonbinary communities, and they were able to find safety and comfort in their identity.

245.    Ray was diagnosed with gender dysphoria in 2019, when they were twenty-five.

246.    Ray has lived openly as a nonbinary person since 2019. Today, they are known only as a nonbinary person to their friends, family, and colleagues.

247.    In July 2022, Ray was able to legally change their name in court. They shortened their birth name to "Ray," a nickname that they have used their whole life.

248.    Ray also updated their Minnesota driver's license with an "X" sex designation in 2022 and their Real ID with an "X" sex designation in 2025 to reflect their nonbinary identity.

They similarly updated their legal name and sex designation with the Social Security Administration in 2022 as well, but because "X" was not an option as a sex designation, they selected "M."

249.    Ray has not used their passport to travel internationally in approximately seven years.  Given that they did not have a reason to travel internationally until recently, Ray did not submit an application to update the sex designation on their passport at the same time as when they updated their other documents.  Their current passport expires in November 2027, and that passport reflects a female sex designation.

250.    Without accurate identification, Ray is terrified of experiencing harassment and heightened scrutiny when they travel.  When Ray was traveling to Florida in March of 2025, they had a mortifying encounter with the Transportation Security Administration due to the discrepancy between the sex designations on their temporary paper Real ID (provided to them by the Minnesota DMV as a placeholder until their Real ID card was ready) and on their passport.  The agent asked that Ray present their passport instead of the paper copy of their Real ID, and when Ray showed the agent their passport, the agent told them "this isn't you."

251.    The agent stated that the passport Ray presented was not theirs because it had an "F" sex designation and an older photo of them.  Ray had to explain that they are nonbinary, that they changed their name to "Ray" in 2022, and that this ID was in fact theirs.  The agent humiliated Ray by having this conversation audibly and openly in front of a large group of people, and sent them to the back of another long line to speak with another security agent, who thankfully understood that Ray is nonbinary and allowed them to proceed through security and make their flight.

252.    Ray is afraid that carrying a passport with an "F" sex designation will continue to subject them to uncomfortable and unsafe travel encounters.

253.    They have worked hard as a caricature artist and have dreamed of working for the best caricature companies nationally and globally.  Those opportunities are finally happening for Ray, and this new passport policy is impeding their ability to achieve their professional aspirations.

254.    The opportunity with Karikaturen Berlin requires Ray to leave for Berlin in July 2025 and stay through August.  Ray is anxious about experiencing harassment when presenting a passport with a female sex designation, which is inconsistent with who they are, upon entry into Berlin and upon re-entering the United States after their stay. During that time in Berlin, Ray may also need their passport to check into their accommodations or potentially travel within Europe. Without a passport that reflects who they are and allows them to travel safely, Ray is terrified that they will be deprived of this opportunity that could take their career to the next level.  Ray is put in the impossible position of choosing between an opportunity that contributes to their livelihood and risking their physical and emotional safety.

255.    Additionally, Ray's family is going through a difficult time right now.  Ray's dad was diagnosed with cancer, and their family wants to take one final international trip together so that they can spend time together before their dad's illness prevents him from traveling.  Without accurate identification, Ray will not be able to join their family on this trip and would lose invaluable time with their ailing father and the rest of their family.

256.    It pains Ray to know that opportunities to travel with their family and further their career are now limited by the sex designation on their passport.

12.    Chelle LeBlanc

257.    Chelle LeBlanc is a twenty-seven-year-old United States citizen and resident of Colorado Springs, Colorado.  Chelle uses "she" and "her" pronouns.

258.    Chelle has lived in Colorado since October of 2024, and moved there from her home state of Mississippi.

259.    Chelle is a lawyer and practices law at a civil litigation firm in Colorado.

260.    Chelle is a transgender woman.  Her sex assigned at birth was male, but her gender identity is female.

261.    She was diagnosed with gender dysphoria in May 2022.

262.    Chelle has lived as a woman in all aspects of her life since March 2022, and she is only known as female to her family, workplace, and community.

