UNITED STATES DISTRICT
DISTRICT OF MASSACHUSETTS


ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, )
CHASTAIN ANDERSON, DREW HALL,          )
BELLA BOE, and REID, SOLOMON-LANE,     )
on behalf of themselves and others     )
similarly situated,                    )
          Plaintiffs,                  )
          vs                           ) No. 1:25-CV-10313
DONALD J. TRUMP, in his official       )
capacity as President of the United    )
States; U.S. DEPARTMENT OF STATE;      )
MARCO RUBIO, in his official capacity  )
as Secretary of State; and UNITED      )
STATES OF AMERICA,                     )
          Defendants.                  )


BEFORE THE HONORABLE JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE
MOTION HEARING


John Joseph Moakley United States Courthouse
Courtroom No. 3
One Courthouse Way
Boston, Massachusetts  02210


TUESDAY, MAY 27, 2025
2:30 P.M.


Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3-205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com


Mechanical Steno - Computer-Aided Transcript

**APPEARANCES:**


            Ansel Carpenter
            Covington & Burling, LLP
            1999 Avenue of the Stars, Suite 3500
            Los Angeles, CA 90064
            Phone:  505-629-7142
            Email: Acarpenter@cov.com
            for Plaintiffs.


            Li Nowlin-Sohl
            American Civil Liberties Union
            125 Broad Street
            New York, NY 10004
            Phone: 206-624-2184
            Email: Lnowlin-sohl@aclu.org
            for Plaintiffs.

            Jonathan Travis Thompson
            Covington & Burling, LLP
            850 10th Street NW
            Washington, D.C. 20001
            Phone: 202-662-5891
            Email:  Jothompson@ecov.com
            for Plaintiffs.


            Aditi Fruitwala
            American Civil Liberties Union Foundation
            125 Broad St
            New York, NY 10004
            Phone: 214-797-9107
            Email: Afruitwala@aclu.org
            for Plaintiffs.


            Zoe Kreitenberg
            ACLU of Massachusetts
            One Center Plaza, Suite 850
            Boston, MA  02108
            Phone: 617-482-3170
            for Plaintiffs.


**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

**APPEARANCES:** (Continued)

Mona Patel
Covington & Burling, LLP
for Plaintiffs.


Michael Velchik
DOJ-Civ
950 Pennsylvania Avenue NW
Washington, D.C.  20530
Phone: 202-860-8388
Email: michael.velchik@usdoj.gov
for Defendants.


Elizabeth Brooke Layendecker
United States Department of Justice
1100 L Street NW
Washington, D.C.  20005
Phone: 202-616-5046
Email: elizabeth.b.layendecker@usdoj.gov
for Defendants.

**P R O C E E D I N G S**

1
2          THE CLERK:  All rise.

3          (The Honorable Court Entered.)

4          THE CLERK:  All right.  Thank you so much.  You can

5   have a seat.

6          This is Civil Matter 25-10313, _Orr, et al. versus_

7   _Trump, et al._

8          And will Counsel, starting with the plaintiffs, please

9   state your name for the record.

10          ATTORNEY CARPENTER:  Good morning, your Honor.  Ansel

11   Carpenter from Covington & Burling on behalf of the plaintiffs.

12          THE COURT:  Okay.  Good afternoon, Attorney Carpenter.

13          ATTORNEY NOWLIN-SOHL:  Good afternoon, your Honor.  Li

14   Nowlin-Sohl on behalf of the plaintiffs.

15          THE COURT:  Okay.  Good afternoon, Attorney Li

16   Nowlin-Sohl.

17          ATTORNEY THOMPSON:  John Thompson on behalf of

18   Plaintiffs.

19          THE COURT:  Good afternoon.

20          ATTORNEY KREITENBERG:  Zoe Kreitenberg on behalf of

21   Plaintiffs.

22          THE COURT:  Okay, Good afternoon.

23          ATTORNEY FRUITWALA:  Good afternoon, your Honor.

24   Aditi Fruitwala on behalf of the plaintiffs.

25          THE COURT:  Good afternoon to you as well.

1          ATTORNEY PATEL:  Good afternoon.  Mona Patel on behalf

2     of the plaintiffs.

3          THE COURT:  Okay.  And good afternoon.

4          All right, for the defendants.

5          ATTORNEY VELCHIK:  May it please the Court, Michael

6     Velchik on behalf of the United States defendants.

7          THE COURT:  Okay.  Good afternoon, Attorney Velchik.

8          ATTORNEY LAYENDECKER:  Elizabeth Layendecker on behalf

9     of the defendants.

10          THE COURT:  All right.  And good afternoon to you as

11     well, Attorney Layendecker.

12          All right, we're here for a hearing on the plaintiffs'

13     motion to certify two classes and, if that motion is granted,

14     to extend the preliminary injunction order to those classes.

15          So since it's the plaintiffs' motion, I'll have them

16     go first, then hear from the government, and then give the

17     plaintiffs an opportunity for a brief rebuttal.

18          Attorney Carpenter?  Yes, go ahead.

19          ATTORNEY CARPENTER:  Yes, thank you, your Honor.  And

20     I practiced the "afternoon" so many times.  So sorry to have

21     flubbed it.

22          THE COURT:  That's all right.

23          ATTORNEY CARPENTER:  If it's all right with the Court,

24     I'm planning to address the class certification motion and my

25     colleague, Ms. Nowlin-Sohl, will be addressing the PI motion.

1          THE COURT:  Sure, that's fine.

2          ATTORNEY CARPENTER:  This case challenges a nationwide

3    policy that uses a uniform definition of sex that inflicts

4    uniform injuries on every member of the classes and would be

5    redressed by a uniform remedy.

6          Now, I don't want to retread all of the briefing, so

7    I'll just hit a few high notes, and then I'm glad to address

8    any more detailed questions that the Court has.

9          THE COURT:  Sure.

10         ATTORNEY CARPENTER:  Every member of the M/F classes

11   wants the same thing:  They want a sex marker on their

12   passports that aligns with their gender identity.  And every

13   member of the X class wants the same thing.  They want an X

14   marker.  Defendants' policy stops this all.

15         This case is going to be driven by common questions

16   which, I think, is underscored by the type of merits analysis

17   the Court performs in its PI order.  And one remedy is going to

18   fix the claims for -- fix the injuries to all of the class

19   members.  That remedy could be an injunction or it could be an

20   APA vacatur.  And in either case, it's going to remedy the

21   harms in one fell swoop.

22         THE COURT:  Can I just stop you there.  I want to ask

23   the government as well, but, since you mentioned vacatur, what,

24   in the plaintiffs' view, is needed to get this case to final

25   judgment?  That is, you know, I understand that vacatur is sort

1    of the default remedy if the Court finds after full

2    adjudication that agency -- a final agency policy violates the

3    APA.

4          What do you think is needed in the nature of

5    discovery, or what not, to -- before you might seek final

6    judgment?  Or the government might?

7          ATTORNEY CARPENTER:  So, in terms of what we might

8    want before final judgment, I don't expect discovery in this

9    case to be hugely burdensome, in part because we're dealing

10   with one single policy.

11         THE COURT:  Right.

12         ATTORNEY CARPENTER:  And that policy, as far as the

13   record shows now and as far as defendants have ever introduced,

14   was adopted solely in response to an Executive Order without

15   any other administrative record created.

16         That said, I do imagine we would seek some discovery

17   including, you know, documents that went into the creation of

18   the Executive Order, potentially testimony or Interrogatories

19   and things of that nature.

20         In terms of the process to achieve final judgment, I'd

21   imagine that for the injunctive relief we'd ultimately be

22   seeking a bench trial.  And I imagine that vacatur could be

23   settled, likely, on summary judgment or, if not that, then a

24   bench trial.

25         THE COURT:  Okay.  So we're looking at many months

1    rather than just a handful of months in the plaintiffs' view?

2              ATTORNEY CARPENTER:  I think that's right, your Honor.

3              THE COURT:  All right.  Go ahead.

4              ATTORNEY CARPENTER:  Thank you.

5         So just to finish up with that, I think, as we lay it

6    out in the papers, the requirements of Rules 23(a) and 23(b)(2)

7    are met.  And we cited a number of cases in which similar

8    claims, similar classes, and similar injuries were treated on a

9    class wide basis.

10        I think, in contrast to that, Defendants have cited no

11   cases where certification was ever denied based on similar

12   claims or similar putative classes, and they haven't really

13   challenged the requirements of Rules 23(a) or 23(b)(2).

14        Instead, they really only make two points:

15        The first is they think this case interferes, I think,

16   in largely an unspecified way with the litigation in the

17   Schlatter case.  But at the same time, they fight against what

18   is the ordinary, common, and appropriate solution to that,

19   which is just to exclude those *Schlacter* plaintiffs from the

20   classes here, as courts have often done.

21        And, second, they say that the classes aren't

22   ascertainable.  And I think it's wrong for two reasons:

23        One is it's legally wrong.  In this Circuit in (b)(2)

24   classes, like in most Circuits in (b)(2) classes,

25   ascertainability, the implied requirement that courts have read

1   into Rule (b)(3), isn't required.

2           But even if it were, the classes here are

3   ascertainable.

