# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASHTON ORR, *et al.*, | |
| *Plaintiffs*, | Case No. 1:25-cv-10313-JEK |
| v. | |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNTS SIX AND SEVEN OF THE AMENDED COMPLAINT

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT.................................................................... 1

II.    BACKGROUND .................................................................................... 2

    A.    The Agency Defendants Abruptly Change Decades-Long U.S. Passport Policy.......................................................................................... 2

    B.    This Court Enjoins the Passport Policy.................................................. 4

III.   LEGAL STANDARD ............................................................................ 5

IV.   ARGUMENT ...................................................................................... 6

    A.    The Passport Policy Is a Final Agency Action Subject to APA Review. ............... 6

        1.    The Passport Policy is not insulated from judicial review merely because it implements an executive order.................................. 6

        2.    The Passport Policy is not subject to the narrow agency-discretion exception. ..................................................................... 9

        3.    The Passport Policy is not insulated from judicial review by the government's invocation of foreign affairs............................... 10

    B.    The Passport Policy Is Arbitrary and Capricious................................... 12

    C.    The Agency Defendants Acted Without Observance of Procedure Required by Law When Replacing Passport Application Forms. ........................ 15

        1.    The Agency Defendants' substitution of passport application forms violated the PRA. .................................................... 15

        2.    The Agency Defendants have not cured their violation.......................... 16

        3.    The Agency Defendants further violated the PRA by failing to fully evaluate public comments and conduct an adequate burden analysis................................................................... 18

    D.    Vacatur Is Warranted. ................................................................. 19

V.    CONCLUSION.................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. C.A.B.*,
   713 F.2d 795 (D.C. Cir. 1983) ................................................................. 19

*Biden v. Texas*,
   597 U.S. 785 (2022) .......................................................................... 7

*Bowen v. Mich. Acad. of Fam. Physicians*,
   476 U.S. 667 (1986) .......................................................................... 9

*Camp v. Pitts*,
   411 U.S. 138 (1973) .......................................................................... 12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..................................................................... 5, 9

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982) ................................................................. 17

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ..................................................................... 9, 10

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ..................................................................... 12, 14

*Env't Integrity Project v. E.P.A.*,
   425 F.3d 992 (D.C. Cir. 2005) ................................................................. 17

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) .......................................................................... 12

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................... 7, 8

*Garland v. Cargill*,
   602 U.S. 406 (2024) .......................................................................... 7

*Georgetown Univ. Hosp. v. Bowen*,
   821 F.2d 750 (D.C. Cir. 1987) ................................................................. 19

*HIV & Hepatitis Pol'y Inst. v. HHS*,
   2023 WL 10669681 (D.D.C. Dec. 22, 2023) .......................................................... 19

*Housatonic River Initiative v. EPA*,
    75 F.4th 248 (1st Cir. 2023) ............................................................................13

*Kent v. Dulles*,
    357 U.S. 116 (1958) ...............................................................................10, 11

*Kooritzky v. Reich*,
    17 F.3d 1509 (D.C. Cir. 1994) ...............................................................16, 17

*Littlefield v. U.S. Dep't of the Interior*,
    656 F. Supp. 3d 280 (D. Mass. 2023) .................................................................5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................6, 12, 14

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ..............................................................................7

*O'Connell v. Shalala*,
    79 F.3d 170 (1st Cir. 1996) ............................................................................17

*Oxfam Am., Inc. v. SEC*,
    126 F. Supp. 3d 168 (D. Mass. 2015) ..............................................................19

*Patel v. Johnson*,
    2 F. Supp. 3d 108 (D. Mass. 2014) ...................................................................5

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) .............................................................................7

*Regan v. Wald*,
    468 U.S. 222 (1984) .......................................................................................11

*Shachtman v. Dulles*,
    225 F.2d 938 (D.C. Cir. 1955) ........................................................................10

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................................7, 9, 12

*Trump v. Orr*,
    No. 25A319 (S. Ct. Sept. 19, 2025) .................................................................16

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ...........................................................................................11

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ...........................................................................................11

*Zzyym v. Pompeo*,
   958 F.3d 1014 (10th Cir. 2020) .................................................................................10

**Statutes**

5 U.S.C. § 701 .................................................................................................................9

5 U.S.C. § 704 .................................................................................................................6

5 U.S.C. § 706 ......................................................................................................6, 15, 19

22 U.S.C. § 211a .........................................................................................................9, 10

44 U.S.C. 3506 .......................................................................................3, 4, 15, 16, 18

44 U.S.C. 3507 ..............................................................................................................15

**Other Authorities**

5 CFR § 1320.5(a)(1)(ii) ...................................................................................................18

Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).................................... *passim*

Exec. Order 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025)....................................................2

Exec. Order 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025)....................................................2

Exec. Order 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025) .....................................................3

Regulations.gov, Agency Information Collection Activities; Proposals,
   Submissions, and Approvals: Application for a U.S. Passport................................18

## I.    PRELIMINARY STATEMENT

The Court has already found that Plaintiffs are likely to succeed on their claim that the Agency Defendants (Department of State and Marco Rubio) acted arbitrarily and capriciously, and without observance of procedure required by law.  Based in part on that finding, the Court granted interim relief on Counts Six and Seven of the Amended Complaint.  The administrative record that has since been produced confirms that Plaintiffs are entitled to summary judgment on those claims: nothing in that record even resembles reasoned decision-making and it contains no justification or explanation for the government's hurried, haphazard policy rollback.  Vacatur is warranted.

