# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR et al.,

     *Plaintiffs*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,

     *Defendants*.

Civil Action No. 1:25-cv-10313
(Leave to file excess pages granted on March 11, 2025)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## TO STAY AGENCY ACTION AND FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

Background .................................................................................................................................. 2

   I.   The Passport Policy............................................................................................................ 2

   II.  State Department's Passport Application Forms ................................................................ 4

   III.  Procedural History ............................................................................................................. 5

Legal Standard ............................................................................................................................ 5

Argument .................................................................................................................................... 6

   I.   Plaintiffs Are Unlikely to Succeed on the Merits. ............................................................ 6

      A.   The Court Should Not Consider Extra-Record Evidence in Assessing the Likelihood of
      Success on the Merits........................................................................................................ 6

      B.   Plaintiffs Are Unlikely to Succeed on Their APA Claim. ............................................... 6

         1.   Rules for Issuing Passports Are Not Reviewable Under the APA. ........................... 6

         2.   Plaintiffs Are Unlikely to Show That the Passport Policy is Arbitrary and
         Capricious. ....................................................................................................................... 9

         3.   Plaintiffs Are Not Likely to Succeed on Their Challenge Under the Paperwork
         Reduction Act ("PRA"). ............................................................................................... 16

      C.   Plaintiffs Are Unlikely to Succeed on Their Constitutional Claims. ............................ 17

         1.   The Court Should Apply Rational Basis Review. ................................................... 17

            i.   Count I: Equal Protection....................................................................................... 17

               a.   The Policy Does Not Discriminate Based on Sex. ........................................... 17

               b.   The Policy Does Not Classify Based on "Transgender Status."....................... 18

               c.   Heightened Scrutiny Is Not Warranted Based on Alleged Animus.................. 20

            ii.   Count II: Right to Travel......................................................................................... 20

            iii.   Count III: Right to Privacy .................................................................................... 23

         2.   Under Heightened Scrutiny or Rational Basis Review, Plaintiffs Are Unlikely to
         Succeed on Their Constitutional Claims........................................................................ 25

   II.  Plaintiffs Have Not Demonstrated Irreparable Harm. .................................................... 26

   III.  The Balance of the Equities Favors the United States. ................................................... 27

   IV.  Any Relief Should Be Limited to the Named Plaintiffs Only. ....................................... 27

Conclusion ............................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Abuhajeb v. Pompeo*,
    531 F. Supp. 3d 447 (D. Mass. 2021) .................................................................. 24

*Albright v. Oliver*,
    510 U.S. 266 (1994)........................................................................................... 24

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
    34 F. Supp. 3d 160 (D.D.C. 2014) .................................................................... 17

*Ancient Coin Collectors Guild v. CBP*,
    801 F. Supp. 2d 383 (D. Md. 2011).................................................................... 8

*Aptheker v. Secretary of State*,
    378 U.S. 500 (1964)........................................................................................... 23

*Arroyo Gonzalez v. Rossello Nevares*,
    305 F. Supp. 3d 327 (D.P.R. 2018).................................................................... 25

*Bowen v. Gilliard*,
    483 U.S. 587 (1987)........................................................................................... 20

*Califano v. Aznavorian*,
    439 U.S. 170 (1978)..................................................................................... 23, 24

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................. 29

*California v. U.S. Bureau of Land Mgmt.*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................................ 29

*Camp v. Pitts*,
    411 U.S. 138 (1973)............................................................................................. 6

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004).............................................................................. 27

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)........................................................................... 18, 19, 20, 21

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989)............................................................................................. 26

*City of New Bedford v. Locke*,
    Civ. A. No. 10-10789, 2011 WL 2636863 (D. Mass. June 30, 2011) ....................... 17

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992) .................................................................. 22

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008) ..................................................... 26

*Corbitt v. Sec'y of the Ala. Law Enf't Agency*,
    115 F.4th 1335 (11th Cir. 2024) ......................... 12, 13, 18, 27

*Craig v. Boren*,
    429 U.S. 190 (1976) .................................................................. 19

*Dalton v. Specter*,
    511 U.S. 462 (1994) .................................................................... 7

*Dandridge v. Williams*,
    397 U.S. 471 (1970) .................................................................. 26

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) .............................................................. 29

*Dep't of State v. Munoz*,
    602 U.S. 899 (2024) .................................................................. 24

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) .................................. 7, 8, 9

*Dist. 4 Lodge of the Int'l Ass'n of Mechanists & Aerospace Workers Loc. Lodge 207 v. Raimondo*,
    18 F.4th 38 (1st Cir. 2021) ...................................................... 10

*Dobbs v. Jackson Women's Health Organization*,
    597 U.S. 215 (2022) .................................................................. 25

*Does 1–6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021) ........................................................ 6

*Eknes-Tucker v. Governor of Ala.*,
    114 F.4th 1241 (11th Cir. 2024) ............................................ 20

*Eunique v. Powell*,
    302 F.3d 971 (9th Cir. 2002) ....................................... 21, 22, 23

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ............................................................ 25, 26

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................ 11, 14

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................................. 7, 11

*Gill v. Whitford,*
  585 U.S. 48 (2018) ......................................................................................................... 29

*Gonzalez-Droz v. Gonzalez-Colon,*
  660 F.3d 1 (1st Cir. 2011) ...................................................................................... 25, 26

*Gore v. Lee,*
  107 F.4th 548 (6th Cir. 2024) ............................................................................. *passim*

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ....................................................................................................... 29

*Haig v. Agee,*
  453 U.S. 280 (1981) ............................................................................................... *passim*

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ......................................................................................................... 9

*Heller v. Doe,*
  509 U.S. 312 (1993) ....................................................................................................... 26

*Ohio Stands Up! v. HHS,*
  564 F. Supp. 3d 605 (N.D. Ohio 2021) .................................................................... 17

*Hill Dermaceuticals, Inc. v. FDA,*
  709 F.3d 44 (D.C. Cir. 2013) ......................................................................................... 6

*Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region,*
  75 F.4th 248 (1st Cir. 2023) .................................................................................... 7, 11

*Jacob v. Curt,*
  721 F. Supp. 1536 (D.R.I. 1989) ................................................................................ 24

*Johnson v. California,*
  543 U.S. 499 (2005) ....................................................................................................... 18

*Kent v. Dulles,*
  357 U.S. 116 (1958) ....................................................................................................... 10

*L. W. ex rel. Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ............................................................................ 18, 19, 20, 21

*Legal Assistance for Vietnamese Asylum Seekers v. U.S. Dep't of State,*
  104 F.3d 1349 (D.C. Cir. 1997) ................................................................................... 9

iv

*Lewis v. Casey*,
    518 U.S. 343 (1996)........................................................................................... 29

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)........................................................................................ 8, 9

*Littlefield v. DOI*,
    85 F.4th 635 (1st Cir. 2023)........................................................................... 10

*Loving v. Virginia*,
    388 U.S. 1 (1967)........................................................................................... 18

*Lyng v. Castillo*,
    477 U.S. 635 (1986)...................................................................................... 19

*Maehr v. U.S. Dep't of State*,
    5 F.4th 1100 (10th Cir. 2021) ................................................................. 22, 23

*Marasco & Nesselbush, LLP v. Collins*,
    6 F.4th 150 (1st Cir. 2021)............................................................................ 10

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976)...................................................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................ 11

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019)........................................................... 29

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................ 6

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)........................................................................................... 23

*Orkin v. Albert*,
    579 F. Supp. 3d 238 (D. Mass. 2022) ........................................................... 28

*Peoples Fed. Sav. Bank v. People's United Bank*,
    672 F.3d 1 (1st Cir. 2012).............................................................................. 6

