# EXHIBIT R

No. 25A_____

# In the Supreme Court of the United States

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

ASHTON ORR, ET AL.

———————

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

———————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

# TABLE OF CONTENTS

Statement ........................................................................................................ 4

    A.    Legal background ................................................................... 4

    B.    Procedural history .................................................................. 6

Argument ....................................................................................................... 13

I.    The government is likely to succeed on the merits ........................................ 13

    A.    The challenged policy is consistent with equal protection .................. 13

        1.    The challenged policy warrants only rational-basis review ...... 15

            a.    The challenged policy does not discriminate based on sex ................................................................... 15

            b.    The challenged policy does not discriminate based on trans-identifying status ................................. 18

        2.    The challenged policy satisfies rational-basis review ............... 20

    B.    Respondents' arbitrary-or-capricious claim fails ................................. 26

        1.    The challenged policy is not reviewable under the APA ........... 26

        2.    In any event, respondents' arbitrary-or-capricious claim fails on the merits ............................................................ 28

    C.    There is no Paperwork Reduction Act violation that could support the injunction ........................................................... 30

II.    The other factors support staying the district court's injunction .................. 32

    A.    The issues raised by the district court's injunction warrant this Court's review ................................................................... 32

    B.    The district court's injunction causes irreparable harm to the government and to the public .............................................. 33

    C.    The balance of equities favors staying the district court's injunction ........................................................................... 34

Conclusion ..................................................................................................... 38

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, President of the United States; the United States of America; Marco Rubio, Secretary of State; and the U.S. Department of State.

Respondents (plaintiffs-appellees below) are Ashton Orr, Zaya Perysian, Sawyer Soe, Chastain Anderson, Drew Hall, Bella Boe, Reid Solomon-Lane, Viktor Agatha, David Doe, AC Goldberg, Ray Gorlin, and Chelle LeBlanc, on behalf of themselves and others similarly situated.

## RELATED PROCEEDINGS

United States District Court (D. Mass):

*Orr* v. *Trump*, No. 25-cv-10313 (July 11, 2025)

United States Court of Appeals (1st Cir.):

*Orr* v. *Trump*, No. 25-1579 (Sept. 4, 2025)

# In the Supreme Court of the United States

————————

No. 25A_____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

ASHTON ORR, ET AL.

————————

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of applicants Donald J. Trump, President of the United States, et al.—respectfully files this application for a stay of the injunction issued by the United States District Court for the District of Massachusetts (App., *infra*, 80a-114a) pending the consideration and disposition of the government's appeal to the United States Court of Appeals for the First Circuit and pending any further review in this Court.

The district court issued an injunction, on behalf of a nationwide class, requiring the State Department to allow passport applicants to self-select the sex designation on their passports—either "M" or "F" without regard to their biology, or even "X" if they would prefer that instead. That injunction has no basis in law or logic. Private citizens cannot force the government to use inaccurate sex designations on identification documents that fail to reflect the person's biological sex—especially not on identification documents that are government property and an exercise of the President's constitutional and statutory power to communicate with foreign governments.

(1)

2

That injunction injures the United States by compelling it to speak to foreign governments in contravention of both the President's foreign policy and scientific reality. As the lower courts have declined to stay this baseless injunction pending appeal, this Court's intervention is warranted.

Since the 1970s, the federal government has issued U.S. passports bearing the passport holder's sex. For much of that history, the passport holder's sex has been designated with one of two markers: "M" for male or "F" for female. App., *infra*, 7a. After the last Administration allowed passport applicants to self-select their sex as "M" or "F" or even "X" as their sex marker, President Trump issued an Executive Order that defined "'[s]ex'" as "an individual's immutable biological classification as either male or female," *id.* at 1a, and required the Department of State to issue passports that "accurately reflect the holder's sex" based on that definition, *id.* at 2a.

That policy is eminently lawful. The Constitution does not prohibit the government from defining sex in terms of an individual's biological classification. And the Executive Order explained that such an immutable trait provides a better "basis for identification" than "'[g]ender identity,'" which "reflects a fully internal and subjective sense of self," "exist[s] on an infinite continuum," and may shift over time. App., *infra*, 2a; see *id.* at 1a. The district court nevertheless enjoined the President's passport policy on a classwide basis, on the ground that respondents—12 individual plaintiffs and the certified classes that they represent—are likely to succeed on their claims that the policy violates equal protection, the Administrative Procedure Act (APA), and the Paperwork Reduction Act (PRA). App., *infra*, 30a-60a, 100a-101a. That ruling is untenable.

With respect to equal protection, the district court concluded that the challenged policy discriminates based on sex. Respondents, however, do not challenge the inclu-

3

sion of a sex designation on passports. Instead, they challenge the government's definition of sex—arguing that the sex designation should reflect a person's self-assessed gender identity, rather than a person's immutable biological characteristics. But as this Court reaffirmed in *United States* v. *Skrmetti*, 145 S. Ct. 1816 (2025), a policy does not discriminate based on sex if it applies equally to each sex without treating any member of one sex worse than a similarly situated member of the other. And here, the challenged policy applies equally, regardless of sex—defining sex for everyone in terms of biology rather than self-identification. Indeed, just as it would not be discrimination based on national origin to define a person's national origin as the person's birth country rather than the country with which the person self-identifies, so too it is not discrimination based on sex to define a person's sex as the person's immutable biological classification rather than the sex with which the person self-identifies.

The district court's conclusion that the challenged policy was motivated by animus toward trans-identifying individuals fares no better. It was entirely rational for the President to reject "gender identity" as a "basis for identification" in favor of a "biological" definition of sex—one grounded in facts that are "immutable." App., *infra*, 1a-2a. And because the challenged policy has "a legitimate grounding," "quite apart from any [animus]," the Court "must accept that independent justification." *Trump* v. *Hawaii*, 585 U.S. 667, 706 (2018).

Respondents' remaining claims also fail. Presidential action is not reviewable under the APA, and the Executive Order dictated the challenged policy here, pursuant to the Passport Act, 22 U.S.C. 211a, which authorizes the President himself to determine the contents of passports. Accordingly, the State Department's ministerial actions implementing the President's direction are neither subject to APA review nor arbitrary or capricious, as the Department had no choice but to comply with the Pres-

ident's Order.  As for respondents' PRA claim, the problem that the district court identified—namely, that the Director of the Office of Management and Budget (OMB) had not approved the Department's use of forms that offer a sex marker of only "M" or "F"—is moot, because the Director has since approved the use of such forms.  The asserted PRA violation therefore cannot support the injunction that the court granted.

Finally, the remaining factors strongly support staying the district court's classwide injunction.  U.S. passports are official government documents, addressed to foreign nations.  The Executive Order in this case is an exercise of power conferred on the President both by the Constitution and by statute to determine the contents of U.S. passports.  Yet the court's injunction countermands that Order—and in so doing, interferes with the President's foreign-policy prerogatives.  Moreover, the record does not establish that the members of the nationwide class covered by the injunction would face a risk of irreparable harm if the injunction were stayed.  That is especially so because membership in that class is not conditioned on having either concrete plans to travel internationally or a diagnosis of gender dysphoria.  The balance of equities therefore decisively favors a stay of the court's classwide injunction.

## STATEMENT

### A.    Legal Background

1.    A U.S. passport is a "political document" issued by the federal government and "addressed to foreign powers."  *Haig* v. *Agee*, 453 U.S. 280, 292 (1981) (quoting *Urtetiqui* v. *D'Arcy*, 34 U.S. (9 Pet.) 692, 698 (1835)).  Its purpose is to identify its bearer as an American citizen and to "request[] foreign powers to allow the bearer to enter and to pass freely and safely."  *United States* v. *Laub*, 385 U.S. 475, 481 (1967).  A passport is thus an official communication "by which the Government vouches for

the bearer and for his conduct." *Agee*, 453 U.S. at 293. And "[a] passport at all times remains the property of the United States." 22 C.F.R. 51.7(a).