263.    In the last few years, she has been able to change her identity documents to reflect a female sex designation that is consistent with her gender identity.  Chelle updated her Mississippi driver's license to reflect a female sex designation in November 2023, and that same month, she updated her name and female sex designation with the Social Security Administration.

264.    In January 2024, Chelle updated her Mississippi birth certificate to reflect her name and that she is female.

265.    Chelle's passport is the only identity document in her possession that does not currently reflect who she is.  Her previous passport that had a male sex designation expired in September 2024.  She submitted an application to renew her passport and update her gender marker on January 19, 2025, requesting that the sex designation also be corrected to female.

266.    After several weeks of processing, her renewed passport was issued on February 12, 2025, and it came back to her with an inaccurate "M" sex designation.

267.    Chelle travels internationally frequently, as she has lived and studied in other countries in the past and has enjoyed her time abroad.  There was a brief hiatus in Chelle's traveling due to time constraints and tight finances during law school, but since graduating last year, she hopes to be able to resume traveling internationally. It is especially important that Chelle be able to travel this year because she has an appointment for medical care in Thailand in August 2025. Chelle has already paid for this medical care, accommodations during her recovery, and plane tickets for her and her partner.

268.    Given the steps that Chelle has taken to align her body with her gender identity, she does not feel safe traveling with a passport with an "M" sex designation, especially to countries that are openly hostile towards transgender people.

269.    Unfortunately, Chelle is no stranger to discrimination, especially having grown up in Mississippi where she experienced frequent harassment based on her identity as a transgender woman.  Having accurate identification affords her safety.  To not have that safety while abroad would dramatically shift the way Chelle approaches travel and whether it is possible for her to travel to certain countries.

270.     Chelle is fearful of traveling with a passport with the wrong sex designation. The idea of re-entering the United States with a passport with the wrong sex marker and that outs her as transgender is causing her immense anxiety.

271.     International travel is likely off the table for Chelle without an accurate passport. She is afraid to risk her physical safety and mental well-being to travel internationally with inaccurate identification.

272.     Chelle is disappointed that her country would take away her right to have identification that is consistent with who she is, and that allows her to feel safe traveling abroad and living domestically as a woman who is transgender.

**CLASS ACTION ALLEGATIONS**

273.     Plaintiffs bring this action for themselves and on behalf of others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2).  Plaintiffs seek certification of the following Classes:

    a.    All people who currently want, or in the future will want, a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy; and

    b.    All people who currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation.

274.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families and (2) Defendants.

275.     The Classes are each so numerous that joinder of all members is impractical.  As alleged above, there are more than 1.6 million transgender people in the United States, more than 1.2 million nonbinary people, and as many as 5.6 million intersex people.  A high percentage of those people need and want to have passports with a sex designation the State Department will refuse to issue them under the Passport Policy.

276.     There are questions of law and fact common to the each Class, including (but not limited to):

a.  Whether the Passport Policy and the Executive Order as applied to passports discriminate on the basis of sex in violation of the Fifth Amendment;

b.  Whether the Passport Policy and the Executive Order as applied to passports discriminates on the basis of transgender status in violation of the Fifth Amendment;

c.  Whether the Passport Policy and the Executive Order as applied to passports are motivated by illegitimate animus;

d.  Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment rights to free movement and travel;

e.  Whether the Passport Policy and the Executive Order as applied to passports infringe the Fifth Amendment right to privacy;

f.  Whether the Passport Policy and the Executive Order as applied to passports infringe the First Amendment right to free speech and expression;

g.  Whether the discrimination perpetuated by the Passport Policy and the Executive Order as applied to passports survives the requisite level of scrutiny, including:

   i.  The legitimacy and strength of the government interests asserted in support of it; and

   ii.  The extent to which it serves, is related to, or is tailored to those interests; and

h.  Whether the Passport Policy is arbitrary, capricious, an abuse of discretion, or otherwise contrary to the APA.