4           THE COURT:  Can I stop you there?

5           So, as I understand First Circuit precedent for a

6   (b)(2) class, where there's no notice that's going out to the

7   class members, ascertainability isn't a requirement, but, if

8   notice were to go out to the class members -- I think there's a

9   *Crosby* case from the First Circuit in 1986 that talks about

10  this -- then ascertainability or having a more definite

11  definition of the class might be more of a requirement.

12          So can you respond to that rough understanding of

13  First Circuit precedent?

14          ATTORNEY CARPENTER:  Absolutely.

15          I think that's largely the correct understanding.  I

16  would just put one wrinkle in the Court's characterization,

17  which is that I'm not sure that *Crosby* was saying that in every

18  (b)(2) class where notice were issued, you would need it.  What

19  they said is in that one, because there were lots of individual

20  specific issues, including the precise remedy they wanted,

21  which depended on an adjudication-by-adjudication determination

22  of unreasonableness, it was required.

23          But just to step back to the broader view in what I

24  think is the heart of the Court's question.  It's exactly

25  right, and that's what the First Circuit said in Yaffe.  They

1    said in (b)(3) classes you need notice because you need to know

2    who upfront is in the class so they can be given notice and

3    probably opt out if they want.

4         In a (b)(2) class, as the Court noted, there's no

5    notice process -- certainly, in this case there, you know,

6    wouldn't be -- and there's no individualized issues of

7    adjudication as you would expect in a (b)(3) class, like

8    determination of specific damages or something like that.

9         And what Yaffe says, which has never been overturned

10   and, as we cited in the papers a Court applied in this district

11   just last year, is that in those circumstances,

12   ascertainability isn't required.

13        And I do as my, I think, final point, before this

14   Court has any other questions -- I just want to say that, even

15   if the Court thinks ascertainability were required or has

16   concerns about the objective criterion argument or any of that,

17   it's met here.  We know who's in the classes.  It's people

18   applying for passports who are wanting X markers that are

19   denied under the current policy.  And that can be known in part

20   because they're just applying to the government for the

21   passports.  It's very similar what courts are also looking at

22   in ascertainability cases, where they're looking, for example,

23   at the records of the company to determine who is impacted by

24   the challenge practices.

25        THE COURT:  So I think this question goes somewhat to

1  ascertainability, but also taking a step back to the 23(a)

2  factors -- and I'm thinking more commonal -- well, all of them,

3  but commonality and typicality here, which is the way that

4  you've defined the classes, it turns on individuals who want a

5  passport that's different from their sex assigned at birth.

6        But why is the class definition -- that is, why does

7  it just hinge on the transgender status or the nonbinary status

8  of the individuals in the class?  You know, as I understand

9  quite a number of the claims here, the fact that the plaintiffs

10  are transgender or nonbinary or, in some cases, intersex, kind

11  of drives the injury that you're alleging and drives the harm

12  that you've identified.  So why isn't that part of the class

13  definition as you've proposed it?

14        ATTORNEY CARPENTER:  So as to the M/F class, I think

15  it's implicitly part of the class definition, because what that

16  class definition is defined as is folks who are barred from

17  having an M or an F that aligns with their gender identity, but

18  instead is the M or the F with the sex assigned at birth.  In

19  terms of the X --

20        THE COURT:  Let me stop you there.  I don't think

21  gender identity is part of the definition -- the class

22  definition as you've proposed it.  Correct me if I'm wrong,

23  but, as I read it, all people who currently want or in the

24  future will want a U.S. passport issued with an M or F sex

25  designation that is different from the sex assigned to that

1    individual under the Passport Policy.

2         I mean, I take it the gender identity is actually

3    vital to the plaintiffs' claims in this case, and yet it's not

4    part of the class definition.

5         ATTORNEY CARPENTER:  Sure.  Let me try to clarify.

6         We think it's implicitly part of that class definition

7    because, if you are barred from having the M or the F that

8    you're seeking by the policy because that was your sex assigned

9    at birth, it necessarily means that you're seeking one based on

10   gender identity.

11        THE COURT:  But, I guess, the way that you've proposed

12   the class could be broader than individuals who are seeking a

13   passport that does not align with your gender or -- excuse me,

14   that does not align with your sex assigned at birth because

15   their gender identity differs from their sex assigned at birth.

16        You know, I don't want to speculate, but you could

17   imagine there are other reasons why someone might want a

18   passport that does not reflect their sex assigned at birth,

19   that does not have to do with gender identity.  So why not

20   hinge the class definition on the harms that you've identified

21   that these plaintiffs have experienced?

22        ATTORNEY CARPENTER:  Sure.  So let me try to take it

23   in a few parts.

24        THE COURT:  Sure.

25        ATTORNEY CARPENTER:  First, I'll try to address why we

1    don't think the class definitions, as they're written, are sort

2    of overbroad, for a lack of a better word, or from

3    certification.  Then let me address why they're drafted as

4    they --

5            THE COURT:  Okay.

6            ATTORNEY CARPENTER:  -- are as opposed to what the

7    Court is saying they are.

8            THE COURT:  Yeas.

9            ATTORNEY CARPENTER:  In terms of overbreadth, I think

10   it's sort of Hornbook class action law that an

11   otherwise-appropriate class definition or class certification

12   can't be denied on the basis of sort of speculative assertions

13   or hypothetical edge cases.  And it's somewhat hard for me to

14   imagine a speculative or of hypothetical case in which someone

15   would want a gender marker that was, you know, denied to them

16   under the government's policy and would be -- you know, would

17   have their gender identity match their sex assigned at birth.

18           In other words, it's somewhat hard for me to imagine a

19   person who was assigned male at birth, identifies as a male,

20   and is seeking an F.  And I think that defendants haven't

21   introduced any evidence that that exists.  So that would be the

22   sort of edge case that doesn't otherwise prevent class

23   certification.

24           I think in terms --

25           THE COURT:  Can I just -- so, you know, the Supreme

1    Court said in *WalMart* that commonality requires the plaintiff

2    to demonstrate that class members have suffered the same injury

3    and that that doesn't really get to the nature of the injury.

4         I mean, I take your point, and I understand that --

5    that law, but the injury, at least as it was briefed at the

6    preliminary injunction stage and as I understand it -- you

7    know, the sex discrimination claim under the Equal Protection

8    Clause, the animus claim under the Equal Protection Clause,

9    and, then -- you know, I didn't reach it on the PI decision,

10   but the privacy right claim and the right to international

11   travel claim -- all hinge on the plaintiffs being transgender

12   or nonbinary.

13        So can you address that specifically?

14        ATTORNEY CARPENTER:  Sure.

15        So, I mean, I think part of it is what I was trying to

16   explain earlier -- that I -- I just do think there's no

17   evidence that those sort of people would be wanting this.  I

18   mean, I think by Defendants' own estimates, only something like

19   44,000 X markers were ever issued.  And we know all the reasons

20   that transgender, nonbinary, intersex people would want markers

21   that don't comply with Defendants' policy.  And so I think the

22   idea that, you know, there is some person out there in the

23   hypothetical the Court's positing, who does not fit into those

24   categories but still wants the M, the F, or the X that

25   Defendants would deny them, there's just not evidence that that

1    person is there.  And so to the extent it's a question of, sort

2    of, overbreadth, I think this would be one of the classic

3    situations where, because there's commonality across the vast

4    majority of the class, because there's typicality, it would,

5    you know, it's an appropriate definition.

6           And I think that dovetails with the law on all of the

7    23(a) factors, which says, you know, you don't need perfect

8    identity of claims; you don't need there to be any question

9    about different facts for every single member of the class.

10   What you need is that the heart of their claims is the same.

11   And here I think the heart of the claims of any member of the

12   class is, you know, largely going to be -- and there's no

13   evidence to dispute -- that they want an M or an F that aligns

14   with their gender identity or they want an X.

15          Now, let me just make one kind of coda on this, which

16   is, on the point about X markers, I don't want to concede that

17   no person who is not nonbinary would not have a claim and, in

18   particular, a privacy claim.  So I think you could see a

19   circumstance in which someone who wants an X marker, because

20   they don't want the government to force them to reveal their

21   sex assigned at birth, would have a constitutional right to

22   informational privacy in that circumstance.  But I just want to

23   bracket that to be sure I'm not conceding it.

24          THE COURT:  Okay.

25          Suppose -- I know you dispute this, but suppose for

1   the sake of argument that I do think the ascertainability has

2   some teeth here, in your view, and maybe it's the same response

3   that you just gave, but is there a meaningful difference

4   between a class that defines the class members in part because

5   of their transgender and nonbinary status versus the way that

6   you've proposed the class that is based on their wants?

7           ATTORNEY CARPENTER:  So I don't think there's going to

8   be a meaningful difference in practice.  I think part of the

9   reason the classes are defined as they are was actually to

10  simplify matters and to avoid putting up extra parts into the

11  class definition.  But, you know, consistent with everything I

12  just said, I agree with the Court that -- or with what your

13  Honor's hypothetical was just suggesting -- that for the

14  mine-run of putative class members, that is going to be the

15  case.