For over thirty years, all Americans were able to travel without fear of misidentification, harassment, or violence by acquiring passports with sex designations that aligned with their gender identity.  The Agency Defendants abruptly changed that reality for countless transgender, nonbinary, and intersex citizens by precipitously instituting a new policy that implemented Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," 90 Fed. Reg. 8615 (the "EO"), issued on the first day of the new presidential administration.  This new policy, requiring that passports reflect the holder's sex assigned at birth, rather than a designation that accords with their gender identity (the "Passport Policy"), puts transgender, nonbinary, and intersex people in potential danger whenever they use a passport, as this Court has previously found.  It is arbitrary and capricious and was enacted without observance of law, all in violation of the Administrative Procedure Act (the "APA").[1]

---

[1] On August 6, 2025, the Court stayed Plaintiffs' claims raising constitutional arguments—Counts One through Five of the Amended Complaint—pending resolution of Defendants' appeal of the preliminary injunction orders.  *See* Ex. A (ECF 137).  Plaintiffs therefore have moved for summary judgment only on Counts Six and Seven of the Amended Complaint, which assert claims under the APA and were not stayed by the Court's August 6 order.  Plaintiffs reserve all rights to seek (continued…)

## II.    BACKGROUND

### A.    The Agency Defendants Abruptly Change Decades-Long U.S. Passport Policy.

For 33 years—the majority of time that U.S. passports listed sex markers—and across six presidential administrations, the government allowed individuals to self-select or amend the sex marker on their passports.  *See* Statement of Undisputed Material Facts ("SOF") ¶ 1.  Beginning in 1992, the State Department allowed passport applicants to choose a sex marker different from their sex assigned at birth.  Such changes initially required submission of medical documentation, but the government later permitted self-selection without such documentation.  *See* SOF ¶ 2; Ex. B (the "First PI") (ECF 74) at 4–6.  In 2021, the United States joined a growing number of jurisdictions in authorizing the use of "X" (*i.e.*, unspecified) sex markers.  SOF ¶ 3; First PI at 4-6.

On January 20, 2025, the first day of the new presidential administration, President Trump issued the EO, which adopts a narrow definition of sex that denies the existence of transgender, nonbinary, and intersex individuals.  SOF ¶ 4; First PI at 6–8.  The EO declares that there are only two, immutable sexes and that "women are biologically female, and men are biologically male." EO §§ 1, 2.  The EO further purports to define sex by reference to the capacity to produce a large or small reproductive cell "at conception."  *Id.*

The EO states that its purpose is to address "ideologues who deny the biological reality of sex [who have] increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers."  EO § 1.[2]  It declares that

---

summary judgment and relief on Counts One through Five following resolution of Defendants' appeal.

[2] The EO is far from the only example of such language directed at transgender individuals from this administration.  *See, e.g.*, Exec. Order 14183, Prioritizing Military Excellence and Readiness, 90 Fed. Reg. 8757, 8757 (Jan. 27, 2025) (stating that being transgender "conflicts with a soldier's (continued…)

transgender people, simply by existing, "attack women by depriving them of their dignity, safety, and well-being." *Id.* The EO refers to gender identity as an "inchoate social concept," and asserts that it is a "false claim that males can identify as and thus become women and vice versa." *Id.*

Mere days after the EO's issuance, the U.S. Department of State swiftly revised its passport issuance policy, requiring that passport sex markers correspond to sex assigned at birth (not, as provided by the EO, by reference to "conception") and eliminating the option for applicants to request an "X" sex designation (the "Passport Policy"). SOF ¶¶ 9-11; First PI at 8. To implement the Passport Policy, the Department replaced passport application forms allowing applicants to select an "X" designation with expired forms that lacked this option and that required applicants to select their sex assigned at birth. SOF ¶ 14; First PI at 9; Ex. C (application form that expired in 2023) (ECF 33.5). "[T]he Agency Defendants [have] concede[d] that the State Department uploaded prior versions of the forms without first issuing a 60-day notice," First PI at 44, as required by the Paperwork Reduction Act, 44 U.S.C. § 3506 ("PRA"). Instead, on February 14, 2025, *after* this lawsuit commenced, the Department belatedly published a 30-day public comment notice for the two-sex designation forms, Ex. D (Declaration of Matthew Pierce) (ECF 53.1) ¶ 20, claiming that the Department could rely on a 60-day notice to renew the three-sex designation forms published in November 2024, Ex. E (ECF 127) at 11. *See* SOF ¶¶ 9-17.