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999).......................................................................... 25

*Regan v. Wald*,
    468 U.S. 222 (1984)...................................................................................... 23

*Risenhoover v. Washington County Community Services,*
  545 F. Supp. 2d 885 (D. Minn. 2008) ................................................................... 23

*Roe v. Wade,*
  410 U.S. 113 (1973) .............................................................................................. 25

*Romer v. Evans,*
  517 U.S. 620 (1996) .............................................................................................. 25

*Saavedra Bruno v. Albright,*
  197 F.3d 1153 (D.C. Cir. 1999) ............................................................................. 9

*Sampson v. Murray,*
  415 U.S. 61 (1974) ................................................................................................ 30

*San Antonio Independent Sch. Dist. v. Rodriguez,*
  411 U.S. 1 (1973) .................................................................................................. 20

*Sessions v. Morales-Santana,*
  582 U.S. 47 (2017) ................................................................................................ 19

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) .............................................................................................. 21

*Sutton v. Providence St. Joseph Med. Ctr.,*
  192 F.3d 826 (9th Cir. 1999) ................................................................................. 17

*Trump v. Hawaii,*
  585 U.S. 667 (2018) .................................................................................. 21, 27, 29

*United States v. Laub,*
  385 U.S. 475 (1967) .............................................................................................. 10

*United States v. O'Brien,*
  391 U.S. 367 (1968) .............................................................................................. 21

*United States v. Virginia,*
  518 U.S. 515 (1996) .............................................................................................. 18

*Urtetiqui v. D'Arcy,*
  34 U.S. (9 Pet.) 692 (1835) ................................................................................... 10

*Vance v. Bradley,*
  440 U.S. 93 (1979) ................................................................................................ 26

*VanDerStok v. Garland,*
  633 F. Supp. 3d 847 (N.D. Tex. 2022) ................................................................. 29

*Vazquez-Rivera v. Figueroa*,
    759 F.3d 44 (1st Cir. 2014) ................................................................. 28

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .............................................................. 22, 24

*Webster v. Doe*,
    486 U.S. 592 (1988) ........................................................................ 8

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ...................................................................... 30

*Winter v. Nat. Res. Def. Counsel, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 6

*Woodward v. Rogers*,
    344 F. Supp. 974 (D.D.C. 1972) ................................................. 23, 24

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ...................................................................... 2, 23

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ........................................... *passim*

**STATUTES**

5 U.S.C. § 701 ............................................................................... 7, 8

5 U.S.C. § 702 ................................................................................. 17

5 U.S.C. § 705 ........................................................................... 29, 30

5 U.S.C. § 706 ................................................................................... 6

22 U.S.C. § 211a ....................................................................... *passim*

44 U.S.C. § 3507 ............................................................................... 4

44 U.S.C. § 3512 ............................................................................. 17

**REGULATIONS**

22 C.F.R. §§ 51.1–51.74 ..................................................................... 2

22 C.F.R. § 51.1 ................................................................................. 2

22 C.F.R. § 51.7 ................................................................................. 2

22 C.F.R. § 51.20 ...............................................................................

22 C.F.R. § 51.23 ............................................................................................................ 2

Rules Governing the Granting, Issuing, and Verifying of United States Passports,
   Executive Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966) ................................... 8

60-day Notice of Proposed Information Collection: Application for a U.S. Passport,
   84 Fed. Reg. 24,590-01 (May 28, 2019) .................................................................. 5

30-Day Notice of Proposed Information Collection: Application for a U.S. Passport,
   84 Fed. Reg. 42,037-02 (Aug. 16, 2019) ................................................................. 5

Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,
   Executive Order 14,168, 90 Fed Reg. 8,615 (Jan. 20, 2025)............................................ *passim*

## OTHER AUTHORITIES

Defining Sex, HHS (*Defining Sex*) (Feb. 19, 2025),
   https://perma.cc/9DNS-CHSZ ........................................................................... 3, 15

## INTRODUCTION

A passport is, at its core, "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Haig v. Agee*, 453 U.S. 280, 292 (1981). As such, it has long been the case that "the issuance of a passport was committed to the sole discretion of the Executive." *Id.* at 293. For decades, administrations of both parties have issued passports with only two options in the sex field: "M" or "F." And for many years, applicants wishing to receive a passport with a sex different from their biological sex could change the sex marker only with certain forms of evidence, such as of surgical reassignment or a physician's certification. Then, in 2021, consistent with an executive order issued by former President Biden, the Department of State ("Department") changed its policy permitting applicants to self-select their sex marker as "M," "F," or "X." Concerned that self-selection and indeterminate definitions of sex undermines "longstanding, cherished legal rights and values," President Trump issued Executive Order 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed Reg. 8,615 (Jan. 20, 2025) [hereinafter EO], which sets forth definitions of *sex*, *female*, and *male* that are to be used across the federal government. The EO also instructs the Department to implement changes to passports such that they accurately reflect the holder's sex according to those definitions. To comply with the EO and to further the goal of government-wide uniformity in the definition of *sex*, the Department changed its policy, issuing passports in only "M" or "F" based on birth certificates or other documentation close to birth ("Passport Policy").

Shortly after the President issued the EO, Plaintiffs, a group of individuals asserting varying gender identities and at varying stages of applying (or not) for a passport, brought this suit, seeking to stay the effective date and to preliminarily enjoin the Passport Policy. ECF Nos 1 & 29. The Court should deny their request. First, Plaintiffs are unlikely to succeed on the merits. Judicial review of Plaintiffs' Administrative Procedure Act ("APA") claim is unavailable because passport issuance is committed to the President's discretion. And even if the Policy were reviewable, under the APA's highly deferential standard of review, the Passport Policy was the product of reasoned

1

decision making. The Policy does not violate the equal protection guarantees of the Constitution or substantive due process either: the Policy does not classify based on a constitutionally protected class or burden any fundamental right, and it easily satisfies constitutional scrutiny under rational basis review. Second, Plaintiffs—all of whom are free to travel abroad—have not shown that they would suffer irreparable harm absent an injunction. Finally, the balance of the equities favors the government, particularly on an issue such as this, which concerns a core Executive function to communicate with foreign sovereigns. The Court should deny Plaintiffs' Motion.

**BACKGROUND**

## I.     The Passport Policy

"The Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. Pursuant to this "broad rule-making authority," *Zemel v. Rusk*, 381 U.S. 1, 12 (1965), the Department has promulgated a series of regulations that govern the issuance of passports, *see* 22 C.F.R. §§ 51.1–51.74. The regulations define a passport as "a travel document regardless of format issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer," *id.* § 51.1(d), and explain that "[a] passport at all times remains the property of the United States and must be returned to the U.S. Government upon demand," *id.* § 51.7(a). Before the Department issues a passport, "[a]n application for a passport . . . must be completed using the forms the Department prescribes." *Id.* § 51.20(a). As part of the application, "[t]he applicant has the burden of establishing his or her identity." *Id.* § 51.23(a).

For many decades, U.S. passports and U.S. passport applications had "sex" as a required field, and "M" and "F" were the only available options. Pierce Decl. ¶¶ 4–5. Beginning in 1992, applicants could submit evidence of surgical reassignment as proof of sex. *See id.* ¶ 6. In 2010, the Department eliminated this requirement and instead accepted a physician's certification of appropriate clinical treatment for gender transition. *See id.* In 2022, passport application forms began to include an "X" gender marker option in addition to "M" and "F" as well as a checkbox

2

for the applicant to indicate a change in their gender. *Id.* But even following that change, the passport visual inspection zone has consistently and continuously used the term "Sex." *Id.*

On January 20, 2025, the President issued Executive Order 14,168, which declares, "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* at 8,615. The EO also provides that certain definitions "shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.* As relevant to this case, the definitions are as follows:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity." . . .
>
> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell. . . .
>
> (g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.* at 8,615–16.