Since "the earliest days of the Republic," the President's Article II authority over "national security" and "foreign policy" has been understood to encompass the power to issue passports. *Agee*, 453 U.S. at 293. The first Passport Act, enacted in 1856, "'confirmed'" that power in "broad and permissive language." *Id.* at 294 (citation omitted); see Act of Aug. 18, 1856, ch. 127, § 23, 11 Stat. 60. Today, that language is codified at 22 U.S.C. 211a, which provides: "The Secretary of State may grant and issue passports * * * under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. 211a; see Act of July 3, 1926, ch. 772, § 1, 44 Stat. 887.

2.    In 1976, the U.S. Department of State (Department) introduced "sex" as a required marker on U.S. passports. App., *infra*, 7a. Four years later, the International Civil Aviation Organization—a specialized agency of the United Nations that develops standards for the civil aviation sector—added "sex" to its uniform specifications for travel documents. *Id.* at 6a-7a. Since then, most countries have included "sex" as a marker on their passports. *Id.* at 7a.

From 1977 to 2021, the Department issued U.S. passports with one of two sex markers: "M" for male or "F" for female. App., *infra*, 7a. In June 2021, the Biden Administration adopted a new passport policy (the 2021 policy). *Id.* at 8a. The 2021 policy "permit[ted] passport applicants to self-select their sex marker" based on their "gender identity." *Ibid.* The 2021 policy also "add[ed] a third option of 'X'" as a marker for applicants who do not self-identify as male or female. *Ibid.*

3.    On Inauguration Day, President Trump issued an Executive Order declaring it "the policy of the United States to recognize two sexes, male and female."

6

App., *infra*, 1a; see Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), 90 Fed. Reg. 8615 (Jan. 30, 2025) (Executive Order or Order).  The Order defined "'[s]ex'" as "an individual's immutable biological classification as either male or female." App., *infra*, 1a.  And the Order distinguished the "immutable biological reality of sex" from "the concept of 'gender identity,'" which the Order described as reflecting "an internal, fluid, and subjective sense of self unmoored from biological facts." *Ibid.*

The Executive Order explained that because "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum," it "does not provide a meaningful basis for identification." App., *infra*, 2a.  The Order therefore directed the Secretary of State (Secretary) to "implement changes to require that government-issued identification documents, including passports,  *  *  *  accurately reflect the holder's sex, as defined by" the Order.  *Ibid.*  The Order further instructed that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Ibid.*

Soon after, the Department implemented the President's directive to issue passports with a sex marker of either "M" or "F" reflecting the holder's "biological sex." App., *infra*, 75a; see *id.* at 11a-13a.  The Department thus ceased issuing passports with an "X" marker.  *Id.* at 11a.  It replaced passport application forms that offered an "X" marker with earlier versions of the forms that offered a marker of only "M" or "F."  *Id.* at 12a.  And it adopted procedures for adjudicating a passport applicant's sex using birth certificates.  *Ibid.*

### B.    Procedural History

1.    In February 2025, seven trans-identifying or non-binary individuals filed a putative class action in the District of Massachusetts against the President,

the Secretary, the Department, and the United States.  Compl. ¶¶ 16-27.  Plaintiffs did not challenge the inclusion of a sex designation on U.S. passports.  Instead, plaintiffs argued that U.S. passports must include a sex designation that "reflect[s] the sex [people] live as and express, rather than the sex they were assigned at birth."  *Id.* ¶ 1.  Plaintiffs thus challenged what they described as the Trump Administration's "reversal" of the 2021 policy of "permitt[ing] all people  * * *  to obtain passports with sex designations that reflected the sex they live as."  *Ibid.*

Plaintiffs claimed that the policy change violated the equal-protection component of the Fifth Amendment's Due Process Clause.  Compl. ¶¶ 193-211.  Plaintiffs also asserted an APA claim challenging "[a]gency actions taken under the Executive Order" as "arbitrary, capricious, and an abuse of discretion," *id.* ¶¶ 243-244, as well as an APA claim challenging the change in passport application forms as contrary to the PRA, *id.* ¶¶ 247-251.  Plaintiffs moved for a preliminary injunction requiring the Secretary and the Department to reinstate the 2021 policy and thus "allow[] [p]laintiffs to self-attest to what their sex is," including by choosing "an 'X' sex designation."  D. Ct. Doc. 29, at 2 (Feb. 18, 2025).

2.    On April 18, the district court granted plaintiffs' motion in part.  App., *infra*, 15a-73a.  The court understood the Department to have "compl[ied] with the Executive Order's directive" by "ma[king] two substantive changes to its prior passport policy":

> First, [the Department] withdrew the option for Americans to obtain a passport reflective of either their gender identity or their sex assigned at birth, and instead required all passports to reflect only applicants' sex assigned at birth. Second, it removed the option for intersex, non-binary, and gender nonconforming applicants to select "X" as the sex marker on their passports.

*Id.* at 16a.  The court "refer[red] to these changes as the 'Passport Policy.'"  *Ibid.*

The district court then held that plaintiffs were "likely to succeed on the merits of their equal protection claim." App., *infra*, 17a; see *id.* at 30a-46a. The court concluded that "[t]he Executive Order and the Passport Policy on their face classify passport applicants on the basis of sex" and failed intermediate scrutiny. *Id.* at 17a; see *id.* at 31a-39a. The court further concluded that the Executive Order and the Passport Policy were motivated by "animus" toward trans-identifying individuals and therefore violated equal protection even under rational-basis review. *Id.* at 41a; see *id.* at 40a-46a.

The district court also concluded that plaintiffs were likely to succeed on their APA claims. App., *infra*, 47a-60a. The court acknowledged that "[p]residential actions, like executive orders, are not * * * subject to APA review," *id.* at 48a; that the Passport Act requires the Secretary to comply with "such rules as the President shall designate and prescribe," *id.* at 49a (quoting 22 U.S.C. 211a); and that the Secretary "adopted the Passport Policy to comply with the directive set forth in the Executive Order," *id.* at 34a. The court nevertheless concluded that the Passport Policy was subject to APA review. *Id.* at 48a-51a. The court then held that plaintiffs were "likely to succeed on their claim that the Passport Policy is arbitrary and capricious," *id.* at 17a, because the Secretary and the Department "failed to offer a reasoned explanation for" the policy beyond pointing to the Executive Order, *id.* at 55a; see *id.* at 55a-57a.

The district court further held that plaintiffs were likely to succeed on their claim that the Department's use of passport application forms that offered a sex marker of only "M" or "F" had not complied with "the procedures required by the [PRA]." App., *infra*, 17a; see *id.* at 58a-60a. The court stated that, "although the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements, the [Secretary and the Department] were nevertheless required to obtain the [OMB] Director's approval before they began using those forms again in January 2025." *Id.* at 60a.

9

After considering the likelihood of irreparable harm and the balance of the equities, the district court concluded that six of the seven plaintiffs were entitled to a preliminary injunction. App., *infra*, 60a-65a. The court determined, however, that the seventh plaintiff, Reid Solomon-Lane, was not "likely to suffer irreparable harm absent a preliminary injunction because he currently possesses a valid passport bearing a sex marker that corresponds to his gender identity and expression, and his passport remains valid until 2028." *Id.* at 72a; see *id.* at 64a. The court therefore entered a preliminary injunction requiring the government "to process and issue passports" to the other six plaintiffs "consistent with" the 2021 policy and to "allow[] [them] to self-attest to their sex," including by selecting "an 'X' sex designation." *Id.* at 72a.