277.    Plaintiffs' claims are typical of the claims of the Class members they represent. Plaintiffs have been harmed by the same Defendants and on the same basis as all members of the Classes they represent, including because Defendants' actions violate Plaintiffs' and the Class members' constitutional rights, are in violation of law, and are arbitrary and capricious and

otherwise in violation of the APA. Plaintiffs seek the same relief as all Class members they represent.

278.    Plaintiffs will fairly and adequately protect the interests of the Classes they represent and have retained counsel competent and experienced in similar litigation, including class actions. Plaintiffs are committed to the vigorous prosecution of this suit and have no interests that are adverse to the Classes. Plaintiffs are represented by experienced counsel from the American Civil Liberties Union Foundation, the ACLU Foundation of Massachusetts, and the law firm of Covington & Burling LLP. The attorneys affiliated with the above law firm and organizations, and who are appearing in this matter, have extensive experience in complex constitutional litigation and class action litigation. They also have extensive experience representing transgender litigants. Plaintiffs' counsel intends to describe their credentials more fully in any forthcoming motion for class certification.

279.    Defendants have acted or refused to act on grounds that apply generally to the Classes, and final injunctive or declaratory relief is appropriate for the Classes as a whole. The Passport Policy and the Executive Order as applied to passports apply to every member of the Classes and cause the same injuries. Defendants' refusal to provide Plaintiffs and members of the Classes with accurate sex designations on their passports—as a result of Defendants' views on the meaning of sex and animus toward transgender, intersex, and nonbinary people—applies to both Classes. Injunctive or declaratory relief holding that the Passport Policy and the Executive Order as applied to passports are unconstitutional and unlawful and that the Passport policy violates the APA would benefit each Class in the same way and remedy the same injuries as to each Class.

280.    All Class members have been injured by Defendants' conduct and will continue to be injured by Defendants' conduct going forward unless declaratory or injunctive relief prevents that continued and future injury.

## CLAIMS

### FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)
### All Defendants

281.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

282.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause includes a guarantee against the United States of equal protection of the laws equivalent to that guaranteed against the States by the Equal Protection Clause of the Fourteenth Amendment.

283.    The Passport Policy and the Executive Order as applied to passports violate the Fifth Amendment's equal protection guarantee in at least two distinct ways and do so both facially and as applied. Defendants' actions have harmed Plaintiffs and the putative Class members by depriving them of the equal protection of the laws and will continue to deprive Plaintiffs and the putative Class members of that constitutional protection unless Defendants are permanently enjoined and their unlawful actions set aside.

**Discrimination Based on Sex**

284.    The Passport Policy and the Executive Order as applied to passports draw a facial sex-based classification; that cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

285.    The Passport Policy and the Executive Order as applied to passports define "female" as a "person belonging, at conception, to the sex that produces the large reproductive cell" and "male" as a "person belonging, at conception, to the sex that produces the small reproductive cell," and then restricts sex designations on passports to those definitions of "male" and "female." That is a sex classification.

286.    If, for example, Plaintiff Perysian, who lives and expresses herself as a woman, and has a female gender identity, were a "person belonging, at conception, to the sex that produces the

large reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide her a female sex designation on her passport. But because Plaintiff Perysian is a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports force her to have a male sex designation on her passport. Or if Plaintiff Solomon-Lane, who lives and expresses himself as a man, and has a male gender identity, were a "person belonging, at conception, to the sex that produces the small reproductive cell," the Passport Policy and the Executive Order as applied to passports would provide him a male sex designation on his passport. But because Plaintiff Solomon-Lane is a "person belonging, at conception, to the sex that produces the large reproductive cell," the Passport Policy and the Executive Order as applied to passports prohibit that.

287. By issuing passports with a female sex designation to women who meet the Executive Order's definition of female but denying it to women who do not, and by issuing passports with a male sex designation to men who meet the Executive Order's definition of male but denying it to men who do not, the Passport Policy and the Executive Order as applied to passports facially classify based on sex.