16          THE COURT:  Okay.

17          So I guess, then, to the extent I do still have some

18  concerns about the class definition, do the plaintiffs have --

19  I guess I'll just put out there to both sides I'm

20  considering -- you know, the Court has the power to amend the

21  class definition, and I'm considering revising it somewhat to

22  reference the class members' transgender or nonbinary status.

23          And, I guess, do the plaintiffs have any objection to

24  that?  And I wouldn't do it sua sponte.  I'd give both sides an

25  opportunity to look at a revised class definition and respond

1    to it.  But, while I have you here, would the plaintiffs have

2    any objection to that?

3            ATTORNEY CARPENTER:  So I think we would love to see

4    the ones that the Court is drafting and just try to think

5    through whether there's any problems, you know, that I'm not

6    seeing standing up here now.  But I think as we've said, that's

7    going to cover the vast majority of cases.

8            THE COURT:  Okay.  All right.

9            Okay, anything further?

10           ATTORNEY CARPENTER:  Nothing --

11           THE COURT:  Oh, actually, sorry, on this point, I just

12   want to make sure I'm understanding correctly.  We do, as I

13   understand it now, after the amended complaint was filed, have

14   two intersex plaintiffs; is that correct?

15           ATTORNEY CARPENTER:  That's right.

16           THE COURT:  Okay.

17           But they would both be class representatives for the

18   M/F class, not for the X class; is that correct?

19           ATTORNEY CARPENTER:  I believe that's correct,

20   your Honor.

21           THE COURT:  Okay.

22           So as I understand the class representatives for the X

23   designation class, that, there are two nonbinary individuals

24   and that's sort of the universe of class representatives.

25           ATTORNEY CARPENTER:  Apology -- oh, yes, yes, it is.

1   Sorry, yes.

2           THE COURT:  Okay.

3           So then, I guess, in your view, could they be

4   representative of the X designation class other than nonbinary

5   individuals?  That is, could they be representative of any

6   potential members of the X designation class who might be

7   intersex or gender nonconforming?

8           ATTORNEY CARPENTER:  Yes, I think they can.  And let

9   me try to explain why, if I could.

10          So if you think of the Rule 23(a) factors, I don't

11  think any of them would turn on that difference at all.  So if

12  you think about the heart of each of the claims, I don't think

13  they depend on that.  For instance, think, you know, the right

14  to privacy claim would depend on someone not being forced to

15  reveal their identity every time -- their, you know, sex

16  assigned at birth under the government's policy every time that

17  they display their passport.

18          Similar with our compelled speech claim -- I think the

19  right to travel claim is similar.  You know, they want the

20  ability to travel, not burdened by the government's policy and

21  not facing the consequences that, you know, we've put into the

22  record would flow from that.

23          THE COURT:  How about the Equal Protection Claim?

24          ATTORNEY CARPENTER:  I think they would still have an

25  Equal Protection Claim for a few reasons:

1          One is the core of our Equal Protection Claim which

2     matters to commonality and typicality, is that this is a policy

3     that classifies based on sex and that policy classifying based

4     on sex it does not meet heightened scrutiny.  And that does not

5     depend on what the Court is highlighting.  And just to run the

6     gauntlet that I did there, I think it would be the same for the

7     APA claim because they would be subject to arbitrary and

8     capricious policy.

9          THE COURT:  Okay.  Coming back to the Equal Protection

10     Claim, there are different theories advanced.  One is sex

11     discrimination, another is transgender individuals should

12     constitute a quasi suspect class.  As I see it, I think it

13     might be different that you're arguing that intersex

14     individuals would rank as a quasi suspect class.

15          And thirdly, you have the animus argument and that

16     strikes me as somewhat different, too.  Do you agree with that?

17          ATTORNEY CARPENTER:  I do, but just to make sure I am

18     clear about what I agree with.  For all the reasons I said are

19     straightforward sex-based theory applies.

20          THE COURT:  Yes.

21          ATTORNEY CARPENTER:  I think, in terms of the

22     transgender status discrimination, that would only apply to

23     those who are transgender.  I think, as we've explained in the

24     papers, you know, we understand in this case, and I think the

25     record reflects, that nonbinary people are going to be a subset

of transgender people because they don't identify with the sex
assigned at birth.  And I think many intersex people, as the
record also reflects, will fall into that category.

And I think, in terms of the animus argument, it
applies just as well as the straightforward, the equal
protection argument to all of them because the animus is
against people who are gender nonconforming.

THE COURT:  Anything further?

ATTORNEY CARPENTER:  Nothing unless the Court has
questions about a particular issue.

THE COURT:  I might turn to the government and have
them respond on the class certification and come back to the
plaintiffs' motion for the API and return to the government.

Attorney Velchik or Attorney Layendecker?  Go ahead.

ATTORNEY VELCHIK:  Thank you, your Honor.  May it
please the Court.  I would like to follow up on your colloquy
about the definition of this class.  I think this Court
adjudicated the motion for a preliminary injunction on a
factual record of named Plaintiffs who had applied for
passports or trying to obtain passports that included sex
designations that were different from their preferences.  That
documented some of the burdens --

THE COURT:  Their sex assigned at birth, you mean?

ATTORNEY VELCHIK:  Okay.

THE COURT:  Yes.

1          ATTORNEY VELCHIK:  -- had documented burdens that they

2     had experienced, and in particular, referenced I think the

3     Anderson Affidavit or Affidavit in other documents.  And we

4     think that these particular named plaintiffs, I think, are very

5     different from all of the potential individuals who could be

6     included in the class as it's currently defined in the motions.

7          I think, as you referenced the definition, it included

8     not just a definition that hinged on subjective beliefs, but

9     also future subjective beliefs.  All people who currently want

10    or in the future will want a U.S. passport.  So just logically

11    taking that the text as it exists in the briefs, I mean this

12    could include individuals who do not even want a passport or

13    may not apply for a passport, let alone on a one-year period.

14    It may include individuals who currently do not allege that

15    they suffer from gender dysphoria or have some other preference

16    for a passport that's different from their sex at the present

17    moment.

18         And I think some of these hypotheticals suggest that

19    there's something wrong with the class definition.  The

20    government, in our brief, raises the --

21         THE COURT:  Can I stop you there?  Because, you know,

22    often classes are defined temporally.  And here I think a class

23    definition would run from something like January 19 or

24    January 20, 2025, into the future.  But often there's not an

25    end date on the class.  Sort of, the end date is set by when

1    final judgment enters.  And, you know, then, if you're a member

2    of the class, you're entitled to the relief.  If you are or

3    not, if -- you know, depending on how final judgment goes.

4         But I think, potentially, there's a bit of conflation

5    of the motion to extend the PI and the motion to certify the

6    class.  That is, as I understand the plaintiffs' argument, they

7    want to certify these classes, but then they're only seeking to

8    extend the PI to the members of the class -- or to certain

9    members of the class.  And that includes folks who want to

10   apply for or renew their passport within the next year.

11        So why, just as to the class certification motion --

12   why is -- why do you see -- why do you think there needs to be

13   a temporal limitation on the end of the class period?

14        ATTORNEY VELCHIK:  I think we've been discussing a

15   number of problems.  I agree that that cashes out differently

16   based on the -- the legal prong.  There's, you know, a separate

17   analysis for the preliminary injunction.

18        With respect to simply class certification, we have

19   focussed on the problems with ascertainability -- that it's

20   difficult to ascertain, at least, if it were moored to

21   individuals who have an application pending before the State

22   Department.  But, as your question has also suggested,

23   depending on how broad the class is described, I think it could

24   also impact some of the 23(a) factors.

25        You referenced commonality.  I think you could also

1    raise questions with typicality if it turns out that the named

2    Plaintiffs happen to be able to document some very specific

3    harms and burdens associated with their rights to travel, that

4    might not be shared with individuals who do not have a present

5    intent to even apply for a passport or even engage in foreign

6    travel.

7         I understand that the class is separately defined for

8    the preliminary injunction.  But even so, I think it is quite

9    expansive and includes people who don't even have that intent

10   to travel for the class for purposes of certification.

11        THE COURT:  So I didn't understand the government to

12   contest the named Plaintiffs would be representative of class

13   members.  And I didn't -- I don't think the government put in

14   any evidence otherwise.  So is that, is that the argument that

15   you're making now, or is this sort of couched under the

16   government's ascertainability argument?

17        ATTORNEY VELCHIK:  I think we're both seeing the same

18   problems with the way the class is defined.  The government's

19   preferred approach would be to say that this fails

20   ascertainability and, therefore, the Court should not certify a

21   class on that basis.

22        There are other ways that the Court could address some

23   of the problems we're discussing.  One of them could be to

24   either invite further briefing or sua sponte certify class with

25   different limitations that would address some of these

1    concerns.

2           But alternatively, the Court could, as an alternative

3    legal basis, decline to certify the class based on 23(a)

4    factors such as commonality or typicality.  We think

5    ascertainability is the easiest way to do this.

6           THE COURT:  All right.  Well, two questions then:

7           So I'll get to you on ascertainability, but -- and

8    understanding you don't have the language that I was discussing

9    with Plaintiffs' counsel, but, if the class definition turned

10   on the plaintiffs' status as transgender individuals or

11   nonbinary individuals, would the government view that as more

12   objective criteria that would kind of alleviate the

13   ascertainability concerns?