Mandating that transgender, nonbinary, and intersex individuals carry passports bearing sex markers inconsistent with their gender identity risks severe and irreparable harms. *See* First

---

commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"); Exec. Order 14187, Protecting Children from Chemical and Surgical Mutilation, 90 Fed. Reg. 8771, 8771 (Jan. 28, 2025) (referring to the treatment of gender dysphoria as "chemical and surgical mutilation" that "will be a stain on our Nation's history"); Exec. Order 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853, 8853 (Feb. 3, 2025) (stating that discussion of these issues "sow[s] division, confusion, and distrust").

PI at 47–49; Ex. F (the "Second PI") (ECF 115) at 24–26.  As this Court recognized, based on undisputed expert evidence, such a requirement exposes transgender, nonbinary, and intersex people to heightened risks of "harassment" and "violence."  Second PI at 24–26.  The Court further acknowledged that the Passport Policy exacerbates psychological harm for these individuals, "increas[ing] their risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence," and interferes with the treatment of gender dysphoria.  *Id.* at 25.

### B.    This Court Enjoins the Passport Policy.

On April 18, 2025, this Court, in granting Plaintiffs' motion for a preliminary injunction for six plaintiffs, found that the Passport Policy likely denies Plaintiffs equal protection of the law, likely is driven by animus (and thus impermissible under any level of scrutiny), and likely violates the APA, both because the Passport Policy is arbitrary and capricious and was adopted in violation of the statutory requirements of the PRA.  Subsequently, on June 17, 2025, the Court granted Plaintiffs' motions for class certification and extension of the preliminary injunction to cover class members with, essentially, an immediate need for a passport or who will have such a need in the near future.

Since the Court's preliminary injunction orders and Defendants' appeal and efforts to stay them, there has been only one relevant development: Defendants' production of the administrative record on August 27, 2025.  *See* Ex. G ("Administrative Record" or "AR") (ECF 140); SOF ¶ 20. The Administrative Record contains a handful of memoranda and draft guidance that center solely on implementation of the EO.  *See, e.g.*, AR at 28 (stating in press guidance regarding "Sex Marker Changes in U.S. Passports" that "State will implement [the EO] in accordance with its terms").

Two days after the EO issued, the State Department circulated a memorandum instructing that it "will no longer issue U.S. passports or [consular reports of births abroad] containing an X sex marker and will suspend applications seeking to change an individual's sex marker from that

defined in the executive order." *Id.* at 9. The only reason given in this memorandum was the signing of the EO. *Id.* What follows in the Administrative Record is guidance on how State Department personnel are to effectuate the EO and only issue passports that contain sex markers reflecting "an applicant's biological sex at birth." *See id.* at 13–14. Notably, the decision to issue passports as such deviates from the EO's definition of sex, which refers to sex "at conception," and the Administrative Record reveals that the State Department recognized this change:

> Although the [EO] defines "male" and "female" at the point of conception, it will be advantageous for CA [(Consular Affairs)] to adjudicate applications based on an applicant's biological sex at birth given that applicants provide vital records such as birth certificates, and because translating "sex at birth," rather than, "sex at conception," will decrease the incidences of an applicant's misunderstanding.

*Id.* Aside from implementing the EO, the Administrative Record does not contain any reasoning for why the State Department changed its policy regarding sex markers on passports. *See* SOF ¶ 20. It does not identify whether or how the prior policy, allowing for self-selection of sex markers and the selection of an "X" sex marker, was unworkable. It does not state that problems emerged as a result of the State Department's prior policy. It contains no evidence that the State Department considered at all how the new Passport Policy would affect stakeholders, citizens generally, or even the workings of the State Department itself. And it contains no evidence that the State Department weighed the pros and cons of any alternatives, including the policy in place for years.

## III.    LEGAL STANDARD

For APA claims, "the traditional Rule 56 standard does not apply," and summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Littlefield v. U.S. Dep't of the Interior*, 656 F. Supp. 3d 280, 290 (D. Mass. 2023). "[T]he district judge sits as an appellate tribunal, and the entire case on review is a question of law." *Patel v. Johnson*, 2 F. Supp. 3d 108, 117 (D. Mass. 2014) (cleaned up). The court considers "the full administrative

record that was before the [agency] at the time [it] made [its] decision." *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

A reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA also prohibits agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## IV.    ARGUMENT

### A.    The Passport Policy Is a Final Agency Action Subject to APA Review.

Defendants have never been able to defend their actions under the rubric of ordinary arbitrary-and-capricious review. Instead, they have sought to avoid judicial review by arguing that the Passport Policy (a) was compelled by executive order, (b) reflects decision-making committed to agency discretion by law, and (c) implicates nebulous foreign-affairs concerns, assertedly exempting it from the APA's reach. None of these arguments rescue the Passport Policy.