The EO also directs the Secretary of Health and Human Services (HHS) to "provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order." *Id.* at 8,616. HHS has recently done that: "***Sex*** is a person's immutable biological classification as either male or female"; "***Female*** is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)"; and "***Male*** is a person of the sex characterized by a reproductive system with the biological function of producing sperm." Defining Sex, HHS (*Defining Sex*) (Feb. 19, 2025), https://perma.cc/9DNS-CHSZ. HHS recognized that "[h]aving the biological function to produce eggs or sperm does not require that eggs or sperm are ever produced" and that "[s]ome females or males may not or may

no longer produce eggs or sperm due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility." *Id.*

The EO requires these definitions to be applied government-wide: each agency must "give the terms 'sex', 'male', 'female', 'men', 'women', 'boys' and 'girls' the meanings set forth in section 2 of th[e] order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." 90 Fed. Reg. 8,616. The EO also states that "[w]hen administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term 'sex' and not 'gender' in all applicable Federal policies and documents." *Id.* And the Department of State must "implement changes to require that government-issued identification documents, including passports, . . . accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* The EO further provides, "Agency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.*

The Department has taken several steps to implement EO 14,168. On January 22, 2025, the Department stopped issuing passports with an "X" and held all non-urgent applications seeking an "X" marker or seeking a sex marker other than the applicant's biological sex to ensure consistent adjudication. *See* Pierce Decl. ¶ 15. On February 7, 2025, the Department resumed processing affected applications with guidance on how to adjudicate sex. *Id.* ¶ 18.

## II.   State Department's Passport Application Forms

Several years ago, the Department initiated a process to change three passport application forms—DS-11 (new passport), DS-82 (passport renewal), and DS-5504 (data correction, name change, and limited validity passport)—to include "X" and allow applicants to indicate a change in gender without supporting documentation. *Id.* ¶¶ 6–7. Those forms expire on April 30, 2025. *Id.*; *see also* 44 U.S.C. § 3507(f)(2) (forms approved under the Paperwork Reduction Act are approved for a maximum of three years). In November 2024, the Department began the renewal process for all three forms by issuing 60-day notices to solicit public comment. Pierce Decl. ¶ 9.

4

On February 24, 2025, the Department issued 30-day notices to solicit additional comments while the Office of Management and Budget reviews the matter. *Id.* ¶ 20.

In late January 2025, after consulting with the Office of Information and Regulatory Affairs, the Department uploaded prior versions of the DS-11, DS-82, and DS-5504 forms to its website and removed the paper versions of the forms that offered only the sex marker of "M" or "F." *Id.* ¶ 17. Those forms had undergone the requisite approval process, wherein the Department issued 60-day notices, followed by 30-day notices and Office of Management and Budget approval. *See* 60-day Notice of Proposed Information Collection: Application for a U.S. Passport, 84 Fed. Reg. 24590-01 (May 28, 2019); 30-Day Notice of Proposed Information Collection: Application for a U.S. Passport, 84 Fed. Reg. 42037-02 (Aug. 16, 2019).

### III.    Procedural History

Plaintiffs filed this a putative class action on February 7, 2025, asserting various equal protection, substantive due process, and Administrative Procedure Act claims. ECF No. 1. Their motion to stay agency action and for preliminary injunction followed. ECF No. 29.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012). A movant may be awarded such an extraordinary remedy "upon a clear showing" that they are "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). That is, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest." *Peoples Fed. Sav. Bank*, 672 F.3d at 9 (citation omitted). Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

**ARGUMENT**

## I.     Plaintiffs Are Unlikely to Succeed on the Merits.

### A.     The Court Should Not Consider Extra-Record Evidence in Assessing the Likelihood of Success on the Merits.

Plaintiffs have attached numerous declarations on which they rely in support of their Motion. *See, e.g.*, Pls.' Mem. 14. The Court should disregard these declarations for purposes of assessing the likelihood of success on the merits and instead focus on the materials that were before the Department when it developed the Policy.

In determining whether agency action may be set aside, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. This means that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (holding that a district court properly disregarded extra-record declarations because "it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision" (citation omitted). Only in rare circumstances can the record be supplemented. *See Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 279 (1st Cir. 2023). Accordingly, the Court should disregard Plaintiffs' declarations in assessing the likelihood of success on the merits.

### B.     Plaintiffs Are Unlikely to Succeed on Their APA Claim.

#### 1.     Rules for Issuing Passports Are Not Reviewable Under the APA.

Plaintiffs' APA claim is not reviewable. The APA provides for judicial review of final *agency* action, not *presidential* action. The President is not an "agency" under Section 704, and presidential action is not reviewable under the APA. *See, e.g.*, *Franklin v. Massachusetts,* 505 U.S. 788, 799–801 (1992); *Dalton v. Specter,* 511 U.S. 462, 469 (1994); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("[T]he APA is not available to review

presidential actions—*i.e.*, actions involving the exercise of discretionary authority vested in the President by law."), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018).

For example, in *Detroit International Bridge*, the plaintiff challenged the State Department's approval of a permit for construction of a new bridge between Canada and the United States. 189 F. Supp. 3d at 88. The court held that the plaintiff could not challenge the approval under the APA because Congress had given the President "broad discretionary authority" to approve the construction of international bridges. *Id.* at 100. This was so even though the President had delegated authority to the State Department: "[b]y delegating authority to the President, . . . Congress recognized the importance of the President's role in the process and made a conscious decision to defer to the President's discretion and decision-making given the foreign policy considerations inherent in deciding whether to approve the construction and maintenance of a new international bridge." *Id.* at 105 (cleaned up).

Here, the Passport Act likewise confers on the President broad discretionary authority to designate and prescribe rules for passports. *See* 22 U.S.C. § 211a (providing that the State Department may issue passports "under such rules as *the President* shall designate and prescribe" (emphasis added)). As in *Detroit International Bridge*, the statute imposes no limitations on the President's discretion in this regard. This is unsurprising, as the Executive has inherent constitutional authority to determine the content of passports. *See, e.g.*, *Agee*, 453 U.S. at 292–94. The rules for issuing passports also implicate "foreign policy considerations," as the passport is an instrument of foreign policy and national security. *See id.* at 292. The President has directed the State Department to implement his policy, but that does not change the analysis. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 105. Accordingly, the Passport Policy is unreviewable under the APA. *Id.*; *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 401–04 (D. Md. 2011) (holding that seizure of coins was unreviewable as presidential action), *aff'd*, 698 F.3d 171 (4th Cir. 2012).[1]

---

[1] The D.C. Circuit in *Detroit International Bridge* and the Fourth Circuit in *Ancient Coin*

Even if the Court were to conclude that the Passport Policy constituted agency (as opposed to presidential) action, APA review is unavailable because the APA limits judicial review "to situations in which . . . the agency action is not committed to agency discretion by law." *Webster v. Doe*, 486 U.S. 592, 599 (1988); *see also* 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Agency action is committed to agency discretion if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Review is also unavailable if the action is of a kind "traditionally regarded as committed to agency discretion," including categories of discretionary judgments. *Lincoln*, 508 U.S. at 192–93.