3.     Plaintiffs then amended their complaint, adding five named plaintiffs. Am. Compl. ¶¶ 23-27. Plaintiffs moved for class certification, emphasizing that the government had "enacted a policy imposing a definition of 'sex' that affects every person in the country in the same way: Americans can only obtain passports that match their sex as this Administration defines it." D. Ct. Doc. 78, at 6 (Apr. 30, 2025). Plaintiffs also moved to extend the preliminary injunction to certain members of the proposed classes. D. Ct. Doc. 79, at 1 (Apr. 30, 2025).

On June 17, the district court agreed to certify two classes under Federal Rule of Civil Procedure 23(b)(2):

> 1. A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class");

> 2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

App., *infra*, 111a; see *id.* at 88a-99a.  The court explained that "enforcement of the Passport Policy  *  *  *  uniformly impacts members of [those classes] by preventing them from obtaining passports with a sex marker consistent with their gender identity." *Id.* at 92a-93a.*

The district court also agreed to extend the preliminary injunction to members of the certified classes who:

> (a) do not have a currently valid passport, (b) need to renew their current passport because it expires within one year, (c) need to make changes to their passport to have the sex designation on it align with their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged.

App., *infra*, 112a-113a.  The court referred to that subset of the certified classes as the "PI Class." *Id.* at 99a.  The court concluded that members of the PI Class faced the same risk of irreparable harm as the six original named plaintiffs. *Id.* at 106a.  The court also concluded that the burden imposed by classwide relief on the government did "not outweigh the equities favoring the PI Class." *Id.* at 107a.  The court therefore entered a preliminary injunction requiring the government "to process and issue passports to members of the PI Class consistent with" the 2021 policy and "to permit members of the PI Class to self-select a sex designation—'M,' 'F,' or 'X'—that is different from the sex assigned to those individuals under the Passport Policy." *Id.* at 113a.

--------

\* The district court excluded from the certified classes the plaintiffs in *Schlacter* v. *U.S. Department of State*, No. 25-cv-1344 (D. Md.), another suit challenging the Executive Order and the State Department's implementation of it. App., *infra*, 111a. The plaintiffs in *Schlacter* are seven individuals who have moved for a preliminary injunction requiring the government "to issue passports to them with sex designations that match their gender identity, including the issuance of passports bearing an 'X' designation." D. Ct. Doc. 31, at 1 (May 14, 2025), *Schlacter*, *supra* (No. 25-cv-1344). On September 9, the district court in *Schlacter* granted the motion as to six of the seven plaintiffs and entered a preliminary injunction requiring the government to "permit (a) changes to the sex designation on [their] passports, including allowing [them] to self-attest to their sex, and (b) an 'X' designation on any passport where that is requested by [them]." D. Ct. Doc. 66, at 2 (Sept. 9, 2025), *Schlacter*, *supra* (No. 25-cv-1344).

11

4.    On June 18, the day after the district court granted the classwide injunction, this Court issued its decision in *United States* v. *Skrmetti*, 145 S. Ct. 1816 (2025), which held that a prohibition on the prescription of puberty blockers or hormones to enable a minor to live as a purported identity inconsistent with the minor's sex did not discriminate based on sex. *Id.* at 1829-1835. In a motion to dissolve the district court's classwide injunction, the government argued that, under *Skrmetti*, a prohibition on the self-selection of a purported identity inconsistent with a passport holder's sex likewise does not discriminate based on sex. D. Ct. Doc. 127, at 10-14 (July 9, 2025). In addition, the government observed that "a key premise of the [c]ourt's prior APA ruling—that forms used by the Department to implement the Executive Order were not approved by the Director of [OMB] as required by the PRA—no longer exists." *Id.* at 16. The government noted that the Director had approved the forms on June 25, thereby "complet[ing] the PRA process." *Id.* at 17; see App., *infra*, 133a.

On July 11, the district court denied the government's motion to dissolve the classwide injunction. App., *infra*, 142a-143a. The court stated that even if *Skrmetti* had undermined its conclusion that "the Executive Order and Passport Policy must be reviewed under intermediate scrutiny," and even if the government had "cured its failure to comply with the procedures required by the PRA," the court's "prior conclusions" as to respondents' likelihood of success on their "animus-based equal protection claim" and their "arbitrary-and-capricious claim under the APA" "would remain unchanged." *Id.* at 143a. The court therefore declined to dissolve its classwide injunction and declined to stay that injunction pending appeal. *Ibid.* (citing Fed. R. App. P. 8(a)(1)(C)).

5.    The government appealed both the district court's original injunction and its classwide injunction. See D. Ct. Doc. 111 (June 13, 2025); D. Ct. Doc. 131

12

(July 11, 2025). On July 18, the government moved the court of appeals for a stay of the classwide injunction pending appeal. Gov't C.A. Stay Mot. 27 (July 18, 2025).

Two months later, on September 4, the court of appeals denied the government's motion for a stay. App., *infra*, 144a-147a. The court took the view that the government had "not made a strong showing that it is likely to succeed on the merits of its appeal" of respondents' APA claim that "the Department's implementation of its Passport Policy was arbitrary and capricious." *Id.* at 145a. Without resolving "the ultimate merits" of whether the Passport Policy is subject to APA review, the court stated that it could not "conclude on the present submissions that the government ha[d] made a strong showing that the Passport Policy is unreviewable under the APA." *Ibid.* The court further concluded that the government had not "demonstrate[d] a strong likelihood of success" on its argument that "the Passport Policy, if reviewable, passes muster under the APA." *Ibid.*

On the view that respondents' arbitrary-or-capricious claim was sufficient to "support the preliminary relief that the district court granted," the court of appeals found no need to go "further in considering the likelihood of success on the merits." App., *infra*, 146a. The court of appeals expressed the view, however, that the government's stay motion had not "engage[d] meaningfully" with the district court's conclusion that respondents were likely to succeed on their "Equal Protection Clause claim premised on 'unconstitutional animus toward transgender Americans.'" *Ibid.* The court of appeals then addressed the remaining stay factors and concluded that "the government 'ha[d] not sufficiently demonstrated that the balance of harms and equities' favors upending the status quo and subjecting [respondents] to the immediate harms identified by the district court." *Id.* at 147a (citation omitted).

13

**ARGUMENT**

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, to obtain a stay of a preliminary injunction pending review in the court of appeals and in this Court, an applicant must show a likelihood of success on the merits, a reasonable probability of obtaining certiorari, and a likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam).  In "close cases," the Court will balance the equities and weigh the relative harms.  *Ibid.*  All of those factors decisively favor a stay of the district court's classwide injunction in this case.

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

In issuing its classwide preliminary injunction, the district court concluded that respondents were likely to succeed on their claims (1) that the Passport Policy violates equal protection because it discriminates based on sex and is motivated by animus; (2) that the Passport Policy violates the APA because it is arbitrary and capricious; and (3) that the Department's use of passport application forms that offer a sex marker of only "M" or "F" violates the PRA because the forms lacked the OMB Director's approval.  App., *infra*, 30a-60a, 100a-101a.  After the district court entered the classwide injunction, however, this Court issued its decision in *United States* v. *Skrmetti*, 145 S. Ct. 1816 (2025), making clear that respondents' sex-discrimination claim lacks merit, and the OMB Director approved use of the forms, rendering respondents' PRA claim moot.  That leaves respondents' animus-based and arbitrary-or-capricious challenges, which also fail.