288. The Passport Policy and the Executive Order also classify on the basis of sex in its treatment of nonbinary and intersex people who desire an "X" sex designation on their passport. Rather than allowing them to obtain a sex designation that accords with how they live their lives and express themselves, or allowing them to obtain an unspecified sex designation, the Passport Policy and the Executive Order as applied to passports require that intersex and nonbinary people's sex designations conform to the Executive Order's definition of female or male. This facially enforces the government's binary and specific sex designations—that is, that a person the Executive Order defines as male must have a passport that labels that person as a man and a person the Executive Order defines as female must have a passport that labels that person as a woman regardless of how they live and express themselves.

289.    The Executive Order and Passport Policy were implemented in part because of, and not simply in spite of, their adverse effects on the ability of people to depart from overbroad expectations about sex. That, too, warrants heightened scrutiny as a sex classification.

290.    Defendants cannot justify the sex classification utilized by the Passport Policy and the Executive Order as applied to passports under the requisite heightened scrutiny or any level of equal protection scrutiny.  The Passports Policy's sex classification is not substantially related to an important government purpose.  Reversing the previous policy permitting Americans to passport sex designations that are consistent with the sex they live and express and replacing it with a policy that requires sex designations on passports that are not consistent with Americans' identities or expression does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

291.    In addition, the Passport Policy and the Executive Order as applied to passports are impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex, including that it is entirely determined by the definitions of male and female utilized by the Passport Policy and mandated by provided in the Executive Order, and their insistence that sex can only be a binary characteristic (*i.e.*, either male or female) notwithstanding that for some people it is not exclusively one or the other.  Under the Passport Policy and the Executive Order as applied to passports, Plaintiffs and the putative Class members are precluded from obtaining passports that they may use without violation of their rights and risking serious harms due to the assumption, expectation, stereotype, and norm that a person defined by the Passport Policy and the Executive Order as male must live and present as male, and a person so defined female must live and present as female.  Plaintiffs and the putative Class members do not adhere to that assumption, expectation, stereotype, and norm, and the Executive Order denies them usable passports entirely on that basis. If Plaintiffs and the putative Class members belonged, at conception, to the sex that produces a different size reproductive cell and adhered to the assumption, expectation, stereotype, and norm of such a sex, the Executive Order would permit Plaintiffs and the putative Class members to obtain a useable passport.

**Discrimination Based on Transgender Status**

292.    The Passport Policy and the Executive Order as applied to passports also classify citizens based on transgender status, and that classification cannot be justified under the requisite heightened scrutiny or under any standard of constitutional review.

293.    On its face, the Passport Policy and the Executive Order as applied to passports classify based on transgender status.

294.    The Passport Policy and the Executive Order as applied to passports deny transgender people, but not cisgender people, a passport that they can use without disclosing sensitive personal information about their transgender status and risking discrimination, harassment, and violence solely because they are transgender.  The Passport Policy and the Executive Order as applied to passports therefore facially treat people differently on the basis of being transgender.

295.    Even if the Passport Policy and the Executive Order did not facially classify based on transgender status, they were implemented in part because of, and not simply in spite of, their adverse effects on transgender people.

296.    Classifications based on transgender status independently warrant heightened scrutiny.

297.    Transgender individuals as a group possess all the indicia of a suspect or quasi-suspect class that have been identified by the Supreme Court as requiring courts to apply heightened scrutiny.  Transgender people have obvious, immutable, or distinguishing characteristics that define that class as a discrete group and these characteristics bear no relation to transgender people's abilities to perform in or contribute to society.  Transgender people have historically been subject to discrimination across the country and remain a small minority of the American population that lacks the political power to protect itself through the political process.  Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person should not be required to abandon it as a condition of equal treatment.

298.    Limiting a person's passport to whether they belonged at conception to a sex that produces a particular size reproductive cell does not substantially advance an important governmental interest.