14          ATTORNEY VELCHIK:  That is certainly a step in the

15   right direction.  I don't think that would necessarily be

16   adequate, and I think there are other ways that the Court could

17   further address the ascertainability issue.

18          Ascertainability still presents questions with

19   subjective beliefs.  And understanding whether an individual

20   believes that their, you know, sex comports or does not comport

21   with the Passport Policy, still is a subjective determination

22   that might not be easy for the government to ascertain from its

23   perspective.

24          If there, for example, is a class defined by

25   individuals who have certain applications pending with the

1    State Department that have raised these concerns or have

2    otherwise objected, that might ground us in sort of even more

3    objective evidence that would provide the government the

4    ability to ascertain class members, but, certainly, that would

5    at least be one step towards cabining the class definition.

6            THE COURT:  Okay, all right.

7            And then just on the ascertainability point, I

8    discussed with Attorney Carpenter, my understanding of

9    First Circuit precedent which is that for (b)(2) classes as

10   opposed to (b)(3) classes, ascertainability is not required

11   where notice is not being given to all of the class members.

12   If notice is being given, it might be a different story, but

13   here notice would not be given.  So can you just address, you

14   know, I take it the government disagrees.  Tell me why you

15   disagree and specifically for the Yaffe decision from the

16   First Circuit?

17           ATTORNEY VELCHIK:  Yeah, we disagree.  We do think

18   that *Crosby* is a good example of where ascertainability has

19   been required.

20           THE COURT:  But in that case, there was notice that

21   needed to be given to the class members.

22           ATTORNEY VELCHIK:  Yes.

23           THE COURT:  But here is different, right?

24           ATTORNEY VELCHIK:  Right.  We still think that

25   ascertainability is an important limiting principle that courts

1    have applied to give some structure and definition to classes

2    in that at least as the class is currently structured.  It is

3    not just unascertainable but quite broad and unmoored in a way

4    that's not helpful or conducive to the goals of Federal Rules

5    of Civil Procedure 23.

6              THE COURT:  Do you want to address Yaffe?  Which, as I

7    understood it, you know, vacated -- excuse me -- reversed and

8    remanded the denial of a motion for class certification and

9    said, you know, you don't need -- for a (b)(2) class, you don't

10   need ascertainability or a definite class definition.

11             ATTORNEY VELCHIK:  Yeah, we don't think that the case

12   law, including Yaffe, has foreclosed the ascertainability in

13   this context.

14             THE COURT:  Okay, all right.  Go ahead.

15             ATTORNEY VELCHIK:  So I think those are most of the

16   points we wanted to discuss on ascertainability.  We can also

17   reference the indivisible nature of relief under 23 (b)(2).

18   The injunctive relief as the Supreme Court said in *WalMart.*  I

19   mean the key is unitary nature of relief.  The only observation

20   I would add to the briefing is that I think everyone agrees

21   that relief here is divisible.

22             I think Plaintiffs have viewed it as divisible insofar

23   as they've been able to carve out the *Schlacter* plaintiffs.  I

24   think this Court was also able to issue preliminary relief that

25   distinguished between different plaintiffs.

1          There's also, like, an adjudicative process here,

2     where people have to apply to the State Department, that

3     necessarily makes it divisible.  And so we think that that

4     should inform the Court's analysis of providing indivisible

5     remedies.

6          THE COURT:  I didn't fully understand this argument

7     because, you know, as I understand it, there are two steps,

8     right?  There's sort of the decision about whether to certify a

9     class and then what is the nature of that class?  And then

10    separately, how is that class treated?

11         And as the plaintiffs have proposed the class

12    definition, it would exclude the *Schlacter* plaintiffs.  If I

13    agree and certify the classes, the *Schlacter* plaintiffs just

14    wouldn't be members of the class.  And so then if the

15    plaintiffs were to prevail, the -- it would not be divisible

16    relief.  It would just be one injunction or one declaratory

17    judgment that applies to the class.

18         And I don't -- I didn't quite understand.  Isn't that

19    exactly what the government is saying it wants?  Is that, you

20    know, you don't have this divisibility within class members?

21    It seems the way the plaintiffs have proposed the class

22    definition alleviates that concern.

23         ATTORNEY VELCHIK:  Well, I think analytically they

24    have divided the class between *Schlacter*.  And so I think that

25    somewhat undermines sort of the points in the *WalMart* decision

1   and in *Califano*.  But I think that's the point we wanted to

2   communicate.

3          THE COURT:  Okay.  But I -- I guess I'd ask you to

4   respond to their argument, which I agree with that *Califano*

5   kind of endorsed the approach that they're taking here.  That

6   is, it approved of a class that, by its definition, excluded

7   certain Plaintiffs who would be in states with similar pending

8   litigation.  And the Court, the Supreme Court in *Califano*, said

9   that's good; that exhibits, sort of attention to not

10  interfering with ongoing litigation in other districts.  And

11  isn't that exactly what's happening here?

12         ATTORNEY VELCHIK:  So there is that language in

13  *Califano*.  There's also other language discussing the merits of

14  allowing for adjudication through different processes, whether

15  that's different applications through the State Department or

16  litigation in other courts.  I think those parts of *Califano*

17  should also be read.

18         *Califano* itself also found the classes to be

19  overbroad; so we also think that that is consistent with our

20  other arguments suggesting that the Court should exercise

21  discretion to redefine the classes or limit them if they are

22  ascertainable.

23         THE COURT:  Okay, all right.  Thank you.

24         Anything further on the class certification motions?

25         ATTORNEY VELCHIK:  On class certifications I'm happy

1    to yield to opposing counsel.

2              THE COURT:  Okay, all right.

3              I'll turn back to the plaintiffs, then.

4              And if there's any brief rebuttal, I'm happy to hear

5    you on that.  And then we'll turn to the motion to extend the

6    PI.

7              ATTORNEY CARPENTER:  Thank you, your Honor.  I

8    appreciate it and I will try to be brief.

9              Before responding to what opposing counsel said, if

10   it's all right, I just wanted to circle back to the

11   definitional point that we were talking about earlier.

12             THE COURT:  Sure.

13             ATTORNEY CARPENTER:  Not to say anything new, I think,

14   but just to clarify the point I was trying to make.

15             So our proposed M/F class definition is:  All people

16   who currently want, or in the future will want, a U.S. passport

17   issued with an M or F sex designation as different from the sex

18   assigned to that individual under the Passport Policy.

19             That means that if someone has a sex that's different

20   than -- they want a sex that's different to the one, you know,

21   assigned to them under the Passport Policy, the one assigned to

22   them under the Passport Policy is necessarily going to be their

23   sex assigned at birth I think was the point I was trying to

24   make earlier.

25             THE COURT:  Yes, I understand that.  It was the want

1    language I was focusing on.  Because everybody under the

2    Passport Policy gets a passport consistent with their sex

3    assigned at birth, and, you know, I think many transgender and

4    nonbinary people might want a passport that reflects a

5    different sex marker, but it could, in theory also be other

6    people who are not transgender and not nonbinary or not

7    intersex who might also want a passport that is not consistent

8    with the Passport Policy for other reasons.  And that was my

9    concerns there.

10          ATTORNEY CARPENTER:  Yeah, I hear that, your Honor.

11          I think -- if I could just talk about a few items that

12    opposing counsel brought up.

13          First, to the extent they're challenging the named

14    Plaintiffs' typicality or adequacy or saying that there aren't

15    common questions based on this new argument.  First, I think

16    it's pretty clear that that's waived or conceded.  It wasn't

17    raised in the briefing, sort of, not even obliquely.

18          To the extent, though, that the Court wants it, I'm

19    happy to address it.  And I think the simple answer is that

20    both commonality and typicality are low bars.  What they

21    require is that the core of the claims be the same in terms of

22    typicality or in terms of commonality -- that the -- you know,

23    there be some common questions.

24          And I think those are met here for the reasons we

25    explained in the briefing.  I'm completely happy to retread

1    them, but I sort of suspect no one wants that.

2            In terms of opposing counsel's arguments that -- all

3    sound in ascertainability.  First, opposing counsel talked

4    about this being defined by subjective beliefs, and I take it

5    they're attaching to the "want" language for that.

6            Just to be very clear, that just means someone in the

7    future applies for the passport.  There's no sort of

8    unexpressed, subjective desire that someone is just sitting

9    there thinking in their head that they want one.  They have to

10   apply, and that gets them there.  And it's just synonymous with

11   that.

12           On what is maybe the deeper broader concern about

13   relief going to people in the future who we don't know about

14   now, I think that is in part precisely why ascertainability

15   isn't required in (b)(2) classes and junctions always operate

16   in the future and sometimes you will not know who the precise

17   beneficiaries are.

18           If I could just give a few very common examples.  In

19   hiring discrimination cases, you don't know who will be

20   applying for that position later, but they are going to benefit

21   from an injunction that's saying don't hire discriminatorily.

22           Or even in school desegregation cases which are the,

23   you know, like, prototypical (b)(2) case that the rule was

24   written to do -- you don't know which parents or students in a

25   future school year will enroll and want to enroll on a

1  nondiscriminatory basis.  I think here it's the same, it is

2  people who will be applying for passports later.