#### 1.    The Passport Policy is not insulated from judicial review merely because it implements an executive order.

Defendants have attempted to avoid judicial review by characterizing the Passport Policy as "presidential action" rather than agency action, Ex. H (ECF 53) at 6–7, but that position is wrong as a matter of law and fact. As this Court held, the Passport Policy is reviewable under the APA, and the government's attempt to redirect to the EO to avoid this outcome "finds no foothold in the text of the APA or on-point case law." First PI at 34.

The text of the APA is clear: final "agency action" is reviewable, and there is no carveout for agency action precipitated by executive orders.  5 U.S.C. § 704; *see also* First PI at 34 ("The APA contains no exception for agency actions, like the State Department's Passport Policy, that carry out an executive order.").  Unsurprisingly, courts have "never excepted a final rule from APA review because it carried out a presidential directive," *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024), and the First Circuit has expressly rejected the government's argument, *see New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("The Defendants also note, without further argument, that 'the President's directions to subordinates' are not 'themselves reviewable under the APA' because the 'President is not an "agency" within the meaning of th[at] statute.'  But the District Court did not review the *President's* actions for consistency with the APA.  Rather, it reviewed—and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders." (emphasis in original) (internal citations omitted)).  And courts, including the Supreme Court, routinely conduct APA review of agency actions that implement presidential directives.  *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406 (2024) (reviewing regulations implementing Presidential Memorandum No. 7949, 83 Fed. Reg. 7949 (Feb. 20, 2018)); *Biden v. Texas*, 597 U.S. 785 (2022) (reviewing actions implementing Exec. Order 14010, 86 Fed. Reg. 8269 (Feb. 2, 2021)).

Nor is the Passport Policy subject to the narrow exception to APA review recognized in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), which precludes APA review of actions taken by the President directly and personally.  *Franklin* embraces only a limited set of circumstances wherein the President—rather than an agency-level officer like the Secretary of State—"takes the final action" affecting the litigant's rights.  *Franklin*, 505 U.S. at 799; *see also Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary

for the agency action directly to affect the parties."). The relevant question, as *Franklin* itself provides, is when "the target stops moving." *Franklin*, 505 U.S. at 798.

Here, the target stopped moving with the State Department, not the President. The State Department took the "final action" that "carrie[s] . . . direct consequences," *id.*, for class members: it created the Passport Policy and implements that policy each time it adjudicates the content of each particular passport. As the Court previously put it, "[t]he final step of executive action that directly affected the plaintiffs here was the Passport Policy, not Executive Order 14168." First PI at 35. In addition, this Court has already recognized that the State Department "made at least three independent determinations in formulating the" Passport Policy *after* the Executive Order issued: "(1) it departed from the Executive Order's definition of 'female,' 'male,' and 'sex,' which depend on the size of the reproductive cells produced by a person at 'conception,' (2) it chose to defer to HHS's guidance on the meaning of these terms, which likewise does not turn on 'sex at conception'; and (3) it determined what sources of evidence to consult in order to assess a person's sex at birth." First PI at 35–36 (internal citations omitted). In other words, the Agency Defendants made several significant decisions in the development and implementation of the Passport Policy.

The Administrative Record confirms this finding. *See* AR at 13–14 ("Although the executive order defines 'male' and 'female' at the point of conception, it will be *advantageous* for [Consular Affairs] to adjudicate applications based on an applicant's biological sex at birth." (emphasis added)); *id.* at 38–40 ("The executive order directs the Department of Health and Human Services to provide guidance regarding the definitions . . . . [T]he documentation issued closest to an individual's birth should be used to establish the biological sex at birth.").

Thus, the Passport Policy constitutes final agency action that is subject to review under the APA notwithstanding that it followed in the wake of an executive order. Expanding the limited

*Franklin* exception to embrace all agency action related to an executive order "contradicts the text of the APA," is "undermine[d]" by "[e]ven a purposive approach to interpreting the APA," and "is not supported by existing precedent." *Su*, 121 F.4th at 15. To hold otherwise would allow "administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first" and sidestep the "public involvement, transparency, and deliberation required under the APA." *Id*. at 16.