Here, as noted, Congress has committed the authority to establish rules for issuing passports to the President's discretion, and the President, in turn, has directed the State Department to implement his policy. *See* 22 U.S.C. § 211a; *Agee*, 453 U.S. at 294 (characterizing the statue as using "broad and permissive language"). Neither the Passport Act nor Executive Order 11295 restricts the Secretary's discretion in specifying the requisite information to be included on a passport and how to verify that information. Nor do they provide any "meaningful standard against which to judge the [State Department's] exercise of discretion." *Heckler*, 470 U.S. at 830; *see, e.g.*, *Detroit Int'l Bridge*, 189 F. Supp. 3d at 106 ("Given the broad discretion afforded to the President in the [statute] and to the Secretary of State in [the executive order], this Court cannot review the issuance of the . . . [p]ermit . . . . There is simply no law to apply.").

The Passport Policy is also the kind of agency action "traditionally regarded as committed to agency discretion." *Lincoln*, 508 U.S. at 192. Courts have long held that claims challenging the United States's specific foreign affairs decisions are not reviewable under the APA. *See, e.g.*, *Detroit Int'l Bridge*, 883 F.3d at 903 ("In the foreign affairs arena, the court lacks a standard to review the agency action."); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999)

---

*Collectors Guild* did not reach the question whether the challenged actions were presidential actions that were unreviewable under the APA. Rather, each court held that even assuming that the actions at issue were agency action, the district courts' decision should be affirmed. *See* 883 F.3d at 903; 698 F.3d at 184.

("When it comes to matters touching on . . . foreign affairs . . . the presumption of review [under the APA] 'runs aground.'" (citation omitted)); *see also Legal Assistance for Vietnamese Asylum Seekers v. U.S. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (holding that the State Department's consular venue policy unreviewable because it implicated foreign policy).

The Department's rules for issuing passports directly implicate specific foreign affairs decisions by the U.S. Government. The Supreme Court has recognized a passport as an instrument of diplomacy through which the President, on behalf of the United States, "in effect request[s] foreign powers to allow the bearer to enter and to pass freely and safely, recognizing the right of the bearer to the protection and good offices of American diplomatic and consular officers." *United States v. Laub*, 385 U.S. 475, 481 (1967). It is also an official communication "by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. It is "addressed to foreign powers; . . . and is considered rather in the character of a political document." *Id.* at 292 (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 698 (1835)); *see also Kent v. Dulles*, 357 U.S. 116, 129 (1958) (besides the critical function of control over exit, "the issuance of the passport carries some implication of intention to extend the bearer diplomatic protection" and to "'request all whom it may concern to permit safely and freely to pass, and in case of need to give all lawful aid and protection' to this citizen of the United States").

Congress has provided no meaningful standards against which courts could judge the Department's discretion over the form and content of passports, which are diplomatic documents through which the President communicates with foreign sovereigns. Accordingly, the Passport Policy is not subject to review under the APA.

### 2. Plaintiffs Are Unlikely to Show That the Passport Policy is Arbitrary and Capricious.

Even if reviewable, Plaintiffs' arbitrary and capricious claim is unlikely to succeed. Under the deferential arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), the reviewing court has "only a narrow role to play," *Dist. 4 Lodge of the Int'l Ass'n of Mechanists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 44 (1st Cir. 2021): the court must decide if the agency

9

action—which is presumed to be valid, *Zzyym v. Pompeo*, 958 F.3d 1014, 1022 (10th Cir. 2020)—is "supported by any rational view of the record." *Littlefield v. DOI*, 85 F.4th 635, 643 (1st Cir. 2023) (quoting *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 172 (1st Cir. 2021)). If it is, the agency action must be upheld. *See id.* A difference of opinion or evaluation of the evidence has no place in arbitrary and capricious review. *See District 4 Lodge*, 18 F.4th at 45–47 (detailing the various ways that the district court erroneously substituted its judgment for that of the agency). The court cannot "substitute its judgment for that of the agency" and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This deferential review is especially narrow in this context, because Congress has authorized the President to exercise broad discretion to "designate" rules governing the issuance of passports. 22 U.S.C. § 211a. If the President had designated rules on his own, that action would not be subject to review under the APA. *See, e.g.*, *Franklin*, 505 U.S. at 799–801. Here, the President determined the policy to govern sex designations in official government documents and communications and directed the Department (and other agencies) to implement that policy. When the President directs an agency to implement a discretionary decision that Congress has vested in him in a particular manner, it cannot be arbitrary and capricious for the agency to act as the President instructs. If APA review is available at all in this context, *see supra* Section I.B.1, the only question is whether the agency reasonably implemented the presidential directive.

Contrary to Plaintiffs' contention, *see* Pls.' Mem. 12, a change in an administration's or agency's position—even when it is an "about-face"—does not justify more searching judicial review. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Rather, the agency needs only to "display awareness that it is changing position" and has "good reasons" for the policy. *Id.* at 515. "A 'more detailed justification' may be required . . . when the agency's new position 'rests upon factual findings that contradict those which underlay [the] prior' position or when the agency's prior position 'has engendered serious reliance interests.'" *Housatonic River Initiative*, 75 F.4th at 270 (quoting *Fox*, 556 U.S. at 515). But "[i]n such cases it is not that further

justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515–16.

The Department reasonably adopted the Passport Policy to implement the President's directive. The Passport Act provides that the Department "may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic and consular officers of the United States . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. And the President declared that "[i]t is the policy of the United States to recognize two sexes" and that "these sexes are not changeable." 90 Fed. Reg. 8,615. He has further set forth uniform definitions of *sex*, *female*, and *male*, and instructed the entire government to adhere to those definitions. More specifically, the President has instructed the Department to "implement changes to require that government-issued identification documents, including passports . . . accurately reflect the holder's sex" under those definitions and as may be further clarified through guidance from the Department of Health and Human Services. 90 Fed. Reg. 8,616. Under these circumstances, it is reasonable for the Department to follow the President's direction and implement a Passport Policy under which passports are issued with a sex field that indicates either "M" or "F" based on birth certificates or other documents close in time to the applicant's birth. As the Department explains, "the Executive Order indicates a government-wide shift to using one uniform definition of 'sex,' so a change in the Department's policies was also needed to support the goal of uniformity." Pierce Decl. ¶ 19.

This is not the first time that a binary sex passport policy has been challenged as arbitrary and capricious. In *Zzyym*, the Tenth Circuit held that the fact that "[t]he policy helped make passport data useful for other agencies" was a justification that reasonably supported the policy. 958 F.3d at 1023. That reason continues to be the case here; the EO sets a government-wide policy "to recognize two sexes, male and female," and specifically instructs each agency to "give the terms 'sex', 'male', 'female', 'men', 'women', 'boys' and 'girls' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other

11

official agency business, documents, and communications." 90 Fed. Reg. 8,615–16. Passport data would not be useful for other agencies if the State Department adopted definitions inconsistent with the policy of the United States. *See* Pierce Decl. ¶ 19.

Indeed, courts have recognized that the government has a legitimate interest "in maintaining a consistent, historical, and biologically based definition of sex." *Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024); *Corbitt v. Sec'y of the Ala. Law Enf't Agency*, 115 F.4th 1335, 1348 (11th Cir. 2024) (recognizing a "State's interest in ensuring consistency with the State's existing requirements for amending a birth certificate" by "'objectively defining sex' for purposes of driver's license designations"). For most of the existence of sex markers on U.S. passports (since 1977), U.S. passports were available only in "M" or "F." *See* Pierce Decl. ¶ 5. And for many years, applicants either could not change their sex from that listed in their supporting documents or could do so only with certain evidence. *See id.* ¶¶ 5–6. Plaintiffs may prefer a different policy. But under the deferential arbitrary and capricious standard, the United States must be permitted to adopt a policy that had previously been in place and that is currently in place around the world, particularly when it concerns a U.S. government-issued document that is "addressed to foreign powers; . . . and is to be considered rather in the character of a political document." *Agee*, 453 U.S. at 292.