### A.    The Challenged Policy Is Consistent With Equal Protection

For decades, U.S. passports have included a sex designation—*i.e.*, a designation identifying the sex of the passport's holder.  App., *infra*, 7a.  Respondents do not challenge the inclusion of a sex designation on U.S. passports.  Nor could they.  Equal

14

protection does not demand that a policy "necessarily apply equally to all persons or require things which are different in fact . . . to be treated in law as though they were the same." *Michael M.* v. *Superior Court*, 450 U.S. 464, 469 (1981) (plurality opinion) (citation and quotation marks omitted); see *Nguyen* v. *INS*, 533 U.S. 53, 63-64 (2001) (explaining that equal protection is not violated by classifications that treat men and women differently where the two sexes "are not similarly situated," such as measures that "take[] into account a biological difference"). And even respondents accept that there are "differen[ces] in fact" that justify distinguishing people based on sex on U.S. passports. *Michael M.*, 450 U.S. at 469 (plurality opinion). After all, respondents sought—and the district court granted—a classwide injunction that requires the government to continue issuing passports with a "sex designation." App., *infra*, 113a.

What respondents challenge is not the inclusion of a sex designation on U.S. passports, but how the government determines a person's sex for purposes of that designation. The 2021 policy determined a person's sex according to that person's "gender identity." App., *infra*, 8a. The 2021 policy thus "permitted all people * * * to obtain passports with sex designations that reflected" their purported identity, Compl. ¶ 2; Am. Compl. ¶ 2, whether "M," "F," or "X," App., *infra*, 8a. In contrast, the Executive Order determines a person's sex according to that person's "immutable biological" characteristics. *Id.* at 1a. The Order thus prohibits the government from allowing anyone to self-select a sex marker based on "gender identity." *Id.* at 2a. It is that policy against self-selection that respondents challenge here. According to respondents, the sex designation on U.S. passports should "reflect[] the sex [people] live as and express, rather than the sex they were assigned at birth." Compl. ¶ 2; Am. Compl. ¶ 2.

The question is whether the Constitution requires the government to adopt respondents' preferred definition of sex.  It does not.  At the outset, it is implausible that equal-protection principles constrain how the President exercises his constitutional and statutory prerogative to speak to foreign governments on government property when identifying U.S. passport holders.  And it becomes completely untenable where, as here, the challenged policy against self-selection does not discriminate against any suspect or quasi-suspect class, and thus warrants only rational-basis review—which it easily satisfies.

### 1.    The challenged policy warrants only rational-basis review

Equal protection generally demands only rational-basis review, unless a policy discriminates against a suspect or quasi-suspect class (or burdens a fundamental right, which is not at issue here).  See *Skrmetti*, 145 S. Ct. at 1828.  Because the challenged policy does not so discriminate, heightened scrutiny is unwarranted.

### a.    *The challenged policy does not discriminate based on sex*

The 2021 policy permitted "all people" to self-select a sex marker of "M," "F," or "X" based on their gender identity.  Compl. ¶ 2; Am. Compl. ¶ 2.  The challenged policy reversed the 2021 policy, requiring that everyone's sex marker reflect their "immutable biological classification as either male or female," rather than their "self-assessed gender identity."  App., *infra*, 1a.  In defining sex based on biology rather than on self-identification, the challenged policy does not discriminate based on sex, because every passport, for every individual, must reflect immutable biological characteristics, not purported gender identity.

This Court has long recognized that sex discrimination requires treating members of one sex differently from "similarly situated" members of the opposite sex. *Nguyen*, 533 U.S. at 63; see *Michael M.*, 450 U.S. at 469.  The Court recently reaf-

firmed that principle in *Skrmetti*. The Court in that case rejected the suggestion that "mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, 145 S. Ct. at 1829. And the Court held that a law does not discriminate based on sex if it applies equally to each sex without treating any member of one sex differently from a similarly situated member of the opposite sex. See *id.* at 1831 (emphasizing that under the challenged statute, "*no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any* sex may be administered puberty blockers or hormones for other purposes"). That is the case here. Under the challenged policy, no one may self-select a marker of "M," "F," or "X" based on gender identity; every sex marker, for any individual, must reflect immutable biological characteristics instead. The challenged policy thus applies equally to each sex—defining sex for everyone in terms of biology rather than self-identification.

Respondents acknowledge as much. In their own words: "Defendants have enacted a policy imposing a definition of 'sex' that affects *every person in the country in the same way*." D. Ct. Doc. 78, at 6 (emphasis added). "[The Department] prohibits *all people* from having on their passport a sex designation different from that mandated by the Policy." *Id.* at 16 (emphasis added). A policy that prohibits "all people" from self-selecting a marker on their passport—and thus "affects every person in the country in the same way"—is not a policy that discriminates based on sex. *Id.* at 6, 16. By analogy, it would not be discrimination based on national origin for a law to define a person's national origin as the country in which the person was born (say, India), rather than the country with which the person self-identifies (say, Pakistan for an Indian born in Kashmir). So too here, it is not discrimination based on sex for the challenged policy to determine a person's sex according to the person's "immuta-

ble biological" characteristics, rather than the person's "self-assessed gender identity." App., *infra*, 1a. Respondents may prefer an identity-based definition of sex over a biology-based one, but the government's rejection of respondents' preferred definition is not sex discrimination.

The district court nevertheless concluded that the challenged policy discriminates based on sex and thus triggers heightened scrutiny. App., *infra*, 31a-36a. In reaching that conclusion, the court misapplied the reasoning of *Bostock* v. *Clayton County*, 590 U.S. 644 (2020). App., *infra*, 32a-33a. At the outset, *Bostock* was a Title VII decision whose reasoning does not extend to the equal-protection context. See *Skrmetti*, 145 S. Ct. at 1838-1839 (Thomas, J, concurring); *id.* at 1859 (Alito, J., concurring in part and concurring in the judgment). And regardless, the challenged policy, like the one in *Skrmetti*, does not discriminate based on sex even under *Bostock*'s reasoning. Here, "changing" a person's "sex" "does not alter the application of" the challenged policy. *Id.* at 1834 (majority opinion). If a female sought to self-select her sex marker as male on a U.S. passport, the challenged policy would prohibit such self-selection—and would require instead that her sex marker reflect her "immutable biological" characteristics, regardless of her "self-assessed gender identity." App., *infra*, 1a. Change that person's sex from "female to male," *Skrmetti*, 145 S. Ct. at 1834, and the challenged policy likewise would prohibit him from engaging in self-selection—and would still require that his sex marker reflect his "immutable biological" characteristics, regardless of his "self-assessed gender identity," App., *infra*, 1a. Sex is therefore not "the but-for cause" of a person's inability to self-select a sex marker under the challenged policy. *Skrmetti*, 145 S. Ct. at 1834.

Neither court below attempted to reconcile the district court's sex-discrimination analysis with *Skrmetti*. In denying the government's motion to dis-

solve the classwide injunction, the district court "expresse[d] no opinion" on whether *Skrmetti* had abrogated its sex-discrimination analysis. App., *infra*, 143a. And in denying the government's motion for a stay of the classwide injunction, the court of appeals likewise expressed no opinion. *Id.* at 146a. That silence is telling. *Skrmetti* makes clear that the challenged policy does not discriminate based on sex.

### b. *The challenged policy does not discriminate based on trans-identifying status*

As an alternative basis for heightened scrutiny, respondents argued below that the challenged policy discriminates based on trans-identifying status. D. Ct. Doc. 30, at 27-28. In issuing its classwide injunction, the district court did not rely on that argument, see App., *infra*, 36a n.6, 100a-101a, and for good reason: Under the challenged policy, *no* person, whether trans-identifying or not, may self-select a sex marker of "M," "F," or "X." The challenged policy therefore "does not classify on the basis of transgender status." *Skrmetti*, 145 S. Ct. at 1833. Again, as respondents acknowledge, the challenged policy applies equally to "all people," D. Ct. Doc. 78, at 16, "affect[ing] every person in the country in the same way," *id.* at 6. In actuality, it is *respondents* who are seeking differential treatment—namely, a *special accommodation* from that neutral policy based on their gender identity. The government's refusal to grant respondents *preferential treatment* cannot plausibly be characterized as "discrimination" based on trans-identifying status. See *Schuette* v. *BAMN*, 572 U.S. 291, 298-315 (2014) (plurality opinion) (concluding that equal protection does not forbid banning affirmative action); *id.* at 316-317 (Scalia, J., concurring in the judgment) (same).