299.    Further, the Passport Policy and the Executive Order as applied to passports fail any level of equal protection scrutiny because they were motivated by animus against transgender people, as illustrated both by the statements of animus described in this Complaint and by the text of the Executive Order itself.  As explained, President Trump and members of his Administration have repeatedly made derogatory and extreme comments about transgender people, including linking them as a class to violence and sexual predation.  The Executive Order itself wrongly states that those who identify as transgender are "ideologues who deny the biological reality of sex [and] have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  Executive Order § 1.  It repeatedly links being transgender with seeking to harm women.  *See id.*  There is no empirical support for these assertions, and they are deeply offensive to and dehumanizing of hundreds of thousands of transgender Americans who exist in every part of this country.

## SECOND CAUSE OF ACTION
### (Fifth Amendment – Right to Travel)
### All Defendants

300.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

301.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include fundamental rights to free movement and travel, including travel abroad.

302.    The Executive Order infringes the constitutional rights of Plaintiffs and the putative Class members to free movement and travel, both facially and as applied.  Defendants' actions

have harmed Plaintiffs and the putative Class members by violating their constitutional right to travel and will continue to violate that right unless the Defendants are permanently enjoined and their unlawful actions set aside.

303.    Federal law generally prohibits U.S. citizens from traveling out of or into the country without a valid U.S. passport. *See* 8 U.S.C. § 1185(b). Foreign countries likewise generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport. As explained in this Complaint, and incorporated here, when traveling abroad, U.S. passports are necessary or practically necessary for numerous purposes and are often the only form of identification carried by a U.S. citizen that will be recognized or acknowledged by foreign authorities or private citizens abroad.

304.    The Passport Policy and the Executive Order as applied to passports infringe the fundamental right of the Plaintiffs and the putative Class members to free movement and travel.

305.    The Passport Policy and Executive Order as applied to passports will entirely prevent certain transgender, nonbinary, and intersex individuals from leaving or returning to the United States because their gender identity is different from that specified by the Executive Order.

306.    The Passport Policy and the Executive Order as applied to passports force Plaintiffs and the putative Class members to either not receive a passport or to receive a passport that puts them at risk of harassment, discrimination, violence, and—in travel to some countries—arrest and imprisonment. The Executive Order thereby gives Plaintiffs and the putative Class members a Hobson's choice: accept a passport that poses these extreme risks on the one hand or be denied any form of international travel or admittance back into the United States from foreign travel on the other.

307.    Many transgender, nonbinary, and intersex individuals present to the world consistent with their gender identity, rather than their sex as identified under the Executive Order's definitions of male and female. For such individuals, government authorities in the U.S. and around the world may question whether a person's passport is authentic or accurate due to the mismatch between the sex they present as and the sex designation on their passport. For example,

if someone is a transgender woman and presents as a woman but, under the Executive Order, is forced to select "M" on her passport because she is defined by the Passport Policy and the Executive Order as male, government authorities may question whether the passport is authentic and/or whether the holder is entitled to use it. Foreign authorities who question whether a passport is authentic can create substantial difficulties or even dangerous treatment for transgender, intersex, and nonbinary Americans when traveling—including confiscation of the passport and detention, as well as arrest and imprisonment in countries where it is illegal to be transgender. Accordingly, the Passport Policy and Executive Order can directly and foreseeably result in substantial barriers to the exercise of the fundamental rights of Plaintiffs and the putative Class members to free movement and travel.

308.    Reversing the previous policy permitting Americans to obtain sex designations on passports that align with the sex they know themselves to be and present as and replacing it with a policy that requires sex designations on passports that do not do so does not rationally advance any legitimate government interest—let alone substantially advance an important governmental objective.

## THIRD CAUSE OF ACTION
### (Fifth Amendment – Privacy)
### All Defendants

309.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

310.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," and the Supreme Court has held that the liberties protected by this Due Process Clause include avoiding forced disclosure of private and intimate information.

311.    Both facially and as applied, the Passport Policy and the Executive Order as applied to passports infringe the constitutional liberty interests of Plaintiffs and the putative Class members, including the right to maintain intimate information as private. Defendants' actions have

harmed Plaintiffs and the putative Class members by violating their constitutional rights and will continue to violate the rights of Plaintiffs and putative Class members unless the Defendants are permanently enjoined and their unlawful actions set aside.