3      In terms of the government's arguments about

4  requiring -- what I think I heard was described -- well, in

5  terms of the government's arguments about, sort of, they would

6  have to do guesswork to know who is in the class, they just

7  don't.  They have to adjudicate the applications as they come

8  in, as they did for three years with, as far as the record

9  shows, no problems before the current policy was introduced.

10      I don't want to spend very long on the divisibility or

11  *Schlacter* point, because I think our papers adequately address

12  what opposing counsel is saying.  They are simply being defined

13  out of the class.

14      Opposing counsel has not cited a single case that ever

15  said there was anything wrong with this, and we cited, I think,

16  something, like, five that did the same thing.  And, of course,

17  the *Califano* case explicitly blessed it.

18      I think, finally, opposing counsel's other point was

19  that the class is somehow divisible because here we're seeking

20  preliminary relief for only certain class members.  That's not

21  correct.

22      The ultimate relief will go to the entire class.  What

23  we're doing here is being reactive and responsive to the

24  Court's reasoning about irreparable injury and saying that,

25  before final judgment, a portion of the class is going to need

1    interim relief, which is the point of a preliminary injunction.

2         *Dukes* does not say otherwise.  That was about truly

3    indivisible, individual monetary determinations that needed to

4    be made for every class member.  Nothing like here and,

5    certainly, not addressing preliminary relief.

6              THE COURT:  Okay, all right.  Thank you.

7              ATTORNEY CARPENTER:  Thank you, your Honor.

8              THE COURT:  All right.  Attorney Nowlin-Sohl.

9              ATTORNEY NOWLIN-SOHL:  Good afternoon, your Honor.

10             As my colleague, Mr. Carpenter, mentioned I'll be

11   addressing the expansion of the preliminary injunction.

12             Defendants do not dispute that the constitutional and

13   APA claims that the Court found the original Plaintiffs likely

14   to prevail on are no different with respect to the putative

15   class members.  So today I'll be focusing simply on the last

16   three aspects of the preliminary injunction factors.

17             Turning first to irreparable harm.  Plaintiffs have

18   shown a significant risk of irreparable harm to the putative

19   class members.  First, all of the putative class members are

20   injured by the legal violations of being subject to a

21   discriminatory, animus-driven, and irrational policy.  As a

22   matter of law, violations of Plaintiffs' constitutional rights

23   constitute irreparable harm.

24             Second, Plaintiffs have provided ample evidence of

25   these harms to all putative class members through the expert

1    declarations and the declarations of the numerous Plaintiffs.

2    Crucially, Defendants have not rebutted and do not dispute

3    either the Plaintiffs' characterizations of the harms or the

4    expert testimony on the harms.  Instead, Defendants say that

5    the evidence is insufficient to show that the members of the

6    class have suffered harm.

7         It's not clear what Defendants think is needed here

8    beyond a declaration from every class member of irreparable

9    harm, but that is not the law and fundamentally misunderstands

10   the class action mechanism.

11        THE COURT:  Can I stop you?  Can I -- what is your

12   best case for the proposition that I think you're advancing?

13   Which is that, if you've established that the -- assuming that

14   the classes are certified, that the class representatives

15   themselves have experienced irreparable harm or are threatened

16   with irreparable harm, that their harm can also be

17   representative of the harms of the class members for purposes

18   of extending a preliminary injunction?

19        ATTORNEY NOWLIN-SOHL:  So two thoughts on that,

20   your Honor.  The kind of even antecedent to that, the

21   constitutional harms go to all the putative class members.  But

22   also the expert declarations go to all the putative class

23   members.  But courts have said that evidence of class

24   representatives injuries is sufficient to -- for the Court to,

25   quote, "engage in inductive reasoning to reach the conclusion

1   that every plaintiff suffered the same threat of irreparable

2   harm."

3           This Court has already found that the original

4   Plaintiffs have suffered -- or that those -- the irreparable

5   harms that they have talked about are sufficient to satisfy the

6   PI factor.  And Defendants have made no effort to kind of

7   distinguish the harms that the original Plaintiffs identified

8   from those of the putative class.  They have not explained why

9   the Court shouldn't engage in that kind of inductive reasoning

10  to reach that conclusion.

11          THE COURT:  Let me ask a small question on that point,

12  which is not all, but many of the named Plaintiffs experienced

13  gender dysphoria or have a diagnosis of gender dysphoria.

14  Perhaps I missed it, but is there evidence in the record of

15  what percentage of transgender people are nonbinary people

16  likewise experience gender dysphoria?

17          ATTORNEY NOWLIN-SOHL:  I don't know, your Honor, that

18  we put in that specific fact.  We would be happy to kind of

19  provide that, but I also don't think that it's necessary for a

20  couple of reasons:

21          So first, you know, Sawyer Soe does not have gender

22  dysphoria.  The expert declarations talk about these harms that

23  can come from having the mismatched identity documents, and

24  those aren't necessarily tied specifically to gender dysphoria

25  as well.  Like, the fear of being outed due to a discorded

1   document is present whether or not someone has gender

2   dysphoria.

3         THE COURT:  Right, but there were two kinds of

4   distinct harms; one of what you're identifying if you're being

5   outed.  But another was treatment for gender dysphoria that

6   includes, if I understand the declarations, having identity

7   documents that reflect the person's gender identity.  And I

8   kind of understood those to be distinct forms of harm that you

9   identified in the motion for preliminary injunction.

10        ATTORNEY NOWLIN-SOHL:  Yes, I think that that is an

11  additional harm that we identified, but I think there is also

12  sufficient evidence of harm kind of separate from the identity

13  documents as treatment for gender dysphoria, that is kind of

14  throughout the plaintiff declarations but, also, the expert

15  declarations.

16        And -- for example, many of the studies that Dr. Shim

17  refers to are about people who identify as transgender, and it

18  doesn't necessarily differentiate between those who have been

19  diagnosed with gender dysphoria and those who haven't.  And So

20  we'd say that a lot of the harms that have been identified are

21  present whether or not someone has been diagnosed with gender

22  dysphoria.

23        And also flagging that, you know, that under this

24  policy, transgender, nonbinary, and intersex people, regardless

25  of whether or not they have a gender dysphoria diagnosis, are

1    only able to obtain passports that expose them to this serious

2    risk of harm and discrimination.  And that causes psychological

3    harm as a result of the mismatch between the passport and their

4    gender identity.

5         So going back to the plaintiffs' declarations, we --

6    again, Defendants have not made any arguments to distinguish

7    the harms that the plaintiffs have said they have suffered in

8    the past and anticipate suffering in the future from those of

9    the putative class members.

10        And we believe that those are representative of the

11   class as a whole.  We've submitted 12 Plaintiff declarations.

12   It's a fairly large class of names, class members, and so we

13   think that is sufficient.

14        But, in addition, as I mentioned, we've submitted the

15   expert declarations of two experts.  And in contrary to

16   Defendants' characterizations of these as "general statements,"

17   they actually are very detailed about the harms that can and do

18   result from having and using identity documents with the wrong

19   sex designation.  These include anxiety, distress,

20   psychological harm, discrimination, harassment, violence.

21   Dr. Shim points to numerous studies and surveys on the impacts

22   of mismatched identity documents in a number of contexts,

23   including airport security, employment, and public spaces.  And

24   so these unrebutted harms and the risk of harm in the expert's

25   declaration applies to all of the putative class members.

1          One quick point is that Defendants argue that, because

2     of these studies that are cited, there's only a percentage of

3     the individuals that have suffered harm rather than all of

4     them -- that Plaintiffs can't show that the class as a whole

5     has incurred irreparable harm.

6          And this argument is somewhat nonsensical under

7     Defendants' reasoning, if studies said that 50 percent of

8     people experienced harassment or assault when presenting a

9     passport with the wrong sex marker, under their reasoning,

10    Plaintiffs would still have failed to show that the PI class as

11    a whole incurred irreparable harm because the study didn't show

12    that 100 percent of people experienced that.

13         That is not the case.  There's no support for this

14    argument.  And the question here is whether there's a

15    significant risk of harm.

16         So turning now to the kind of imminence point of this.

17    Imminent travel plans is not the standard here for imminent

18    harm for several reasons:

19         The only case that Defendants cite to support this

20    argument is the Massachusetts Coalition of Citizens with

21    Disabilities, but there that case was about kind of the mere

22    specter of a nuclear accident and that that was not enough to

23    show irreparable harm for the PI component about evacuation

24    plans.

25         Those facts are a far cry from the facts here and the

1    harms and the imminent harms that Plaintiffs have shown.

2    Contrary to what Defendants say in their opposition,

3    Plaintiff Solomon-Lane wasn't excluded from the original

4    preliminary injunction because he didn't have imminent travel

5    plans, but because he currently has an accurate sex marker and

6    his need to renew his passport and, therefore, be exposed to

7    the risk and harm of having the wrong sex designation on his

8    passport was not imminent.

9          Plaintiffs have crafted the scope of the preliminary

10   injunction to include only those likely to experience

11   irreparable harm prior to the full adjudication on the merits.