### 2. The Passport Policy is not subject to the narrow agency-discretion exception.

Defendants also have attempted to evade judicial review by arguing that the Passport Policy is action of the type "traditionally regarded as committed to agency discretion" under 5 U.S.C. § 701(a)(2). Ex. H at 8–9. This position—that the agency has such boundless discretion no court can review its actions—contradicts Defendants' argument that the State Department had *no* discretion because the Passport Policy was compelled by executive order.

In any event, the Passport Policy does not fall within the narrow exception to the APA for actions committed to agency discretion by law. There is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986), and the "very narrow" agency-discretion exception is applicable only in "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Overton Park*, 401 U.S. at 410 (cleaned up). This exception is "generally limited . . . to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (cleaned up).

The Passport Policy does not fit the bill.  This Court has previously held that the Passport Act, 22 U.S.C. § 211a, "furnishes a meaningful standard against which to judge" the State Department's exercise of discretion and that the agency determinations made pursuant to the Passport Policy do not fall within "one of those areas traditionally committed to agency discretion."  First PI at 38 (cleaned up).  Similar to other agency actions that the Supreme Court has held do not fall within this exception, that Court "and other courts have entertained both constitutional and statutory challenges to [passport]-related decisionmaking," which is fatal to invoking the agency-discretion exception.  *Dep't of Com.*, 588 U.S. at 722.  For example, the Supreme Court has held that the authority granted by the Passport Act "is expressed in broad terms," and the Secretary of State does not have "unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose."  *Kent v. Dulles*, 357 U.S. 116, 127–28 (1958).  It has subjected the State Department's actions concerning passports to judicial review, including invalidating them when appropriate.  *Id.* at 128–29.  And other courts have entertained APA challenges to passport-related decisions too.  *See, e.g.*, *Zzyym v. Pompeo*, 958 F.3d 1014, 1022 (10th Cir. 2020); *see also, e.g.*, *Shachtman v. Dulles*, 225 F.2d 938, 941 (D.C. Cir. 1955) (due process arbitrariness challenge).

In short, agency decisions regarding the content of passports can—and must—be made "according to the general requirements of reasoned agency decisionmaking."  *Dep't of Com.*, 588 U.S. at 773 (internal quotation marks and citation omitted).

### 3.    The Passport Policy is not insulated from judicial review by the government's invocation of foreign affairs.

The government at various points additionally has claimed that foreign-affairs concerns prevent judicial review—although its precise arguments for why have been hazy and changed at each stage of proceedings.  But no matter how the government frames the argument, it too fails.

10

As this Court explained, the Passport Policy does not concern "a matter so intertwined with foreign relations that it is insulated from judicial review." First PI at 39. That finding flows from the Supreme Court's holdings. The Supreme Court has held that the President does not have plenary control over all content of passports, or all decisions to issue passports, and that aspects of the passport process like the Passport Policy do not implicate the President's foreign-affairs powers. For instance, "passport refusals based on the character of the particular applicant" do not implicate the President's foreign-policy powers (in contrast to passport refusals implicating "foreign policy considerations affecting all citizens"). *Zemel v. Rusk*, 381 U.S. 1, 13 (1965). Nor do actions like "selectively []deny[ing] passports on the basis of political belief or affiliation" implicate foreign-affairs powers. *Regan v. Wald*, 468 U.S. 222, 241 (1984); *see Kent*, 357 U.S. at 116. As this Court found, "the Passport Policy is based on characteristics peculiar to applicants like the plaintiffs—namely, their sex and gender"—so it falls outside the foreign-affairs prerogative. First PI at 39 (cleaned up). Or as Justice Scalia explained after reviewing the history of passports (in a passage that is consonant with the majority's holding), the history "discredit[s] any claim that, in the 'Anglo–American legal tradition,' travel documents have 'consistently been issued *and controlled* by the body exercising executive power.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 82 (2015) (Scalia, J., dissenting); *see also id.* at 83 (questioning whether passports "contain[] a communication directed at a foreign power" (internal quotation marks, alteration, and citation omitted)).

In addition, the government has failed to explain—let alone support with evidence—how sex markers on passports could possibly implicate foreign affairs. "Nothing in the Executive Order mentions foreign relations, and the government's declaration in this case does not justify the Passport Policy on foreign affairs or national security grounds; instead, it avers that the policy was

promulgated to comply with Executive Order 14168." First PI at 39. The government has no evidence—in the Administrative Record or otherwise—that would undermine the Court's finding. To the contrary, the Administrative Record makes *no mention* of foreign-affairs or national-security objections associated with the Passport Policy. And to the extent Defendants attempt to introduce such objections now for the first time, considering new, extra-record evidence would contravene the requirement that judicial review of the government's justifications is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

**B.      The Passport Policy Is Arbitrary and Capricious.**

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). It must examine "important aspect[s] of the problem." *Id.* And it must provide "a reasoned explanation for" a change to a prior policy and "take[] into account" the "serious reliance interests" that the prior "polic[y] may have engendered." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (cleaned up). The Passport Policy fails at each juncture.