None of Plaintiffs' counterarguments has merit. *See* Pls.' Mem. 11–16.

*First*, Plaintiffs assert that the Department implemented a change in policy without any explanation. *See* Pls.' Mem. 12–13. That is incorrect. As explained above (and as Plaintiffs appear to recognize), *see id.* at 13, the Department implemented the Policy pursuant to the EO, which reasonably sets forth uniform definitions and requirements across the government, including for identification documents such as passports. *See* Pierce Decl. ¶ 15. And, as discussed above, the Department must issue passports "under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. Because of this statutory obligation to adhere to the President's rules and because the EO reasonably sets forth uniform definitions and requirements across the federal government, the Policy more than satisfies the deferential arbitrary and capricious standard.

*Second*, Plaintiffs appear to suggest that the mere change in policy makes the Passport Policy arbitrary and capricious. *See* Pls.' Mem. 12–13. But no statute or regulation requires the Department to allow applicants to change their sex or to have an "X" marker in the sex field. In fact, no statute or regulation defines the requirements for what the Executive must include in a passport. *Cf. Agee*, 453 U.S. at 293–300 (detailing the history of Executive discretion over passports). Accordingly, just as the Department was able to change its policy in 1992 and 2010 to permit applicants to change the sex demarcated in their passport or in 2022 to permit applicants to have their sex demarcated as "X," so too in 2025 the Department may change its policy again to rely on documentation issued closest to an applicant's birth and to eliminate the "X" option. Arbitrary and capricious review permits an agency to change its position without having to provide more explanation than the agency would for any other action. *See Fox*, 556 U.S. at 515. Moreover, there is a reasonable explanation for the change, as explained above.

*Third*, Plaintiffs argue that the EO does not account for purported "problems that will result when the sex designation on someone's passport conflicts with how they present and with their other identity documents." Pls.' Mem. 13–14. Plaintiffs point to three purported problems: (1) "interference with efficient screening of passport bearers' identity," (2) "outing of transgender, intersex, and nonbinary individuals," and (3) "the harms to third parties." *Id.* at 13 n.8. The first two are actually core to the Policy; Plaintiffs simply dislike the conclusion that the EO and Department came to. The EO explains that because "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." 90 Fed. Reg. 8,616. Accordingly, the EO instructs the Department to "implement changes to require that . . . passports . . . accurately reflect the holder's sex, as defined under section 2 of this order" (i.e., "an individual's immutable biological classification as either male or female"). *Id.* at 8,615–16. Moreover, a passport is intended to be "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Agee*, 453 U.S. at 292. Plaintiffs may wish for their passports to reflect their gender

13

identity, but the Department has reasonably chosen to document passport applicants' sex as reflected in documentation issued closest in time to the bearer's birth. The third "problem" (i.e., "harms to third parties," such as businesses that might indirectly be affected by the Passport Policy, *see* Pls.' Mem. 13 n.8), is simply not a relevant criterion for the Department. The purpose of passports is to provide an identity document containing information the State Department deems appropriate. Third parties would be in the same position they were when passports were issued in either "M" or "F" based on documentary evidence close to birth.

*Fourth*, Plaintiffs argue that that the EO definitions of *female* ("a person belonging, at conception, to the sex that produces the large reproductive cell") and *male* ("a person belonging, at conception, to the sex that produces the small reproductive cell") are "irrational" because "embryos have undifferentiated reproductive cells during the period immediately following conception." *See* Pls.' Mem. 14. But the EO definitions do not say that large or small reproductive cells are produced at conception; rather, sex is determined based on whether the person *belongs* to the sex that produces a large or small reproductive cell. Ultimately, the Department, which lacks expertise in this area, defers to HHS, *see* Pierce Decl. ¶ 18, which, in providing "clear guidance expanding on the sex-based definitions set forth in" the EO, 90 Fed. Reg. 8,616, has stated that "[t]he sex of a human, female or male, is determined genetically at conception (fertilization), and is observable before birth," *Defining Sex*, *supra*. At any rate, Plaintiffs' focus on defining sex at conception is beside the point; the Department determines sex based on documents produced after birth because those are the only documents that are ascertainable. *See* Pierce Decl. ¶ 18.

Plaintiffs also assert that "some intersex individuals do not at conception, and may never, belong to a sex that produces either a large or small reproductive cell." *See* Pls.' Mem. 14–15. But as HHS has explained, "[h]aving the biological function to produce eggs or sperm does not require that eggs or sperm are ever produced," recognizing that "[s]ome females or males may not or may no longer produce eggs or sperm due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility." *Defining Sex*, *supra*. As HHS has further concluded, "[r]are disorders of sexual development do not constitute a

third sex because these disorders do not lead to the production of a third gamete." *Id*. But again, Plaintiffs' definitional concern is beside the point: the Department has historically issued passports to intersex individuals without offering an "X" marker, *see, e.g.*, *Zzyym*, 958 F.3d at 1018, and continues to do so now based on adjudicating the applicant's sex at birth, *see* Pierce Decl. ¶ 18. Plaintiffs identify no intersex applicant who cannot get a passport under the Policy.

*Fifth*, Plaintiffs argue that the EO's definitions "undermine[] passports' usefulness in confirming the bearer's identity," pointing out that the bearer may not "look like the sex defined by the EO" or that the passport may "conflict[] with other identifying documents." Pls.' Mem. 15. These are policy questions for the Executive. As discussed above, a passport is an instrument of diplomacy and an official communication "by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. It is therefore for the President—not Plaintiffs—to decide how to identify the bearer in communicating with foreign sovereigns. 22 U.S.C. § 211a.

*Sixth*, Plaintiffs argue that "the Policy conflicts with current government practice concerning passports from foreign countries" that have an "X" marker. *See* Pls.' Mem. 16. But there is no conflict: under International Civil Aviation Organization ("ICAO") guidelines, member states are permitted, not required, to include "X" in the sex field. *See* Pierce Decl. ¶ 4; ICAO Doc 9303 (8th ed.), https://perma.cc/VSB4-HW5R. And at any rate, the Policy's focus is consistent within the *U.S.* government, and "[i]t is the policy of the United States to recognize two sexes, male and female." EO 14168, 90 Fed. Reg. 8,615.

*Seventh*, Plaintiffs argue that the Policy conflicts with some state laws that permit an "X" marker on driver's licenses and allow individuals to update the sex designation on birth certificates. *See* Pls.' Mem. 16. But state laws have little bearing on the requirements for U.S. passports, and Plaintiffs cite nothing to the contrary. Moreover, the fact that *some* state identification documents have sex fields different from the federal government merely confirms that other state identification documents follow the same protocol and permit only male or female designations.

**3.    Plaintiffs Are Not Likely to Succeed on Their Challenge Under the Paperwork Reduction Act ("PRA").**

Plaintiffs are also unlikely to succeed on their PRA challenge. Plaintiffs argue that the Department violated the PRA when it posted the "older, expired versions" of all three passport forms. Pls.' Mem. 17. As discussed above, these forms were validly promulgated pursuant to the PRA, including the applicable notice and comment procedures. Plaintiffs therefore cannot argue that the State Department failed to go through proper procedures.

Nor is Plaintiffs' challenge to the Department's use of the expired forms reviewable. APA review is unavailable "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Such is the situation here. The PRA impliedly forbids the relief sought because it provides for review of the validity of information collection forms only when the issue is raised defensively in an enforcement action. *See* 44 U.S.C. § 3512(b) ("The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto."). Indeed, "federal courts that have addressed the PRA have confirmed what the plain language of the statute already makes clear: the PRA may be raised as a *defense* to an agency action, but *does not create* a private cause of action." *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014); *see also Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999) ("As is apparent from subsection (b), the Act authorizes its protections to be used as a defense."). For this reason, courts have routinely rejected attempts by plaintiffs seeking judicial review outside the PRA's statutory scheme of PRA violations related to information collection.[2] In sum, because PRA forbids review of Plaintiffs' affirmative claim, Plaintiffs may not do so under the APA, either. 5 U.S.C. § 702.