Even if the challenged policy discriminated based on trans-identifying status, heightened scrutiny would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. Respondents contend that trans-identifying peo-

ple satisfy a multi-factor test for recognizing such a class.  D. Ct. Doc. 30, at 27-28.
But that test has no basis in the text or original understanding of the Constitution,
and this Court has "*never* embraced" a new suspect or quasi-suspect class under it.
*Skrmetti*, 145 S. Ct. at 1851 (Barrett, J., concurring); see *id.* at 1866 (Alito, J., con-
curring in part and concurring in the judgment) (observing that the Court has previ-
ously declined to recognize the poor, the elderly, illegal aliens, close relatives, and
people with disabilities as suspect or quasi-suspect classes).

In any event, trans-identifying people do not satisfy respondents' preferred
test.  First, trans-identifying people are not marked by the "obvious, immutable, or
distinguishing characteristics" of a "discrete group."  *Skrmetti*, 145 S. Ct. at 1851
(Barrett, J., concurring) (citations omitted); see *id.* at 1866 (Alito, J., concurring in
part and concurring in the judgment).  Second, trans-identifying people have not "suf-
fered a history of *de jure* discrimination."  *Id.* at 1853 (Barrett, J., concurring) (cita-
tions omitted); see *id.* at 1866 (Alito, J., concurring in part and concurring in the
judgment).  Third, trans-identifying people are not politically powerless.  *Id.* at 1866
(Alito, J., concurring in part and concurring in the judgment); see *id.* at 1854 (Barrett,
J., concurring) (noting that *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152-
153 n.4 (1938), "equates political powerlessness with laws burdening those who
lacked a vote").  And finally, treating trans-identifying people as a quasi-suspect class
"would require courts to oversee all manner of policy choices normally committed to
legislative discretion."  *Id.* at 1852 (Barrett, J., concurring); see *City of Cleburne* v.
*Cleburne Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (holding that individuals with
mental disabilities should not be treated as a quasi-suspect class because govern-
ments must have "flexibility and freedom from judicial oversight in shaping and lim-
iting their remedial efforts").

### 2.    The challenged policy satisfies rational-basis review

a.    Because the challenged policy does not discriminate based on sex or any other suspect or quasi-suspect characteristic, rational-basis review applies.  Under that standard, the government "has no obligation to produce evidence to sustain the rationality of" the policy.  *Heller* v. *Doe*, 509 U.S. 312, 320 (1993).  Instead, the policy "is presumed constitutional," and the burden is on the challengers "'to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record."  *Id.* at 320-321 (citation omitted).  "Where there exist 'plausible reasons' for the relevant government action, '[the Court's] inquiry is at an end.'"  *Skrmetti*, 145 S. Ct. at 1835.

Here, it was entirely rational for the President to decide that "'[g]ender identity'" "does not provide a meaningful basis for identification" on passports.  App., *infra*, 2a.  As the Executive Order explains, "'[g]ender identity' reflects a fully internal and subjective sense of self," "exist[s] on an infinite continuum," and may shift over time.  *Ibid.*; see *id.* at 1a (describing the "concept of self-assessed gender identity" as "fluid" and "ever-shifting").  Indeed, a person who claims to be "transgender now may not be transgender later."  *Skrmetti*, 145 S. Ct. at 1866 (Alito, J., concurring in part and concurring in the judgment).  "[S]ome transgender individuals 'detransition' later in life—in other words, they begin to identify again with the gender that corresponds to their biological sex."  *Id.* at 1851 (Barrett, J., concurring).  Thus, gender identity is not a trait that is "immutable" or "definitively ascertainable at the moment of birth."  *Ibid.* (citations omitted).

Given the "internal, fluid, and subjective" nature of "gender identity," the President rationally rejected gender identity as a "basis for identification" in favor of a "biological" definition of sex—one grounded in facts that are "immutable."  App.,

21

*infra*, 1a-2a.  Other designations on U.S. passports, such as a person's date or place of birth, similarly reflect immutable facts.  A person cannot simply self-identify as having been born on December 31, 1969, in San Francisco, if her birth certificate says she was in fact born on January 1, 1970, in Oakland, let alone on July 1, 1980, in New York.  The President rationally decided that, just as a person may not self-select a date or place of birth, so too a person may not self-select a sex marker.  And in the interest of uniformity, the President rationally decided to apply the same biology-based definition of sex throughout the federal government, making no exception for passports.  App., *infra*, 2a.

b.    In concluding that the challenged policy nevertheless failed rational-basis review, the district court expressed the view that the policy reflected "animus toward transgender Americans."  App., *infra*, 41a.  But under rational-basis review, a court may infer animus only if the challenged policy "lack[s] any purpose other than a 'bare . . . desire to harm.'"  *Trump* v. *Hawaii*, 585 U.S. 667, 705 (2018) (citation omitted).  That is not the case here.  As explained above, the challenged policy can "reasonably be understood" to serve the government's legitimate interests in a mean-ingful basis for identification and a uniform definition of sex.  *Ibid.*; see pp. 20-21, *supra*.  Thus, "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'"  *Hawaii*, 585 U.S. at 706.  Because the challenged policy has "a legitimate grounding" in the interests discussed above, "quite apart from any [animus]," the Court "must accept that independent justification."  *Ibid.*

In any event, the district court's purported reasons for inferring animus fail on their own terms.  App., *infra*, 41a-46a.  First, according to the district court, the Ex-ecutive Order "announces" that "transgender women are not women and transgender

22

men are not men." *Id.* at 41a. But respondents themselves define "[t]ransgender people" as people who "have a gender identity different from their sex assigned at birth." Compl. ¶ 32; Am. Compl. ¶ 37. And the Executive Order simply defines "[m]ale" and "[f]emale" in terms of "sex," rather than "gender identity." App., *infra*, 1a. The fact that the Order adopts a biology-based definition of sex cannot, in and of itself, be considered evidence of animus. After all, this Court's own precedents refer to "men" and "women" in the same sense. *Skrmetti*, 145 S. Ct. at 1856 (Alito, J., concurring in part and concurring in the judgment) (quoting *United States* v. *Virginia*, 518 U.S. 515, 533 (1996)); see *Bostock*, 590 U.S. at 655 (proceeding on "the assumption that 'sex'" in Title VII refers to "biological distinctions between male and female").

Second, according to the district court, the Executive Order "imposes a 'broad and undifferentiated disability' on a discrete group of people." App., *infra*, 42a (citation omitted). To the contrary, the Executive Order applies to "every person in the country in the same way." D. Ct. Doc. 78, at 6. Any disproportionate burden on trans-identifying individuals is immaterial because disparate-impact claims are not cognizable under equal-protection principles. See *Skrmetti*, 145 S. Ct. at 1833 (holding that facially neutral laws do not discriminate based on gender identity even if they disproportionately burden trans-identifying individuals, such as by banning use of a medical procedure for a condition that "only transgender individuals" would seek to remedy through the procedure); *Washington* v. *Davis*, 426 U.S. 229, 242 (1976) (holding that a racially disproportionate impact alone does not establish racial discrimination). In any event, far from imposing any "broad" or "undifferentiated disability," App., *infra*, 42a (citation omitted), the challenged policy governs the government's own speech on its own "property," 22 C.F.R. 51.7(a). And "the transgender population" is not a "'discrete group'"; rather, "the category of transgender individuals is

23

'large, diverse, and amorphous.'" *Skrmetti*, 145 S. Ct. at 1851-1852 (Barrett, J., concurring) (citations omitted); see *id.* at 1867 (Alito, J., concurring in part and concurring in the judgment) ("[T]ransgender people make up a 'diverse' and 'amorphous class.'") (citation omitted).