312.    For transgender, nonbinary, and some intersex people, whether "at conception" they "belong[ed] to" "the sex that produces the large reproductive cell" or "the small reproductive cell" is highly sensitive and personal medical information.

313.    Requiring transgender, nonbinary, and intersex people to be identified as "male" or "female" on their passports, when that is not the sex they live and express, reveals private, intimate, and sensitive information about them to others without their consent, and is deeply invasive.  Such forced disclosure of a person's transgender, nonbinary, or intersex status can put their safety at risk, given that transgender, nonbinary, and intersex people are often subject to violence, harassment, and mistreatment on the basis of not being cisgender or identifying in binary terms.

314.    Under the Passport Policy and Executive Order as applied to passports, Plaintiffs and the putative Class members are required to display their sex as determined by the Executive Order, when that does not match their gender identity or gender presentation.  As a result, the Passport Policy and Executive Order as applied to passports force disclosure of Plaintiffs' and the putative Class members' transgender, nonbinary, or intersex status against their will, thereby revealing private, intimate, and sensitive information and potentially inviting violence, harassment, and mistreatment.  By contrast, providing them "M" or "F" to align with their gender identity, or providing an "X," does not reveal this private and sensitive information.

315.    Because the Executive Order infringes a fundamental right, it is subject to strict scrutiny.  It fails that scrutiny because it is not narrowly tailored to advance a compelling government interest. It also does not even rationally advance any legitimate government objective. The conclusory government interests identified in the text of the Executive Order are inaccurate and motivated by animus.  In addition, denying transgender, nonbinary, and intersex people accurate passport sex designations is not rationally related to achieving even the illegitimate interests identified by the Executive Order.

## FOURTH CAUSE OF ACTION
### (First Amendment)
### All Defendants

316.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

317.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."

318.    The Passport Policy and the Executive Order as applied to passports violate the First Amendment rights of Plaintiffs and the putative Class members to free speech and expression.

319.    Under the First Amendment, the government cannot require a person to convey a controversial, ideologically-infused message with which they disagree.  The Passport Policy and the Executive Order as applied to passports force transgender people and individuals who do not identify as male or female to either (a) forgo having a passport or (b) express the government's counter-factual and ideologically-infused message that their sex is what the Executive Order defines it to be each time they apply for or use a passport with the definition of sex mandated by the Passport Policy and the Executive Order as applied to passports—a message with which they strongly disagree.

320.    The Passport Policy and the Executive Order as applied to passports therefore impermissibly require compelled speech.

321.    Underscoring that this is compelled speech, many people would reasonably fear that the Passport Policy raises the possibility that the Administration may seek to prosecute them for perjury if they fill out the sex designation field on the State Departments' passport application accurately, instead of following the Administration's factually incorrect definition of sex.[33]

322.    Even if the sex designation on a passport were considered government speech, the fact that the government forces the passport bearer to communicate the government's message every time they travel internationally, on all other occasions when passports must be used, or any

---

[33] For the avoidance of doubt, Plaintiffs do not agree that any such prosecution would be factually or legally appropriate.

other time when they are used, violates their First Amendment rights by forcing them to participate in the dissemination of an ideological message with which they do not agree. A passport is an item that is readily associated with an individual, and the government cannot use it to force someone to convey the government's ideologically-infused speech with which they disagree.

323.    Because the Passport Policy and the Executive Order as applied to passports force individuals to communicate an ideological message with which they disagree, they are subject to strict scrutiny. The Passport Policy and the Executive Order as applied to passports engage in this infringement of a First Amendment right without any meaningful justification, let alone the compelling government interest that the Constitution requires. They also are not narrowly tailored to achieve any such interest. Even if a lower level of heightened scrutiny applied, the Passport Policy and the Executive Order as applied to passports would fail because they lack an important governmental objective, and the means the Defendants employ are not substantially related to achieving any legitimate and sufficient objective.