12         Now, turning to the burden component of Defendants'

13   arguments -- so Defendants argue that a preliminary injunction

14   for the preliminary injunction class would be too burdensome

15   because the State Department would, "have to determine whether

16   each applicant has in fact suffered such injury, something the

17   Department is not equipped to do."  And Plaintiffs agree that

18   the Department is not equipped to do this.  Fortunately, that

19   is a determination for this Court, not the State Department.

20   If the Court finds that irreparable harm is likely for the

21   putative class and extends a preliminary injunction for the PI

22   class, the Department --

23         THE COURT:  Are you quoting from paragraph 11 of the

24   second Pierce declaration?

25         ATTORNEY NOWLIN-SOHL:  I was quoting from page 6 of

1    the opposition.

2          THE COURT:  Okay, all right.  Yes, I -- I understood

3    the Pierce declaration to kind of imagine a world in which I

4    were to issue a more limited form of preliminary injunction

5    that required the State Department to do that kind of

6    individual assessment, but that was sort of a secondary

7    argument to the broader argument.  But go ahead.

8          ATTORNEY NOWLIN-SOHL:  Okay.  Yes, your Honor.

9          And so I think I wanted to make clear that, as we have

10   presented the preliminary injunction class, the State

11   Department is fully equipped to process the passports under

12   that definition.  They only need to determine if someone is --

13   kind of falls within the scope of the PI and the PI class.

14         And the question they ask is is this a new passport

15   application?  If yes, process it as normal.

16         Is this a change of the sex designation or name?  If

17   yes, process as normal.

18         And is this replacing a lost or stolen or damaged

19   passport?  Yes, process it as normal.

20         The only one where they might have to make some kind

21   of determination is passport renewal.  But, again, the question

22   there is simply is this person applying to renew their passport

23   within one year of the expiration date of the passport?  Pretty

24   easy determination.  And if so, they process it as normal.

25         THE COURT:  Can I stop you?  And, again, I would allow

1    briefing on this, but, if I were to suggest to the parties an

2    amended class definition that turned on the class members'

3    transgender or nonbinary status, would there be any, in your

4    view, additional administrative burdens?  That is, would the

5    class members who are applying to get a new passport or renew

6    their passport or any of the other things need to submit any

7    kind of statement saying, "I am a member of the class," or any

8    kind of attestation?

9        ATTORNEY NOWLIN-SOHL:  Potentially, your Honor, I

10   think it would depend how that class is defined.  To the extent

11   someone who is transgender or nonbinary is by definition

12   somebody who has a gender identity different than their sex

13   assigned at birth.  I think, you know, the mere fact that

14   they're asking for a sex marker different than their sex

15   assigned at birth indicates that they are transgender or

16   nonbinary, and it would fall within it.  So I think, you know,

17   our current class definition also would be somewhat synonymous

18   with what you are suggesting.  Because, you know, by

19   definition, if someone is seeking a sex marker different than

20   their sex assigned at birth, they are, kind of, transgender

21   under that umbrella term.

22       It is, you know, potentially a little bit different

23   for people who are intersex because sometimes the sex assigned

24   at birth was an incorrect designation.  So somebody could be

25   intersex and not transgender.  But I think, still, the act of

1    seeking that different marker would identify them accordingly.

2         THE COURT:  Okay, all right.

3         Go ahead.

4         ATTORNEY NOWLIN-SOHL:  Defendants, you know, identify

5    another alleged burden.  And this is kind of the unwinding of

6    the preliminary injunction.

7         First, Defendants cite no authority for this or for

8    why that would be necessary.  I think this seems especially

9    unlikely given that they are currently allowing people who were

10   issued passports less than five months ago under the same

11   policy that we're asking this Court to kind of return to, to

12   maintain the status quo, are still able to utilize those

13   passports right now.  So they have not identified any issues

14   with people having these passports.

15        Defendants also say that there's not an automated

16   system to identify from historic applications who previously

17   changed their sex marker, and, therefore, "such review would

18   have to be done manually, a time-consuming and labor-intensive

19   process."  We disagree with this.  But, also, the evidence

20   suggests that the State Department is already doing this.

21        For example, Plaintiff Bella Boe sought to renew her

22   passport.  She had the appropriate F sex designation on her

23   passport.  When she received the renewal back, it had an

24   M marker.  Therefore, somebody undertook the time-consuming,

25   labor-intensive process of reviewing her historic applications

1    to identify her as someone who had previously changed her

2    passport.

3         The same thing happened with David Doe.  Presumably,

4    the State Department is doing this for a wide swath of

5    applications to be able to identify those who have changed

6    their sex marker in the past.  So this would -- the State

7    Department is already doing this the best that we can tell.

8         Defendants also argue that Plaintiffs are seeking

9    final relief.  This is not final relief.  This is asking the

10   Court to enjoin the new policy and maintain the status quo.

11   Final relief in this case will be a permanent injunction of the

12   policy.  That some people may be issued a passport under the

13   injunction does not make it final relief.  I think this is also

14   really highlighted by the fact that passports expire -- typical

15   expiration timelines are one year, five year, or ten years --

16   and also occasionally need changing or replacing.

17        Defendants' final argument is that an injunction would

18   add confusion and uncertainty to government policy and that

19   inconsistent policies burden the government's interest in

20   uniformity.

21        This Court, in its preliminary injunction memorandum

22   order, found that, in light of the "evidentiary void," it could

23   not discern a relationship between the Passport Policy and any

24   genuine interest in maintaining a uniform definition of sex

25   across data kept by the State Department and other federal

1    agencies.

2            It is telling that, even after this finding by the

3    Court, Defendants provided no further evidence supporting their

4    alleged interest in uniformity.  The most obvious conclusion

5    here is that this is because no such evidence exists.

6            So the record is clear that any burden on Defendants

7    as a result of an expanded preliminary injunction would be

8    de minimis and pales in comparison to the significant risk of

9    the harm that Plaintiffs in the putative class members face.

10           So, in conclusion, your Honor, this Court has already

11   found that Plaintiffs are likely to succeed on the merits of

12   their claim, and defendants have conceded that the same

13   analysis applies to the putative class members.

14           Plaintiffs have shown that the putative class members

15   whom they seek to expand the preliminary injunction to are all

16   at risk of irreparable harm.  The burdens on Defendants are

17   de minimis, and, therefore, having satisfied the requirements

18   for a PI for the putative class, we respectfully request that

19   the preliminary injunction be expanded to the PI class.

20           THE COURT:  Okay.  Thank you.

21           Attorney Velchik.

22           ATTORNEY VELCHIK:  Thank you.  Thank you, your Honor.

23           Happy to go through, individually, the *Winter* factors

24   as they apply here.  I don't want to skip over the likelihood

25   of success on the merit.  I think that's a very important

1    component.  Just a threshold observation.

2         The Supreme Court is poised to address, I mean, an

3    underlying issue here in _United States versus Skrmetti_; so we

4    think it might be appropriate to wait for that guidance if that

5    is going to factor into the analysis of the likelihood on the

6    merits.  But even in the absence of that guidance, we don't

7    think that this Court's analysis of the preliminary injunction

8    as applied to the class members necessarily translates whole

9    cloth into the preliminary injunction analysis as applied to

10   the class, should the Court certify it.

11        As we've discussed this afternoon, I think that there

12   is a substantial or, at least, a non-trivia delta between some

13   of the specific harms that named Plaintiffs have been able to

14   document and some of the individuals who could be included in a

15   very capacious definition of the class.

16        There may be some merits claims that are not affected

17   by these differences, but we think that there probably are some

18   merits claims that do turn on those differences.

19        So to the extent that an individual's, you know, right

20   to travel is burdened, well, we would ask, you know, what is

21   the burden?  And that analysis could come out differently for

22   someone who is a named plaintiff, who has included Affidavits

23   describing the difficulties they've encountered including being

24   subjected to a strip search.

25        THE COURT:  Can I stop you there, though?  Because my

1  preliminary injunction decision didn't address the right to

2  international travel claim.  You know, it talked about the

3  equal protection claim and the APA claims.  But as to those

4  claims where there was a likelihood of success on the merits

5  analysis, do you think that there are meaningful differences

6  between class members?

7       ATTORNEY VELCHIK:  I think equal protection.  Equal

8  protection either as it currently exists or it can be clarified

9  by the Supreme Court in *Skrmetti* that they suggest that there

10 are certain factors or other evidence that individuals can look

11 to.

12      But I think it's -- often with rational basis review,

13 it wouldn't necessarily come into the Court's analysis.  But I

14 think, even at intermediate scrutiny, those are nontrivial

15 differences, and we wanted to flag that rather than passing

16 over the likelihood of success on the merits.

17      THE COURT:  Just how does that work, though?  I

18 understand *Skrmetti* will be decided at some point, likely soon.

19 But as to the analysis in my preliminary injunction decision,

20 it was just sort of a facial look at the Executive Order and

21 the Passport Policy.  There's a threshold determination -- does

22 this discriminate on the basis of sex?  I thought yes.  And

23 then, you know, did the government meet its burden to show the

24 policy was substantially related to an important government

25 interest.  I didn't think it had.

1          Are there individual differences as to that analysis?

2          ATTORNEY VELCHIK:  Not to the portions you described.

3   But to the extent that either the Court in its previous

4   analysis or in conducting sort of a fresh look for purposes of

5   this preliminary injunction, makes any reference to the

6   particular burdens of Plaintiffs, we do think that is a

7   difference worth flagging for the Court's awareness.