The Passport Policy was neither "reasonable" or "reasonably explained." *Prometheus*, 592 U.S. at 423. The record before the Court in entering the preliminary injunctions indicated that the Agency Defendants made *no* factual findings in effectuating the Passport Policy and took *no* data into account in the "mere days" between the issuance of the Executive Order and the Passport Policy. *See* First PI at 43–44. Instead, it shows only that they rushed to comply with the EO. Indiscriminate compliance with an executive order without informed policymaking is not sufficient justification for agency action under the APA. *See, e.g.*, *Su*, 121 F.4th at 16 ("There is

12

[]nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order.").

The Administrative Record confirms the Court's preliminary findings.  The Administrative Record does not contain any indication that the State Department examined important aspects of the issues, considered alternatives, or explained the reasons for its sudden reversal of longstanding policy.  To take just a few examples, the State Department failed to consider the severe harms that transgender, nonbinary, and intersex individuals face when forced to present identity documents with sex markers discordant with their gender identity.  *See, e.g.*, Ex. I (Expert Declaration of Sarah D. Corathers) (ECF 78.13) ¶¶ 82–83 (documenting such harms).  The Department failed to consider that the Passport Policy would "out" transgender, nonbinary, and intersex individuals to officials—among other things, potentially leading to "terrif[ying]" "strip search[es]" at airports— effectively making it impossible to travel to countries that criminalize transgender status or cross- dressing.  *See, e.g.*, Ex. J (Affidavit of Chastain Anderson) (ECF 30.6) ¶ 13; Ex. K (Expert Declaration of Ayden Scheim) (ECF 78-14) ¶¶ 22–23.  The Department failed to consider that the government's definitions of "sex" cannot account for individuals with certain intersex conditions. *See* Ex. L (Rebuttal Expert Declaration of Sarah D. Corathers) (ECF 62.1) ¶¶ 6–7.  And the Department did not consider how formulating its own definition of "sex" undermined the stated "goal" of "one uniform definition of 'sex.'"  *See* Ex. D ¶¶ 14, 19.  More fundamentally, there is no indication that the Agency Defendants weighed the pros and cons of any alternatives, including the alternative that had been in place without any problems for years.

The Administrative Record also does not contain the required reasoned explanation for the Passport Policy's adoption other than implementation of the EO.  It certainly does not contain the "more detailed justification" required when an agency makes an "about-face" from a prior policy.

*Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023).  It does not identify whether the State Department's prior policy posed significant problems, let alone why those problems warranted changing policy to one that inflicts grave harm.  And it contains no discussion or analysis by the State Department regarding how the Passport Policy would affect stakeholders and others once in effect.  The Administrative Record, once again, instead confirms that the Passport Policy was a rushed attempt at implementing an animus-filled, ideological executive order and was not the product of reasoned policymaking.

Even if the Department's sole reliance on the EO were enough under the APA—a position this Court has rightly rejected as one that would "contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review," First PI at 43—the EO itself contains no reasoned analysis that could adequately support the Passport Policy.  It is replete with misleading, unsubstantiated assertions about transgender people and characterizes its objective as "defending women from gender ideology"—an ideological aim that is disconnected from reality.  90 Fed. Reg. at 8615.

In any event, the mismatch between the justifications in the EO and the operation of the Passport Policy, as well as Defendants' post-hoc reliance on purported governmental interests such as foreign relations or government consistency and uniformity nowhere mentioned in the Administrative Record or the EO undermine any "rational connection" between the Passport Policy and the EO.  *State Farm*, 463 U.S. at 43.

There is likewise no evidence that the Department attempted to identify and consider, let alone mitigate, any "serious reliance interests" implicated by its 180-degree policy change.  *Navarro*, 579 U.S. at 221–22; *see also* First PI at 41–42.  The State Department allowed sex markers for sexes other than those indicated on birth certificates for 33 years before effectuation

of the Passport Policy, *see* Ex. D at ¶ 6, and this longstanding practice has engendered reasonable reliance interests.  For instance, those who previously obtained passports with sex markers that aligned with their gender identity reasonably relied on receiving the same sex markers when they sought to renew their passports prior to adoption of the Passport Policy but instead received sex markers inconsistent with their gender identity after the policy went into effect.  Likewise, those who applied for a new or changed passport prior to adoption of the Passport Policy reasonably relied on being able to obtain a sex marker consistent with their gender identity when they made travel plans, only to receive a passport that would "out" them and subject them to risk of harm when used.

## C.    The Agency Defendants Acted Without Observance of Procedure Required by Law When Replacing Passport Application Forms.