---

[2] *See, e.g.*, *City of New Bedford v. Locke*, Civ. A. No. 10-10789, 2011 WL 2636863, at *9 (D. Mass. June 30, 2011), *aff'd*, 701 F.3d 5 (1st Cir. 2012); *Ohio Stands Up! v. HHS*, 564 F. Supp. 3d 605, 613 (N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) (collecting cases).

**C.      Plaintiffs Are Unlikely to Succeed on Their Constitutional Claims.**

**1.      The Court Should Apply Rational Basis Review.**

**i.      Count I: Equal Protection**

Plaintiffs contend that "heightened scrutiny" applies to the Passport Policy because it "classifies based on sex . . . [and] on transgender status." Pls.' Mem. 18. Plaintiffs are incorrect.

**a.      The Policy Does Not Discriminate Based on Sex.**

The Passport Policy is not a "sex-based" classification that would trigger heightened scrutiny. This is so because it "does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex." *Gore*, 107 F.4th at 555. It "does not prefer one sex over the other." *L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (2024). And it "does not include one sex and exclude the other." *Id.* Nor does it "apply one rule for males and another for females." *Id.* "There thus is no reason to apply skeptical, rigorous, or any other form of heightened review to" the policy. *Id.* at 481 (declining to apply heightened scrutiny to law that limited certain sex-transition treatments for minors).

To be sure, the subject matter of the Policy relates to sex. "But the Equal Protection Clause does not proscribe all laws and regulations that relate to or implicate sex in their subject matter." *Corbitt*, 115 F.4th at 1346; *see also Skrmetti*, 83 F.4th at 482 (mere "mention" of "sex" does not trigger heightened scrutiny). "If any reference to sex in a statute dictated heightened review, virtually all abortion laws would require heightened review." *Skrmetti*, 83 F.4th at 482. Heightened scrutiny also would extend "to statutes that regulate medical procedures defined by sex." *Id.* (collecting statutes). But such laws are not "presumptively unconstitutional." *Id.*

Plaintiffs nonetheless contend that the Policy classifies based on sex because "it hinges the issuance of an 'M' or 'F' passport on a person's sex." Pls.' Mem. 18. But the classification—males get "M" and females get "F"—is not sex discrimination because it does not "reflect[ ] outmoded notions of the relative capabilities of men and women," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985), but treats males and females equally.

This case is therefore nothing like *Loving v. Virginia*, 388 U.S. 1 (1967), which involved a racial classification. *See* Pls.' Mem. 18 n.15. The Supreme Court "has never 'equated gender classifications, for all purposes, to classifications based on race.'" *Skrmetti*, 83 F.4th at 483 (quoting *United States v. Virginia*, 518 U.S. 515, 532 (1996)) (alterations omitted). "When laws on their face treat both sexes equally," as the Policy does, "a challenger must show that the State passed the law because of, not in spite of, any alleged unequal treatment." *Id.* By contrast, "'racial classifications' always receive strict scrutiny 'even when they may be said to burden or benefit the races equally.'" *Id.* (quoting *Johnson v. California*, 543 U.S. 499, 506 (2005)).

Nor is heightened scrutiny warranted on the ground that the Policy is allegedly based on "overbroad generalizations about the way men and women are." Pls.' Mem. 18–19 (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017)). For one, that is not an independent basis for triggering heightened scrutiny; what matters is how the law classifies people. *Sessions*, for example, concerned a statutory exception that expressly applied to unwed mothers but not to unwed fathers. Heightened scrutiny applied because unlike here, the statute "grant[ed] or den[ied] benefits on the basis of the sex of the qualifying parent." 582 U.S. at 53–54, 58 (citation omitted). In any event, the Passport Policy is not based on any "overbroad generalizations" about men and women. It does not assume, as Plaintiffs contend, "that all people at conception likely to have a 'small reproductive cell' will live, identify, and express themselves as men for their entire lives," *see* Pls.' Mem. 19—the Policy says nothing about that issue. Rather, the Policy simply provides that, consistent with the rest of the federal government, sex markers will correspond to an individual's sex. That policy does not rest on "overbroad generalizations" about men and women.

### b. The Policy Does Not Classify Based on "Transgender Status."

Plaintiffs next contend that the Policy is subject to heightened scrutiny because it "facially classifies based on transgender status." Pls.' Mem. 19–20. Again, the Policy does no such thing. And even if it did, the Supreme Court has "never recognized transgender status as a suspect class." *Skrmetti*, 83 F.4th at 486. Nor has it recognized any new constitutionally protected class in almost

half a century. *See Craig v. Boren,* 429 U.S. 190 (1976) (sex constitutes quasi-suspect class). Indeed, it has repeatedly declined to do so. *See, e.g.*, *Cleburne*, 473 U.S. at 442 (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay people qualify as quasi-suspect class).

Plaintiffs cannot meet the extraordinarily high bar to recognize a new quasi-suspect class, which requires a showing of: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Mass. Bd. of Ret.*, 427 U.S. at 313–14). Individuals who assert a gender identity inconsistent with their the biological sex do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Their self-identification is not "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487. Nor is their status characterized by a specific defining feature; rather, it includes "a huge variety of gender identities and expressions." *Id.* at 487; *see also* Br. of American Psychological Association as *Amicus Curiae* at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S.) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Moreover, this purported class is not "political[ly] powerless[]." *San Antonio Independent Sch. Dist.*, 411 U.S. at 28. "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. It is therefore not the case that members of this purported class "have no ability to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445. The mere fact that they may not be able to "themselves mandate the desired legislative responses," and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Id.* Similarly, claims of historical injustice are insufficient: the Court in *Cleburne* "rejected the argument that mental disability is a suspect classification, . . . despite a history of compulsory sterilization, exclusion from public schools, and

a system of state-mandated segregation and degradation." *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring) (citation omitted).

Accordingly, even if the Policy classifies based on "transgender status" (it does not), heightened scrutiny would not apply.

### c. Heightened Scrutiny Is Not Warranted Based on Alleged Animus.

Plaintiffs contend that heightened scrutiny applies also because the Policy "is based on animus against transgender people." Pls.' Mem. 20. But assessing "motives or purposes" for a law "is a hazardous matter," and in any event, "it's not the point of the inquiry." *Skrmetti*, 83 F.4th at 487 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). "Instead of asking judges to read the hearts and minds of [policy-makers], the inquiry asks whether the law is 'inexplicable by anything but animus.'" *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)). Indeed, "a bare . . . desire to harm a politically unpopular group" is inferred only when there is no legitimate government interest to justify the challenged classification. *Cleburne*, 473 U.S. at 450.

Here, the Policy "does not fit this pattern"; it "cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Hawaii*, 585 U.S. at 706. As noted above and explained further below, the Policy serves the legitimate government interest of having a consistent approach to identifying individuals throughout the federal government. Likewise without merit is Plaintiffs' assertion that animus can be inferred because the Policy is allegedly part of "a systemic effort by the federal government to restrict legal protections for transgender people," citing a "litany of orders . . . targeting transgender people," Pls.' Mem. 20. Those orders on their face address policies implementing this Administration's views concerning sex identification and can be explained based on similar legitimate government interests in not treating "sex" synonymously with "gender identity."