Third, according to the district court, "the government does not defend the Passport Policy by reference to the Executive Order's express purposes." App., *infra*, 43a. That is incorrect. The Executive Order expressly distinguishes its definition of sex (which is based on "immutable biological reality") from respondents' preferred concept of "gender identity" (which the Order describes as an "internal, fluid, and subjective sense of self unmoored from biological facts"). *Id.* at 1a. And the Order explains that such an "internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum," "does not provide a meaningful basis for identification." *Id.* at 2a. The government defends the challenged policy by reference to that express justification. See pp. 20-21, *supra*.

Fourth, the district court purported to infer animus from the fact that the challenged policy was adopted as "part of a constellation of close-in-time executive actions," including one about military service by individuals with gender dysphoria and another about "gender-affirming medical care" for minors. App., *infra*, 44a. But contrary to the district court's suggestion, none of those other executive actions reflects animus toward trans-identifying people. In fact, this Court stayed an injunction against the military policy, over the objection of plaintiffs who claimed that the policy was motivated by animus. See *United States* v. *Shilling*, No. 24A1030, 2025 WL 1300282, at *1 (U.S. May 6, 2020); Resp. in Opp. to Appl. for Stay at 20-21, *Shilling*, *supra* (No. 24A1030). And in *Skrmetti*, this Court rejected the notion that policies about "gender-affirming care" discriminate against trans-identifying people. See 145

24

S. Ct. at 1832-1833. The district court thus failed to identify any evidence of animus—let alone establish that the challenged policy is "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706.

c.    In denying the government's motion for a stay of the classwide injunction, the court of appeals did not endorse the district court's analysis of respondents' animus-based claim. App., *infra*, 146a. Instead, the court of appeals stated that the government's motion had "fail[ed] to engage meaningfully the district court's analysis." *Ibid.* But the government's stay motion argued (1) that the challenged policy was rationally related to the government's valid interests in an "objective, rather than subjective," basis for identification and in a "'uniform'" definition of sex, Gov't C.A. Stay Mot. 15-17; and (2) that "because these are valid reasons for the [challenged policy], that policy is not 'inexplicable by anything but animus,'" *id.* at 17 (quoting *Hawaii*, 585 U.S. at 706).

The court of appeals misunderstood the relationship between those two arguments. The rational bases for the challenged policy that the government identified as part of the first argument supplied the premise for the second, which the government's motion was able to make in a couple of sentences by relying on this Court's decision in *Hawaii*. Gov't C.A. Stay Mot. 17. To say, as the court of appeals did, that the government "devote[d] only two sentences to challenging the district court's assessment of the respondents' animus-based Equal Protection Clause claim" is to ignore the government's first argument altogether. App., *infra*, 146a, And it also ignores that two sentences were more than sufficient to demonstrate the indisputable error in the district court's holding—as confirmed by the fact that the court of appeals could not even bring itself to say one word in support of the animus holding on the merits.

25

The court of appeals also misunderstood the standard for assessing an animus-based claim under *Hawaii*. Under that standard, as the government made clear in its stay motion, the question is whether the challenged policy is "'inexplicable by anything but animus'"; if it can be explained by a rational basis, the inquiry is at an end. Gov't C.A. Stay Mot. 17 (quoting *Hawaii*, 585 U.S. at 706). Thus, as the government's motion explained, the fact that "there are valid reasons" for the challenged policy is dispositive of respondents' animus-based claim. *Ibid.* Contrary to the court of appeals' suggestion, there was no need for the government's motion to go further and address "the four prongs" of the district court's misguided reasoning, all of which were clearly irrelevant. App., *infra*, 146a.

Finally, the court of appeals misunderstood the standard for rational-basis review. The court of appeals faulted the government for "le[aving] undeveloped" in the district court the government's "interest in using an 'objective' criterion for determining sex." App., *infra*, 146a. But under rational-basis review, the government's policy "is presumed constitutional," and the burden is on *respondents* "'to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320-321 (citation omitted). The court of appeals therefore erred in placing the burden on *the government* to justify the challenged policy. Indeed, the government's briefing in the district court defended the challenged policy on the ground that the policy served an "interest 'in maintaining a consistent, historical, and biologically based definition of sex,'" D. Ct. Doc. 53, at 21 (citation omitted), including for purposes of maintaining a "meaningful basis for identification," as articulated in the Executive Order, *id.* at 22 (quoting App., *infra*, 2a). The burden rested with respondents to refute that interest, which they did not and could not possibly do. Respondents' equal-protection challenge therefore lacks merit.

**B.    Respondents' Arbitrary-Or-Capricious Claim Fails**

Respondents' APA claim that the challenged policy is arbitrary or capricious also fails.  As discussed, the challenged policy consists of two changes: the withdrawal of the option to self-select a sex marker of "M" or "F" based on one's purported gender identity, and the removal of the option to self-select "X" as one's sex marker.  See App., *infra*, 16a; p. 7, *supra*.  The Executive Order dictated both of those changes pursuant to the President's statutory and constitutional authorities.  Accordingly, the challenged policy is presidential action, unreviewable under the APA; and regardless, the Department's ministerial compliance with the President's Order was not arbitrary or capricious because the Department was *required* to comply.

### 1.    The challenged policy is not reviewable under the APA

a.    The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. 704.  The President is not an "agency" under the APA.  5 U.S.C. 701(b)(1); see *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992).  The President's actions therefore "are not subject to [the APA's] requirements" and "are not reviewable" under the APA.  *Franklin*, 505 U.S. at 801.

The Passport Act commits to the President the power to make rules governing the issuance of passports.  The Act provides:  "The Secretary of State may grant and issue passports  * * *  under such rules as the President shall designate and prescribe for and on behalf of the United States."  22 U.S.C. 211a.  The statute thus supplements the President's inherent Article II authority to prescribe rules for the issuance of passports.  *Haig* v. *Agee*, 453 U.S. 280, 293-294 (1981).  And the President exercised this statutory and constitutional power in the Executive Order.  App., *infra*, 1a-4a.

Respondents challenge as arbitrary or capricious what the district court referred to as the "Passport Policy," which consists of the two changes discussed above.

App., *infra*, 16a; see p. 26, *supra*.  Both of those changes were dictated by the Executive Order, which declares it to be "the policy of the United States to recognize two sexes, male and female"; instructs that "'[g]ender identity'" "does not provide a meaningful basis for identification"; provides that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity"; and directs the Secretary to "require that government-issued identification documents, including passports * * * , accurately reflect the holder's sex, as defined under" the Order.  *Id.* at 1a-2a.  Respondents' challenge to the Passport Policy is thus a challenge to the Executive Order.  And because the Executive Order is a presidential action that is "not subject to [the APA's requirements]," *Franklin*, 505 U.S. at 801, respondents may not challenge the Passport Policy as arbitrary or capricious under the APA.

Respondents cannot evade that conclusion by purporting to challenge "[a]gency actions taken under the Executive Order."  Compl. ¶ 243 (emphasis added); Am. Compl. ¶ 331 (emphasis added).  This is not a case where the challenged agency action is the exercise of discretion "delegated to an agency head but directed by the President."  Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).  Rather, this is a case where the exercise of discretion is "committed to * * * the President" himself, and the challenged agency action just ministerially carries out the President's decision.  *Ibid.*  Because the President's exercise of discretion committed to him is "not subject to [the APA's] requirements," the Passport Policy is "not reviewable" under the APA.  *Franklin*, 505 U.S. at 801.

b.    In declining to stay the classwide injunction, the court of appeals did not express a view on the "ultimate merits" of whether the challenged policy is reviewable under the APA.  App, *infra*, 145a.  Instead, the court stated only that it could not "conclude on the present submissions that the government has made a strong showing

that the Passport Policy is unreviewable under the APA." *Ibid.* The court's reasoning, however, was flawed. The court stated that "the Department made several 'independent determinations in formulating' the Passport Policy," *ibid.* (citation omitted); for example, the Department "determined what sources of evidence to consult in order to assess a person's sex at birth," *id.* at 50a. But those "independent determinations" are not the agency actions that respondents challenged or part of the Passport Policy that the district court enjoined. *Id.* at 145a (citation omitted); see *id.* at 16a, 113a; Am. Compl. ¶¶ 328-334. Rather than attacking *details about how* to determine a person's biological sex under the Executive Order, the injunction invalidates the *policy about whether* sex should be defined in terms of biology at all. And that policy was adopted by the President pursuant to his own authorities, not by the Department.