**FIFTH CAUSE OF ACTION**
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Contrary to Constitutional Right, Power, Privilege or Immunity)**
**Agency Defendants**

324.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

325.    The APA, 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ."  5 U.S.C. § 706(2).

326.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the

62

Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

327.    For the reasons described in the preceding claims, and incorporated here, the Passport Policy and any agency actions taken under the Executive Order are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and therefore must be held unlawful and set aside. In particular, as described above, those actions violate the Due Process Clause of the Fifth Amendment for multiple independent reasons and violate the First Amendment.

**SIXTH CAUSE OF ACTION**
**(Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., 706 – Arbitrary, Capricious, and Abuse of Discretion)**
**Agency Defendants**

328.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

329.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2).

330.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order. The Secretary of State and State Department's Passport Policy and implementation of the Executive Order

63

constitute a final agency action under the APA. As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment. Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department. For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration. The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

331.    Agency actions taken under the Executive Order are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), for multiple independent reasons.

332.    The challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are irrational and unreasonable:

      a.    The classifications imposed by the Passport Policy (as mandated in the Executive Order) are not based on scientific or medical knowledge or evidence. To the contrary, they contradict current scientific and medical understandings and are based on an animus-laden view of sex, gender identity, and being transgender, nonbinary, or intersex, that is divorced from reality. Even though medical and scientific evidence—and the lives of millions of people—attests to the existence of transgender, nonbinary, and intersex people, the Passport Policy and Executive Order sweep that evidence aside in favor of empty rhetoric unmoored from facts.

      b.    The Passport Policy (per the Executive Order) also defines "male" and "female" as a person who "at conception" "belong[s]" to the sex that produces the large

or small reproductive cell—but, as explained above and incorporated here, embryos with either XX or XY chromosomes have undifferentiated reproductive cells during the initial period after conception.

c. In addition, grouping all people into "male" and "female" based on which reproductive cell is likely to be produced ignores the established biological reality that some individuals are intersex and do not, at conception, belong to a sex that produces either large or small reproductive cells.

d. Requiring sex designations based upon the sex a person "belong[s]" to "at conception" based upon the reproductive cells they are likely to produce does not further an interest in accurately identifying passport holders.

333.    Further, the challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are unsupported by a reasoned explanation:

a. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to use a designation for their sex as they live and express it, nor does the Executive Order do so.

b. The Agency Defendants have provided no meaningful explanation for their removal of the option for people to not specify their sex by using the "X" designation, nor does the Executive Order do so.

c. The Agency Defendants have provided no meaningful explanation for their attempt to proclaim it the policy of the United States that transgender, nonbinary, and intersex people do not exist.  The Executive Order and Passport Policy entirely fail to address any of the medical and scientific evidence demonstrating the importance of legal recognition of transgender, nonbinary, and intersex people and the medical and practical importance of accurate identification.

d. Further, the Agency Defendants have failed to explain what alternatives, if any, were considered to address any potential legitimate interests the Passport Policy

could serve, nor does the Executive Order do so.  This includes less restrictive alternatives and those that do not discriminate on the basis of sex or being transgender, nonbinary, or intersex.

    e.   Relatedly, the Agency Defendants have failed to explain why the status quo ante—which the State Department implemented for years before the Executive Order—was in any way flawed, let alone sufficiently flawed to warrant this abrupt and substantial change, nor does the Executive Order do so.

334.    The Agency Defendants have also failed to consider or address numerous crucial aspects of the change in policy, nor does the Executive Order do so.  Most acutely, they have failed to consider or address the effects on transgender, nonbinary, and intersex people.  They have not even considered the effects on their own employees and the operation of the federal government.  The Agency Defendants have failed to consider or address the many ways they are foreseeably, obviously, and directly harmed by the Passport Policy.  They failed to consider or address the needs of these individuals and their families to obtain accurate passports that do not expose them to mistreatment.

## SEVENTH CAUSE OF ACTION
### (Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, 706 – Failure to Observe Procedure Required by Law )
### Agency Defendants

335.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

336.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law. . . ."  5 U.S.C. § 706(2)(D).