8          THE COURT:  Okay, thank you.

9          ATTORNEY VELCHIK:  With respect to an irreparable

10  harm, I think this is where those differences really do cash

11  out.  Again, I think we would emphasize that the class as

12  currently defined or as proposed includes people who do not

13  necessarily have an intent to travel abroad.

14          I think that there are individuals who could be

15  included in the class who otherwise might not necessarily be

16  able to demonstrate standing if they had been in Court

17  themselves, much less irreparable harm.  And so we do not think

18  that a finding of irreparable harm for the class for the named

19  Plaintiff should necessarily translate over to whole cloth.

20          THE COURT:  So how does that work?  Because I mean,

21  usually if you certify a class and you find that the named

22  plaintiffs are representative of members of the class, each

23  member of the class then does not need to kind of provide their

24  own individual evidence or, you know, individually support

25  their argument about irreparable harm.  That wouldn't be

1    administrable.  That's kind of why you have the class device,

2    which is to allow the class representatives to represent the

3    class.

4         So, I mean, is the government suggesting that to

5    demonstrate irreparable harm sufficient to extend the PI to the

6    class -- that each class member would have to submit their own

7    Affidavit?  Or how would that work?

8         ATTORNEY VELCHIK:  So I think we're seeing the same

9    fundamental problems.  I think that we've been discussing in

10   isolation the preliminary injunction extension and the class

11   certification, but, to the extent that they're both looking at

12   the same problem, I think that how the Court rules on one

13   motion could affect the other.

14        So one response could be to say, well, the motion for

15   class certification is quite capacious; there may be problems

16   with it, but, if we really tighten the language to narrow it to

17   those who really would, in the Court's view, suffer irreparable

18   injury, I think that would obviate some of the concerns that,

19   you know, once that class is certified, they could demonstrate

20   irreparable harm.  And so that might suggest, you know,

21   limiting the class definition on the front end.

22        Alternatively, if the Court chooses to certify a class

23   that is quite capacious in its definition, maybe the Court may

24   nevertheless decide to certify such a broad class, but for, at

25   least, that class, a preliminary injunction might not be

1    appropriate in that context, not least because of the

2    irreparable harm analysis would apply differently.

3            THE COURT:  Okay.

4            And can you speak to the point that the plaintiffs, as

5    they've crafted their motion, have not sought to extend the

6    preliminary injunction to the entire class that they've

7    proposed?  That is, they've set this one-year limitation on,

8    you know, folks who are seeking to -- I think it's -- renew --

9    let me make sure I have this right.  But renew their passport

10   because it expires within one year.

11           As the motion is crafted, they seem to be trying to

12   speak to some of these concerns.  That is, it's not every

13   member of the class.  It's just folks who, by the nature of

14   their application to the State Department, probably do have

15   fairly imminent travel plans, because, otherwise, why else

16   would they be seeking to renew their passport or obtain a new

17   passport?

18           ATTORNEY VELCHIK:  We acknowledge that Plaintiffs have

19   made efforts to try and cavot the definition of the class for

20   purposes of the preliminary injunction.  I think that we view

21   that as a sign, if not an admission, that I think there are

22   problems establishing irreparable injury to whatever class

23   we're trying to define.  We do not think that those limitations

24   are adequate even if they are accepted for purposes of the

25   preliminary injunction.

1          I would like to raise with the Court also the point

2    about a one-year limitation.  It is my understanding that

3    there's a quite broad definition for the class certification.

4    And then there's a definition for the class that would apply

5    for purposes of extending the preliminary injunction, and that

6    includes four different requirements.  They do not have a

7    currently valid passport; they need to renew their current

8    passport because it expires within a year, et cetera.  But

9    these are joined by Orr.  And so the one-year limitation as

10   I've read the briefing, and maybe the Court can clarify, or

11   someone can clarify.  But that one-year limitation only applies

12   to individuals who need to renew their current passport because

13   it expires within a year.  My understanding, based on the

14   pleadings, is that this is responsive to two points.

15         Number one, the State Department typically does not

16   allow for renewals of passport until they're about to expire

17   within a year.  And this Court in the preliminary injunction

18   distinguished one of the named Plaintiffs.

19         But that one-year limitation is limited to those who

20   have a current valid passport that is set to expire in a year.

21   And that one-year limitation does not expire, as I read it, to

22   the other three subclasses that have been crafted.  So, you

23   know, individuals who do not currently have a passport --

24         THE COURT:  For those individuals, if they don't have

25   a passport and they're applying in the first instance, it's

1    probably because they have travel plans in the coming, you

2    know, months, year.

3              ATTORNEY VELCHIK:  But that's not part of either the

4    class definition or anything they've been able to enter into

5    the record that -- I mean, for all we know, if you literally

6    just looked at the briefings and the pages, you looked at how

7    the classes are defined, it could include many, if not a

8    majority, of individuals who do not have plans for

9    international travel.  And so to certify a class and then grant

10   a preliminary injunction to a class so defined without further

11   clarity -- I think that that does speak to problems with the

12   irreparable injury analysis.

13             THE COURT:  Okay, all right.  Go ahead.

14             ATTORNEY VELCHIK:  Good.  Happy, then, to move to the

15   balance of the equities.

16             So there are three harms that I would just like to

17   emphasize and clarify to the Court on the government's side.

18             First, if the Court should grant a preliminary

19   injunction, that will require the State Department to process

20   additional applications; that requires time or requires

21   resources.  This scales roughly linearly with the number of

22   applications.  And so, whatever analysis this Court applied to

23   the preliminary injunction for six named Plaintiffs, there are

24   greater costs for however large this class could potentially

25   be.

1          THE COURT:  So I don't understand that, because, you

2    know, presumably, people need passports.  They're going to be

3    applying either way, right?  Whether the marker reflects their

4    gender identity or not, people need passports to travel.

5          So the State Department would be processing those

6    applications in any universe.  The question is just would the

7    preliminary injunction require more work on the State

8    Department's part?

9          And on that I didn't quite understand it.  I think, as

10   Attorney Nowlin-Sohl pointed out, I mean, the record shows that

11   the State Department is already doing more work under its

12   current Passport Policy because it does seem to be

13   cross-referencing applicants' prior passports with their

14   current application.  It happened to a few plaintiffs in this

15   case.  I know at least one plaintiff had a passport officer

16   call to verify some of the facts in the application.  So there

17   does seem to be an administrative burden associated with the

18   Passport Policy as it exists now that was greater than what

19   existed before.

20         So why, in your view, would the preliminary injunction

21   amount to any more administrative burden?

22         ATTORNEY VELCHIK:  I don't think it's accurate to say

23   that there would be no administrative burden or a net loss of

24   administrative burden.  In particular, individuals who

25   currently have valid passports, who wish to change them because

1    they do not believe that they want the passport with the sex

2    designation consistent with the new Passport Policy, those are

3    individuals who would not otherwise apply for passports if they

4    were not going to expire within the next year.

5         So there are subclasses where individuals still would

6    apply for applications that they would not, as measured against

7    the baseline of current practice.

8         But, at any rate, I do want to cavot, sort of, the

9    first harm as a resource or cost harm.  But I think most people

10   can see that.  I'd like to distinguish that between a second

11   harm, which, I think, is like a constitutional harm, that, I

12   think, is important to acknowledge.  Passports, as the Supreme

13   Court has recognized, are diplomatic communications from one

14   sovereign to another sovereign.  And, to the extent that the

15   Court enjoins the Executive Branch to print communications that

16   are addressed to foreign sovereigns that are not consistent

17   with the Executive Branch's policies, that is a constitutional

18   harm, whether one wants to articulate it as, you know, a

19   limitation of government speech or interfering with the

20   President's responsibilities as the sole organ in the conduct

21   of foreign affairs.  But that is a separate, distinct

22   constitutional harm.  And I think that's just one component of

23   it.  But then --

24        THE COURT:  Is this -- so, I mean, I know I addressed

25   some of these issues in the PI decision, but is this part and

1    parcel of the government's argument on non-reviewability?

2             ATTORNEY VELCHIK:  Not on -- I wanted to -- I want to

3    locate this argument specifically in the balance of the

4    equities.  I acknowledge that I think this Court referenced

5    this problem.  But I -- maybe it was in the briefing that there

6    were arguments that this could not be a burden to the

7    government if a previous administration had been including this

8    in the passports.

9             But I would just draw analytically a distinction

10   between a previous administration adopting one Passport Policy

11   that was consistent with the Executive Branch's policy at the

12   time versus enjoining the current administration in requiring

13   it to print passports that are inconsistent with the Executive

14   Branch's policy.

15            I mean, I do think that is a distinct constitutional

16   harm just in a general legal sense, but it is also a

17   distinction --

18            THE COURT:  But is it in sort of a power sense?  It's

19   premised on the assumption, you know, if I were to find

20   likelihood of success on the merits, again, part of that is a

21   finding of a likely constitutional violation of the Plaintiffs'

22   rights.  So I don't, I don't know, are you saying sort of like

23   in an intrusion on the executive sphere kind of way?