This Court has already recognized that Plaintiffs have a substantial likelihood of prevailing on their claim that the Agency Defendants violated Section 706(2)(D) of the APA by acting without observance of procedure required by law when they failed to comply with the requirements of the PRA.  *See* First PI at 44–46.  Plaintiffs are now entitled to summary judgment that the Agency Defendants violated the PRA by hurriedly substituting the passport application forms in place prior to Executive Order 14168 (Exs. M–O) (the "Existing Forms") with expired forms (Exs. C, P–Q) (the "Substituted Forms") almost immediately thereafter.

### 1.    The Agency Defendants' substitution of passport application forms violated the PRA.

Under the PRA, any federal agency seeking to collect information from the public for use by the agency must first "provide 60-day notice in the Federal Register, and otherwise consult with members of the public" to solicit comments. 44 U.S.C. § 3506(c)(2)(A).  Then, the government must provide a 30-day period for notice and comment while the Office of Management and Budget ("OMB") reviews the forms.  *See* 44 U.S. Code § 3507(b).

15

Defendants have conceded that passport application forms are subject to the PRA and that they began using the Substituted Forms without first issuing a 60-day notice regarding them. *See* First PI at 44–45. This use of the Substituted Forms, which had by then expired, violated the PRA. *See* 44 U.S.C. § 3506(c)(2)(A).

### 2. The Agency Defendants have not cured their violation.

Defendants have claimed that their PRA violation was cured through the OMB's June 2025 certification of the Substituted Forms. *See* Ex. E at 11–12. But the process by which the Agency Defendants obtained OMB's certification itself did not satisfy the PRA.

The government has misleadingly suggested that it satisfied the PRA because "the State Department issued 60-day notices for [the Substituted Forms] in November 2024 and issued 30-day notices for all three forms in February 2025." Ex. E at 11. That is false: it *never* issued a 60-day notice for the Substituted Forms. The November 2024 notice was for renewing the *Existing Forms*, which are materially different—indeed, diametrically opposed—and allowed self-selection of a sex marker and selection of an X marker. *See* Ex. D ¶¶ 8–9. The government already admitted as much in its briefing before the Supreme Court: the Substituted Forms "differed from the forms that the Department had previously published during the 60-day comment period." Ex. R (Application for Stay, *Trump v. Orr*, No. 25A319 (S. Ct. Sept. 19, 2025)) ("Stay App."), at 31.

The notices published in the Federal Register in November 2024 proposing the renewal of the Existing Forms do not cure the PRA violation for the Substituted Forms. The government provides no support for the notion that putting one form through the notice-and-comment process satisfies the PRA for *other* forms—especially for forms that are their antithesis in that one set *permitted* self-selection of sex markers and an X marker and one set *prohibited* those options.

The government has not identified any case law that supports its proposition that an agency can cut the PRA's 90-day notice and comment requirement down to a 30-day period by simply

initiating a 60-day period on one set of forms and then commencing a 30-day period on a substantially different set of forms. Defendants referenced *Kooritzky v. Reich*, 17 F.3d 1509 (D.C. Cir. 1994), in their Supreme Court briefing. *See* Stay App. at 31. That case is about the APA's rulemaking notice-and-comment requirements, not the PRA. But even assuming the same approach applied to the PRA's requirements, *Kooritzky* cuts against Defendants. While *Kooritzky* states that "[a]gencies should be free to adjust or abandon their proposals in light of public comments or internal agency reconsideration without having to start another round of rulemaking," it explains that "[t]he necessary predicate" for doing that "is that the agency has alerted interested parties to the possibility of the agency's adopting a rule different than the one proposed." *Id.* at 1513. As in *Kooritzky*, the forms that were the subject of the 60-day notice "contain[ed] nothing, not the merest hint, to suggest that the Department might tighten its existing practice" and "prohibit[] what the [original proposal] had permitted." *Id.*

In fact, applying the government's apparent approach of using the APA's notice-and-comment requirements demonstrates how far it strayed from basic administrative-law requirements. As the First Circuit has explained, the APA "does not permit . . . proposing one regulation and then issuing something radically different as a final rule." *O'Connell v. Shalala*, 79 F.3d 170, 180 (1st Cir. 1996). Instead "a final rule must be . . . in character with, the earlier proposed rule," and if it "deviates substantially from the proposed rule, it amounts to a new proposal and must run the regulatory gauntlet afresh." *Id.*; *see also, e.g.*, *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 533 (D.C. Cir. 1982) (similar). "If the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about which particular aspects of its proposal are open for consideration." *Env't Integrity Project v. E.P.A.*, 425 F.3d 992, 998 (D.C. Cir. 2005). The government's about-face

here is the very definition of a "radically different" final product, *O'Connell*, 79 F.3d at 180, and deprived the public of its statutorily required chance to comment—and the "trust" that comes with it, *Env't Integrity Project*, 425 F.3d at 998.