### ii. Count II: Right to Travel

Plaintiffs likewise are unlikely to succeed on their right to travel claim because they lack standing and because the Policy is rationally related to a legitimate government interest.

Plaintiffs lack standing to assert a right to international travel because Defendants have not restricted Plaintiffs' ability to travel abroad. Article III requires Plaintiffs to show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Consistent with these requirement, where the plaintiffs have established standing to challenge restrictions on international travel, the government has actually infringed their ability to travel abroad in a concrete manner. *See Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002) (involving the denial of a passport application); *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1106 (10th Cir. 2021) (involving the revocation of a passport).

Here, in contrast, the Department continues to issue passports. And every plaintiff who wants a passport has received one or is in the process of receiving one. *See* Perysian Decl. ¶ 11 (received passport on January 28, 2025); Orr Decl. ¶ 12 (passport began processing on January 22, 2025); Boe Decl. ¶ 13 (passport shipped on February 13, 2025); Anderson Decl. ¶ 11 (received passport on February 14, 2025); Hall Decl. ¶ 12 (expecting passport on February 17, 2025); Solomon-Lane Decl. ¶ 11 (has a passport in his desired sex); Soe Decl. ¶ 9 (does not have a passport and does not appear to have applied for one). The only change is that passports now reflect the applicant's biological sex at birth. The alleged injury stems from Plaintiffs' personal decision not to travel abroad with a passport that does not conform to their gender identity.

Plaintiffs in any event are unlikely to succeed on their right-to-travel claim, Compl. ¶¶ 212–20, because there is no fundamental right to international travel. The Fifth Amendment to the Constitution protects certain fundamental rights, such as "the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). But "the [Supreme] Court has always been reluctant to expand the concept of substantive due process" because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). When assessing whether a right falls within the orbit of substantive due process, the Supreme Court considers whether it is a

"fundamental right[] [or] libert[y] which [is], objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if the[] [right] w[as] sacrificed." *Glucksberg*, 521 U.S. at 720–21 (citations omitted).

Plaintiffs confuse the right to *interstate* travel, which is fundamental, with a right to *international* travel, which is not. The Supreme Court has explained that while "[t]he constitutional right of interstate travel is virtually unqualified[,] the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Agee*, 453 U.S. at 307 (citation omitted). "As such this 'right,' the Court has held, can be regulated within the bounds of due process." *Id.*; *see also Califano v. Aznavorian*, 439 U.S. 170, 176–77 (1978). Because only laws that infringe on the exercise of a fundamental right or that categorize based on an inherently suspect characteristic are subject to heightened scrutiny, *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992), heightened scrutiny is inapplicable to review Plaintiffs' right to travel claim.

*Zemel v. Rusk*, 381 U.S. 1 (1965), and *Aptheker v. Secretary of State*, 378 U.S. 500 (1964), which Plaintiffs cite, were decided at a time when the rights to interstate travel and international travel were treated indiscriminately. *See Regan v. Wald*, 468 U.S. 222, 241 n.25 (1984). But the Supreme Court has since rejected that position. *See id.*; *Agee*, 453 U.S. at 306 (holding that "the freedom to travel abroad with a 'letter of introduction' in the form of a passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation" and that "the freedom to travel outside the United States must be distinguished from the right to travel within the United States").

The cited out-of-circuit concurring opinions are not helpful to Plaintiffs either, *see* Pls.' Mem. 23, because the majority or lead opinions in those cases held that intermediate scrutiny does not apply to the right to international travel. *See Maehr*, 5 F.4th at 1120 ("We disagree with Mr. Maehr that the Supreme Court's cases establish a fundamental right to travel internationally."); *Eunique*, 302 F.3d at 973 ("The difference [between interstate and intrastate travel] means that we do not apply strict scrutiny to restrictions on international travel rights that do not implicate First

22

Amendment concerns."). The two cited district court opinions, Pls.' Mem. 23, are also unhelpful to Plaintiffs: the court in *Risenhoover v. Washington County Community Services* did not actually state that international travel is a fundamental right, which would trigger heightened scrutiny; rather, the court found it unnecessary to decide which standard of review applied because the claim failed under any standard of review (including heightened scrutiny). 545 F. Supp. 2d 885, 890 (D. Minn. 2008) (analyzing the plaintiff's claim "[a]ssuming arguendo that the Government needs an important reason to interfere with an individual's right to international travel"). *Woodward v. Rogers* is likewise inapposite. It was decided before the Supreme Court distinguished interstate and international travel under the Due Process Clause. *Compare* 344 F. Supp. 974, 986–87 (D.D.C. 1972), *with Aznavorian*, 439 U.S. at 176–77. As every other district court in this circuit that has considered the issue has done, *see Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 459 (D. Mass. 2021) (Hillman, J.); *Jacob v. Curt*, 721 F. Supp. 1536, 1539 (D.R.I. 1989), this Court should apply rational basis review to international travel claims.

### iii. Count III: Right to Privacy

Plaintiffs next contend that the Passport Policy violated their purported constitutional right to keep their biological sex private. *See* Pls.' Mem. 24–26. The argument is unlikely to succeed.

As discussed above, the Supreme Court has always been reluctant to expand the concept of substantive due process. Because "[i]dentifying unenumerated rights carries a serious risk of judicial overreach," the Supreme Court "exercises the utmost care whenever [it is] asked to break new ground in this field." *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (quoting *Glucksberg*, 521 U.S. at 720). "To that end, *Glucksberg*'s two-step inquiry disciplines the substantive due process analysis." *Id.* "First, it insists on a 'careful description of the asserted fundamental liberty interest.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "Second, it stresses that 'the Due Process Clause specially protects' only 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720–21). Accordingly, as discussed above, "[t]he protections of substantive due process have for the

most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994)).

"The right to a [passport] conforming to one's gender identity is not 'deeply rooted' in our history and 'implicit in the concept of ordered liberty.'" *Gore*, 107 F.4th at 562 (rejecting substantive due process challenge to Tennessee law requiring that birth certificates conform to biological sex). "The concept of 'gender identity' did not enter the English lexicon until the 1960s." *Id.* As discussed above, it was not until 1992 that passport applicants could request to amend their sex on their passport, and even then, they could do so only after proof of sex-reassignment surgery. The Department did not allow "X" gender markers until 2022. "On this historical record, the claimed right to change an individual's sex on a [passport] to reflect the person's gender identity is not deeply rooted in our history." *Id.*

Plaintiffs resists this conclusion by framing the right broadly as one to "informational privacy," Pls.' Mem. 24, but that label is stated at too high a level of generality and "does not alter the history just described." *Gore*, 107 F.4th at 562. "[T]hat history shows that, however important individuals may perceive the designation of their sex on a [passport], it is only recently that" the State Department has allowed passports to conform to gender identity. *Id.* Plaintiffs' claim "does not turn on the kind of deeply rooted value that substantive due process protects." *Id.*

In contending otherwise, Plaintiffs rely on outdated and nonbinding precedent that does not account for the Supreme Court's most recent pronouncements in this area. For example, *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018), cited *Roe v. Wade*, 410 U.S. 113 (1973), in support of a broad "constitutional right to privacy" that encompassed a right not to disclose one's "transgender status." 305 F. Supp. 3d at 332–33. But *Roe* has been overruled by *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). Other cited cases likewise lack analysis of how the substantive due process right asserted meets the *Glucksberg* standard for recognizing new, unenumerated substantive due process rights. *See, e.g.*, *Arroyo Gonzalez*, 305 F. Supp. 3d at 332–33 (no discussion of *Glucksberg*); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (same). Accordingly, Plaintiffs are unlikely to succeed on this claim.