The court of appeals stated that "agency action that carries out a presidential directive is ordinarily subject to APA review." App., *infra*, 145a. But again, presidential directives ordinarily tell agencies how to exercise *their* statutory authorities, rather than compelling them to implement the exercise of *his own* statutory and constitutional authorities. Indeed, it makes no sense to invoke the APA to prevent an agency from exercising its ministerial duty to carry out a presidential direction that the APA does not restrict the President from making.

> **2.    In any event, respondents' arbitrary-or-capricious claim fails on the merits**

Relatedly, even if respondents could proceed with their arbitrary-or-capricious claim, that claim would fail because respondents have not identified any "agency action" that was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. 706(2)(A). As noted, the Passport Act directs "the Secretary of State [to] grant and issue passports * * * under such rules as the President shall designate and prescribe." 22 U.S.C.

211a. Thus, the statute itself requires the Department to follow the President's "rules," *ibid.*, and the President did not need to provide a reasoned explanation for those rules because he himself is not subject to the APA, see *Franklin*, 505 U.S. at 801.

Here, the two challenged changes—(1) the "withdr[awal]" of "the option" to self-select a sex marker based on "gender identity," and (2) the "remov[al]" of "the option" to "select 'X' as [a] sex marker"—were both dictated by the President's rules (*i.e.*, the Executive Order). App., *infra*, 16a; see p. 27, *supra*. Accordingly, the Passport Act *required* the Department to make both of those changes. The Department's decision to do so therefore was not "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. 706(2)(A). To the contrary, it would have been a violation of the Passport Act—and thus "not in accordance with law" under the APA, *ibid.*—for the Department *not* to have followed the President's rules. And that is precisely what the injunction below requires: It perversely compels the Department to violate the Passport Act by issuing passports *in contravention of* the "rules" that the President has "designat[ed] and prescribe[d]." 22 U.S.C. 211a.

The district court nevertheless faulted the Department for "fail[ing] to offer a reasoned explanation for [its] decision to reverse [its] prior passport policy." App., *infra*, 55a. The court viewed it as problematic that the record "merely suggests that the policy was adopted in accordance with Executive Order 14168." *Id.* at 56a. But given that the Passport Act requires the Department to "grant and issue passports * * * under such rules as the President shall designate and prescribe," 22 U.S.C. 211a, "the agency's path" was not just "reasonabl[y] * * * discern[ible]"; it was obvious—and mandatory. *Motor Vehicle Mfrs. Ass'n of United States, Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Far from "entirely fail[ing] to consider an important aspect of the problem," *ibid.*, the Department considered the only aspect rel-

evant here: that the Passport Act required it to follow the President's rules. That requirement rendered irrelevant any other consideration in following those rules. In short, because Congress instructed the Department to follow the President's rules, which are not themselves subject to APA review, it could not have been arbitrary or capricious for the Department to have followed the President's rules here by making the changes dictated by the Executive Order.

Finally, even if the Executive Order and the changes that it dictated were subject to APA review—which they are not—they are not arbitrary or capricious for the same reasons that they satisfy rational-basis review. See pp. 20-21, *supra*.

### C. There Is No Paperwork Reduction Act Violation That Could Support The Injunction

In the court of appeals, respondents made no attempt to defend the district court's classwide injunction based on a PRA violation. See Resp. C.A. Stay Opp. 18 n.2 (stating only that respondents "do not waive" their PRA claim, without defending the district court's analysis). For good reason, as there is no PRA violation that could even arguably support the district court's injunction.

The PRA requires the OMB Director's approval of forms used by the government to collect information. 44 U.S.C. 3507(a)(2). The Act establishes a process for obtaining the OMB Director's approval. Under the Act, an agency generally must publish the form and provide 60 days for the public to comment. 44 U.S.C. 3506(c)(2)(A), 3507(a)(1)(B). After that 60-day period, the agency may submit the form to the OMB Director for a decision on whether to approve the form. 44 U.S.C. 3507(a)(1)(C). Before the OMB Director may make a decision, however, the agency must provide another 30 days for public comment. 44 U.S.C. 3507(a)(1)(D) and (b).

After that 30-day period, the OMB Director may approve the form. If he does so, his approval may last for a period of up to three years. 44 U.S.C. 3507(g).

The OMB Director's approval of the Department's last set of passport application forms was set to expire in April 2025. App., *infra*, 8a. In November 2024, the Department published passport application forms for 60 days of public comment as part of the PRA process for renewing the OMB Director's approval. *Ibid.*; see 89 Fed. Reg. 94,867 (Nov. 29, 2024); 89 Fed. Reg. 93,390 (Nov. 26, 2024); 89 Fed. Reg. 93,389 (Nov. 26, 2024). Consistent with the policy in effect at the time, the published forms allowed applicants to self-select an "X" marker. See App., *infra*, 8a. In late January 2025, after the change in Administration and the President's issuance of the Executive Order, the Department started using passport application forms that offered a sex marker of only "M" or "F." *Id.* at 12a. The following month, the Department published those forms for 30 days of public comment as part of the same PRA process that had already begun. *Id.* at 13a; see 90 Fed. Reg. 9800-9801 (Feb. 18, 2025); 90 Fed. Reg. 9652 (Feb. 14, 2025). Those forms differed from the forms that the Department had previously published during the 60-day comment period, but the PRA does not prohibit agencies from revising their forms in between the 60-day and 30-day comment periods. See generally 44 U.S.C. 3506, 3507; cf. *Kooritzky* v. *Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). In June 2025, after the close of the 30-day comment periods, the OMB Director approved the revised forms. App., *infra*, 13a, 133a.

In its April 18 ruling, the district court held that respondents were likely to succeed on their claim that the Department was violating the PRA by using passport application forms that the OMB Director had not approved. App., *infra*, 60a. But as noted above, the OMB Director has since approved the use of forms that offer a sex marker of only "M" or "F." See *id.* at 133a. Because the OMB Director's approval

completed the PRA process for those forms, there is no PRA violation that could support the district court's classwide injunction. And indeed, since the OMB Director's approval of the forms, respondents and the courts below have not suggested that a PRA violation could support the injunction. See *id.* at 143a (district court assuming, without deciding, that the government had "cured its failure to comply with the procedures required by the PRA").

## II. THE OTHER FACTORS SUPPORT STAYING THE DISTRICT COURT'S INJUNCTION

The remaining factors—*i.e.*, whether the underlying issues warrant review, whether the applicant likely faces irreparable harm, and, in close cases, the balance of equities, see *Hollingsworth*, 558 U.S. at 190—likewise support relief here.

### A. The Issues Raised By The District Court's Injunction Warrant This Court's Review

If the court of appeals were to uphold the district court's classwide injunction, certiorari would plainly be warranted. Respondents challenge the Executive Order (and the Department's implementation of it) on constitutional and APA grounds. Those challenges concern a matter of imperative public importance: the authority of "the President" to "prescribe for and on behalf of the United States" "rules" governing the issuance of passports under the Passport Act. 22 U.S.C. 211a. Exercising that statutory authority supplementing his own constitutional authority, the President determined that the sex designation on U.S. passports should reflect "immutable biological reality," rather than "self-assessed gender identity." App., *infra*, 1a. And in so doing, he restored this Nation's policy since 1977, except during the last Administration, of not permitting passport applicants to self-select their preferred sex designation. See p. 5, *supra*.