337.    The Executive Order is, by its terms, binding on the Agency Defendants, and on information and belief, as publicly reported and recounted above, the Secretary of State and State Department have already taken concrete steps to implement the Executive Order.  The Secretary of State and State Department's Passport Policy and implementation of the Executive Order

constitute a final agency action under the APA.  As a result of that action, each Plaintiff must either: (1) attempt to obtain a passport with a sex designation that will necessarily be denied due to the Executive Order, or (2) select a sex designation that does not match who they are, in violation of their rights, and that risks subjecting Plaintiffs and the putative Class members to violence and harassment.  Further, as a direct result of agency action, Plaintiffs and the putative Class members cannot renew existing passports with their appropriate sex designation without fear that it will be confiscated or its processing suspended once it is submitted to the State Department.  For example, Plaintiff Perysian, who is a transgender woman and presents as female, applied for a passport with an "F" sex designation on January 23, 2025, shortly after President Trump's inauguration.  The State Department denied Plaintiff Perysian a passport with an "F" sex designation and issued her passport instead with an "M" sex designation.

338.    Agency actions taken under the Executive Order are "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Under the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 *et seq*., when a federal agency seeks to collect information from the public (often through government forms), it is obligated to "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information[.]"  44 U.S.C. 3506(c)(2)(A).

339.    As explained above, and incorporated here, the State Department has changed the forms used to apply for, apply for renewal of, and apply to change passports and replaced them with a form that does not permit collection of the "X" sex designation, but only permits collection of the "M" and "F."  That change was not announced with 60 days' notice in the Federal Register or any other public consultation.  Indeed, it was not announced at all.  The State Department made the change surreptitiously, using forms that are labelled expired.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.  Issue declaratory judgment that (i) the Passport Policy and the Executive Order as applied to passports violate Plaintiffs' constitutional rights; and (ii) the Passport Policy is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA;

b.  Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Passport Policy or the Executive Order as applied to passports, and require that they permit (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport applications to the same extent they did before the Executive Order and Passport Policy were issued;

c.  Hold unlawful, set aside, and vacate any agency actions taken under Passport Policy or the Executive Order as applied to passports that had the purpose or effect of not permitting (i) changes to the "Sex" designation on passports to the same extent they did before the Executive Order and Passport Policy were issued, including allowing individuals to self-attest to what their sex is and (ii) the use of an "X" sex designation on passports and passport applications to the same extent they did before the Executive Order and Passport Policy were issued;

d.  Certify classes as set forth in this Complaint and enter class-wide declaratory and injunctive relief as described above;

e.  Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.  Grant all such other and further relief as the Court may deem just and proper.

*[Signatures on following pages]*

April 25, 2025

Respectfully submitted,

/s/ *Isaac D. Chaput*
Isaac D. Chaput (*pro hac vice*)
William P. Kasper (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: 415-591-6000
Facsimile: 415-591-6091
ichaput@cov.com
wkasper@cov.com

Jessie J. Rossman (BBO # 670685)
Zoe R. Kreitenberg (BBO #715356)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
Telephone: 617-482-3170
jrossman@aclum.org

Jon W. Davidson (*pro hac vice*)
    (admitted only in California)
Li Nowlin-Sohl (*pro hac vice*)
    (admitted only in Washington)
Sruti J. Swaminathan (*pro hac vice*)
Malita V. Picasso (*pro hac vice*)
James D. Esseks (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org
sswaminathan@aclu.org
mpicasso@aclu.org
jesseks@aclu.org

Aditi Fruitwala (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Ansel F. Carpenter (*pro hac vice*)
Gavin W. Jackson (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

Jonathan Thompson (*pro hac vice*)
Sean M. Bender (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-5891
Facsimile: 202-778-5891
jthompson@cov.com
sbender@cov.com

Robert C. Gianchetti*
Yuval Mor (*pro hac vice*)
Alyssa L. Curcio (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-841-1000
Facsimile: 212-841-1010
rgianchetti@cov.com
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs*

\**Pro hac vice* application forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

*/s/ Isaac D. Chaput*
Isaac D. Chaput