24            ATTORNEY VELCHIK:  That is a component of it, but I

25   think it's also a good way to distinguish why -- it's important

1    to distinguish how enjoining this administration to require

2    this policy, when it's inconsistent with the current

3    administration, is distinct from just maintaining the status

4    quo.  Because I think there's a difference between a previous

5    administration promulgating diplomatic communications that are

6    consistent with that administration's foreign policy and then

7    requiring a different administration to continue promoting a

8    previous foreign policy that they no longer endorse.

9         And I just think, analytically, that's an important

10   distinction that we think the Court should grapple with in its

11   balance of the equities analysis.

12        THE COURT:  Okay.

13        ATTORNEY VELCHIK:  And then, third, somewhat

14   relatedly, if this Court were to grant a preliminary injunction

15   and certify the class, and individuals, class members, were to

16   apply for passports and the State Department were to issue them

17   consistent with the Court's injunction, those passports, as I

18   understand it, would be valid for ten years.

19        And so that could create any number of insurmountable

20   harms for the government.  And it's unclear what steps they

21   would take.  To the extent that there are passports out there

22   that are inconsistent with the administration's policy, it

23   might be practically very difficult to locate these and either

24   try to revoke them and reissue them in a way that would be

25   consistent.  Certainly the logistical effects of that would be

1    very difficult.  It would be very resource intensive.  But even

2    if the government declined to do that, there would then be

3    existing any number of documents issued under the government's

4    seal with these diplomatic communications that are inconsistent

5    with the Executive Branch policy at that time and at this time.

6         THE COURT:  But that's baked into the current policy,

7    right?  I mean, as I understand the current policy, the State

8    Department is recognizing that prior passports issued with an

9    X marker or passports that were reflective of the applicant's

10   gender identity rather than their sex assigned at birth remain

11   valid.  Like, the government's not taking the position that

12   those passports issued before this new Passport Policy was

13   adopted are invalid.  So why would it be any different in this

14   case?

15        ATTORNEY VELCHIK:  Well, two distinctions:

16        Number one, you're increasing the number of passports

17   that are inconsistent with the Executive Branch's policies.

18        But two -- and, again, this is a subtle analytic

19   distinction, but I do think there is a relevant legal

20   distinction between, you know, honoring passports issued by a

21   different administration that was promoting its own policies at

22   the time and acknowledging that those remain to be valid,

23   versus enjoining the government to issue passports currently

24   inconsistent with its policies and then being forced to

25   effectively just let these remain in circulation and be

 1    addressed to foreign sovereigns when individuals travel.

 2            THE COURT:  Okay.

 3            And just so I'm clear, that would be a choice for down

 4    the line for the government to make.  That is, if I were to

 5    issue an injunction here as to certified class or some portion

 6    of it and then that were to later be vacated or reversed, the

 7    Government would then have to decide are those passports that

 8    were issued pursuant to the preliminary injunction -- are we

 9    just going to let them stand, or are we going to try to

10    identify those individuals who got passports under the

11    preliminary injunction and revoke those?

12            Is that correct?

13            ATTORNEY VELCHIK:  I acknowledge that that is a future

14    decision that the Executive Branch would have to make.  The

15    point that I would emphasize is that, whichever route of the

16    decision tree that the Executive Branch takes, there's real and

17    substantial harm that weighs in the balance of the equities.

18            Because either it's to permit ongoing constitutional

19    harms, as we believe, or to incur prohibitive administrative

20    costs.  And even if it can make those decisions in the future,

21    either choice is a substantial cost that weighs against

22    extending the motion for preliminary injunction.

23            THE COURT:  I understand the argument.

24            ATTORNEY VELCHIK:  Great.

25            THE COURT:  Is there anything further that you wanted

1    to argue on that point?

2         ATTORNEY VELCHIK:  No.

3         THE COURT:  Okay.  Let me just quickly -- I asked the

4    plaintiffs so I want to ask the government as well.  What, in

5    your view, would be needed to get this case to final judgment?

6    That is, part of this case as an APA case, may be record bound.

7    Do you think that there's significant discovery that might be

8    involved or no?

9         ATTORNEY VELCHIK:  Certainly, with respect to, like,

10   APA claims, I think those are fundamentally legal questions.  I

11   don't expect much discovery in that way.

12        I think, to the extent that discovery is required or

13   beneficial, I think that turns on the particular Constitutional

14   claims that Plaintiffs decide to press.  And it may also just

15   turn on the test or guidance that we get in the *United States*

16   *versus Skrmetti*.

17        To the extent that this Court believes or Plaintiffs

18   pursue legal theories that seek to turn on the types of burdens

19   that class members may be experiencing, such as the burden on a

20   purported right to international travel, I think that, you

21   know, would be an opportunity for Plaintiffs to engage in

22   factual development to support their arguments.  But,

23   otherwise, I don't think that this is a discovery-intensive

24   case.

25        THE COURT:  I'm not going to hold either side to it.

1    It was just more to in the nature of interest at this point

2    while I have you.

3             Okay, all right.

4             ATTORNEY VELCHIK:  That's my reaction.

5             THE COURT:  Anything further?

6             ATTORNEY VELCHIK:  Nothing further, your Honor.

7             THE COURT:  Thank you, Attorney Velchik.

8             Brief rebuttal, Attorney Nowlin-Sohl?

9             ATTORNEY NOWLIN-SOHL:  Yes, your Honor.  And I will

10   try to be brief.

11            So, as an initial matter, Defendants are making

12   arguments here that they have not made in their briefs and that

13   are not supported by the record, for example, about the foreign

14   communications -- that argument is not in the briefing about

15   expanding the preliminary injunction.

16            And as -- your Honor, I think that argument is -- more

17   appropriately kind goes to the likelihood of success on the

18   merits with regard to the APA claim and the equal protection

19   claim.

20            Defendants also mention the insurmountable harms of

21   having passports out there issued under kind of the status quo

22   policy as of January 19th.  They have not identified what those

23   harms are.  They don't make that argument in the brief.

24            The argument they're making is that it's difficult to

25   unwind and there would be burdens about unwinding it.  But they

1    do not talk about the harms of those passports being out there.

2    And it's not in the record.  There's no evidence as to that as

3    well.

4         With regard to the burden, to the extent that

5    Defendants are arguing that, you know, there might be more

6    applications if this -- the, kind of, status quo is maintained,

7    that that's not a burden.  That's part of what the State

8    Department does -- is that it processes passport applications.

9         And so, to the extent that there might be more people

10   applying, that's -- again, that's not a burden, that's part of

11   their kind of job responsibilities.

12        And then lastly, I wanted to talk a little bit about

13   the imminent travel piece.  So defendants pointed out that

14   Plaintiffs have only included that one-year limitation to the

15   renewal.  And the reason for that is that there's more imminent

16   harm for the other folks.

17        So example, if you have the wrong sex designation on

18   your passport and you want to change it, there's no reason why

19   there would be a time limitation on that.  That harm is

20   happening now.  And so, that is, kind of logically follows that

21   the one-year limitation only applies to those who are not being

22   currently harmed because they have an accurate passport with an

23   accurate sex designation on it.

24        And then, you know, to the extent that they're arguing

25   that people need to have evidence of imminent travel.  A couple

```
1    of responses to that.
2            So first, the expert declarations talk about the harm
3    inherent to having an identity document with the wrong sex
4    designation on it.  And so that, that harm is there whether or
5    not someone has imminent travel.
6            But also Defendant, like a rule that would require
7    imminent travel:  A, that's not the requirement for anybody
8    else applying for a passport.  If you apply for the passport,
9    the State Department doesn't ask you kind of what reason do you
10   have for this?  They just process your passport application.
11           But here it also puts people in a somewhat impossible
12   position, that they can't apply for a passport until they have
13   travel plans, but you may not want to make travel plans until
14   you have a passport, particularly because passports can take a
15   long time to process -- up to ten weeks.
16           You may also want a passport because, you know, you
17   travel a lot.  You might not have, like, plans, but you will,
18   and you need to replace your passport that expired or you've
19   changed your name or you lost it.  And plans can come up at the
20   last minute.  So there are all sorts of reasons why people
21   would want a passport, and the harms that flow from having an
22   inaccurate sex marker would occur absent this preliminary
23   injunction.
24           THE COURT:  Okay, all right.  Anything further?
25           Thank you.
```

1           All right.  I want to thank both sides for a good

2    argument.  I'm going to take both motions under advisement and

3    we'll stand in recess.

4           Thank you.

5           THE CLERK:  All rise.

6           (The Honorable Court Exited.)

7           (Whereupon, at 3:47 p.m., Court Stood in Recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4     UNITED STATES DISTRICT COURT )

 5     DISTRICT OF MASSACHUSETTS     )

 6

 7

 8            I, Catherine L. Zelinski, certify that the foregoing

 9     is a true and accurate transcription of my stenographic notes

10     from the record of proceedings taken Tuesday, May 27, 2025, in

11     the above-entitled matter to the best of my skill and ability.

12

13

14          /s/ Catherine L. Zelinski

15          Catherine L. Zelinski, RPR, CRC      ____5/30/2025____
            Official Court Reporter                      Date
16

17

18

19

20

21

22

23

24

25
```