### 3. The Agency Defendants further violated the PRA by failing to fully evaluate public comments and conduct an adequate burden analysis.

The PRA's notice-and-comment periods are not mere formalities; they are statutory requirements that permit members of the public to be heard by the government agencies that seek to collect information from them. As such, agencies must "evaluate the public comments received." 5 CFR § 1320.5(a)(1)(ii). Not only did the Agency Defendants completely deprive the public of the opportunity to comment on the Substituted Forms during the 60-day period mandated by the PRA, but public records indicate that the government failed to adequately evaluate the public comments it received during the abbreviated 30-day notice-and-comment period.

Upon approval of one of the Substituted Forms, for example, the Office of Information and Regulatory Affairs ("OIRA") issued a supporting statement claiming compliance with the PRA and stating that the State Department received 1,620 comments during the 30-day comment period that closed on March 17, 2025. *See* Ex. S (OIRA Supporting Statement for Paperwork Reduction Act Submission, Application for a U.S. Passport OMB No. 1405-0004); SOF ¶ 18. Yet, according to the government's system to which the public submits comments, the agency actually received *116,258* comments in response to its notice of the proposed Substituted Forms, all of which were received during the 30-day period from February 13, 2025 to March 17, 2025.[3] The Agency Defendants cannot possibly have adequately evaluated the public comments received during this

---

[3] *See* SOF ¶ 18; Regulations.gov, Agency Information Collection Activities; Proposals, Submissions, and Approvals: Application for a U.S. Passport, https://www.regulations.gov/document/DOS_FRDOC_0001-6771.

30-day period given this discrepancy between the number of comments received as reported by OIRA and that reported by Regulations.gov. That failure to adequately and in good faith evaluate comments also violates the APA.

### D.    Vacatur Is Warranted.

Once the Court grants summary judgment, the APA requires that it "set aside" the Passport Policy by vacatur. 5 U.S.C. § 706(2). And, as this Court has put it, "[i]t is well established that when a court vacates an agency's rules under 5 U.S.C. § 706(2), the vacatur restores the status quo before the invalid rule took effect." First PI at 54 (cleaned up); *see, e.g., Oxfam Am., Inc. v. SEC*, 126 F. Supp. 3d 168, 172 (D. Mass. 2015) (collecting cases); *see also Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) (same). That "reinstatement-on-vacatur principle" is "consistent with the unanimous body of law" from across the country. *HIV & Hepatitis Pol'y Inst. v. HHS*, 2023 WL 10669681, at *3 (D.D.C. Dec. 22, 2023) (cleaned up); *see also Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("[B]y vacating or rescinding the recissions proposed by [the challenged rule], the judgment of this court had the effect of reinstating the rules previously in force.").

Here, vacatur and restoration of the status quo before the Passport Policy require reinstating the country's passport sex marker policy as it stood before the current Passport Policy came into effect. The Court should order the State Department to process passport applications, issue passports, and provide passport application forms in the manner it did on January 19, 2025.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment, vacate the Passport Policy and restore the status quo that existed before that policy was enacted.

Respectfully submitted,

October 17, 2025

*Isaac D. Chaput*
Isaac D. Chaput (*pro hac vice*)
William P. Kasper (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: 415-591-6000
Facsimile: 415-591-6091
ichaput@cov.com
wkasper@cov.com

Jessie J. Rossman (BBO # 670685)
Jennifer M. Herrmann (BBO # 708231)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
Telephone: 617-482-3170
jrossman@aclum.org
jherrmann@aclum.org

Jon W. Davidson (*pro hac vice*)
    (admitted only in California)
Li Nowlin-Sohl (*pro hac vice*)
    (admitted only in Washington)
Sruti J. Swaminathan (*pro hac vice*)
Malita V. Picasso (*pro hac vice*)
James D. Esseks (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
jondavidson@aclu.org
lnowlin-sohl@aclu.org
sswaminathan@aclu.org
mpicasso@aclu.org
jesseks@aclu.org

20

Aditi Fruitwala (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
afruitwala@aclu.org

Ansel F. Carpenter (*pro hac vice*)
Gavin W. Jackson (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 424-332-4758
Facsimile: 424-332-4749
acarpenter@cov.com
gjackson@cov.com

Jonathan Thompson (*pro hac vice*)
Sean M. Bender (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: 202-662-5891
Facsimile: 202-778-5891
jothompson@cov.com
sbender@cov.com

Robert C. Gianchetti (*pro hac vice*)
Yuval Mor (*pro hac vice*)
Alyssa L. Curcio (*pro hac vice*)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
Telephone: 212-841-1000
Facsimile: 212-841-1010
rgianchetti@cov.com
ymor@cov.com
acurcio@cov.com

*Attorneys for Plaintiffs and the Classes*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/ <i>Isaac D. Chaput</i>
Isaac D. Chaput