24

### 2.    Under Heightened Scrutiny or Rational Basis Review, Plaintiffs Are Unlikely to Succeed on Their Constitutional Claims.

Because the Passport Policy "neither burdens a fundamental right nor targets a suspect class, [the Court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Rational-basis review "is a paradigm of judicial restraint." *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 9 (1st Cir. 2011) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993)). It is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause," *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989), and the challenged law enjoys "a strong presumption of validity." *Beach*, 508 U.S. at 314–15. The challenger "must negate any and all conceivable bases upon which the challenged regulation might appropriately rest." *Gonzalez-Droz*, 660 F.3d at 9. Courts are further "compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). Legislative classifications may be "both underinclusive and overinclusive" and "perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979). And "[r]ational basis review does *not* permit consideration of the strength of the individual's interest or the extent of the intrusion on that interest cased by the law; the focus is entirely on the rationality of the state's reason for enacting the law." *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).

Here, the State Department reasonably determined that the Passport Policy furthers the government's interest in maintaining a consistent definition of sex throughout the federal government. Courts have recognized this as a legitimate interest and that requiring government documents to reflect only one's biological sex furthers that interest. *See Zzym*, 958 F.3d at 1023; *Gore*, 107 F.4th at 561. To the extent Plaintiffs contend that the Policy fails to account for individuals' desire to identify with the opposite biological sex or individuals who are intersex, the classification does not fail under rational-basis review simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Given the prior long history of a binary sex policy across the government, reverting to that policy to ensure prospective uniformity is not irrational.

25

Plaintiffs contend that the Policy cannot satisfy even rational-basis review (i) for the same reasons that Plaintiffs contend it is arbitrary and capricious and (ii) because it is allegedly motivated by animus. Defendants have explained above why the Policy is not arbitrary and capricious. As to alleged animus, as explained above, the Supreme Court has struck down policies on animus grounds only in the "few occasions" where "it cannot be said that the policy is inexplicable by anything but animus." *Hawaii*, 585 U.S. at 705–06. That is not the case here. *See Zzyym*, 958 F.3d at 1023; *Gore*, 107 F.4th at 561.

Finally, the Policy would survive heightened scrutiny as well. The government's interest in consistency and uniformity—so that federal agencies can verify an individual's identity—is important. *See Corbitt*, 115 F.4th at 1349 (consistently defining sex across government is an important government interest); *Gore*, 107 F.4th at 561 ("Maintaining a consistent definition [of sex] . . . is a legitimate State interest."). And the Policy is substantially related to the achievement of that objective. *See Corbitt*, 115 F.4th at 1349. Passport data would not be useful for other agencies if the State Department adopted definitions of sex inconsistent with the rest of the federal government. Accordingly, under either rational-basis review or heightened scrutiny, Plaintiffs' constitutional claims are unlikely to succeed.

## II. Plaintiffs Have Not Demonstrated Irreparable Harm.

Plaintiffs will not be irreparably harmed in the absence of a preliminary injunction. They remain free to travel with the passports they have now or with passports issued pursuant to the Passport Policy. Plaintiffs speculate that traveling with a passport reflecting their biological sex will put their safety at risk. But "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Most Plaintiffs have been traveling with a passport reflecting their birth sex for their entire lives. Plaintiff Anderson is alleged to have been subjected to an invasive search in 2017 purportedly because Anderson's gender presentation did not match that of the state driver's license. Compl. ¶ 146. But

Anderson did not change the sex designation on Anderson's driver's license until 2019 and did not seek to obtain a passport with a female sex designation until December 2024. Compl. ¶ 144.

Some Plaintiffs additionally allege that having inconsistent identification documents will heighten the risk that an official will discover that they are transgender. But the Department is not responsible for Plaintiffs' choice to change their sex designation for state documents but not their passport. Most Plaintiffs who allege to have inconsistent documentation—Orr, Perysian, Soe, and Anderson—changed the sex markers on their drivers licenses years ago. *See id.* ¶¶ 110, 123, 134, 144. From 2021 until this Policy, applicants for passports were allowed to self-identify their sex designation on their passports without providing supporting documentation. Pierce Decl. ¶ 7. Any of the Plaintiffs who submitted applications in December or January could have obtained a passport with their preferred sex marker in the last four years. If having inconsistent documents constituted an irreparable injury, they would have updated their passports along with their other identification documents.

## III. The Balance of the Equities Favors the United States.

The balance of equities favors the Government. Passport administration is a matter of foreign policy, which is "rarely [a] proper subject[ ] for judicial intervention." *Agee*, 453 U.S. at 292. The administration and issuance of passports is an important function of the State Department, and interference with those processes during the pendency of this litigation would impair the Department's ability to operate effectively. The Department's interest in the orderly administration of passports greatly outweighs Plaintiffs' speculative allegations of harm. Plaintiffs' asserted public interest, on the other hand, rests simply on the fact that the Policy is unlawful, which is not the case as demonstrated above. *Cf. Orkin v. Albert*, 579 F. Supp. 3d 238, 246 (D. Mass. 2022) (rejecting argument that the public interest favored an injunction because "the Court cannot be certain that granting [the plaintiffs'] requested relief would properly uphold any rights.").

## IV. Any Relief Should Be Limited to the Named Plaintiffs Only.

Even if the Court determines that a preliminary injunction is appropriate, the injunction should be limited to only Plaintiffs, as Plaintiffs themselves concede. *See* Pls.' Mot. at 2, ECF No.

29 (requesting injunction enjoining enforcement of Policy "against Plaintiffs" and "as to Plaintiffs," requiring the State Department to revert to prior policy).

Not only have Plaintiffs waived any argument in support of a nationwide injunction, *see Vazquez-Rivera v. Figueroa*, 759 F.3d 44, 47 (1st Cir. 2014), but such relief would not be appropriate under either Article III or longstanding equitable principles. Under Article III, a federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Thus, "a plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury." *Id.* (emphasis added). As for a court's equitable authority to award relief, it is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Hawaii*, 585 U.S. at 716 (Thomas, J., concurring).

The fact that Plaintiffs request a "stay" under the APA does not compel a different outcome. As an initial matter, the request for a stay is moot. Section 705 allows an agency to postpone the effective date of its own action pending judicial review. 5 U.S.C. § 705. And "on such conditions as may be required and to the extent necessary to prevent irreparable injury," it also allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" the court's review. *Id.* No postponement is available here because the agency has already taken the action at issue. *See* Pls.' Mem. 10–11 (arguing that agency has already taken "final" action and that the Policy "is already being implemented"); *see also VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) ("While [§ 705] might authorize a Court to 'postpone the effective date' of an unlawful agency action in a particular context, the Final Rule at issue here took effect [already]."); *Nat. Res. Def.*

28

*Council v. DOE*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017).

In any event, § 705 does not require a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018). There is no pre-APA tradition of district courts granting stays (as opposed to preliminary injunctions) of agency rules, and in enacting Section 705, Congress did not intend to create any new remedies. Rather, section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Accordingly, a § 705 stay is improper.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Stay Agency Action and for a Preliminary Injunction.

Dated: March 12, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          JEAN LIN
                                          Special Litigation Counsel

                                          *Benjamin Takemoto*
                                          BENJAMIN T. TAKEMOTO
                                          JOHN ROBINSON
                                          ELIZABETH B. LAYENDECKER
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          P.O. Box No. 883, Ben Franklin Station
                                          Washington, DC 20044
                                          Phone: (202) 532-4252
                                          Fax: (202) 616-8470
                                          E-mail: benjamin.takemoto@usdoj.gov

                                          *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on March 12, 2025.

*Benjamin Takemoto*
BENJAMIN T. TAKEMOTO