33

The district court's classwide injunction countermands that presidential deci-

sion and commandeers the contents of a "political document" "addressed to foreign

powers." *Agee*, 453 U.S. at 292 (quoting *Urtetiqui* v. *D'Arcy*, 34 U.S. (9 Pet.) 692, 698

(1835)).  If the court of appeals were to affirm the injunction, a judicial intrusion of

that significance into an area "generally accepted" to be "the province and responsi-

bility of the Executive" would unquestionably warrant this Court's review.  *Id*. at 293-

294.  Indeed, this Court frequently grants plenary review of lower-court decisions

blocking significant federal policies or programs.  See, *e.g.*, *Trump* v. *V.O.S. Selec-*

*tions, Inc.*, No. 25-250, 2025 WL 2601020 (Sept. 9, 2025); *Becerra* v. *Braidwood*

*Mgmt., Inc.*, 145 S. Ct. 1038 (2025); *Garland* v. *VanDerStok*, 144 S. Ct. 1390 (2023).

And the Court has previously granted certiorari to address disputes over the contents

of U.S. passports.  See, *e.g.*, *Zivotofsky* v. *Kerry*, 572 U.S. 1059 (2014).

**B.    The District Court's Injunction Causes Irreparable Harm To The**
**Government And To The Public**

The district court's classwide injunction irreparably harms the government

and the public by blocking the President's exercise of his constitutionally and statu-

torily conferred power to prescribe rules of the issuance of passports.  That power

inheres in the President's Article II authority over "national security" and "foreign

policy," *Agee*, 453 U.S. at 293, and it has been expressly "confirmed" by Congress in

the Passport Act, *id*. at 294 (citation omitted).  Accordingly, the President's "authority

is at its maximum," encompassing "all that he possesses in his own right plus all that

Congress can delegate." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 635

(Jackson, J., concurring).  The court's injunction nevertheless prevents the applica-

tion of the President's rules to a nationwide class of Americans.  App., *infra*, 112a-

113a.  And any time the government is enjoined from carrying out its responsibilities

under a "statute[] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (quoting *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

That injury is particularly pronounced here, where the injunction dictates the contents of official U.S. communications with foreign sovereigns. A passport, after all, is a "document by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. By requiring the government to let members of the class self-select their sex marker, the injunction deprives the government of control over its own speech. See 22 C.F.R. 51.7(a) (recognizing that a U.S. passport is "government property"). Even worse, the injunction forces the government to misrepresent the sex of passport holders to foreign nations by using markers that reflect "the false claim that males can identify as and thus become women and vice versa." App., *infra*, 1a. And because of the injunction's classwide scope, the government will be forced to contradict both biological reality and its own declared policy on potentially "tens or hundreds of thousands" of passports. D. Ct. Doc. 123-1, at 4 (July 2, 2025). That is an intolerable intrusion on the President's foreign-affairs prerogatives.

## C.   The Balance Of Equities Favors Staying The District Court's Injunction

1.   On the other side of the balance, staying the district court's June 17 classwide injunction would not cause respondents irreparable harm. The court took the view that trans-identifying individuals could experience "anxiety or distress" or "violence or harassment" "if required to use passports bearing a sex marker corresponding to their sex assigned at birth." App., *infra*, 61a-62a. The court further concluded that, for six of the named plaintiffs, those harms were "not speculative" because each of them "plan[ned] to travel internationally in 2025." *Id.* at 63a. And

the court viewed such harms as irreparable because those plaintiffs would "thus be required to choose between forgoing international travel plans" and "travelling with passports bearing sex markers that correspond to their sex assigned at birth." *Id.* at 63a-64a. The court then regarded such harms as "representative of the risk of irreparable harm faced by every member of the PI Class." *Id.* at 106a. The court's reasoning is flawed.

First, membership in the PI Class is not conditioned on whether an individual has concrete international travel plans, see pp. 9-10, *supra*, so for the rest of the PI Class, the harms that the district court identified *are* speculative. Attempting to bridge that gap in the evidence, the court suggested that members of the PI class could experience irreparable harm in other ways—*i.e.*, through "interference with their treatment for gender dysphoria" and through "their inability to use their passports anywhere without outing themselves," such as "to rent a car," to "open bank accounts and establish employment eligibility," to "travel domestically," or to "identify themselves in administrative settings." App., *infra*, 106a-107a. But membership in the PI Class is also not conditioned on a diagnosis of gender dysphoria, a medical condition that only "[s]ome" trans-identifying individuals have. *Skrmetti*, 145 S. Ct. at 1824; see pp. 9-10, *supra*. And unlike international travel, none of the other activities that the court mentioned requires a U.S. passport. Because an individual may engage in each of those other activities without using a U.S. passport, any harm would be self-inflicted. And "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 2025); see *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

36

In denying a stay, the court of appeals stated that the government had "fail[ed] to contest" the "'uncontroverted evidence of the harms that transgender and non-binary people face' if required to use * * * passports" bearing sex designations corresponding to their biological sex. App., *infra*, 147a (quoting *id.* at 103a). But as the district court noted, see *id.* at 106a, the government disputed the premise—*i.e.*, that members of the PI class would be "required to use such passports" in the first place, *id.* at 147a. The government argued below, as it does here, that because membership in the PI Class is not conditioned on having concrete international travel plans, respondents failed to show that members of that class would be "required to use such passports" at all. *Ibid.*; see D. Ct. Doc. 89, at 7 (noting that "[m]any members" of the PI Class "may not have travel plans in 2025"). And that hole in respondents' evidence renders the asserted harms to the class too speculative to support the classwide injunction.

Second, for all respondents, being unable to force the government to describe their sex in the way they prefer does not give rise to any cognizable, let alone irreparable, harm. A U.S. passport is a government document; it represents the speech of the government, not respondents. See pp. 4-5, *supra*. Respondents may disagree with what the government has chosen to say, and that disagreement may cause "feelings of anxiety and distress." App., *infra*, 61a. But that disagreement cannot count as irreparable injury, lest every policy disagreement with the government turn into irreparable injury. See *Diamond* v. *Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."); *Valley Forge Christian Coll.* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees * * * is not an injury sufficient to confer standing under Art. III."). Respond-

37

ents also assert that they will suffer "violence or harassment" going through airport security if they use "passports bearing a sex marker corresponding to their sex at birth." App., *infra*, 62a.  But those alleged harms stem from the conduct of others, and the assertion that others will engage in violence or harassment is speculative, notwithstanding any particular respondent's past exposure to such conduct.  See *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983) (explaining that past exposure to harm does not in and of itself establish entitlement to prospective relief); *Noem* v. *Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *2 (Sept. 8, 2025) (Kavanaugh, J., concurring in the grant of the application for stay) (same).

2.    In any event, any harm to members of the PI Class in the absence of a stay is substantially outweighed by the far more substantial harm to the government from forcing it to misrepresent the sex of a nationwide class of individuals in official sovereign-to-sovereign communications.  See *Agee*, 453 U.S. at 292; *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).  For nearly 50 years, the Department has issued U.S. passports with a sex marker.  See p. 5, *supra*.  Yet it was not until the 2021 policy, instituted by the previous Administration, that the sex marker became entirely a matter of self-identification, including with the option of selecting an "X."  App., *infra*, 8a.  The interests of members of the PI Class in maintaining the 2021 policy are substantially outweighed by the interests of the government and the public discussed above.  The balance of equities therefore tips decisively in favor of staying the classwide injunction.

### CONCLUSION

This Court should stay the district court's June 17 classwide preliminary injunction.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

SEPTEMBER 2025